**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:

EX PARTE APPLICATION OF
GULF INVESTMENT CORPORATION FOR
AN ORDER TO OBTAIN DISCOVERY FOR
USE IN FOREIGN PROCEEDINGS
PURSUANT TO 28 U.S.C. §1782

Case No. _____

**MEMORANDUM OF LAW IN SUPPORT OF GULF INVESTMENT CORPORATION'S**
***EX PARTE* APPLICATION FOR AN ORDER TO CONDUCT DISCOVERY FOR USE**
**IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION AND SUMMARY STATEMENT ........................................................1

    A.      Missing Funds from Sale of Clark Asset ........................................................2

    B.      Additional Port Fund Misconduct........................................................3

    C.      Requested Discovery ........................................................3

II.     FACTUAL BACKGROUND ........................................................5

    A.      Parties ........................................................5

        1.      GIC........................................................5

        2.      The Port Fund ........................................................5

        3.      KGLI........................................................6

        4.      Port Link........................................................6

        5.      The Fund Manager ........................................................6

    B.      Key Individuals........................................................7

III.    MISCONDUCT AT ISSUE IN THE CONTEMPLATED CAYMAN
      LITIGATION........................................................8

    A.      Missing Funds from Sale of Clark Asset ........................................................8

        1.      Background........................................................8

        2.      Initial Investment Structure........................................................9

        3.      Divesting and Regaining Control of the Clark Asset................................9

        4.      Sale of Clark Asset and Promises of Distribution .......................................9

        5.      The Port Fund's Distributions to its Limited Partners, including
            GIC........................................................10

    B.      Additional Port Fund Misconduct........................................................11

IV.     REQUESTED DISCOVERY ........................................................12

V.      CONTEMPLATED CAYMAN LITIGATION........................................................13

VI.     ARGUMENT........................................................14

    A.      Legal Framework ........................................................14

    B.      GIC Meets the Statutory Requirements of Section 1782.......................................15

        1.      The Correspondent Banks "Reside" or Are "Found" in the
            Southern District ........................................................15

        2.      The Discovery Sought is "For Use" in a Foreign Proceeding ..................19

(a)    The Contemplated Cayman Litigation is a Foreign
Proceeding.........................................................................19

(b)    The Requested Discovery is "For Use" in a Foreign
Proceeding.........................................................................21

3.    GIC is an "Interested Person" ........................................................21

C.    The Discretionary Factors of Section 1782 Weigh in Favor of GIC's
Application.................................................................................................21

1.    The First *Intel* Factor Favors Granting Discovery ....................22

2.    The Second *Intel* Factor Favors Granting Discovery ...............22

3.    The Third *Intel* Factor Favors Granting Discovery ..................24

4.    The Fourth *Intel* Factor Favors Granting Discovery.................24

VII.    CONCLUSION.............................................................................................25

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*,
  785 F. Supp. 2d 434 (S.D.N.Y. 2011)........................................................................ 20

*Application of Malev Hungarian Airlines*,
  964 F.2d 97 (2d Cir. 1992).......................................................................................... 25

*Ayyash v. Crowe Horwath LLP*,
  No. 17-MC-482(AJN), 2018 WL 1871087 (S.D.N.Y. Apr. 17, 2018).................................... 17

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
  673 F.3d 76 (2d Cir. 2012)........................................................................... 14, 15, 21, 24

*Bravo Express Corp. v. Total Petrochemicals & Ref. U.S.*,
  613 F. App'x 319 (5th Cir. 2015) .................................................................................. 20

*Euromepa S.A. v. R. Esmerian*, Inc.,
  51 F.3d 1095 (2d Cir. 1995)....................................................................... 15, 22, 23

*Gushlak v. Gushlak*,
  486 F. App'x 215 (2d Cir. 2012) .............................................................................. 1, 20

*Hertz Corp. v. Friend*,
  559 U.S. 77 (2010)....................................................................................................... 15

*In re Accent Delight Int'l Ltd.*,
  869 F.3d 121 (2d Cir. 2017)........................................................................................ 21

*In re Hornbeam Corp.*,
  No. 14 MISC. 424, 2014 WL 8775453 (S.D.N.Y. Dec. 24, 2014).................................... 17, 18

*In re Hornbeam Corp.*,
  722 F. App'x 7 (2d Cir. 2018) ..................................................................................... 20

*In re Aso*,
  No. 19MC190JGKJLC, 2019 WL 3244151 (S.D.N.Y. July 19, 2019) ................................ 17

*In re Bayer AG*,
  146 F.3d 188 (3d Cir. 1998)......................................................................................... 25

*In re Bracha Found.*,
  663 F. App'x 755 (11th Cir. 2016) .............................................................................. 20

*In re Edelman*,
  295 F.3d 171 (2d Cir. 2002)......................................................................................... 15

*In re Ex Parte Application of Kleimar N.V.*,
  220 F. Supp. 3d 517 (S.D.N.Y. 2016).......................................................................... 17

*In re Fernando Celso De Aquino Chad*,
  No. 19MC261, 2019 WL 2502060 (S.D.N.Y. June 17, 2019) .................................... 17

*In re Furstenberg Fin. SAS*,
  No. 18-MC-44 (JGK), 2018 WL 3392882 (S.D.N.Y. July 12, 2018) ............................... 17, 20

*In re IJK Palm LLC*,
  No. 3:16MC171(RNC), 2019 WL 2191171 (D. Conn. Jan. 30, 2019) ........................ 20, 23, 24

*In re Iraq Telecom Ltd.*,
  No. 18-MC-458 (LGS) (OTW), 2019 WL 3798059,(S.D.N.Y. Aug. 13, 2019),
  *reconsideration denied*, No. 18-MC-458 (LGS) (OTW),
  2019 WL 5080007 (S.D.N.Y. Oct. 10, 2019) ......................................................................... 18

*In re Kiobel*,
  2017 WL 354183 (S.D.N.Y. Jan 24, 2017) ............................................................................ 19

*In re Mangouras*,
  No. 17-MC-172, 2017 WL 4990655 (S.D.N.Y. Oct. 30, 2017) .............................................. 19

*In re Metallgesellschaft*,
  121 F.3d 77 (2d Cir. 1997) .............................................................................................. 15, 24

*In re OOO Promnesftstroy*,
  No. M 19-99(RJS), 2009 WL 3335608 (S.D.N.Y. Oct 15, 2009) .......................................... 22

*In re Penner*,
  No. 17-CV-12136-IT, 2017 WL 5632658 (D. Mass. Nov. 22, 2017) ..................................... 23

*In re Platinum Partners Value Arbitrage Fund L.P.*,
  583 B.R. 803 (Bankr. S.D.N.Y. 2018) .................................................................................. 23

*In re Sargeant*,
  278 F. Supp. 3d 814 (S.D.N.Y. 2017) ................................................................................... 15

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241 (2004) ................................................................................................... passim

*Lyxor Asset Management S.A. v. Phoenix Meridian Equity Limited*,
  2009 CILR 553 (Sep. 24, 2009) ........................................................................................... 23

*Mees v. Buiter*,
  793 F.3d 291 (2d Cir. 2015) ................................................................................................. 19

*Sandra Holding Ltd. v. Al Saleh*,
  No. 18-MC-91406-PBS, 2019 WL 3072197 (D. Mass. July 15, 2019) .................................. 23

## **Statutes**

28 U.S.C. § 1782 .............................................................................................................. 1, 14, 21

Fed. R. Civ. P. 26 ..................................................................................................................... 25

## I.    INTRODUCTION AND SUMMARY STATEMENT

Gulf Investment Corporation ("**GIC**") respectfully files this *ex parte* [1] application ("**Application**") for judicial assistance pursuant to 28 U.S.C. § 1782 ("**Section 1782**"). The factual underpinnings of this Application are complex, but in summary, involve disputes arising from GIC's investment in The Port Fund L.P. ("**Port Fund**"), a private equity fund. In short, hundreds of millions of dollars are missing, and GIC – as a significant limited partner in the Port Fund – is seeking answers and its well-deserved money. The discovery sought herein will support contemplated litigation by GIC in the Cayman Islands ("**Contemplated Cayman Litigation**") pursuing both answers and, ultimately, its now-missing money.

