*The Port Fund | Project Master Exit Report* 

Figure 4 *Structure of TPF's investment in NNC*



Based on the recommendations of local and international advisors, TPF set up three SPVs – KGL Investment Cooperatief U.A. and KGL Investment B.V. in the Netherlands, and KGLI-NM Holdings, Inc. in the Philippines.

KGLI BV initially subscribed to 116,325 Preferred A shares and 795 common shares for 80% economic and 32% voting interest in KGLI-NM. Under the Shareholders' Agreement, KGLI BV had the right to solely nominate two Directors (out of five Directors), and jointly nominate a fifth director. Further, the presence and affirmative vote of a KGLI BV nominated Director is required for a quorum and board resolution, respectively. Aside from BOD nomination rights, KGLI BV also had right of first refusal and assignable call options on NHMC's Preferred C shares.



Figure 5. NNC and KGLI NM Ownership: Initial Equity Infusion

**NNC**

| Entity | Class | Entry into NX | % of Total |
|---|---|---|---|
| KGLI-NM | Common | 2,996,500,065 | 99.0% |
| Other | Common | 29,233,058 | 1.0% |
| **Total Common** | | **3,025,733,123** | **100.0%** |

**KGLI-NM**

| Entity | Class | Entry into NX | % of Total per Class |
|---|---|---|---|
| KGL Investment BV | Preferred A | 116,325 | 80.0% |
| NHMC | Preferred B | 29,081 | 20.0% |
| **Total Preferred A&B** | | **145,406** | **100.0%** |
| NHMC | Preferred C | 219,609 | 100.0% |
| **Total Preferred C** | | **219,609** | **100.0%** |
| KGL Investment BV | Common | 795 | 79.5% |
| NHMC | Common | 195 | 19.5% |
| Other | Common | 10 | 1.0% |
| **Total Common** | | **1,000** | **100.0%** |

| | Authorized and Paid-up Capital | | | |
|---|---|---|---|---|
| | No. of Shares | Par Value (Php/share) | Amount (Php) | % of Outstanding |
| Common | 1,000 | 10.00 | 10,000 | 0.2% |
| Preferred A | 116,325 | 10,000.00 | 1,163,250,000 | 26.7% |
| Preferred B | 29,081 | 10,000.00 | 290,810,000 | 6.7% |
| Preferred C | 219,609 | 1.00 | 219,609 | 50.4% |
| **Total** | **366,015** | | **1,454,289,609** | **100.0%** |

### E.    Transaction Development and Management

1.    *Original Capital Infusion: Revitalization and Stabilization*

In the first half of 2008, the Team focused on finalizing the due diligence and negotiations on the terms of the transaction. On January 30, 2008, The Port Fund entered into a Memorandum of Agreement with NNC. In March 2008, the IC approved the transaction and authorized the Team to proceed with negotiations to close the deal. As part of the negotiations, NNC continued parallel discussions with the remaining equity holder, Metro Pacific Corporation. In late April, MPC confirmed their intent to sell.

On May 13, 2008, the Team executed an Investment Agreement with NHMC, the parent company of NNC. The Investment Agreement provided for the creation of KGLI-NM, the primary vehicle for the respective interests and investments of both parties into NNC. It further outlined the terms of the transaction including the execution of a Shareholders' Agreement and the acquisition of MPC debt and equity, among others. On May 17, 2008, NHMC and TPF executed a Shareholders Agreement and other key agreements required to close the transaction. NNC and the Team finalized negotiations with MPC on the acquisition of its debt and equity and this resulted in an increase in the total equity owned by KGLI-NM to approximately 99.0%.

*The Port Fund | Project Master Exit Report*

 **2GO**

Figure 6 *Sources and Uses of TPF's Investment in NNC*

| Sources & Uses (USD mm) | | | |
|---|---|---|---|
| Direct Equity Infusion | 28.5 | Vessel Refleeting | 10.0 |
| | | Debt buyback | 13.5 |
| | | Buyout of MPC shares | 4.0 |
| | | Deal related costs & expenses | 1.0 |
| **Total** | **28.5** | | **28.5** |

The Port Fund's investment in NNC provided the necessary capital for the Company to exit the court approved rehabilitation program, buyout existing shareholders and implement its strategic refleeting plan.

The refleeting plan involved purchasing two freighters and two RoPax vessels, which required a total funding of USD10.0 million. Retirement of company debts to exit the rehabilitation program required USD13.5 million and purchasing existing shareholder's shares required USD4.0 million. Transaction costs related to the investment amounted to USD1.0 million.

2.    Acquisition and Growth Strategy: Industry Consolidation

Following the execution of the Shareholders' Agreement, KGLI-NM Management began evaluating a potential opportunity for NNC to acquire the market leader and its largest competitor, ATSC. Preliminary discussions with ATSC's major shareholders, the Aboitiz Group, indicated a high level of interest. In-depth discussions and negotiations followed and resulted in the signing of a Memorandum of Understanding in September 2008, with a target completion date of April 2009.

Figure 7 *Acquisition/Consolidation Transaction Highlights*



The initial strategy for the acquisition required a combination of debt and equity financing to fund the transaction. The Team approached several prospective lenders from both local financial institutions and foreign lenders.

 

Discussions progressed during the first quarter of 2009 and at the end of March, KGLI-NM informed the Aboitiz Group of its intent to proceed with the acquisition of their shareholdings in ATSC. The Team continued discussions with a number of well-known local and international banks and potential equity partners, but due to the escalating economic instability caused by the global financial crisis, it was decided to hold off on pursuing the transaction until the market stabilized.

During the financial crisis and the resulting global uncertainty, the Team focused on improving and expanding the Company's operations. Management aggressively evaluated ship acquisition opportunities and grew the business organically which resulted in the business significantly outperforming prior year results with a 38.3% increase in EBITDA in 2009. This financial success was largely the result of more efficient vessels that NNC bought as well as continued improvement in cost controls and trip routing efficiency.

*Figure 8 Financial Performance 2008 – 2010, in USD millions*



During the second half of 2009, the Team restarted discussions with the Aboitiz Group to acquire ATSC.

The Team focused on raising the necessary debt/equity capital for the acquisition. The Team held in-depth discussions and management presentations with potential capital providers such as Deutsche Bank, Standard Chartered, Macquarie and CLSA.

In December 2009, the Team was introduced to CAF for preliminary discussions. CAF was a newly formed USD1 billion fund backed by the Export-Import Bank of China and China Investment Corporation. During the preliminary discussion, CAF expressed interest participating in the transaction. During the first quarter of 2010, the Team and CAF proceeded with in-depth discussions regarding the transaction. Site visits and tours, along with additional due diligence discussions took place in the early weeks of April 2010. Successful discussions led to the execution of a term sheet in May 2010. Extensive due diligence, covering financial, legal and tax reviews, was performed from June to August 2010.

*Figure 9. Acquisition Due Diligence Package*

| Project Vasco Due Diligence Package | |
| --- | --- |
| **Report / Document** | **Consultant** |
| Shipping Industry Study | Grant Thornton - Philippines |
| Financial and Tax Due Diligence | Ernst & Young - Philippines |
| Structure Advisory | Ernst & Young - Netherlands |
| Vessel Appraisals | Eagle Marine - Philippines |
| Integration Plan | TPF Team/Management/Drewry - UK |


the PORT FUND



In August 2010, shortly following completion of the due diligence process, CAF initiated renegotiation of terms, specifically indicating a higher ownership percentage. Discussions with CAF continued throughout August but reached an impasse following certain events, and the Team decided that continuing discussions under the new terms proposed by CAF would not be beneficial to TPF. The Team proceeded then to pursue other avenues for financing, including discussions with Deutsche Bank and Credit Suisse, among others.

In October 2010, the Team received a letter from CAF which expressed their interest and willingness to resume negotiations under terms more closely aligned to the original term sheet. The Team agreed to continue negotiations on this basis and transaction documents, such as the Securities Purchase Agreement and Shareholders' Agreement, were drafted in coordination with KGLI-NM's and CAF's respective legal counsels.

The Team continued discussions with CAF in November 2010 and transaction documents were finalized in the latter part of the month. Under the revised agreements, CAF invested USD100.0 million in NNC for 40% voting and 60% economic interest in the Company. The funds were used to purchase the Aboitiz Group's entire shareholding interest in ATSC.

Figure 10. NNC Ownership Structure: CAF Equity Infusion



The Team also began internally developing a comprehensive Integration Plan. Key areas of focus included: Revenue Enhancement, Terminal Consolidation, Route Rationalization, Human Capital Management, Ship Management, and Corporate Communications. The Team worked extensively with NNC and ATS Managements, along with external consultants to finalize the Integration Plan.

On December 1, 2010, representatives from KGLI NM, NNC, CAF and the Aboitiz Group executed the Securities Purchase Agreements, Subscription Agreements and Shareholders' Agreement in Shanghai, China. In Manila, ATSC filed all the necessary disclosures with the Philippine Stock Exchange and Securities and Exchange Commission.

On December 28, 2010, the Aboitiz Group completed the sale of their entire shareholding interest (representing 93.2% outstanding common shares) in ATSC to

 

NNC for PHP4.28 billion. On December 29, 2010, NNC initiated a tender offer for the remaining 6.8% shares held by the public. The tender offer was completed in February 2011, increasing NNC's ownership interest in ATSC to 98.12%.

The integration process began in 2011 and was executed in two phases, with the initiatives grouped according to their complexity and magnitude.

The first phase involved the elimination of overlapping routes and redundant secondary terminals; with manpower complements rationalized per division. Support functions, such as finance, accounting, human resources, IT and legal were consolidated.

The second phase of the integration process focused on improving processes and operations to realize revenue synergies, further consolidation of primary terminals, optimizing vessel routes and the rebranding of the combined company as 2GO Group, Inc.



*Figure 11. 2GO Rebranding*

The Team led and closely monitored all aspects of the integration process, having organized regular progress meetings with NNC and ATSC managements and engaged consulting professionals.

Specific activities undertaken resulted in the following:

- Reduced terminal expenses as container yards at various ports across the country were consolidated;
- Enhanced asset utilization as duplicate routes were consolidated and excess capacities were spun-off;
- The development of a Central Sales Team that concentrates on selling fully integrated supply chain solutions;
- Eliminated intercompany competition;
- Rightsized support functions such as Human Resources, Finance, IT and legal teams;
- Enhancement of existing processes and identification of new channels with the assistance of industry specialists;



* Recruited logistics industry specialists to develop and lead the supply chain solutions strategy; and
* A consolidated master brand that offered full service end-to-end supply chain solutions.

*Figure 12. 2GO Group Integration Process*



The Team also led key initiatives such as the following:

* Raised PHP4.8 billion in senior financing to support the integration process, completed in February 2011;
* Engaged a consulting group specializing in the supply chain business, LCA, that identified key areas of improvement which significantly reduced warehouse inefficiencies and improved bad order management;
* Developed a routing and capacity planning tool designed to optimize vessel deployment parameters that reduced costs and improved asset utilization;
* Determined the Company's optimal asset base resulting in reduced vessel fleet size while maintaining capacity to serve the current and planned future growth;
* Hired the former head of DHL Indochina, who directly led the restructuring of all logistics businesses; and
* Identified and recruited a team of experienced supply chain and logistics professionals to lead the LED group.