Based on GIC's investigation to date, this is a tale of misconduct and missing money at the center of which is KGL Investment Company KSCC ("**KGLI**") and the Port Fund (a Cayman Islands exempted limited partnership for which KGLI was the Administrator and Placement Agent). The Port Fund was set up in 2007 as a vehicle for investments in port-related assets around the world. The Port Fund's investment manager – Emerging Markets PE Management Limited ("**Fund Manager**") formerly known as KGL Investment Cayman Ltd. and a wholly-owned subsidiary of KGLI – intended to raise USD 500 million, but raised far less than that amount. The Port Fund made only a handful of investments in total, which it largely exited at losses. The investment relevant to the present Application – Clark Global City, a major greenfield airport infrastructure site in the Philippines ("**Clark Asset**") – was the Port Fund's most successful investment, and, indeed, one of only two that made money.[2]

---

[1]   This Court routinely entertains *ex parte* applications pursuant to Section 1782. *See Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) ("[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte.*"). This is because an opposing party may move to quash a subpoena issued pursuant to a Section 1782 application, thereby preserving its due process rights. *See id.*

[2]   The Port Fund's other profitable investment, in shipping company Negros Navigation Co., Inc. ("**Negros Navigation**"), was also in the Philippines.

A.    **Missing Funds from Sale of Clark Asset**

In November 2017, the Port Fund announced the sale of the Clark Asset. According to financial filings in the Philippines, the sale price approached USD 1 billion. However, in sharp contrast, the widely reported exit amount for the Port Fund's sale of the Clark Asset was only *half* of that. Specifically, the Port Fund belatedly reported that the proceeds from its sale of the Clark Asset amounted to USD 496 million (after its principals initially claimed it was far less than even that amount). The half-billion-dollar discrepancy has never been acknowledged, let alone explained, by the Port Fund.

Immediately following the sale, and unbeknown to GIC and the other investors in the Port Fund, the sale proceeds of USD 496 million were transferred, not to the Port Fund's regular bank accounts with HSBC Bank Middle East Limited, Kuwait ("**HSBC Kuwait**") or Al Ahli Bank of Kuwait ("**Al Ahli Bank**"), but to an account at Noor Bank in Dubai held in the name of the Port Fund's general partner, Port Link GP Ltd. ("**Port Link**"). To date, the Port Fund has failed to address any investor queries related to whether it commingled the sale proceeds with other funds, and what internal controls were in place to ensure proper segregation of client funds. The Port Fund has also refused to provide any bank statements to ensure that funds belonging to the Port Fund and wrongfully deposited at Noor Bank were fully disbursed back to the Port Fund and its investors.

Immediately upon arrival in Dubai, the money was frozen by the UAE Central Bank under suspicion of money laundering. The monies remained frozen in Dubai until February 2019, when part, but not all, of such monies, were distributed to the Port Fund's limited partners. Critically, however, as of the filing of this Application – nearly a year later – only USD 305 million (or approximately 61% of the total amount) has been distributed to the Port Fund's limited partners.

This chronology leads to two unsettling questions:

1. What is the basis for the USD 500 million discrepancy between the sales price of the Clark Asset as reported in the Philippines (approximately USD 1 billion) and the Port Fund's reported exit amount (USD 496 million)?

2. What is the basis for the discrepancy between the reported exit amount of USD 496 million and the USD 305 distributed from Noor Bank to the limited partners (i.e., what happened to the USD 191 million)?

Despite GIC's repeated requests for answers to these basic queries, the Port Fund and its principals have failed to provide any response whatsoever. The Contemplated Cayman Litigation will address these issues.

### B.      Additional Port Fund Misconduct

It is also anticipated that the Contemplated Cayman Litigation will address, among other things: (1) suspicious litigation in Dubai instituted by the Fund Manager against the Port Fund and Port Link, which resulted in an uncontested award of USD 57 million to the Fund Manager that was concealed from the Port Fund's limited partners; and (2) the potential misappropriation of Port Fund assets to pay lobbying and public relations firms; (3) unexplained, favorable treatment of a party related to KGLI under a loan agreement related to the Port Fund's unprofitable investment in Damietta International Ports Company ("**DIPCO**"); and (4) the Port Fund's engagement of a non-arm's length financial advisor, Apache Asia Limited ("**Apache Asia**"), purportedly to assist with transactions relating to at least two of its investments.

### C.      Requested Discovery

In short, it appears that GIC is the victim of egregious misconduct directed by KGLI and its principals who managed the Port Fund, and who diverted hundreds of millions of dollars of Port Fund assets that should have flowed to the Port Fund's limited partners, including GIC.

Accordingly, GIC brings this Application seeking permission to subpoena documents and information for use in the Contemplated Cayman Litigation from twelve non-party banks located in the Southern District of New York ("**Southern District**"): (1) Bank of America, N.A. ("**Bank of America**"); (2) The Bank of New York Mellon ("**Bank of New York**"); (3) Citibank, N.A. ("**Citibank**"); (4) Deutsche Bank AG, New York Branch ("**Deutsche Bank USA**"); (5) Deutsche Bank Trust Company USA ("**Deutsche Bank Trust**"); (6) Goldman Sachs and Co. ("**Goldman Sachs**"); (7) HSBC Bank USA, N.A. ("**HSBC**"); (8) J.P. Morgan Chase Bank, N.A. ("**J.P. Morgan**"); (9) Mashreqbank PSC, New York Branch ("**Mashreqbank**"); (10) National Australia Bank Limited, New York Branch ("**National Australia Bank**"); (11) Standard Chartered Bank, New York Branch ("**Standard Chartered**"); and (12) Wells Fargo Bank N.A. ("**Wells Fargo**") (collectively, "**Correspondent Banks**").