As a result of the integration initiatives, revenues declined over the period 2011 – 2013 from USD325.7 million to USD288.3 million due to trip reductions as the Company streamlined its operations. EBITDA for the period, meanwhile, increased at a CAGR of 35.4% from USD20.1 million to USD36.8 million.

*The Port Fund | Project Master Exit Report*



Figure 13  *Financial Performance: 2011 – 2013, in USD millions*

3.       Capital Raise and Rights Offer: Rapid Expansion Initiatives

In 2012, concurrent with the integration process, the Team determined that the Company would require an additional capital infusion to realize its full potential as the Company repositioned 2GO from a pure play shipping company to a full service end-to-end supply chain provider. The capital infusion would provide funding for growth initiatives and strengthen the balance sheet.

Capital raising process underwent multiple phases. The Team first approached external financing providers, such as Jefferies & Company, Darby Mezzanine and AMCG. Several rounds of information requests were addressed, and term sheets were received from AMCG and Darby for USD25 million. The Company agreed to pursue in-depth discussions with AMCG in May 2012 and the due diligence process commenced thereafter.

In August 2012, due to delays, the shareholders opted to self-fund instead of commencing with external financing. The Port Fund's share was approximately USD14.3 million, which it raised via a loan facility from Goldman Sachs. The facility was refinanced in 2015 and was repaid in August 2016 using the proceeds from the sale of TPF's shares in the Company.

In line with the Company's strategic repositioning, the Company grew into the largest and most preferred logistics and supply chain provider in the country. 2GO's unique service offering, covering the entire spectrum of supply chain solutions, allowed the Company to capture a larger part of the logistics requirements of top consumer goods companies in the Philippines. The merged capabilities allowed business segments to cross-sell solutions among respective key clients and offer combined services. As a result, for the first time in 2013, the Company generated more revenues from supply chain and value-added services than from freight and passenger transportation combined. This marked the first year that 2GO demonstrated its successful business repositioning from a pure shipping company to an end-to-end supply chain solutions company.

 



*Figure 14. Revenue Share per Business Segment*

The Company experienced rapid growth in the succeeding years. NNC recognized revenues of USD313.1 million and USD354.7 million in 2014 and 2015, respectively. In 2014, revenues grew by 8.6% year-on-year and in 2015, revenues grew by a further 13.3%. The trailing twelve month performance as of June 2016 estimates full year revenues of USD452.8 million[4]. EBITDA, meanwhile, grew by 15.8% to USD42.6 million in 2014 and 54.5% to USD65.8 million in 2015.



*Figure 15. Financial Performance: 2014 – TTM Jun 2016, in USD millions*

*\* TTM Jun16 results are based on management reports that do not account for intercompany eliminations. 2014 and 2015 figures are from the Company's audited financial statements.*

**F.     Exit Process**

The Port Fund began analyzing exit scenarios for the NNC investment in late 2013. In coordination with CAF, the Team evaluated options for either an outright sale of its interest in NNC or a secondary share offering in the public exchange.

The Team began to prepare for a potential public offering and initiated discussions with top investment groups, such as BDO, BPI, Metrobank and Security Bank. The Team also prepared a detailed and comprehensive investment memorandum that went out to a full offering of potential investors, including Texas Pacific Group, Metro Pacific Investments Corporation, Platinum Equity, Bain Capital, SC Lowy, Blackstone and others.

As the shareholders were going through the exit process, 2GO Management preempted with an offer to buy both CAF and TPF's shares with a proposed purchase price that would have resulted in net exit proceeds to TPF of USD66.1 million[5].

---

[4] *TTM Jun16 results are based on management reports that do not account for intercompany eliminations. 2014 and 2015 figures are from the Company's audited financial statements.*
[5] *Figure is net of deal specific debt, costs and expenses related to the transaction.*



  **2GO**

During this time, CAF was especially keen to exit the investment expeditiously, and was exerting pressure on TPF to sell.

While the offer from 2GOManagement was a welcome development, the Team felt that the Company's positive historical performance and further growth prospects warranted an effort to explore other potential offers/transactions. Through discussions with CAF, the Team convinced them to agree to a proper competitive sales/marketing process. In September 2014, TPF has hired a Honk Kong IB/investment advisor firm - Apache Asia, to facilitate a proper competitive sales process of 2Go.

In October 2014, Apache Asia and The Team then identified and approached groups that: 1) had a stated interest in the transportation, logistics or consumer goods industries, 2) were actively seeking new transactions, and 3) had a target investment bite size that is sufficient relevant to 2GO's contemplated sale price. Preliminary information, such as a Teaser and Executive Summary, were provided to 42 groups that fit the criteria. Of the 42 groups approached, seventeen (17) received the Information Memorandum, financial model and a preliminary due diligence package. Fourteen (14) groups expressed interest in further discussions and they received additional due diligence information following the receipt of Q&A and information requests. Six (6) groups traveled to the Philippines for additional due diligence, site visits and Management Presentations. The competitive sales process took six (6) months and by April 2015, four (4) finalists indicated a high level of interest in completing a transaction. These groups were Navis Capital Partners, Platinum Equity, ADV Partners and Metro Pacific Investments Corporation.

*Figure 16 Exit Process Marketing Summary*



In May 2015, Navis's offer was accepted by TPF awaiting a final confirmation acceptance from CAF. Unfortunately, during this time, there was a change in CAF's Management which reversed the previous CAF's Management's decision to sell. The



Team then went through a whole new period of negotiations and discussions with CAF and Navis which led to a protracted delay in the sale process.

The Team then decided that the only option to exit was to pursue a separate minority stake (TPF's stake) sale process. Once receiving a final confirmation from CAF that CAF will not sell, Apache Asia and The Team proceeded to resume discussions with the interested buyers that were identified during the competitive sales process in addition to searching for other potential minority buyers.

During this time, 2GO Management came back with a revised upward offer that would have resulted in net exit proceeds of USD80.2 million* for TPF's shares. Considering that a quick exit was one of the Team's priorities, and given the long-standing relationship between TPF and 2GO Management, a term sheet was executed by both parties. However, 2GO Management could not raise the required capital in time and the term sheet expired.

Apache Asia and the Team then continued to work towards a private sale to get the deal completed at the earliest opportunity. Of the discussions with interested parties, the highest offer that was received was from Udenna Group, with gross exit proceeds of USD120 million, and hence, with net exit proceeds of USD91.9 million*. This was significantly better than the next highest offer from ADV Partners which would have resulted in net proceeds of USD82.3 million*.

During the first two weeks of July 2016, the Team worked with the Buyer to finalize the Letter of Intent, which was executed on July 19, 2016, and which included a USD5.0 million upfront payment. In the following weeks, the Team prepared the necessary due diligence documents and coordinated with legal counsels to finalize the SPA, which was executed on July 28, 2016. Under the SPA, the Buyer had until August 22, 2016 to fund the remaining amount. The Buyer remitted the funds on August 16, 2016, a week before the mandated deadline. In the following days, the Team worked with the Buyer and respective legal counsels to wrap up all administrative items, including the transfer of all relevant shares, which was effected on August 19, 2016. Then, the Team and the Buyer worked on the final completion accounts to ensure the cash-and-debt-free state of the sold entity, KGLI BV, which was completed in September 2016.

Breakdown of net sales proceeds:

| Particulars | USD |
|---|---|
| Sales proceeds of Investment in 2 GO Group | 120,000,000 |
| **Less: Liabilities** | |
| Settlement of NNC transaction related liabilities | (1,431,145) |
| Settlement of loan for subscription in capital increase of 2 GO group | (20,148,203) |
| **Less:  Cost to sell** | |
| Transaction advisory and professional fees | (6,480,024) |
| Net Sales proceeds of 2 GO Group | 91,940,628 |

* *Figure is net of deal specific debt, costs and expenses related to the transaction*



*The Port Fund | Project Master Exit Report*  **2GO**

The existing NN related loan facility and transaction and exit related expenses were paid from the sale proceeds, resulting in a net cash inflow to TPF of USD91.9 million. Given the TPFs total investment in NNC of USD28.5 million[7], TPF realized an investment multiple of 3.2x and a gross IRR of 15.1%.

*Figure 17. Investment Returns*



* Figures are inclusive of deal transaction costs and set out deal specific debt, costs and expenses that were incurred for the transaction

As The Port Fund is currently in its exit stage, the immediate liabilities of the Fund must be paid before any distributions. The total amount of USD 59,899,616 was utilized to cover TPFs related outstanding liabilities and USD 2,041,012 was retained by TPF to cover ongoing Fund exit related expenses.

Usage of the net sales proceeds:

| Particulars | USD |
|---|---|
| Net Sales proceeds of 2 GO Group | 91,940,628 |
| **Less: Transfers for** | |
| Final payment to MPC GMO | (3,200,000) |
| Loan paid on behalf of GGDC | (54,265,116) |
| Exit related expenses paid on behalf of GGDC | (2,434,500) |
| Distribution to LPs (first tranche payment) | (30,000,000) |
| **Retained by The Port Fund** | 2,041,012 |

Hence, a net amount of USD 30 million, the first tranche payment, was distributed to the LPs of the Fund. Each LP's pro rata share of this distribution was computed by the Administrators of the Fund based on the capital account balance as of 31 December 2015.

The remaining amount of USD 61,940,628 from the net proceeds of the 2GO Group exit will be distributed to the LPs upon receipt of sales proceeds from exit of TPF's investment in Global Gateway Development Corporation (Sabah Al Ahmed Global Gateway Logistics City).

---

[7] *Inclusive of deal transaction costs and expenses*

نيجروز نافيجيشن

صندوق الموانئ
تقرير التخارج النهائي للمشروع

نوفمبر 2016

سري وخاص للغاية

جدول المحتويات

| | | |
|---|---|---|
| 1. | الصفقة ونبذة عامة عن الشركة | 4 |
| أ. | نبذة عامة عن الصفقة | 4 |
| ب. | نبذة عن الشركة وتاريخها | 6 |
| ت. | المبادرات البيئية والاجتماعية والحوكمة | 7 |
| 2- | إجراءات الصفقة وتاريخها | 10 |
| أ. | إيجاد الصفقة | 10 |
| ب. | تقييم الصفقة | 11 |
| ت. | الفحص النافي للجهالة | 11 |
| ث. | هيكلة الصفقة | 11 |
| ج. | تطور وإدارة الصفقة | 13 |
| (1 | ضخ رأس المال الأساسي: الإنعاش والاستقرار | 13 |
| (2 | استراتيجية الاستحواذ والنمو : دمج القطاع | 14 |
| (3 | رفع رأس المال وحقوق الأولوية: مبادرة التوسع السريع | 19 |
| ح. | عملية التخارج | 20 |

الشكل رقم 1 يوضح قطاعات الاعمال المختلفة لشركة نجروز نافيجيشن

الشكل رقم 2 تاريخ الشركة

الشكل رقم 3 استراتيجية إعادة التموضع، توزيع مصادر الدخل وفقاً لقطاع الأعمال

الشكل رقم 4 هيكل استثمار صندوق الموانئ في شركة نجروز نافيجيشن

الشكل رقم 5 ملكية كي جي إل انفسمنت ان ام في شركة نجروز نافيجيشن : الدفعة الأولية ن الاستثمار

الشكل رقم 6: مصادر واستخدامات استثمار صندوق الموانئ في نجروز نافيجيشن

الشكل رقم 7: أهم معالم الاستحواذ/ الاندماج

الشكل رقم 8 : الأداء المالي للأعوام ما ين 2008 إلى 2010 (دولار أمريكي)

الشكل رقم 9 : اعمال الفحص النافي للجهالة

الشكل رقم 10: هيكل ملكية نجروز نافيجيشن وضع رأس المال من CAF

الشكل رقم 11: إعادة هيكلة العلامة التجارية لمجموعة GO2 جروب

الشكل رقم 12: عملية دمج اعمال مجموعة GO2  جروب

الشكل رقم 13: الأداء المالي ما بين الفترة الممتدة من 2011 إلى 2013 (مليون دولار أمريكي)

الشكل رقم 14: تقسيم الإيرادات وفقاً لقطاعات الأعمال

الشكل رقم 15: الأداء المالي : العام 2014 – الاثني عشر شهراً المتتالية يوليو 2016 (مليون دولار أمريكي)

الشكل رقم 16: ملخص تسويق عملية التخارج

الشكل رقم 17: عائدات الاستثمار

## 1. الصفقة ونبذة عامة عن الشركة

### أ. نبذة عامة عن الصفقة

تم بيع كامل ملكية صندوق الموانئ في شركة نيجروز نافيجيشن في أغسطس 2016 بصافي إيرادات بلغت 91.9 مليون دولار أمريكي[1]، ليتم بذلك التخارج رسمياً بالكامل من الاستثمار في رأس مال الشركة بقيمة 28.5 مليون دولار أمريكي. وتمثلت عائدات الصفقة بأرباح بمعدل 3.2 ضعف المبلغ المستثمر وعائد داخلي على الاستثمار بنسبة 15.1 في المائة على مدى المتوسط المرجح لفترة الاستثمار البالغة 7.8 أعوام.