Through its proposed subpoenas (*see* the Sworn Declaration of Kristin N. Tahler, annexed hereto as Appendix A, at Exhibits M through X), GIC seeks from the Correspondent Banks documents and information relating to, among other things, USD transactions: (1) relating to the Port Fund's investment in the Clark Asset; (2) relating to the Port Fund's investment in Negro Navigation; (3) relating to the Port Fund's investment in DIPCO; (4) between the Port Fund, Port Link, KGLI, and the Fund Manager (collectively, "**Port Fund Companies**") and certain companies that advised the Port Fund ("**Advisors**"); (5) between the Port Fund Companies and lobbying firms that worked on behalf of the Port Fund ("**Lobbying Firms**"); (6) between the Port Fund Companies and public relations companies that may have worked on behalf of the Port Fund ("**Public Relations Companies**"); (7) between the Port Fund Companies and entities controlled by KGLI's former parent Kuwait and Gulf Link Transport Company K.S.C.P. ("**KGL**") ("**Related Companies**"); and (8) between the Port Fund Companies and certain companies outside of the

Related Companies that have suspicious/hidden ownership structures ("**Anomalous Companies**") (collectively, "**Requested Discovery**"). GIC's investigation to date indicates that the Correspondent Banks would have processed such USD transactions.

As demonstrated in detail below, GIC meets each of the statutory and discretionary factors routinely considered by this Court in determining whether to grant relief under Section 1782. Indeed, the court handling the Contemplated Cayman Litigation will be receptive to any extraterritorial discovery obtained by GIC – precisely the circumstance Section 1782 was designed to assist. *See* Sworn Declaration of Anna Peccarino, annexed hereto as Appendix B, at ¶¶ 10-11. Accordingly, the Application should be granted.

## II.      FACTUAL BACKGROUND

### A.      Parties

#### 1.      GIC

GIC is a Kuwait-based corporation owned by the governments of the six member states of the Gulf Cooperation Council (i.e., Bahrain, Kuwait, Oman, Qatar, Saudi Arabia, and the United Arab Emirates). App'x A at ¶ 1 n.1.

#### 2.      The Port Fund

The Port Fund is an exempted limited partnership organized under the laws of the Cayman Islands in 2007 to make private equity investments. *See* Sworn Declaration of Nicholas Bortman, annexed hereto as Appendix C, at ¶ 7. Although the Port Fund had intended to raise USD 500 million in capital commitments from its limited partners, it ultimately only managed to raise USD 188 million. *Id.* GIC is one of the limited partners in the Port Fund. App'x A at ¶ 1. Specifically, GIC invested a total of USD 20 million into the Port Fund between 2007 and 2013. *Id.* at ¶ 5.

Pursuant to the terms of an Amended and Restated Limited Partnership Agreement ("**LPA**") entered into between the Port Fund's limited partners and its general partner (Port Link):

(1) Port Link was supposed to cause each of the Port Fund's limited partners (including GIC) to be provided with annual reporting from the Port Fund's auditor on the Fund's finances (e.g., balance sheet, cash flow statement); and (2) the Port Fund's administrator, KGLI, was supposed to cause each of the Port Fund's limited partners (including GIC) to be provided with quarterly reporting on investments that the Port Fund had made and exited. *Id.* at ¶ 6.

The LPA also sets forth an order and process that the Port Fund was required to follow when making distributions from each of its exited investments: (1) return of capital: first, the Port Fund would return any capital contributions made by its limited partners; (2) preferred return: second, the Port Fund would pay the limited partners an 8% annual return on their respective capital contributions; (3) investment manager catch-up: third, the Port Fund would pay its investment manager 20% of the preferred return amounts paid to the limited partners; and (4) finally, the Port Fund would split any funds remaining after the first three distributions with 80% going to its limited partners and 20% going to its investment manager. *Id.* at ¶ 7.

### 3. KGLI

KGLI, a Kuwaiti private equity and venture capital firm, is the sponsor of and the placement agent and administrator for the Port Fund. App'x C at ¶ 8.

### 4. Port Link

Port Link, a Cayman Islands exempted limited company, is the Port Fund's general partner. *Id.* at ¶ 9.

### 5. The Fund Manager

The Fund Manager was known as KGL Investment Cayman Ltd. until at least August 2017. *Id.* at ¶ 10. It subsequently and inexplicably changed its name to Emerging Markets PE Management Limited. *Id*. It is a Cayman Islands exempted limited company and serves as the

investment manager of the Port Fund pursuant to an Investment Management Agreement, dated June 28, 2007 ("**IMA**"). *Id.* It was also previously a wholly-owned subsidiary of KGLI. *Id.*

### B.    Key Individuals

Marsha Lazareva ("**Lazareva**") is the Vice Chairman and Chief Executive Officer of KGLI and is a former director of both Port Link and the Fund Manager. *Id.* at ¶ 11. On November 11, 2019, Lazareva was convicted by a Kuwaiti court and sentenced to imprisonment for 15 years in connection with misappropriation of public funds. *Id.* at ¶ 12. She is also facing separate criminal charges in connection with alleged embezzlement from the Kuwait Ports Authority ("**KPA**") related to an advisory services contract between KPA and KGLI.[3] *Id.* at ¶ 13.

Saeed Dashti ("**Dashti**") was the Chairman of the KGL Group of Companies and serves on Port Link's Board of Directors. *Id.* at ¶ 11. On November 11, 2019, Dashti was convicted by a Kuwaiti court and sentenced to imprisonment for 15 years in connection with misappropriation of public funds. *Id.* at ¶ 12. He is also facing separate criminal charges in connection with alleged embezzlement from KPA related to an advisory services contract between KPA and KGLI. *Id.* at ¶ 13.

Mark Williams ("**Williams**") is KGLI's Investment Director, the Chief Executive Officer of KGLI subsidiary KGL Investment Company Asia, and the President of Global Gateway Development Corporation ("**GGDC**"), one of the special purpose vehicles created by the Port Fund for its investment in the Clark Asset. *Id.* at ¶ 14.

---

[3]    Lazareva was convicted in connection with the KPA matter, and as of the date of this filing is awaiting rehearing in connection therewith. *Id.* at ¶ 13.

## III.     MISCONDUCT AT ISSUE IN THE CONTEMPLATED CAYMAN LITIGATION

### A.     Missing Funds from Sale of Clark Asset

#### 1.     Background

In April 2008, the Port Fund invested in the Clark Asset.[4] *Id.* at ¶ 14. In November 2017, the Port Fund exited the investment for nearly USD 1 billion, according to Philippines corporate filings. *Id.* at ¶¶ 19-21. The Port Fund meanwhile reported an exit figure of USD 496 million, which was transferred from a bank in the Philippines to an account held by the Port Fund's general partner at Noor Bank in Dubai. *Id.* at ¶ 23. Immediately upon arrival in Dubai, the money was frozen by the UAE Central Bank under suspicion of money laundering. *Id.* The Port Fund has never acknowledged, let alone explained, the difference between the sale price listed in official audited financial statements filed in the Philippines (USD 1 billion) and the Port Fund's reported exit figure (USD 496 million).

Although the money transferred to Noor Bank was ultimately unfrozen, the Port Fund and its principals have refused to provide GIC to what it is entitled under the LPA: a precise accounting for the USD 496 million reported exit figure. App'x A at ¶ 15. Further, to date, the Port Fund has only sought to distribute USD 305 million in proceeds from the Clark Asset to its limited partners. App'x C at ¶ 25. The Port Fund and its principals have refused to provide GIC with any information regarding the whereabouts of the remaining USD 191 million that (1) rightfully belongs to the Port Fund's limited partners; and (2) on information and belief, has been improperly distributed to third parties. App'x A at ¶ 16.