وكان التخارج الناجح للصفقة نتاجاً مباشراً لاستراتيجية صندوق الموانئ التي اعتمدت على تحويل شركة شحن كانت في وقت ما تعمل على تشغيل السفن الصغيرة إلى شركة شحن عملاقة وأكبر شركة مهيمنة في القطاع اللوجستي ومزود لحلول سلاسل الامداد في الفلبين.

- حيث تقوم شركة نيجروز نافيجيشن بتشغيل 24 سفينة تربط ما بين 24 ميناء فيما يمثل أكثر من 80% من شبكة الموانئ الفلبينية. وقد عززت الشركة موقعها الريادي على مستوى قطاع سلاسل الامداد.
- كما نمت مساحات المخازن وتخطت اكثر من 100 ألف متر مربع في العام 2015 وساهمت في دعم نمو خدمات أرصفة الموانئ وحلول التوزيع والتسويق، بالإضافة إلى التخزين.
- وسجلت خدمات البريد السريع نمواً تخطى 1,200 فرعاً واحتفظت الشركة بشراكات مع الشركات الكبرى مثل فيديكس، يو بي اس، ومزودي خدمات التجارة الالكترونية والوكالات الحكومية.
  - كما تتميز خدمات التبريد بحصة سوقية كبيرة في قطاع نقل الحاويات المثلجة والمبردة.

وعلى مدى فترة الاستثمار، ارتفعت إيرادات شركة نيجروز نافيجيشن من42.0 مليون دولار إلى 354.7 مليون دولار وبلغ نمو الأرباح قبل خصم الفوائد والضرائب والاستهلاك من 8.1 مليون دولار إلى 65.8 مليون دولار بما يمثل نمو سنوي مركب بنسبة 35.6 % و 34.9% على التوالي.

---

[1] الرسم البياني يمثل صافي الديون والتكاليف والمصروفات المتعلقة بالصفقة

[2] يتضمن تكاليف ومصروفات الصفقة



* TDM (with results are based on management agree that do not account for intercompany eliminations 2008 to 2015 figures are from the Company's audited financial statements

تستند نتائج الاثني عشر شهراً المنتهية على تقارير الإدارة والتي لا تأخذ في اعتبارها التصفيات بين الشركات، الأعوام ما بين 2008 إلى 2015 تعتمد على بيانات الشركة المالية المدققة.

وكان صندوق الموانئ مضطلع بنشاط في اعمال الشركة والتخطيط الاستراتيجي، ووضع الميزانيات، وأنشطة جمع الأموال. وفيما يلي ابرز النقاط المتعلقة بالاستثمار:

| مراحل الصفقة | ابرز تفاصيل الاستثمار |
|---|---|
| إيجاد الصفقات والاستثمار الأولى | • تقييم الفرص المحتملة للاستثمار في شركة نيجروز نافيجيشن واستكمال الإدارة لعملية الاستحواذ على شركة ATS<br>• اجراء فحص نافي للجهالة للجانب المالي، والضرائب والوضع القانوني.<br>• استكمال اتفاقية الاستثمار وتسديد 28.5 مليون دولار[3] على شرائح ما بين عامي 2008 و2009 من خلال شركة غرض خاص SPV. |
| تحسين الوضع قبل الاستحواذ | • العمل مع الإدارة لإعادة شراء الديون<br>• ضخ الأموال وشراء الديون انقذت الشركة من وضعها تحت الحراسة<br>• إعادة توزيع الاسطول لتحسين الكفاءة الاستيعابية وتحسين الكفاءات الإدارية والتشغيلية |
| اندماج القطاع | • التفاوض بنجاح للاستحواذ على شركة ATS<br>• القيام بإجراءات مستفيضة للفحص النافي للجهالة من الناحية المالية، والضرائب والجانب القانوني فيما يتعلق بالاستحواذ على شركة ATS<br>• جمع رأس المال لدعم عملية الاستحواذ وتم الفعل في العام 2010 الاستحواذ على شركة ATS |
| التكامل | • بعد الاستحواذ مباشرة، قام صندوق الموانئ بالعمل مع الإدارة لتطوير عملية التكامل بالتفصيل الدقيق بهدف دمج وتكامل العمليات والقضاء على المنافسة<br>• تحليل وتنفيذ طرق ملاحية مكثفة والتخلص من السعات الإضافية والسفن غير الفعالة<br>• دمج عمليات الدعم ووظائف المكاتب الخلفية مثل الموارد البشرية والحسابات وتكنولوجيا المعلومات وإدارة الشحن وغيرها |
| التحول الاستراتيجي | • تكوين فريق مبيعات مركزي لدمج عمليات حلول سلاسل التوريد والبيع المتقاطع بين القطاعات المختلفة<br>• تعيين خبراء واستشاريين متخصصين في المجال اللوجيستي وحلول سلاسل التوريد<br>• ضخ مزيداً من الأموال والتي تمت من خلال تسهيلات ائتمانية لتستخدم في عمليات النمو والاستحواذ على أصول إضافية لخدمة قطاع سلاسل التوريد |
| التخارج | • البدء في عملية بيع مبدئي بنهاية العام 2013 تتضمن عرض ثانوي او البيع لمستثمري استراتيجي / مالي.<br>• في العام 2015/2014 تم بيع تنافسي/ عملية تسويقية تتضمن 4 اطراف مهتمة بشراء الصفقة |

| • مع اعتراض صندوق الصين- الأسيان للتعاون الاستثماري CAF الاشتراك في عملية البيع، قام صندوق الموانئ ببيع الأسهم الخاصة به (حصة الأقلية) وتلقى العديد من العروض من جهات مختلفة<br>• استكمل صندوق الموانئ عملية بيع حصة الأقلية لمستثمر استراتيجي في أغسطس / سبتمبر 2016. | |

[5] يتضمن تكاليف ومصروفات الصفقة

## ب. نبذة عن الشركة وتاريخها

شركة نيجروز نافيجيشن اكبر شركة لسلاسل التوريد ومزود حلول الخدمات من الباب إلى الباب في الفلبين. وتقوم الشركة بخدمة كافة متطلبات سلاسل القيمة من التوريد والتخليص الجمركي والتخزين والنقل بالشاحنات والشحن البحري على المستوى الوطني بالكامل بالإضافة إلى ادارة المخازن والتوزيع والبضائع. كما تقوم الشركة بتزويد خدمات قطاع التجزئة والبريد السريع والنقل البحري والخدمات اللوجستية العالمية والتعامل مع الشحنات المتخصصة تحت مظلة الشركة.

**الشكل رقم 1 يوضح قطاعات الاعمال المختلفة لشركة نيجروز نافيجيشن**



ويعود تاريخ تسجيل الشركة إلى العام 1932 وتعد بذلك أقدم شركة شحن محلية في الفلبين. وفي العام 1994 أصبحت شركة نيجروز نافيجيشن اكبر شركة شحن يتم ادراجها في سوق الأوراق المالية بالفلبين.

**الشكل رقم 2 تاريخ الشركة**

في العام 2006، قامت شركة نيجروز القابضة، وهي شركة تم تنظيمها لادارة شركة نيجروز نافيجيشن، بالاستحواذ على حصة الأغلبية من شركة نيجروز نافيجيشن من مترو باسيفيك جروب.

في العام 2008 ، أقدمت نيجروز القابضة و كي جي إل انفسمنت بي في على تنفيذ اتفاقية الاستثمار لتأسيس شراكة استراتيجية مع نيجروز نافيجيشن. وكانت شركة كي دي إل انفسمنت ان ام هي الادارة الاستثمارية لشركة نيجروز نافيجيشن.

في العام 2010، قامت شركة كي دي إل انفسمنت ان ام بالدخول في شراكة مع صندوق الصين- الأسيان للتعاون الاستثماري CAF بنية استخدام نيجروز نافيجيشن كمنصة للاستحواذ على شركة ابويتيز ترانسبورت سيستمز كوربوريشن (ATS)، والتي كانت اكبر شركة وتتمتع بأوسع شبكة لتغطية الموانئ على مستوى الدولة.

وكانت شركة ATS تمتلك وتدير عمليات الشحن البحري والنقل التجاري والممرات تحت الأسماء التجارية سوبر فيري وسوبر كات وسيبو. بخلاف ذلك، كانت مجموعة ابويتيز قد أسست عمليات النقل السريع والتوزيع. وساهم الاستحواذ على ATS واعمالها التحالفية في الارتقاء بأعمال نيجروز نافيجيشن لتصبح بذلك الشركة الرائدة على مستوى قطاع الشحن لبحري والنقل التجاري حصة سوقية بلغت نسبتها 80% من اجمالي السوق المحلي للنقل البحري للأفراد واكثر من 40% من قطاع الشحن البحري للبضائع. وقامت الإدارة بتدشين عملية مكثفة لتكامل وتحقيق التجانس بين الشركتين.

ومن خلال تطبيق عملية التناغم بين اعمال الشركتين التي بدأت في العام 2011 واكتملت بمنتصف العام 2013، تمكنت المجموعة من الانتقال من التركيز بصفة أساسية على قطاع النقل البحري والشحن إلى شركة تقدم مجموعة متكاملة من الخدمات اللوجستية وسلاسل الامداد. وكانت شركة نيجروز نافيجيشن في وضع يسمح لها بخدمة الاقتصاد الفلبيني المتنامي المدفوع بقوى استهلاكية وتجارة متبادلة بين الجزر المختلفة. وتستمد الشركة نموها في الوقت الحالي من القطاع اللوجستي وخدمات القيمة المضافة مع توفير قطاع الشحن البحري التابع للمجموعة لمنصة ثابتة وميزة تنافسية سباقة.