---

[4]    At various times the Clark Asset has also been referred to as the Sabah Al-Ahmad Global Gateway Logistics City and Clark Global City. *Id.* at ¶ 4 n.1.

### 2.      Initial Investment Structure

In 2008, the Port Fund created GGDC in the Cayman Islands for its investment in the Clark

Asset. App'x C at ¶ 14. The Port Fund has concealed from GIC the amount it, in fact, invested in

GGDC. App'x A at ¶ 15. Reports of the investment amount vary: a 2012 report suggests that the

Port Fund had already invested USD 200 million in the Clark Asset and planned to invest an

additional USD 500 million; a 2014 press release states that the Port Fund had already invested

USD 100 million and pledged to invest an additional USD 150 million by the end of 2015. App'x

C at ¶ 17.

### 3.      Divesting and Regaining Control of the Clark Asset

In an opaque, undisclosed 2014 transaction, the Port Fund transferred its interest in the

Clark Asset to a third party. *Id.* at ¶ 18. In a further series of opaque, undisclosed transactions

involving Cayman shell companies, the Port Fund "regained" control of the Clark Asset by

transferring ownership to a new Clark Asset-related entity, GGDC Holdings ("**GGDH**"), before

selling it to a developer. *Id.* at ¶ 19.

Ultimately, GGDH was sold to Clark Global City Corp. ("**CGCC**"), a subsidiary of

Philippine holding company Udenna Development Corp. for approximately USD 1 billion,

according to CGCC's financial statements for the year ended December 31, 2017. *Id.* at ¶¶ 19-20.

### 4.      Sale of Clark Asset and Promises of Distribution

In November 2017, the Port Fund wrote to its limited partners to inform them that (1) "the

Port Fund had successfully exited its investments in [Sabah Al-Ahmad Global Gateway Logistics

City (GGDC)] in November 2017; (2) "[w]ith the completion of the sale of [GGDC], the Port Fund

has exited all of its investments"; and (3) in addition to an October 2016 distribution of USD 30

million to the Port Fund's limited partners stemming from the Port Fund's exit of its Negros

Navigation investment ("**Negros Navigation Distribution**"), the Port Fund was now intending to

distribute approximately USD 340 million to its limited partners ("**Clark Asset Distribution**") by the end of 2017, resulting in a total distributions of USD 370 million to the limited partners. *Id.* at ¶ 21. This USD 340 million amount is in sharp contrast to (1) the USD 1 billion reported in the Philippines corporate filings; (2) the USD 496 acknowledged by the Port Fund as the exited amount; and (3) the USD 305 million the Port Fund actually distributed.

Importantly for purposes of the instant Application, the USD 496 million was transferred in November 2017 from the Philippines to Port Link's account at Noor Bank in Dubai. *Id.* at ¶ 23. The funds passed through an account at Citibank. *Id.* The money was subsequently frozen in Dubai on suspicions of money laundering. *Id.*

### 5.    The Port Fund's Distributions to its Limited Partners, including GIC

Of the five investments made by the Port Fund, only two generated sufficient profits to allow for any distributions to its limited partners. *Id.* at ¶ 15. In October 2016, as part of the Negros Navigation Distribution, the Port Fund distributed USD 2.8 million to GIC. App'x A at ¶ 9.[5] With regard to the Clark Asset, the Port Fund has only sought to distribute USD 305 million in exit proceeds to its limited partners. App'x C at ¶ 25. On February 6, 2019, as part of the Clark Asset Distribution, Port Link distributed USD 25.4 million to GIC. App'x A at ¶ 12. On information and belief, the Clark Asset Distribution was made from Port Link's account at Noor Bank rather than from the Port Fund's bank accounts with HSBC Kuwait or Al Ahli Bank. *Id.*

The GIC's portion of Clark Asset Distribution was made without any proper accounting for the commingled funds. *Id.* at ¶ 13. Further, because the amount received by GIC in connection

---

[5]    Of the USD 120 million exit proceeds received from the sale of Negros Navigation, an amount of USD 61.9 million was used to settle "a loan outstanding for Global Gateway Development Corporation and other liabilities of the Fund." App'x C at ¶ 25 n.39.  The Port Fund has provided no information as to what the nature of the loan was that was settled (for USD 54.2 million), or what the nature of the "other liabilities" of the Fund were that were paid (in the amount of USD 2.4 million). *Id.*

with the Clark Asset Distribution (USD 25.4 million) was based on a total distribution to the limited partners of USD 305 million, it failed to account for the remaining amount of USD 191 million belonging to the limited partners, which is believed to have been improperly distributed to third parties. *Id.*

### B. Additional Port Fund Misconduct

Additional misconduct involving the Port Fund includes: (1) suspicious litigation in Dubai instituted by the Fund Manager against the Port Fund that resulted in an uncontested award of USD 57 million to the Fund Manager within two weeks of the original filing and which has been concealed from the Port Fund's limited partners;[6] (2) potential misappropriation of Port Fund assets to fund payments to lobbying and public relations firms who were hired (a) without the knowledge or consent of the Port Fund's limited partners; and/or (b) to disparage the reputation of the State of Kuwait (one of GIC's owners) in an attempt to secure the release from prison of KGLI principals Lazareva and Dashti;[7] (3) unexplained, favorable treatment of KGL International for Ports, Warehousing and Transport KSCC ("**KGLIP**"), a party related to KGLI, under a loan

---

[6]  In July 2018, the Investment Manager filed a USD 57 million claim against the Port Fund and Port Link in the Dubai International Financial Centre ("**DIFC**") Courts, alleging, among other things, that, while the Port Fund had exited all of its investments, it was in breach of the IMA and had withheld payments due to the Investment Manager. App'x C at ¶ 30. The claim contains a number of material misstatements, including that the Investment Manager was owed penalty interest on its management fees, and that it was entitled to receive a distribution even before any of the limited partners had been paid. *Id.* at ¶ 31. Despite these crucial misstatements and the fact that the Port Fund is a Cayman entity without any ties to Dubai, the Port Fund and Port Link did not dispute the jurisdiction of the DIFC, nor did they submit a defense. *Id.* at ¶ 32. Within two weeks of the claim being filed, a judgment for USD 57 million was issued against the Port Fund and Port Link. *Id.* at ¶ 33.

[7]  During the period from Q3 2018 through Q1 2019, without the knowledge or consent of the Port Fund's limited partners, five separate lobbying firms registered on behalf of the Port Fund and were paid USD 2.7 million to lobby for the release of the Port Fund monies that were frozen in Dubai. *Id.* at ¶ 36. Although these funds were ultimately released, is unclear what efforts were expended by these U.S. lobbying firms in connection with the release of funds held in Dubai. Troublingly, four of these five firms then proceeded to register on behalf of KGLI, to lobby for, among other things, the imposition of sanctions against members of the Kuwaiti government and the release from prison of Lazareva and Dashti, leading to concerns that Port Fund monies may have been expended as part of this campaign. *Id.* at ¶ 37. Further, it appears that the Port Fund may have engaged public relations firms, without the knowledge or consent of its limited partners, for campaigns focused on Lazareva's and Dashti's imprisonment and the "significant damage this is doing to Kuwait's international reputation among foreign investors." *Id.* at ¶ 38.

agreement related to the Port Fund's unprofitable investment in DIPCO;[8] and (4) the Port Fund's engagement of Apache Asia, purportedly to assist with transactions relating to at least two of its investments.[9]

## IV.   REQUESTED DISCOVERY

With the exception of the limited information that GIC has gathered from public sources and its own investigative efforts, GIC largely lacks visibility into the Port Fund's finances and investments because the Port Fund and its principals have refused to provide GIC with information about these topics, and instead have engaged in a pattern and practice of concealment. App'x A at ¶¶ 15-16. As a result, GIC has been unable to fully investigate or substantiate the misconduct involving the Port Fund.