الشكل رقم 3 استراتيجية إعادة التموضع، توزيع مصادر الدخل وفقاً لقطاع الأعمال



**ت. المبادرات البيئية والاجتماعية والحوكمة**

يتخطى استثمار صندوق الموانئ في نيجروز نافيجيشن ومجموعة 2GO Group مجرد الحصول على عوائد هائلة وارتفاع في الأداء المالي للاستثمار. حيث دأب صندوق الموانئ دائماً على توفير عوائد متوازنة مقابل المخاطر للمستثمرين بالإضافة إلى خلق تأثير مستدام وإيجابي. وتتوافق آراء الفريق بقوة ويجتمعوا على أهمية الالتزام القوي بالاعتبارات البيئية والاجتماعية والحوكمة وأثارها بعيدة المدى على أداء الاستثمار، ومن ثم العمل بجهد لتطبيق هذه المبادئ اثناء القيام بأنشطة الأعمال.

وفي اطار ذلك السياق، يؤمن صندوق الموانئ بأن الاعتبارات البيئية والاجتماعية والحوكمة لها اثراً إيجابيا وسلبياً على الأداء المالي للاستثمار وكذلك على العوامل الخارجية الإيجابية التي يسعى فريق العمل لارساء قواعدها في الأسواق المستهدفة. كما يدرك فريق العمل ايضاً ان القرارات الاستثمارية وانشطة صندوق الموانئ قد يكون لها اثراً على ما يترتب على البيئة والمجتمع، ومن ثم يسعى صندوق الموانئ إلى القيام بما يل:

- تطبيق المعايير البيئية والاجتماعية والحوكمة ضمن ممارساته الاستثمارية

- مطالبة الشركات التي يتعامل معها الصندوق من التأكد من استخدام توجه وقائي فيما يتعلق بالتأثير البيئي والاجتماعي. اذا لم يكن ممكناً تجنب الاثار السلبية على البيئة والمجتمع، يجب العمل على تقليلها او التعويض عن ذلك.

- مطالبة الشركات التي يتعامل معها الصندوق من تطبيق المتطلبات القانونية والتنظيمية التي تخضع لها مناطق عملها على اقل تقدير والعمل اضافياً على تطبيق المعايير الدولية المتعلقة بالبيئة والمجتمع والحوكمة.

- مطالبة الشركات التي يتعامل معها الصندوق من تطبيق اعلى المعايير الخاصة بأخلاقيات العمل والحوكمة

- تشجيع الشركات التي يتعامل معها الصندوق من إقامة حوار مفتوح مع أصحاب المصالح فيما يتعلق بالتأثير البيئي والمجتمعي لانشطتهم.

- الحرص دائماً على التحسين المستمر فيما تعلق بإدارة الأنشطة البيئية والاجتماعية والحوكمة.

- توفير المعلومات ذات الصلة بالأنشطة البيئية والاجتماعية والحوكمة بشفافية فيما يتعلق بالانشطة الاستثمارية مع اتباع متطلبات السرية التجارية.

بناء على ما تقدم، قام صندوق الموان بإقامة شراكة مع نيجروز نافيجيشن للقيام بالمبادرة وتطبيق العديد من البرامج والمشاريع البيئية والمجتمعية والحوكمة بما يحقق النفع للأشخاص والمجتمع بصفة مباشرة وغير مباشرة. ويشمل الجزء التالي من التقرير بعض الأنشطة والبرامج المختارة.

### إدارة معايير الأمان والريادة

في بداية الدخول في الاستثمار قام صندوق الموانئ بالمبادرة بنشاط لاستبدال الاسطول القديم والمتهالك حينها بسفن جديدة. حيث تعتمد سفن الشحن في الفلبين على اساطيل قديمة والتي قد تكون معرضة للحوادث في البحر. وأدى هذا البرنامج في تعزيز أسطول السفن الجديدة لنيجروز نافيجيشن وتزويدها احدث معايير الأمان والمساندة البحرية وأجهزة التواصل مثل نظم المخططات الملاحية الالكترونية واحدث أنواع الرادار واجهز التعريف الالكترونية.

كما قام الصندوق بالتعاون مع نيجروز نافيجيشن بتعيين استشاريين وخبراء في إدارة نظم الأمان مثل ديت نوريسك فيرتاس للمساعدة في التحضير والتدريب والتطبيق لنظم ومعايير الأمان وفقاً لاعلى النظم العالمية. كما حرصت إدارة صندوق الموانئ على تطبيق تلك المعايير وفقاً للمتطلبات التنظيمية (مؤسسة قطاع الشحن البحري، وحرس السواحل الفلبيني) وافضل الممارسات العالمية مثل الاتفاقية الدولية لسلامة الحياة في البحر والمدونة الدولية لإدارة السلامة.

ومن خلال تلك المبادرة التي تعاون من خلالها الصندوق مع الإدارة، برزت نيجروز نافيجيشن كشركة رائدة في إدارة معايير الأمان واعلى مستويات الأداء ضمن قطاع النقل البحري. وساهمت تلك المبادرة في تحسين سجل الأمان الجيد للشركة.

### جهود الإغاثة في حالات الكوارث

في العام 2013 تعرضت الفلبين لاحد أسوأ الكوارث الطبيعية في التاريخ. حيث ضرب اعصار هايان (اسمه المحلي يولاندا) والذي صنف من الدرجة الخامسة حيث بلغت سرعته 195 متر في الساعة وقوة رياح 235 متر في الساعة وعصف السواحل الشرقية للأرخبيل وتسبب في مقتل 2,000 شخص وبلغت خسائره 5% من الناتج المحلي الإجمالي. وتأثر بالاعصار اكثر من 8 آلاف شخص وكان 2.5 مليون شخص بحاجة إلى الغذاء و660,000 فقدوا منازلهم.

وتم تشكيل عملية الأمل operation hope في ضوء تلك النكبة الوطنية والظروف الصعبة التي تمر بها البلاد. وقام صندوق الموانئ بالتعاون مع CAF و نيجروز بجهود مشتركة لتوفير مأوى لاكثر من 1,500 شخص وتوفير اكثر من 6 ألاف وجبة ساخنة يومياً، وماء نظيف للشرب، والدواء، وأدوات الإغاثة للألاف ممن تأثروا بهذه النكبة.

و عرضت مجموعة 2GO استخدام سفنها سانت بيترذا ابوستول لتوفير خدمة مؤقته لايواء من فقدوا منازلهم او تعرضوا لاصابات شخصية. وتصل سعة تلك السفينة 152 متر و عرضها 52 متر لاستيعاب المسافرين والبضائع المشحونة ولها قدرة استيعابية

لاكثر من 1,500 مسافر و250 من افراد الطاقم الطبي بحمولة اجمالية 10,000 طن.

وقامت السفينة بتوفير منطقة الشحن بها لتخزين الامدادات الحيوية مثل الغذاء والماء والملابس ومستلزمات الرعاية الصحية. وبعد توزيع الامدادات تم تحويل منطقة التخزين إلى مركز رعاية صحية لخدمة ورعاية المتضررين.

وخلال فترة 90 يوماً بعد وقوع الكارثة، تمكنت 2GO من شحن حوالي 18 الف طن متري في التوسط من المساعدات ونقلت الامدادات والأشخاص المتأثرين بصفة يومية.

- وعلى مدار السنوات، ساهمت وشاركت مجموعة  2GO بنشاط مع العديد من الجهات الحكومية وغير الحكومية الساعة لنشر الوعي بالإضافة للجمعيات الخيرية وساهمت في  احداث تأثير تجاه البيئة والمساهمات الاجتماعية كمؤسسة كبرى في الفلبين. وتضمنت الأنشطة السنوية التي شاركت الشركة بها ما يلي:
- أنشطة زراعة الأشجار في مقاطعات مختلفة في الفلبين بالشراكة مع الجهات الحكومية مثل مكتب البيئة الاجتماعية والموارد الطبيعية
- زراعة أشجار المانغروف وتنظيف الشواطئ بالشراكة مع هيئة الموانئ الفلبينية وحرس السواحل الفلبيني.
- المشاركة مع فريق تطوعي يخضع لاشراف وزارة العمل والتوظيف للتطوع في اصلاح وصيانة فصول المدارس الحكومية قبل بداية العام الدراسي.
- الشراكة مع اكبر جهة موزعة للكتب والمستلزمات المدرسية لتوزيع المواد الدراسية على الأطفال في المناطق النائية من الفلبين.
  - المشاركة في برامج التطوع بالدم مع الصليب الأحمر الفلبيني ومركز الرعاية الصحية للأطفال.

## 2- إجراءات الصفقة وتاريخها

### أ. إيجاد الصفقة

قام فريق عمل صندوق الموانئ بالاجتماع مع إدارة نيجروز نافيجيشن في منتصف نوفمبر  2007 واسفرت المناقشات الأولية عن ادراك ان نيجروز نافيجيشن تمثل فرصة استثمارية. بعد قيام كبار مديري الشركة بتقديم عرض تقديمي مفصل من ضمنهم جون تاجود وجيري كروزبارة، قرر فريق عمل الصندوق القيام بإجراءات الفحص النافي للجهالة والتحليل. وقام فريق العمل بإعداد تقرير عن الصفقة (تقرير ترتيب الصفقة) للمجلس الاستشاري الذي أوصى بشدة القيام المزيد من إجراءات الفحص النافي للجهالة لتلك الصفقة. وأوصى فريق العمل مبدئياً باستثمار ما بين 25 إلى 30 مليون دولار أمريكي يكون من ضمنها 11 إلى 15 مليون دولار لشراء ديون الشركة والمبلغ المتبقي لإجراء عمليات توسعية للسفن.

ب. تقييم الصفقة

بعد تقديم فريق العمل تقرير ترتيب الصفقة بدأ  في نوفمبر 2017 العمل على إجراءات الفحص النافي للجهالة المبدئي لشركة نيجروز نافيجيشن . وقد تضمن ذلك القيام بعدد من الزيارات لموانئ متعددة تقوم الشركة بالعمل وتشغيل سفنها من خلالها وإجراءات مقابلات شخصية مع عدد من كبار المسؤولين في الشركة واجراء تحليلات مالية عن الأداء التاريخي للشركة والتوقعات المالية المستقبلية، هذا الى جانب بعقد اجتماعات الفحص النافي للجهالة مع الجماعات القطاعية المختلفة والجهات الملمة بالعمليات التشغيلية. وقد واصل الفحص النافي للجهالة المبدئي في إعطاء إشارات قوية ان شركة نيجروز نافيجيشين تستوفي الأهداف الاستثمارية  المستهدفة لصندوق الموانئ. ونتيجة لذلك، قام فريق العمل بإعداد  تقرير  التوصية الاستثمارية الذي تم تقديمه إلى لجنة الاستثمار في ديسمبر 2007. وقد وافقت لجنة الاستثمار بالإجماع على الصفقة وبدأت المفاوضات الرسيمة وإجراءات الفحص النافي للجهالة المستفيضة.


ت. الفحص النافي للجهالة

بدأ فريق العمل اجراء الفحص النافي للجهالة واشرك الجهات التالية لعمل تحليل مفصل عن الصفقة: ايرنست اند يونج – الفلبين قامت بعمل فحص مالي مفصلة وقدمت المشورة فيما يتعلق بأفضل هيكل ضريبي، بيكر ماكينزي – الفلبين قامت بعمل فحص قانوني للصفقة المستهدفة، جرانت ثورنتون – الفلبين قامت بعمل دراسة تجارية عن قطاع النقل والشحن البحري. كما قام الفريق باستشارة خبير متخصص في تقييم السفن لفحص كل سفينة ومراجعة عمليات الموانئ الرئيسية بالإضافة إلى العديد من الأعمال الأخرى.