Accordingly, GIC must obtain information about the Port Fund's finances and investments – including its exit from the Clark Asset – from other sources, such as the Correspondent Banks, which process USD transactions for several of the foreign banks involved in transactions at issue in the underlying misconduct. App'x C at ¶¶ 39-40. Such information will be of significant use to GIC in the Contemplated Cayman Litigation.

Through this Application, GIC seeks documents and information in the possession or control of the Correspondent Banks regarding certain USD transactions at issue in the

---

[8]   In 2007, the Port Fund provided a USD 20 million loan to another KGL group entity, KGLIP, that (1) carried an interest of 28% per annum; and (2) was convertible into 2 million shares in DIPCO. *Id.* at ¶ 26. In 2014, the entirety of the loan and its interest was written off with no explanation. *Id.* at ¶ 27. No attempt was made to convert the loan into shares in DIPCO, nor did the Port Fund take any steps to recover the loan. *Id.* The effect of this write-off appeared to benefit Kuwait and Gulf Link Transport Company K.S.C.P., the parent company of KGLIP. *Id.* at ¶ 28. Notably, the Port Fund's investment in DIPCO has resulted in three separate arbitration disputes including allegations of commingling. *Id.* at ¶ 29.

[9]   It appears that the Port Fund engaged a Hong Kong-based financial advisor, Apache Asia, to assist with the sale of at least two of the investments. *Id.* at ¶ 34. Evidence suggests that Apache Asia was not conducting business on an arm's-length basis. *Id.* at ¶ 35. KGLI registered the domain for Apache Asia's website even before the company was incorporated. *Id.* After the company was incorporated, the website was transferred to and hosted on a server owned by Williams's brother Matthew Williams. *Id.* Throughout the website's existence, KGLI's IT infrastructure manager has administered the domain. *Id.*

Contemplated Cayman Litigation, including, but not limited to (1) transactions relating to the Port Fund's investment in and exit from the Clark Asset; (2) transactions relating to the Port Fund's investment in and exit from Negros Navigation; (3) transactions relating to the Port Fund's investment in DIPCO; (4) transactions between the Port Fund Companies and the Port Fund's advisors; (5) transactions between the Port Fund Companies and the Lobbying Firms; (6) transactions between the Port Fund Companies and the Public Relations Companies; (7) transactions between the Port Fund Companies and the Related Companies; and (8) transactions between the Port Fund Companies and the Anomalous Companies. *See* App'x A, Exs. M-X. GIC's investigation to date indicates that the Correspondent Banks would have processed such USD transactions. App'x C at ¶¶ 39-40.

## V.    CONTEMPLATED CAYMAN LITIGATION

GIC is considering pursuing litigation in the Cayman Islands in relation to the Port Fund (i.e., the Contemplated Cayman Litigation). App'x B at ¶ 6. Specifically, through the Contemplated Cayman Litigation, GIC may bring claims against, among others, the Port Fund, Port Link, KGLI, and/or the Fund Manager, relating to the: (1) missing funds from the sale of the Clark Asset; (2) litigation in Dubai involving the Fund Manager that resulted in an uncontested USD 57 million judgment against the Port Fund and Port Link; (3) payments to lobbying and public relations firms that were hired in the name of the Port Fund, without the knowledge or consent of the Port Fund's limited partners; (4) unexplained, favorable treatment of a party related to KGLI under a loan agreement related to the Port Fund's investment in DIPCO; and (5) the Port Fund's engagement of Apache Asia, purportedly to assist with transactions relating to at least two of its investments. *Id.* at ¶ 7.

VI.     **ARGUMENT**

A.      **Legal Framework**

Section 1782 permits U.S. District Courts to grant discovery for use in a pending or "reasonabl[y] contemplat[ed]" foreign proceeding. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 259 (2004). The statute, in relevant part, states:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made . . . upon the application of any interested person.

28 U.S.C. § 1782(a).

An application made pursuant to Section 1782 must satisfy three statutory requirements: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012).

After determining that the three statutory requirements are satisfied, courts must then consider four discretionary factors in deciding whether to grant a Section 1782 application: (1) whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach, and thus accessible absent Section 1782 aid; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the subpoenas contain unduly intrusive or burdensome requests. *See Intel*, 542 U.S. at 264-65.

Moreover, courts in this Circuit "evaluate discovery requests under section 1782 in light of the statute's twin aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Euromepa S.A. v. R. Esmerian*, Inc., 51 F.3d 1095, 1097 (2d Cir. 1995) (citation omitted); *see also In re Metallgesellschaft*, 121 F.3d 77, 79 (2d Cir. 1997). Both the Supreme Court and the Second Circuit have acknowledged a Congressional intent to provide a liberal avenue to discovery in aid of foreign and international proceedings. *See, e.g.*, *Intel*, 542 U.S. at 247-48; *Brandi-Dohrn*, 673 F.3d at 80 ("[T]he statute has, over the years, been given increasingly broad applicability."); *In re Edelman*, 295 F.3d 171, 179-80 (2d Cir. 2002) ("In sum, Congress has expressed as its aim that the statute be interpreted broadly . . . .").

### B.     GIC Meets the Statutory Requirements of Section 1782

GIC satisfies the three statutory requirements of section 1782: (1) the Correspondent Banks "reside" or are "found" in the Southern District; (2) the requested information is for use in a foreign proceeding; and (3) GIC is an "interested person" as the putative plaintiff in a foreign proceeding.

### 1.     The Correspondent Banks "Reside" or Are "Found" in the Southern District

The Correspondent Banks maintain their place of incorporation or principal place of business within the Southern District and/or engage in the sort of systematic and continuous activities that courts have considered sufficient for the purposes of Section 1782 to find that a corporation "resides" or can be "found" in a district.