ث. هيكلة الصفقة

وأوصى مكتب ارنست أند يونج اتباع هيكل استثماري مزدوج في هولندا فيما يتعلق باستثمار شركة نيجروز نافيجيشن بما يتيح لصندوق الموانئ مزايا ضريبية متعددة مثل (1) الإعفاء من ضريبة الشركات الهولندية (2) الإعفاء من ضريبة استقطاع الأرباح عن أي توزيعات من الكيانات الهولندية إلى صندوق الموانئ (3) الإعفاء من ضريبة الشركات الهولندية غير المقيمة على التوزيعات النقدية والأرباح التي يحصل عليها صندوق الموانئ من الكيانات الهولندية. كما أوصى التقرير بتعيين شركة هولندية لتقديم الخدمات المحلية والخدمات الإدارية لتجنب التعرض لاي أمور متعلقة بالاقامة.

**الشكل رقم 4 هيكل استثمار صندوق الموانئ في شركة نيجروز نافيجيشن**

وبناء على توصيات الاستشاريين المحليين والدوليين، قام صندوق الموانئ بتأسيس ثلاثة شركات ذات أغراض خاصة  وهي كي جي أل انفسمنت كوبريتيف بو ايه وكي جي إل انفسمنت بي في ومقرهما هولندا وشركة كي جي إل ان ام هولدنج ومقرها الفلبين

قامت شركة كي جي إل انفسمنت بي في بالاكتتاب مبدئياً في 116,325 سهم ممتاز من الفئة أ و 795 سهم عادي مقابل حق حصة اقتصادية بنسبة 80% و32% حق التصويت في كي جي إل انفسمنت ان ام. ووفقاً لاتفاقية المساهمين، تملك شركة كي جي إل انفسمنت بي في الحق الحصري لترشيح (2) مديرين (من أصل خمسة) والاشتراك في التوصية بتعيين الخامس. بالإضافة إلى ذلك، فان حضور المدير المرشح من قبل  كي جي إل انفسمنت بي في وتصويته بالقبول يعد شرطاً لاكتمال النصاب وتمرير القرارات. إلى جانب حقوق ترشيح أعضاء مجلس الإدارة، يحق لشركة كي جي إل انفسمنت بي في في حق الأولوية (الرفض الأول) وحق شراء خيارات الأسهم المفضلة فئة (ج) لشركة نيجروز نافيجيشن.



صندوق الموانئ  |  تقرير التخارج النهائي للمشروع

الشكل رقم 5 ملكية شركة نيجروز نافيجيشن كي جي إل انفسنت ان ام: الدفعة الأولية للاستثمار

| الجهة | نوع الأسهم | عدد الأسهم | النسبة من الإجمالي |
|---|---|---|---|
| شركة نيجروز نافيجيشن | | | |
| كي جي إل انفسنت ان ام | عادية | 2,996,500,065 | 99.0% |
| جهات أخرى | عادية | 29,233,058 | 1.0% |
| اجمالي الأسهم العادية | | 3,025,733,123 | 100% |
| | | | |
| كي جي إل انفسنت – ان ام | | | |
| كي جي إل انفسنت بي في | اسهم ممتازة فئة أ | 116,325 | 80% |
| نيجروز هولندج آند مانيجمنت | أسهم ممتازة فئة ب | 29,081 | 20% |
| اجمالي الأسهم الممتازة أ و ب | | 145,406 | 100% |
| | | | |
| نيجروز هولندج آند مانيجمنت | الأسهم الممتازة فئة ج | 219,609 | 100% |
| اجمالي الأسهم الممتازة فئة ج | | 219,609 | 100% |
| | | | |
| كي جي ال انفسنت بي في | عادية | 795 | 79.5% |
| نيجروز هولندج آند مانيجمنت | عادية | 195 | 19.5% |
| جهات أخرى | عادية | 10 | 1.0% |

| | عدد الأسهم | القيمة الأسهم (بيسو/ للسهم) | المبلغ ( بيسو) | النسبة من الإجمالي |
|---|---|---|---|---|
| رأس المال المصرح به والمدفوع | | | | |
| الأسهم العادية | 1,000 | 10.00 | 10,000 | 0.2% |
| الأسهم الممتازة ا | 116,325 | 10,000.00 | 1,163,250.000 | 26.7% |
| الأسهم الممتازة ب | 29,081 | 10,000.00 | 290,810.000 | 6.7% |
| الأسهم الممتازة ج | 219,609 | 1.00 | 219,609 | 50.4% |
| الإجمالي | 366,015 | | 1,454,289,609 | 100.0% |

## ج. تطور وإدارة الصفقة

### 1) ضخ رأس المال الأساسي: الإنعاش والاستقرار

في الصنف الأول من العام 2008، ركز فريق العمل اهتمامه على استكمال الفحص النافي للجهالة والتفاوض على شروط الصفقة. وفي 30 يناير 2008، دخل صندوق الموانئ في مذكرة اتفاق مع نيجروز. وفي مارس 2008 اقرت لجنة الاستثمار الصفقة وصرحت لفريق العمل للمضي قدما في المفاوضات لاتمام الصفقة. وكجزء من المفاوضات، واصلت نيجروز التفاوض مع بقية حاملي الأسهم وهم مترو باسيفيك. وبنهاية أبريل، اكدت مترو باسيفيك عزمها على البيع.

وفي 13 مايو 2008، قام فريق العمل بتنفيذ اتفاقية الاستثمار مع نيجروز هولدنج آند مانيجمنت ،الشركة الأم لنيجروز نافيجيشن. وهيأت اتفاقية الاستثمار تأسيس شركة كي جي إل انفسنت ان ام وهي الوعاء الرئيسي لتلقي الحصص والاستثمار لكلا الطرفين في نيجروز . كما وضحت الاتفاقية ايضاً شروط إتمام الصفقة بما في ذلك تنفيذ اتفاقية المساهمين والاستحواذ على ديون وحصة الملكية الخاصة بشركة مترو باسيفيك وغيرها من التفاصيل. وفي 17 مايو 2008، قامت نيجروز هولدنج آند مانيجمنت وصندوق الموانئ بتنفيذ اتفاقية المساهمين وغيرها من الاتفاقيات الأساسية اللازمة لإتمام الصفقة. واستكملت نيجروز نافيجيشن مع فريق عمل صندوق الموانئ المفاوضات مع مترو باسيفيك بخصوص الاستحواذ على ديونه وحصة ملكية الشركة وادى ذلك إلى زيادة اجمالي حصة ملكية كي جي إل انفسنت ان ام إلى حوالي 99.0%.

**الشكل رقم 6: مصادر واستخدامات استثمار صندوق الموانئ في نيجروز نافيجيشن**

| المصادر والاستخدامات (مليون دولار أمريكي) | | | |
|---|---|---|---|
| ضخ رأس المال المباشر | 28.5 | إعادة هيكلة الاسطول | 10.0 |
| | | شراء الديون | 13.5 |
| | | شراء اسهم مترو باسيفيك | 40 |
| | | تكاليف ونفقات الصفقة | 1.0 |
| الإجمالي | 28.5 | | 28.5 |

وقد وفر استثمار صندوق الموانئ في شركة نيجروز نافيجشين رأس المال المطلوب للشركة حتى تخرج من برنامج التأهيل الذي فرضته عليها المحكمة، وشراء حصة المساهمين القائمين وتطبيق استراتيجية إعادة هيكلة الأسطول.

وتضمنت خطة إعادة هيكلة الاسطول شراء بارجتين واثنتين من العبارات من نوعية RoPax بما تطلب تمويل بقيمة 10 مليون دولار أمريكي. كما كلف شراء ديون الشركة للخروج من تحت طائلة برنامج التأهيل الذي فرضته المحكمة 13.5 مليون دولار امريكي وبلغت تكاليف شراء حصة المساهمين القائمين 4 مليون دولار أمريكي. أما تكاليف ونفقات الصفقة فقد بلغت 1.0 مليون دولار أمريكي.

## 2) استراتيجية الاستحواذ والنمو : دمج القطاع

في اعقاب تنفيذ اتفاقية المساهمين بدأت ادارة كي جي إل انفسمنت ان ام في تقييم الفرص المرتقبة لاستحواذ نيجروز نافيجيشن على الشركة الرائدة وأكبر منافس لها في السوق وهي شركة ابويتز . وبدأت المباحثات مع كبار مساهمي أبويتز وابدو درجة كبيرة من الاهتمام. وتبع ذلك مفاوضات ومناقشات متعمقة نتج عنها توقيع مذكرة تفاهم في سبتمبر 2008 مع وضع تاريخ مستهدف لإتمام الصفقة بحلول ابريل 2009.

**الشكل رقم 7: أهم معالم الاستحواذ/ الاندماج**

صندوق الموانئ | ابويتز | نيجروز

| مكانة ريادية في السوق | مقومات لسوق قوي | منصمة للاستقرار والنمو | قيمة مرتفعة للأصول والملكية |
|---|---|---|---|
| اكبر واكثر شركة على صعيد الربحية ضمن قطاع استراتيجي أساسي في الفلبين | تعد السفن هي الوسيلة الأولى للمواصلات ما ين الجزر الفلبينية نظراً لميزة السعر وما تتميز بها الطبيعة الجغرافية للفلبين(اكثر من 7 الاف جزيرة) | تغطي نيجروز وابيتويز مجتمعتان 831 من اجمالي ادارة الموانئ في الفلبين | قيمة مرتفعة للأصول تتخطى اكثر من 120 مليون دولار امريكي |
| (جدول:) ابويتز / نيجروز / صندوق الموانئ<br>الركاب: %50 / %30 / %20<br>الشحن: %25 / %12 / %17 | قلة الكفاءة الاستيعابية للشحن بما يخلق طلب من المستهلك | تنفرج بتقديم شبكة الخدمات اللوجستية المتكاملة الوحيدة على مستوى الفلبين | سعر مغري للشراء لمثل هذا القطاع |
| يجمع الاستحواذ اكبر ثلاث شركات ضمن القطاع | نمو قوي وتوقع مزيداً من النمو لقطاع الشحن على خلفية النمو القوي للناتج المحلي الإجمالي للفلبين | توفر منصة لتحسين النمو من خلال الكفاءة والتناغم وامكانيات التوسع | توقيت ممتاز للاستحواذ<br>الاستفادة من تباطؤ الاقتصاد<br>قطاع اعمال لوجيستي سريع النمو<br>تقليل سعة القطاع<br>تناغم فوري |

وتطلبت الاستراتيجية المبدئية للاستحواذ والدمج ما بين الديون والملكية لتمويل الصفقة. وقام فريق العمل بالاتصال بعدد من المقرضين المحتملين من المؤسسات المالية المحلية والعالمية.

وتطورت المباحثات خلال الربع الأول من العام 2009 وبنهاية شهر مارس، قامت شركة كي جي إل للاستثمار أن ام KGLI NM بإعلان ابويتز جروب عن عزمها التقدم بعملية الاستحواذ على حصتها في ATSC. وواصل فريق العمل مناقشاته مع عدد من البنوك المحلية والأجنبية المعروفة وشركاء محتملين للملكية، إلا انه نظراً لتصاعد حالة عدم الاستقرار الاقتصادي بسبب الأزمة المالية العالمية، فتم اتخاذ القرار بعدم إتمام تلك الصفقة إل ان تستقر أوضاع السوق.