First, a corporation "resides or is found" a jurisdiction if it is "at home" there, such as when the jurisdiction is the corporation's place of incorporation or its principal place of business. *In re Sargeant*, 278 F. Supp. 3d 814, 820 (S.D.N.Y. 2017); *Hertz Corp. v. Friend*, 559 U.S. 77, 81, 93 (2010) (holding that principal place of business "should normally be the place where the

corporation maintains its headquarters"). The Bank of New York, Citibank, Deutsche Bank USA, Deutsche Bank Trust, Goldman Sachs, HSBC, J.P. Morgan¸ Standard Chartered, Mashreqbank, and National Australia Bank are headquartered and/or maintain a principal place of business in New York, NY – respectively at (1) 240 Greenwich Street, New York, NY 10286[10]; (2) 388 Greenwich Street, New York, NY 10013[11]; (3) 60 Wall Street, New York, NY 10005[12]; (4) 60 Wall Street, New York, NY 10005[13]; (5) 200 West Street, New York, NY 10282[14]; (6) 452 Fifth Avenue, New York, NY 10005[15]; (7) 383 Madison Avenue, New York, NY 10179[16]; (8) 1095 Avenue of the Americas, New York, NY 10036[17]; (9) 50 Broadway, Suite 1500, New York, NY 10004[18]; and (10) 245 Park Avenue, 28th Floor, New York, NY 10167[19] – and are thus "found" in the Southern District for purposes of Section 1782, satisfying the first statutory requirement. In addition, courts in this District have found that Bank of New York, Citibank, Deutsche Bank USA,

---

[10] Fed. Deposit Ins. Corp., BankFind, Bank of America New York Mellon, *available at* https://research2.fdic.gov/bankfind/detail.html?bank=639&name=The%20Bank%20of%20New%20York%20Mellon&searchName=bank%20of%20new%20york&searchFdic=&city=&state=&zip=&address=&searchWithin=&activeFlag=&searchByTradename=false&tabId=2.

[11] Sec. Exch. Comm., Citigroup Filing Detail, *available at* https://www.sec.gov/Archives/edgar/data/831001/000095010319017478/0000950103-19-017478-index.htm; Sec. Exch. Comm., Citigroup Inc. Form 10-K 2018, https://www.sec.gov/Archives/edgar/data/831001/000083100119000027/c-12312018x10k.htm.

[12] Deutsche Bank USA, Contact, https://www.db.com/usa/content/en/Contact.html.

[13] Fed. Deposit Ins. Corp., BankFind, Deutsche Bank Trust Company Americas, *available at* https://research2.fdic.gov/bankfind/detail.html?bank=623&name=Deutsche%20Bank%20Trust%20Company%20Americas&searchName=Deutsche%20Bank&searchFdic=&city=&state=&zip=&address=&searchWithin=&activeFlag=&searchByTradename=false&tabId=2.

[14] Fed. Deposit Ins. Corp., BankFind, Goldman Sachs Bank USA, *available at* https://research2.fdic.gov/bankfind/detail.html?bank=33124&name=Goldman%20Sachs%20Bank%20USA&searchName=goldman%20sachs&searchFdic=&city=&state=&zip=&address=&searchWithin=&activeFlag=&searchByTradename=false&tabId=2.

[15] HSBC, HSBC USA Inc. Form 10-K 2017; https://www.about.us.hsbc.com/-/media/us/en/investor-relations/hsbc-usa/company-reports/180220-form-10-k.pdf.

[16] Sec. Exch. Comm., JPMorgan Chase & Co. Form 10-K 2018, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/19617/000001961719000054/corp10k2018.htm.

[17] Standard Chartered US, Contact Us, https://www.sc.com/us/contact-us/.

[18] Mashreqbank, International Banking, https://www.mashreqbank.com/qatar/en/international-banking/network/usa.

[19] National Australia Bank, Locations, https://www.nab.com.au/corporate/global-relationships/contact-us.

Deutsche Bank Trust, Goldman Sachs, HSBC, J.P. Morgan¸ and Standard Chartered maintain their respective principal places of business in the Southern District. *See In re Fernando Celso De Aquino Chad*, No. 19MC261, 2019 WL 2502060, at \*\*2-3 (S.D.N.Y. June 17, 2019) (holding that the Section 1782 residency requirement was met for Citibank, Bank of New York, HSBC, and J.P. Morgan); *In re Hornbeam Corp.*, No. 14 MISC. 424, 2014 WL 8775453, at \*5 (S.D.N.Y. Dec. 24, 2014) (same for Bank of New York, Citibank, Deutsche Bank USA, HSBC, J.P. Morgan, and Standard Chartered); *In re Furstenberg Fin. SAS*, No. 18-MC-44 (JGK), 2018 WL 3392882, at \*1 (S.D.N.Y. July 12, 2018) (same for Bank of New York, Citibank, Deutsche Bank Trust, HSBC, J.P. Morgan, and Standard Chartered); *In re Aso*, No. 19MC190JGKJLC, 2019 WL 3244151, at \*2 (S.D.N.Y. July 19, 2019) (same for HSBC and Goldman Sachs).

Second, courts in this district have held that an entity is "found" in this district if it has a "systematic and continuous" presence in the Southern District of New York. *See In re Ex Parte Application of Kleimar N.V.*, 220 F. Supp. 3d 517, 521 (S.D.N.Y. 2016) (defendant that conducted "systematic and regular business" in New York was "found" in this district); *Ayyash v. Crowe Horwath LLP*, No. 17-MC-482(AJN), 2018 WL 1871087, at \*2 (S.D.N.Y. Apr. 17, 2018) (defendants that maintained offices in New York were "found" in New York). Bank of America and Wells Fargo are "found" in the Southern District for the purposes of Section 1782 on the basis that both have engaged in systematic and continuous activities in the Southern District and, in particular, New York, NY, central to their respective businesses thus satisfying the first statutory requirement.

Specifically, Bank of America has 286 locations in New York State.[20] This includes Bank of America's Global Wealth & Investment Management, Global Banking, and Global Markets services, which are located at 1 Bryant Park, New York, NY 10036.[21] In addition, Bank of America has over 13,000 employees in New York.[22] Similarly, Wells Fargo has 85 full-service banks within New York State.[23] Moreover, its international branch, which is the institution associated with its SWIFT Code, is located at 375 Park Avenue, New York, NY 10152.[24] Wells Fargo occupies 3.5 million square feet of property in the New York metropolitan area,[25] and recently Wells Fargo purchased nearly a half million square feet of office space to serve as future headquarters of Corporate & Investment Banking at 30 Hudson Yards.[26] In addition, courts in this District have found that Bank of America and Wells Fargo are "found" in the Southern District. *See In re Hornbeam Corp.*, 2014 WL 8775453, at *3 (finding that, under Section 1782, Wells Fargo and Bank of America reside in the Southern District); *see also In re Iraq Telecom Ltd.*, No. 18-MC-458 (LGS) (OTW), 2019 WL 3798059, at *3 (S.D.N.Y. Aug. 13, 2019), *reconsideration denied*,

---

[20] Fed. Deposit Ins. Corp., BankFind, Bank of America Nat'l Ass'n Locations, *available at* https://research2.fdic.gov/bankfind/detail.html?bank=3510&name=Bank%20of%20America%2C%20National%20Association&searchName=BANK%20OF%20AMERICA&searchFdic=&city=&state=&zip=&address=&tabId=2#.

[21] Sec. Exch. Comm., Bank of America Corp. Form 10-K 2018, https://www.sec.gov/Archives/edgar/data/831001/000083100119000027/c-12312018x10k.htm.

[22] Lananh Nguyen & Lily Katz, Bank of America Plans to Concentrate Manhattan Staff at Midtown Hub, Bloomberg, https://www.bloomberg.com/news/articles/2019-06-12/bofa-unveils-plan-to-concentrate-manhattan-staff-at-midtown-hub.