وخلال الأزمة المالية العالمية وما نتج عنها من عدم استقرار على المستوى العالمي، وجه فريق العمل تركيزه على تحسين وتوسعة عمليات الشركة. ونشطت الشركة بتقييم فرص الاستحواذ على السفن وتنمية اعمال الشركة عضوياً بما نتج عنه نمواً قوياً في اعمال الشركة بالمقارنة بأداء السنوات السابقة وارتفاع الأرباح قبل الفوائد والضريبة والاستهلاك وإطفاء الدين بنسبة 38.3% في العام 2009. ويعزى هذا النجاح المالي الهائل في الأساس إلى كفاءة تشغيل سفن نيجروز نافيجيشن التي تم شرائها بالإضافة إلى التحسن المستمر في تحكم الشركة في التكاليف وكفاءة حركة الرحلات.

**الشكل رقم 8 : الأداء المالي للأعوام ما بين 2008 إلى 2010 (دولار أمريكي)**



وخلال النصف الثاني من العام 2009، استعاد فريق العمل مباحثاته مع ابويتز جروب للاستحواذ على ATSC.

وركز فريق العمل اهتمامه على تجميع تمويل رأس المال اللازم لعملية الاستحواذ سواء من خلال الديون/ الملكية. وعقد فريق العمل في مباحثات متعمقة وعروض تقديمية مع مزودي رأس المال مثل دويتشة بنك و ستاندرد تشارتر وكاوير و CLSA.

وفي ديسمبر 2009، تم تقديم فريق العمل للتعرف على صندوق الصين- الأسيان للتعاون الاستثماري CAF لبدء المباحثات المبدئية. وكان صندوق CAF حديث التأسيس برأس مال قدره 1 مليار دولار أمريكي بدعم من بنك الصين للتصدير والاستيراد ومؤسسة الصين للاستثمار. وخلال فترة المباحثات المبدئية ابدى صندوق CAF اهتمامه بالاشتراك في الصفقة. وخلال الربع الأول من العام 2010، قام فريق العمل وصندوق CAF باجراء في مباحثات متعمقة بخصوص الصفقة. بالإضافة إلى ذلك، تمت زيارة الموقع وترتيب العديد من إجراءات الفحص النافي للجهالة في بداية ابريل 2010. واسفرت المباحثات إلى التوصل إلى مذكرة الشروط الأساسية في مايو 2010. وتم تنفيذ اعمال الفحص النافي للجهالة باستفاضة لتغطية الجوانب المالية والقانونية والضريبية خلال الفترة الممتدة من يونيو إلى أغسطس 2010.

**الشكل رقم 9 : اعمال الفحص النافي للجهالة**

| حزمة اعمال الفحص النافي للجهالة | |
|---|---|
| المستند/ التقرير | الاستشاري |
| دراسة عن قطاع الشحن البحري | جرانت ثورتن – الفلبين |
| الفحص النافي للجهالة للجوانب المالية والضريبية | ارنست آند يونج – الفلبين |
| الفحص النافي للجهالة للجوانب المالية والضريبية | ارنست آند يونج – الفلبين |
| تقييم السفن | ايجل مارين – الفلبين |
| خطة الدمج | فريق عمل صندوق الموانئ/ الإدارة/ درويري – المملكة المتحدة |

وفي أغسطس 2010، مباشرة بعد الانتهاء من اعمال الفحص للجهالة، قام صندوقCAF ببدء المناقشات الخاصة بالشروط وتحديداً فيما يخص الاستحواذ على حصة أكبر. واستمرت المحادثات بين الطرفين خلال شهر أغسطس، إلا انها تعثرت بعد وقوع بعد الاحداث، قرر فريق العمل ان استمرار المحادثات مع CAF لن يكون في صالح صندوق الموانئ. وبدأ فريق العمل حينذاك تتبع طرق أخرى للتمويل بما في ذلك التحدث مع دويتشة بنك وكريدي سويس وغيرها من الجهات.

وفي أكتوبر 2010، استلم فريق العمل كتاباً من CAF يعربوا فيه عن اهتمامهم ورغبتهم في مواصلة المحادثات مرة أخرى وفقاً لشروط مقاربة لمذكرة الشروط الأساسية. ووافق فريق العمل على مواصلة المفاوضات على هذا الأساس وتم تحضير المستندات الرئيسية للصفقة مثل اتفاقية شراء الأسهم واتفاقية المساهمين بالتعاون مع الممثلين القانونيين لشركة KGL NM وCAF .

**الشكل رقم 10: هيكل ملكية نيجروز نافيجيشن وضخ رأس المال من CAF**



كما بدأ فريق العمل ايضاً بتطوير خطة شاملة على المستوى الداخلي. وتضمنت جهات التركيز الرئيسية: تحسين الإيرادات، دمج المحطات، وتحسين استغلال مسار الرحلات، وإدارة الثروة البشرية، وإدارة السفن، والاتصالات المؤسساتية. وواصل فريق العمل من جهة نيجروز نافيجيشن وابويتز بالتعاون مع الاستشاريين الخارجيين خطة الاندماج.

وفي 1 ديسمبر 2010، قام ممثلين عن KGLI NM ونيجروز نافيجيشن و CAF وابويتز بتنفيذ اتفاقية شراء الأسهم واتفاقية المساهمين في الصين. وفي مانيلا، قامت ابويتز بتقديم كافة الافصاحات الازمة لسوق الأوراق المالية الفلبيني ولجنة الأوراق المالية والبورصات.

وفي 28 ديسمبر 2010، قامت مجموعة ابويتز باستكمال صفقة البيع لكامل حصتهم (93.2% من الأسهم المصدرة) في شركة ابويتز

إلى نيجروز نافيجيشن مقابل 4.28 مليار بيسو فلبيني. وفي 29 ديسمبر 2010، تقدمت نيجروز بعرض لشراء الحصة المتبقية بنسبة 6.8% المملوكة من قبل المساهمين. وتمت إجراءات هذا العرض في فبراير 2011، بما رفع مليكة نيجروز في ابونيز إلى 98.12%.

وبدأت عملية الدمج في بداية العام 2011 وتمت على مرحلتين، مع تجميع المبادرات وفقاً لصوبتها وحجمها.

وتضمنت المرحلة الأولى التخلص من المسارات المكررة والمحطات الثانوية الزائدة عن الحاجة وتحسين استخدام القوى البشرية لكل قطاع. وتم دمج الخدمات المساندة مثل الإدارة المالية، والحسابات، والموارد البشرية، وتكنولوجيا المعلومات، والإدارة القانونية.

وركزت المرحلة الثانية من عملية التكامل على تحسين العمليات والإجراءات لتحقيق تأزر الإيرادات وتحسين دمج اعمال المحطات الرئيسية، والحصول على أعلى مستويات الكفاءة في استخدام خطوط الرحلات وإعادة تعريف العلامة التجارية للكيان الجديد تحت اسم 2GO جروب.

**الشكل رقم 11: إعادة هيكلة العلامة التجارية لمجموعة 2GO جروب**



وقام فريق العمل بقيادة كافة جوانب عملية الدمج ومراقبتها عن كثب من خلال عقد اجتماعات دورية مع إدارة كلا من نيجروز نافيجيشن وابونيز والاستشاريين للوقوف على التقدم الذي تم احرازه.

وقد اسفرت الأنشطة المحددة التي تم اتباعها عما يلي:

- خفض تكلفة المحطات كساحات حاويات في موانئ مختلفة على مستوى الدولة مع عملية الاندماج.
- تحسين استخدام الأصول نظراً لدمج المسارات المتكررة وفصل الطاقات الزائدة.
- تأسيس فريق مبيعات مركزي للتركيز على تقديم حلول سلسلة الخدمات المتكاملة .
- التخلص من المنافسة ما بين الشركتين.
- الوصول إلى حجم سليم للخدمات المساندة مثل الموارد البشرية والإدارة المالية وتكنولوجيا المعلومات والفريق القانوني.
- تحسين الإجراءات القائمة وتحديد قنوات جديدة بمساعدة متخصصين من داخل القطاع.

صندوق الموانئ    | تقرير التخارج النهائي للمشروع

- تعيين متخصصين في القطاع اللوجستي لتنمية وقيادة استراتيجيات حلول سلسلة الامداد.
- اسم كبير موحد لتوفير خدمات متكاملة وحلول سلاسل الامداد من الباب إلى الباب.

الشكل رقم 12: عملية دمج اعمال مجموعة 2GO جروب



كما قام فريق العمل ايضاً بقيادة العديد من المبادرة كما يلي:

- الحصول على تسهيلات تمويلية من فئة الديون الممتازة بقيمة 4.8 مليار بيسو فلبيني لتعزيز عملية الدمج وتم استكمال ذلك في فبراير 2011.
- تعيين مجموعة استشارية متخصصة في اعمال سلاسل الامداد (LCA) لتحديد المناطق الرئيسية لإدخال التحسينات بما عمل على تقليص أوجه القصور في المخازن وتحسين إدارة الأوامر السيئة.
- تصميم أدوات للتخطيط المسارات والقدرات الاستيعابية لرفع كفاءة اطلاق السفن بما ساهم في تخفيض التكاليف وحسن استخدام الأصول.
- تحديد قاعدة الأصول المثلى للشركة لخدمة النمو الحالي والمستقبلي.
- تعيين المدير السابق لشركة دي اتش أل لمنطقة الهند الصينية، والذي قام بقيادة إعادة الهيكلة مباشرة فيما يتعلق بكافة الاعمال اللوجستية.
- تحديد وتعيين فريق عمل يتمتع بخبرة في مجال سلاسل الامداد وخبراء لوجستيين لريادة المجموعة.

وقد نتج عن مبادرات التكامل المذكورة أعلاه ان تراجعت الإيرادات في الفترة ما بين الأعوام 2011 – 2013 من 325.7 مليون دولار أمريكي إلى 288.3 مليون دولار أمريكي نتيجة لتقليص الرحلات على خلفية تآزر عمليات الشركة. في المقابل، ارتفعت الأرباح قبل خصم الفوائد والضرائب والاستهلاك لنفس الفترة بمعدل نمو سنوي مركب بلغت نسبته 35.4% مرتفعاً من 20.1 مليون دولار إلى 36.8 مليون دولار.

**الشكل رقم 13: الأداء المالي ما بين الفترة الممتدة من 2011 إلى 2013 (مليون دولار أمريكي)**



3) رفع رأس المال وحقوق الأولوية: مبادرة التوسع السريع

في العام 2012، بالتزامن مع عملية التكامل، قام فريق العمل بتحديد احتياج الشركة لمزيج من رأس المال حتى تبلغ أقصى امكانياتها حيث تم إعادة تموضع 2Go جروب من شركة متخصصة في الشحن إلى شركة حلول متكاملة توفر سلسلة كاملة من الخدمات من الباب للباب. وسوف يساهم ضخ رأس المال في توفير التمويل اللازم لمبادرات النمو وتعزيز موازنة الشركة.