[23] Fed. Deposit Ins. Corp., BankFind, Wells Fargo Bank Nat'l Ass'n Locations, *available at* https://research2.fdic.gov/bankfind/detail.html?bank=3511&name=Wells%20Fargo%20Bank%2C%20National%20Association&searchName=wells%20fargo&searchFdic=&city=&state=&zip=&address=&searchWithin=&activeFlag=&searchByTradename=false&tabId=2#.

[24] SWIFT, Wells Fargo Bank, N.A., https://www2.swift.com/bsl/facelets/bicsearch.faces.

[25] Wells Fargo Form 10-K at 6, https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/sec-filings/2018/10k.pdf.

[26] Wells Fargo, Hudson Yards a 'big bet' on New York's Future, Says Wells Fargo CEO, https://stories.wf.com/hudson-yards-big-bet-new-yorks-future-says-wells-fargo-ceo/.

No. 18-MC-458 (LGS) (OTW), 2019 WL 5080007 (S.D.N.Y. Oct. 10, 2019) (same for Wells Fargo).

### 2.    The Discovery Sought is "For Use" in a Foreign Proceeding

Under the second statutory requirement, an applicant must demonstrate that the requested discovery is for use in a proceeding before a foreign tribunal. As discussed further below (1) the Contemplated Cayman Litigation constitutes a foreign proceeding under Section 1782; and (2) the Requested Discovery is for use in that foreign proceeding.

### (a)    The Contemplated Cayman Litigation is a Foreign Proceeding

The Contemplated Cayman Litigation qualifies as a proceeding in a "foreign or international tribunal" for purposes of Section 1782. In the Second Circuit, "where an applicant has not yet initiated a foreign proceeding, [1782] discovery is available when the materials may help the applicant either to plead or to prove the anticipated claims. Indeed, 'the foreign proceeding need not be pending, so long as it is within reasonable contemplation.'" *In re Mangouras*, No. 17-MC-172, 2017 WL 4990655, at *5 (S.D.N.Y. Oct. 30, 2017) (citing *Mees v. Buiter*, 793 F.3d 291, 299 (2d Cir. 2015)); *see also Intel*, 542 U.S. at 259 (foreign proceeding need not have actually commenced at the time when Section 1782 discovery is sought; it need only "be within reasonable contemplation").

A petitioner need only "provide some objective indicium that the action is being contemplated." *In re Kiobel*, 2017 WL 354183, *3 (S.D.N.Y. Jan 24, 2017) (citation omitted) (rev'd on other grounds). Here, GIC will use the requested discovery to plead and prove its claims in the Contemplated Cayman Litigation. Specifically, GIC has taken steps establishing that the Contemplated Cayman Litigation is "within reasonable contemplation" by conducting a comprehensive investigation relating to the potential claims and retaining Cayman counsel to evaluate the potential claims that may be included as part of the Litigation. *See* App'x B at ¶¶ 6-7;

*see also In re IJK Palm LLC*, No. 3:16MC171(RNC), 2019 WL 2191171, at *4 (D. Conn. Jan. 30, 2019) (holding potential lawsuits in the Cayman Islands constituted a reasonably contemplated foreign proceeding where the petitioner had hired attorneys and investigated parties and its own files ); *In re Hornbeam Corp.*, 722 F. App'x 7, 9-10 (2d Cir. 2018) (summary order) (holding that a foreign proceeding was reasonably contemplated where the applicant "represented that it intended to initiate further litigation," and "articulated a theory on which it intended to litigate"); *In re Furstenberg Fin. SAS*, 2018 WL 3392882, at *4 (holding that for use requirement was been met where petitioners swore that they intended to file a criminal complaint in Luxembourg Criminal Court and articulated a specific legal theory on which they intended to rely); *see also In re Bracha Found.*, 663 F. App'x 755, 764 (11th Cir. 2016) (affirming district court's decision that foreign proceeding was within reasonable contemplation because the applicants "have represented their intention to return to litigation in the BVI and have articulated a theory upon which they intend to litigate."); *Bravo Express Corp. v. Total Petrochemicals & Ref. U.S.*, 613 F. App'x 319, 323 (5th Cir. 2015) (finding that the application was for use in a contemplated proceeding because, inter alia, the applicant filed a "sworn affidavit" from his foreign lawyer that he had prepared papers). In addition, as further evidence of GIC's intention to pursue the Contemplated Cayman Litigation, GIC has already filed litigation against the Port Fund and Port Link pursuant to Section 22 of the Cayman Islands Exempted Limited Partnership Law. *See* App'x B at ¶ 2 n.1.

In addition, Cayman courts qualify as a "foreign or international tribunal" for purposes of Section 1782. Indeed, numerous courts have found that civil proceedings before Cayman courts satisfy Section 1782. *See, e.g.*, *Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434, 438 (S.D.N.Y. 2011); *Gushlak*, 486 F. App'x at 215. Thus, the Contemplated Cayman Litigation plainly qualifies as a foreign proceeding under Section 1782.

**(b)**     **The Requested Discovery is "For Use" in a Foreign Proceeding**

The Requested Discovery is also for "use" in the Contemplated Cayman Litigation. Notably, GIC is not required to show that the information sought would be discoverable or admissible in the foreign proceeding. *Brandi-Dohrn*, 673 F.3d at 82 ("[A]s a district court should not consider the *discoverability* of the evidence in the foreign proceeding, it should not consider the *admissibility* of evidence in the foreign proceeding in ruling on a section 1782 application." (emphasis in original)). Rather, GIC only needs to show that he has "the *practical ability* . . . to place a beneficial document—or the information it contains—before a foreign tribunal." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 131 (2d Cir. 2017) (emphasis in original).

As discussed above, the discovery sought will be used to support GIC's claims in the Contemplated Cayman Litigation. App'x B at ¶ 5.

**3.     GIC is an "Interested Person"**

Finally, Section 1782 requires persons seeking discovery to show that they possess a reasonable interest in the foreign proceeding. While Section 1782 broadly covers those with the right to participate and submit evidence in a foreign proceeding, there is "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782." *Intel*, 542 U.S. at 256. GIC will be a party to the Contemplated Cayman Litigation and is, therefore, an "interested person" under Section 1782. App'x B at ¶¶ 5.

**C.     The Discretionary Factors of Section 1782 Weigh in Favor of GIC's Application**

Once the threshold requirements under Section 1782 are met, the Court should consider the four discretionary "*Intel* factors." Each of these factors weighs in favor of granting the discovery requested herein:

*First*, the Correspondent Banks will not be parties to Contemplated Cayman Litigation. *Second*, there is no reason to believe that the Cayman courts would be unreceptive to evidence obtained through Section 1782 discovery. *Third*, GIC is acting in good faith and is not seeking to avoid any foreign restriction on gathering evidence. *Fourth*, GIC's Requested Discovery is carefully circumscribed and targeted to key facts so as to avoid undue burden on the Correspondent Banks.

### 1.    The First *Intel* Factor Favors Granting Discovery

The first *Intel* factor asks whether the party from whom discovery is sought is a party to the foreign proceeding. "[W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Intel*, 542 U.S. at 264. Here, because the Correspondent Banks will not be parties to the Contemplated Cayman Litigation, this factor weighs in favor of granting discovery. App'x B at ¶ 8.