وقد خضعت عملية رفع رأس مال الشركة إلى عدة مراحل. حيث قام فريق العمل في بادئ الأمر بالتطرق إلى المقرضين الخارجيين مثل جيفريز اند كومبني، وداربي ميزانين وام ايه ام سي جي. وتم تلبية الدورات المختلفة من المعلومات المطلوبة والحصول على الشروط المبدئية من ام ايه ام سي جي و وداربي بقيمة 25 مليون دولار. ووافقت الشركة على التعمق في المباحثات مع ام ايه ام سي جي في مايو 2012 وبدأت إجراءات الفحص النافي للجهالة في اعقاب ذلك.

وفي أغسطس 2012، ونظراً للتأخير، قرر المساهمون ان يقدموا التمويل بأنفسهم عوضاً عن الحصول على التمويل الخارجي. وكان نصيب صندوق الموانئ 14.3 مليون دولار تم الحصول عليها في هيئة قرض من جولدمان ساكس. وتمت إعادة هيكلة القرض في العام 2015 وتسديد المبلغ في أغسطس 2016 باستخدام عائدات من بيع اسهم صندوق الموانئ في الشركة.

وفي اطار إعادة التموضع الاستراتيجي للشركة، تمكنت الشركة من تحقيق نمواً ملحوظاً واصبحت أكبر وافضل مزود للخدمات اللوجستية وسلاسل الامداد على مستوى الدولة. وساهمت الخدمات الفريدة التي تقدمها الشركة وتغطيتها لمدى واسع من حلول سلاسل الامداد في وضعها في مركز يؤهلها من الاستحواذ على أكبر حصة لتقديم الخدمات اللوجستية لأفضل شركات السلع الاستهلاكية في الفلبين. وساعد تكامل ودمج عمليات وإمكانيات الشركة قطاع الاعمال على تنفيذ عمليات البيع المتقاطع على صعيد العملاء الرئيسين وتقديم خدمات مشتركة. ونتيجة لذلك، ولأول مرة في العام 2013، تمكنت الشركة من توليد إيرادات اعلى من قطاع سلاسل الامداد وخدمات القيمة المضافة بالمقارنة بخدمات الشحن البحري ونقل الركاب مجتمعين. وكانت تلك علامة فارقة لمجموعة 2GO حيث أكدت نجاح اعمالها وتموضعها من شركة شحن فقط إلى شركة تقدم خدمات حلول سلاسل الامداد المتكاملة من الباب إلى الباب.

صندوق الموانئ | تقرير التخارج النهائي للمشروع

**الشكل رقم 14: تقسيم الإيرادات وفقاً لقطاعات الأعمال**

   

وعاصرت الشركة نمواً سريعاً على مدار الأعوام التالية. وحققت نيجروز نافيجيشن إيرادات بقيمة 313.1 مليون دولار و354.7 مليون دولار في عامي 2014 و2015 على التوالي. وفي العام 2014 ارتفعت الإيرادات بنسبة 8.6% على أساس سنوي وفي العام 2015، سجلت الإيرادات مزيداً من النمو وبلغت 452.8 مليون دولار. أما بالنسبة للأرباح قبل خصم الفوائد والضرائب والاستهلاك، فقد ارتفعت بمعدل 15.8% من 42.6 مليون دولار في العام 2014 إلى 65.8 مليون دولار في العام 2015.

**الشكل رقم 15: الأداء المالي : العام 2014 – الاثني عشر شهراً المتتالية يوليو 2016 (مليون دولار أمريكي)**



*تم احتساب نتائج الاثني عشر شهراً المتتالية بناء على تقارير الإدارة والتي لم تحتسب حذف العمليات المشتركة بين الجهات المختلفة للشركة. أرقام عامي 2014 و 2015 وفقاً للبيانات المالية المدققة للشركة

### ح. عملية التخارج

بدأ صندوق الموانئ في تحليل سيناريوهات التخارج من نيجروز نافيجيشن في نهاية العام 2013. وبالتعاون مع صندوق CAF، قام الفريق بتقييم الخيارات سواء بقيام عملية بيع مباشرة لحصة الصندوق في نيجروز نافيجيشن او بيع ثانوي يطرح من خلال سوق الأوراق المالية.

وبدأ فريق العمل التحضير لعملية البيع الثانوي المحتمل وبدأ المباحثات مع اكبر الشركات الاستثمارية مثل بي دي أو و بي بي أي، ومتروبنك و سيكورتي بنك. كما قام فريق العمل أيضاً بتحضير مذكرة استثمار متكاملة ومفصلة والتي تم ارسالها للمستثمرين المرتقبين بما في ذلك تكساس باسيفيك جروب، ومترو باسيفيك انفسمنت كوربوريشن، وبلاتيناام ايكويتين وبين كابيتال، واس سي لوين وبلاكستون وغيرهم.

وفي اثناء قيام المساهمين بعملية التخارج، قامت إدارة 2GO بالمبادرة بتقديم عرضاً لشراء حصة كل من CAF وصندوق الموانئ بسعر لا يتعدى صافي تخارج بقيمة 66.1 مليون دولار لصندوق الموانئ.

وفي تلك الاثناء، حرص صندوق CAF على التخارج من الاستثمار بسرعة ووضع ضغوطاً على صندوق الموانئ ليقوم بالبيع.

وكان عرض إدارة 2GO من التطورات الإيجابية، وشعر فريق العمل انه نظراً للأداء التاريخي الإيجابي للمجموعة وتوقعات تحقيقها لنمو اكبر تجدر بذل جهود لاستكشاف فرص لعروض/ صفقات أخرى. ومن خلال المباحثات مع CAF تمكن فريق العمل من اقناعهم بالموافقة على اجراء عملية بيع/تسويق تنافسية. وفي سبتمبر 2014، قام فريق عمل صندوق الموانئ بتعيين مكتب الاستشارات الاستثمارية بهونج كونج أباتشي آسيا لتسهيل عملية البيع التنافسي لمجموعة 2GO .

وفي أكتوبر 2014، قامت شركة أباتشي بالتعاون مع فريق عمل الصندوق بتحديد والاتصال بمجموعات1) أبدت اهتمامها بقطاعات النقل، واللوجستيات والسلع الاستهلاكية 2) تسعى للبحث بنشاط عن صفقات جديدة 3) لديها قدرة استثمارية تتناسب مع حجم سعر صفقة بيع 2GO . وتم اعداد المعلومات المبدئية مثل مخلص الصفقة والمخلص التنفيذي وتقديمها لعدد 42 مجموعة تتوافق مع المعايير الموضوعة. من ضمن هؤلاء، 14 مجموعة أبدت اهتمامها في اجراء مباحثات اعمق وحصلوا على معلومات إضافية بخصوص الفحص النافي للجهالة بعد الحصول على أسئلة واجوبة ومعلومات تم طلبها. ست مجموعات سافرت إلى الفلبين لإجراء مزيداً من اعمال الفحص النافي للجهالة وزيارة الموقع وحضور العروض التقديمية للإدارة. واستغرقت عملية البيع التنافسية ستة اشهر وفي ابريل 2015، أعربت 4 مجموعات عن اهتمام كبر في استكمال الصفقة، وهم نافيس كابيتال بارتنيرز و بلاتينام ايكويتي و ايه دي في بارتنرز و مترو باسيفيك انفسمنت كوربوريشن.

**الشكل رقم 16: ملخص تسويق عملية التخارج**



وفي مايو 2015، قام صندوق الموانئ بقبول العرض المقدم من شركة نافيس بشرط الحصول على موافقة CAF إلا انه للأسف خلال هذا الوقت عاصر CAF تغيراً في ادارته والتي قامت بإلغاء قرار الإدارة السابقة فيما يتعلق بعملية البيع التنافسية.

ودخل فريق العمل في مرحلة جديدة من المفاوضات والمناقشات مع CAF ونافيس بما أدى الى تأخير صفقة البيع.

وفي ذلك الحين اتخذ فريق العمل قراراً بان الخيار الوحيد للتخارج سيتمثل في الأنفراد ببيع حصة الأقلية التي يمتلكها صندوق الموانئ. وبعد الحصول على التأكيدات النهائية من ان صندوق CAF لن يقوم ببيع حصته، واصل الصندوق وابتاشي المباحثات للعثور على مستثمر مهتم بشراء الصفقة وفقاً لما تم تحديده من قبل خلال عملية البيع التنافسية بالإضافة إلى العثور على جهات أخرى مهتمة بشراء حصة الأقلية.

وخلال تلك الفترة، عادت إدارة 2GO بمراجعة العرض المقدم منها ورفعت قيمته بحيث يصل نصيب التخارج الصافي لصندوق الموانئ 80.2 مليون دولار[6]. وباعتبار ان التخارج السريع كان من الأولويات التي حددها فريق العمل ونظراً لعلاقة العمل الطويلة التي جمعت بين صندوق الموانئ وإدارة 2GO تم وضع مذكرة الشروط الأساسية للطرفين. إلا ان إدارة 2GO لم تتمكن من توفير رأس المال اللازم لعملية الشراء في الوقت المقرر ومن ثم انتهت صلاحية مذكرة الشروط الأساسية.

وواصل فريق عمل الصندوق وابتاشي أسيا العمل تجاه صفقة بيع خاصة لاستكمال صفقة البيع في أقرب فرصة. ومن ضمن المباحثات التي تمت مع اطراف مهتمة، جاء اعلى عرض من قبل اوديبا جروب بقيمة اجمالية بلغت 120 مليون دولار، بما يصل إلى صافي بقيمة 91.9 مليون دولار. وكان هذا العرض افضل بكثير من عرض ايه دي في بارتنرز بقيمة صافية 82.3 مليون دولار.

وخلال الأسبوعين الأولين من يوليو 2016، عمل فريق العمل مع المشتري لانجاز خطاب النوايا والذي تم توقيعه في 19 يوليو 2016 وتضمن دفعة مقدمة بقيمة 5 مليون دولار. وعلى مدار الأسابيع التالية، قام فريق العمل بتحضير مستندات الفحص النافي للجهالة والتنسيق مع المستشارين القانونيين لإنهاء إجراءات اتفاقية صفقة شراء الأسهم التي تمت في 28 يوليو 2016. ووفقاً لاتفاقية شراء الأسهم تم إعطاء المشترى فترة حتى 22 أغسطس 2016 لتسديد المبلغ المتبقي من الصفقة. وقام المشترى بتحويل المبلغ المتبقي في 16 أغسطس 2016، قبل أسبوع من انتهاء المهلة. وفي اعقاب ذلك، عمل الفريق مع المشتري والمستشارين القانونيين على انجاز الأمور الادارية بما في ذلك تحويل الأسهم والتي تمت في 19 أغسطس 2016. بعد ذلك عمل فريق العمل والمشتري على استكمال الحسابات لضمان الموارد النقدية والديون للشركة البائعة كي جي اي بي في والتي تم استكمالها في سبتمبر 2016.

تقسيم صافي إيرادات البيع

| دولار أمريكي | التفاصيل |
|---|---|
| 120,000,000 | متحصلات بيع الاستثمار في 2GO |
| | ناقص المطلوبات |
| (1,431,145) | مطلوبات متعلقة بتسوية صفقة نيجروز نافيجيشن |
| (20,148,203) | تسوية القرض المستخدم لزيادة رأس مال 2GO |
| | ناقص: تكاليف عملية البيع |
| (6,480,024) | اتعاب المستشارين والمهنيين |
| 91,940,628 | صافي متحصلات عملية البيع |

الأرقام مسالية بين دين السدد والتكاليف ونفقات الحملة بالصفقة

صندوق الموانئ   |   تقرير التخارج النهائي للمشروع

وتم تسديد التسهيلات الائتمانية وتكاليف عملية البيع من عائدات صفقة البيع وبلغ صافي التدفقات النقدية لصندوق الموانئ 91.9 مليون دولار. وباعتبار اجمالي استثمار الصندوق في نيجروز نافيجيشن كان بقيمة 28.5 مليون دولار، فيكون الصندوق بذلك قد حقق 3.2 اضاعف المبلغ المستثمر او ما يعادل اجمالي عائد داخلي على الاستثمار بنسبة 15.1%.