### 2.    The Second *Intel* Factor Favors Granting Discovery

Under the second *Intel* factor, this Court should look to whether the foreign tribunal would be receptive to evidence obtained through section 1782. *See In re OOO Promnesftstroy*, No. M 19-99(RJS), 2009 WL 3335608, at *7 (S.D.N.Y. Oct 15, 2009) (describing the second *Intel* factor as inquiring into whether the foreign proceeding would "*reject* evidence obtained with the aid of section 1782") (citation omitted). There is a strong presumption that the foreign tribunal will be receptive to evidence obtained in the United States, with the Second Circuit holding that "[a]bsent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district courts to provide some form of discovery assistance." *Euromepa*, 51 F.3d at 1102. A court should deny discovery on the basis of lack of receptiveness only where it is

provided with "*authoritative proof* that [the] foreign tribunal would reject evidence obtained with the aid of section 1782." *Id.* at 1100 (emphasis added).

As discussed below, Cayman courts are receptive to discovery obtained via Section 1782. *See* App'x B at ¶¶ 10-11. In *Lyxor Asset Management S.A. v. Phoenix Meridian Equity Limited*, the Cayman Islands Court of Appeals specifically allowed a party to obtain discovery in the United States under Section 1782, stating that "*prima facie* a party who can invoke the jurisdiction of the US District Court under §1782 may choose to do so." 2009 CILR 553, 575 (Sep. 24, 2009); *see also* App'x B, Ex. 1 (attaching copy of *Lyxor* decision). As another court in the Southern District recently recognized, "[t]he decision in *Lyxor* demonstrates that Cayman courts take a permissive, and indeed, solicitous, view of a Cayman litigant's efforts to utilize U.S. discovery procedures when possible, so long as such litigant is not acting oppressively or abusing the process of the Cayman courts." *In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. 803, 816-17 (Bankr. S.D.N.Y. 2018) (holding that "far from being hostile to Cayman litigants seeking evidence under U.S. law, Cayman courts are in fact receptive to evidence obtained through U.S. discovery procedures, even if such evidence may not be discoverable under Cayman law"); *see also Sandra Holding Ltd. v. Al Saleh*, No. 18-MC-91406-PBS, 2019 WL 3072197, at *4 (D. Mass. July 15, 2019) (finding Cayman Grand Court "receptive" to accepting discovery obtained pursuant to Section 1782); *In re IJK Palm LLC*, 2019 WL 2191171, at *6 (finding there is "no legal barrier to the use of the requested discovery in Cayman Island courts"); *In re Penner*, No. 17-CV-12136-IT, 2017 WL 5632658, at *3 (D. Mass. Nov. 22, 2017) (agreeing with the applicant that "the [Cayman] Grand Court is open to receiving § 1782 discovery.").

Furthermore, there is no indication that Cayman courts would reject evidence collected pursuant to Section 1782. App'x B at ¶ 11 n.2.

As such, this factor weighs in favor of granting the Application.

### 3. The Third *Intel* Factor Favors Granting Discovery

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. The *Intel* Court expressly rejected the notion that Section 1782 requires that the evidence sought must be discoverable in the foreign proceeding itself, and the Second Circuit has added that the specific documents or testimony discovered need not be admissible abroad. *See Brandi-Dohrn*, 673 F.3d at 82 ("While *Intel* concerned the *discoverability* of evidence in the foreign proceeding, we see no reason why it should not extend to the *admissibility* of evidence in the foreign proceeding. As in *Intel*, there is no statutory basis for any admissibility requirement.") (emphasis in original); *Intel*, 542 U.S. at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions—reasons that do not necessarily signal objection to aid from United States federal courts."). Nor is there any requirement that an applicant must exhaust its remedies in the foreign court first. *See In re Metallgesellschaft*, 121 F.3d at 79 ("a 'quasi-exhaustion requirement[]' finds no support in the plain language of the statute and runs counter to its express purposes").

Here, the Application does not "attempt to circumvent" proof-gathering restrictions of Cayman courts. *See* App'x B at ¶ 12; *see also In re IJK Palm LLC*, 2019 WL 2191171, at *6 (holding the third *Intel* factor favored granting discovery due to stringent pleading standard in actions brought in Cayman courts).

As such, this factor also weighs in favor of granting the Application.

### 4. The Fourth *Intel* Factor Favors Granting Discovery

The fourth *Intel* factor looks to whether the requests are "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. The standard is substantially the same as in ordinary domestic civil litigation

under the Federal Rules of Civil Procedure. "The reference in § 1782 to the Federal Rules suggests that under ordinary circumstances the standards for discovery under those rules should also apply when discovery is sought under the statute."[27] *In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998).

Here, the Requested Discovery is narrowly tailored (e.g., the subpoenas reference specific entities about which GIC seeks documents and information),[28] temporally limited, maintained in the regular course of business of the Correspondent Banks, and directly relevant to the issues in the Contemplated Cayman Litigation. Indeed, whatever burden the Correspondent Banks may incur by producing the Requested Discovery is both modest and proportionate given the circumstances. GIC seeks documents and information from the identified Correspondent Banks that bears directly on the transactions at issue in the Contemplated Cayman Litigation.

## VII.   CONCLUSION

For the foregoing reasons, GIC respectfully requests that the Court (1) grant the *Ex Parte* Application for an Order to Conduct Discovery; (2) enter the Proposed Order attached to Appendix A as Exhibit Y; (3) authorize GIC, pursuant to Section 1782, to serve the proposed subpoenas on the Correspondent Banks; and (4) grant any and all other relief to GIC as deemed just and proper.

---

[27]   To the extent that the Court finds that the discovery requests are overbroad, it need not deny the Application altogether; rather, it may exercise its authority under Federal Rule of Civil Procedure 26 to limit the requests, thereby reducing the burden on the Correspondent Banks. *See Application of Malev Hungarian Airlines,* 964 F.2d 97, 102 (2d Cir. 1992) ("On remand, we wish to note that the district court can utilize its powers under the Federal Rules of Civil Procedure to lessen significantly the burden of handling this discovery."); *see also* Fed. R. Civ. P. 26(b)(2)(C)(i); Fed. R. Civ. P. 26(c). In addition, once the subpoenas are served upon the Correspondent Banks, if there are ways in which the discovery requests can be more finely focused to reduce any burdens while still providing GIC with the documents and information it requires, GIC will, in good faith, meet and confer with the Correspondent Banks to address any such burdens. That said, however, there is no reason to believe that the Requested Discovery is, in any way, unduly burdensome.

[28]   In addition, during any meet and confer process, GIC will provide the Correspondent Banks with search terms, including account numbers, to further target and narrow the scope of the subpoenas.

Dated:  December 26, 2019

Respectfully submitted,

/s/ Marc P. Hedrich

_____
QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Kristin N. Tahler, Esq.
  kristintahler@quinnemanuel.com
Marc P. Hedrich, Esq.
  marchedrich@quinnemanuel.com

865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: 213-443-3000

1300 I Street NW, Suite 900
Washington, DC 20005
Telephone: 202-538-8000

*Attorneys for Applicant Gulf Investment
Corporation*