الشكل رقم 17: عائدات الاستثمار



وحالياً، يقوم صندوق الموانئ بالتخارج النهائي من استثماراته، وسوف يتم تسديد مطلوبات الصندوق قبل القيام بأي توزيعات. وتم استخدام مبلغ بقيمة 59,899,616 دولار أمريكي لتغطية المطلوبات القائمة على صندوق الموانئ و الاحتفاظ بمبلغ قيمته 2,041,012 دولار لتغطية مصاريف وتكاليف تخارج الصندوق.

استخدام صافي عوائد صفقة البيع

| التفاصيل | دولار أمريكي |
|---|---|
| صافي عائدات صفقة بيع الاستثمار في 2GO | 91,940,628 |
| ناقص التحويل إلى: | |
| الدفعة النهائية إلى MPC – GMO | (3,200,000) |
| قرض جلوبل جيتواي | (54,265,116) |
| نفقات خاصة التخارج متعلقة بجلوبل جيتواي | (2,434,500) |
| توزيعات للشركاء المحدودين (الشريحة الأولى) | (30,000,000) |
| المبلغ المحتفظ به من قبل الصندوق | 2,041,012 |

وبذلك، تم توزيع الشريحة الأولى من التوزيعات على الشركاء المحدودين لصندوق الموانئ بقيمة 30 مليون دولار. وحصل كل شريك محدود على حصته وفقاً للنسبة والتناسب وفقاً لحسابات القائم على إدارة الصندوق لحسابات رأس المال كما في 31 ديسمبر 2015.

وسوف يتم توزيع المبلغ المتبقي من عائدات التخارج من استثمار 2GO جروب بقيمة 61,940,628 دولار للشركاء المحدودين بعد حصول الصندوق على عائدات التخارج من استثماره في مدينة جلوبل جيتواي اللوجستية العالمية (مدينة صباح الأحمد اللوجستية العالمية).

**EXECUTION VERSION**

**PAY-OFF LETTER**

To:     KGL Investment B.V. ("**you**")
          Schiphol Boulevard 231
          1118 BH Schiphol
          The Netherlands

From:  Madison Pacific Trust Limited ("**we**" or "**Madison Pacific**")

Date: 18 August 2016

Dear Sirs,

1.     We refer to a facility agreement dated 28 December 2015 between, among others, KGL Investment B.V. as borrower, The Port Fund L.P. as parent, the parties listed in schedule 1 thereto as lenders (the "**Lenders**") and Madison Pacific Trust Limited as agent and security agent (as varied, amended and/or restated from time to time, the "**Facility Agreement**").

2.     Unless defined otherwise in this letter, any term defined in the Facility Agreement shall have the same meaning when used in this letter.

3.     We are writing to you in our capacity as Agent, and to you in your capacity as Borrower under the Facility Agreement.

4.     We received the waiver request letter dated 15 August 2016 (as amended on 18 August 2016 and from time to time) whereby you and the Guarantors seek the waivers set forth therein, and we understand that you intend to pay and/or repay all amounts outstanding under the Finance Documents on or before 23 August 2016, 18 August 2016 or 19 August 2016 (the "**Intended Settlement Date**") and you have given instructions to wire the funds for repayment of all outstanding amounts under the Finance Documents on or before 5:00PM (Hong Kong time) on 18 August 2016.  The payment and/or repayment will be funded by a payment made by Clark Gateway Investment Group LP, acting as your agent (the "**Substitute Agent**"), pursuant to a facility agreement between you and certain lenders dated on or about the date hereof, to the following account:

| | |
|---|---|
| Correspondence Bank | JP Morgan Chase Bank |
| SWIFT | CHASUS33 |
| Beneficiary Bank: | DBS Bank (Hong Kong) Ltd, Hong Kong |
| SWIFT: | DHBKHKHH |
| Beneficiary Name: | Madison Pacific Trust Limited – Client Account |
| Beneficiary Account Number: | 478-788520700 |

Ref:                              KGL Investment Repayment 2016

5.   We confirm that the total aggregate amount required to repay and discharge in full all sums due or payable under the Finance Documents, including without limitation all principal, interest, fees, Break Costs, costs and expenses as at and including the Intended Settlement Date, is US$74,413,318.77 (the "**Settlement Amount**").  Please refer to Schedule 1 (*Settlement Amount Breakdown*) of this letter which sets out a detailed breakdown of the Settlement Amount as at the Intended Settlement Date.

6.   If repayment occurs after the Intended Settlement Date (the date of actual repayment being the "**Settlement Date**"), we will, as soon as reasonably practicable following a written request from you, inform you of the additional interest accrued or accruing and payable to Madison Pacific (for each Lender's account) by you for the period from the Intended Settlement Date to the anticipated Settlement Date ("**Additional Interest**").

7.   We will further, as soon as reasonably practicable following a written request from you, notify you of any break costs ("**Break Costs**"), fees ("**Fees**") and/or costs and expenses ("**Expenses**") incurred, accruing or owing up to and including the Settlement Date (the Settlement Amount, Additional Interest, Break Costs, Fees and Expenses together being, in aggregate, the "**Final Settlement Amount**"), and such amounts will be payable to Madison Pacific (for each Lender's account) within 3 Business Days of notification of such amounts by Madison Pacific to you.

8.   Any amount received by Madison Pacific after 10:30AM (Hong Kong time) on any day will be treated for the purposes of this letter as having been received on the following Business Day. Any Additional Interest, Break Costs, Fees and/or Expenses accruing or incurred as a result of such deemed receipt shall be payable on the next Business Day.

9.   As soon as reasonably practicable following receipt by Madison Pacific of the Final Settlement Amount (if necessary, as adjusted in accordance with paragraph 6, 7 or 8 above) and joint instructions from the Lenders to release any Security constituted by the Transaction Security Documents given under the Finance Documents, we agree to: (i) confirm such receipt to the Substitute Agent (the "**Funds Receipt Confirmation**") by email in substantially the form set out in Schedule 3 (*Form of Funds Receipt Confirmation*) and to the email addresses set out therein, and with a copy to the addressees set out therein, and (ii) send (1) by email to the addressees set out in Schedule 3 (*Form of Funds Receipt Confirmation*) the electronic copies of, and (2) by courier, or arrange to deliver by hand, the originals of, any duly executed release documents listed in Schedule 2 (*List of Release Documents*) to the offices of KGL Investment Company Asia, 17th Floor, Marajo Tower, 312, 26th Street West, Bonifacio Global City 1634; Taguig City, Philippines and marked for the attention of Mark Williams and (iii) make available any share certificates, transfer forms or any other documents ancillary to the existing Philippines share pledge dated 28 December 2015 between you as pledgor and Madison Pacific as pledgee (including deeds of trust and irrevocable proxies) delivered to and held by Madison Pacific in relation to security held by it over the shares in KGLI-NM Holdings, Inc., to be retrieved at the offices of Madison Pacific in Hong Kong by a representative appointed by KGL Investment B.V.

10. This letter may be executed in any number of counterparts and all of those counterparts taken together will be deemed to constitute one and the same instrument.

11. This letter and any non-contractual obligations arising out of or in connection with it shall be governed by and construed in all respects in accordance with English law.

*[The remainder of this page has been intentionally left blank.]*

Yours faithfully,

**Madison Pacific Trust Limited**
as Agent

Acknowledged and agreed by:

**KGL Investment B.V.**
as Borrower

[Acknowledgment to the Pay-Off Letter]

**SCHEDULE 1**

**SETTLEMENT AMOUNT BREAKDOWN**

| | |
|---|---|
| Total Principal Outstanding: | 78,194,415.00 |
| Total Accrued Interest Outstanding (through and including 31 August): | 8,059,619.99 |
| *less* Debt Service Excess Amount: | (11,894,415.00) |
| Sub-Total: | 74,359,619.99 |
| Fees, costs and expenses: | 53,698.79 |
| **Settlement Amount:** | **74,413,318.77** |

## SCHEDULE 2

## LIST OF RELEASE DOCUMENTS

1. Global release deed to be executed upon the actual receipt by Madison Pacific of the Settlement Amount by KGL Investment B.V., as borrower, KGL Investment Coöperatief U.A., as the guarantor and Madison Pacific Trust Limited, as security agent, in respect of the release of all securities granted under the Facility Agreement for the benefit of Madison Pacific Trust Limited including, but not limited to, the release of the pledge over the shares of KGL Investment Coöperatief U.A. in KGL Investment B.V.

2. Philippines law release of pledge executed by Madison Pacific Trust Limited as pledgee (the "**Pledgee**") in favor of KGL Investment B.V. as pledgor (the "**Pledgor**") in respect of the pledge over the Pledgor's shares in KGLI-NM Holdings, Inc. as evidenced by a pledge agreement dated 28 December 2015 by and between the Pledgor and the Pledgee.

**SCHEDULE 3**

**FORM OF FUNDS RECEIPT CONFIRMATION**

To:            Clark Gateway Investment Group LP to the attention of Marsha Lazareva
               marsha@kglinvest.com

Copied to:    evan.mcbride@kglinvest.com; mark.williams@kglinvest.com;
              arnell.uychoco@apulaw.com; bart.wolters@hvglaw.nl;
              nick.van.dijk@hvglaw.nl; nikita.gommeren@hvglaw.nl;
              toroperations@torinvestment.com; spepper@torinvestment.com;
              s.houdijk@houthoff.com; e.schutte@houthoff.com; j.terpstra@houthoff.com;
              tjmendoza@picazolaw.com; daniel.anderson@ropesgray.com;
              andrew.bishop@ropesgray.com; andrew.wang@ropesgray.com;
              fof-ops@corbincapital.com; Kelvin_ong@pacificeagle.biz;
              vincy_yau@peagle.com.hk; ops@ssgasia.com; swu@ssgasia.com;

We refer to the letter dated [●] 2016 from Madison Pacific Trust Limited ("Madison Pacific")
as Agent to KGL Investment B.V. (the "**Pay-Off Letter**").

In its capacity as Agent under and as defined in the Pay-Off Letter, Madison Pacific confirms
that it has received the aggregate amount of US$[●] into the following account:

| | |
|---|---|
| Correspondence Bank | JP Morgan Chase Bank |
| SWIFT | CHASUS33 |
| Beneficiary Bank: | DBS Bank (Hong Kong) Ltd, Hong Kong |
| SWIFT: | DHBKHKHH |
| Beneficiary Name: | Madison Pacific Trust Limited – Client Account |
| Beneficiary Account Number: | 478-788520700 |
| Ref: | KGL Investment Repayment 2016 |

Madison Pacific confirms that this amount constitutes the Final Settlement Amount, under
and as defined in the Pay-Off Letter, and that this email constitutes a Funds Receipt
Confirmation (each term as defined in the Pay-Off Letter, unless otherwise defined in this
email).

**Madison Pacific Trust Limited**

_____

Managing Director