# EXHIBIT 14

**JUDICIAL ADMINISTRATION**

Date Received: *9th April 2020*

Time Received: *4:14 pm*

1. The Defendants
2. Andrew J.Childe
3. First Affidavit
4. Exhibit AC-1
5. 9 April 2020

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO. 235 OF 2019 (RJP)**

**IN THE MATTER OF THE APPLICATION FOR INFORMATION UNDER SECTION 22 OF THE EXEMPTED LIMITED PARTNERSHIP LAW (2018 REVISION)**

**BETWEEN:**

**(1) GULF INVESTMENT CORPORATION**
**(2) GENERAL RETIREMENT AND SOCIAL INSURANCE AUTHORITY**

<u>**PLAINTIFFS**</u>

**AND:**

**(1) THE PORT FUND L.P.**
**(2) PORT LINK GP LTD.**

<u>**DEFENDANTS**</u>

---

**FIRST AFFIDAVIT OF ANDREW JOSEPH CHILDE**

---

I, **ANDREW JOSEPH CHILDE**, of FFP (Directors) Limited, 2nd Floor, Harbour Centre, 42 North Church Street, George Town, Grand Cayman, Cayman Islands, being duly sworn **MAKE OATH AND SAY** as follows:

**Introduction**

1. I am one of the Directors of Port Link GP Ltd. (the "**GP**"), which acts as the general partner of The Port Fund L.P. (the "**Fund**"). I am duly authorised to swear this Affidavit on behalf of the GP and the Fund (together, the "**Defendants**").

2. I make this Affidavit in support of the Defendants' opposition to the application filed by Gulf Investment Corporation (the "**First Plaintiff**") and General Retirement and Social Insurance Authority (the "**Second Plaintiff**" and together with the First Plaintiff, the "**Plaintiffs**") for information from the Defendants pursuant to Section 22 of the Exempted Limited Partnership Law (2018 Revision) (the "**ELP Law**") in respect of the Fund (the "**S.22 Proceedings**").

3. On 26 November 2019, Bader Abdulmohsen El-Jeaan ("**Mr El-Jeaan**"), a Senior Partner of Meysan Partners who acts as Kuwaiti legal counsel to the Plaintiffs, swore an affidavit in support of the First Plaintiff's request for information in the S.22 Proceedings ("**El-Jeaan 1**") with its respective exhibit ("**BAE1**")[1]. In paragraph 29 (a) to (u) of El-Jeaan 1, the First Plaintiff has set out its extensive requests for information and documentation to be provided by the Defendants (the "**Plaintiffs' Information Requests**").

4. On 21 January 2020, Mr El-Jeaan swore a second affidavit in support of an application by the Second Plaintiff to be joined as an additional plaintiff in the S.22 Proceedings ("**El-Jeaan 2**").

5. This Affidavit will, broadly speaking, deal with the following key issues:

   (a) the background to the S.22 Proceedings (**paragraphs 10 to 39**);

   (b) the disclosure provided by the Defendants to date and responses to the Plaintiffs' Information Requests, including requests which do not fall within Section 22 of the ELP Law or the terms of the LPA (as defined below) (**paragraphs 40 to 68**);

   (c) the CIDL Application (as defined below) (**paragraphs 69 to 71**);

   (d) the Defendants' response to El-Jeaan 2 (**paragraphs 72 to 73**); and

   (e) the misleading and inaccurate statements made in El-Jeaan 1 (**paragraphs 74 to 100**);

6. Produced to me at the time of swearing this Affidavit and marked "**AC-1**" is a bundle of true copy documents referred to in this Affidavit. A reference to a tab and page number in this Affidavit is a reference to the corresponding tab and page number of the exhibit. Where documents have been exhibited to El-Jeaan 1 and referred to herein, I have not included such documents in AC-1 but have instead referred to such documents as they appear within the exhibit to El-Jeaan 1.

7. Save where otherwise indicated, the matters to which I depose are within my own knowledge acquired by me in the above capacities, except where I state that I am

---

[1] A reference in this affidavit to BAE1/XXX is a reference to the tab number under which a specific document is located within BAE1.

relying on information from others.  The content of this Affidavit is true to the best of my knowledge, information and belief.

8.    In circumstances where I have only recently been appointed as a Director of the GP, a final draft of this Affidavit has been carefully reviewed by Abdulghfoor M A Alwadhi, who has acted as a Director of the GP since 2010.  Following such review, Mr Alwadhi has sworn an affidavit confirming that he considers the facts deposed herein to be accurate and a true, full and frank account of the dealings of the Defendants (see **Tab 1**).

9.    For the avoidance of doubt, nothing in this Affidavit is intended to waive privilege in respect of any matter referred to and privilege is not being waived.

**Background to the S.22 Proceedings**

10.   The Fund was registered as a Cayman Islands exempted limited partnership under the ELP Law on 21 March 2007 with registration number 19582.

11.   The GP is an exempted limited company incorporated under the laws of the Cayman Islands and has acted as the general partner of the Fund since 2007 to date.

12.   The Fund provided investors with an opportunity to invest in the port management industry.  As noted in paragraph 9 of El-Jeaan 1, the Fund raised US$188,152,000 from the limited partners of the Fund, the majority of whom were based in Kuwait, between 2007 and 2013.

13.   Emerging Markets PE Management Limited (formerly known as KGL Investment Cayman Ltd) ("**EMPEML**"), an exempted limited company incorporated under the laws of the Cayman Islands, acted as the investment manager of the Fund.

14.   KGL Investment Company K.S.C.C. ("**KGLI**"), a company incorporated under the laws of the State of Kuwait, acted as the sponsor and placement agent of the Fund at the establishment of the Fund in 2007.

15.   Two of the investments made by the Fund resulted in successful exits for the Fund, which ultimately enabled the Fund to make significant distributions to the limited partners.  The Fund made its first distribution of approximately US$30,000,000 to investors in October 2016 following the sale of one of the Fund's investments.  The Fund subsequently made a second and final distribution of approximately US$305,000,000 to investors in February 2019 and, accordingly, distributed a total

3

sum of US$335,000,000 to investors (representing a significant positive return for investors with reference to their total capital commitments to the Fund).

16. Notwithstanding the successful performance of the Fund during a difficult economic climate, in or around September 2019 I am informed by counsel to KGLI and verily believe that the Defendants became aware that certain third parties, who had no financial interest in the Fund, were attempting to persuade the limited partners of the Fund that there had been serious mismanagement relating to the Fund.

17. I understand from my discussions with counsel to KGLI that the Defendants' concerns in this regard arose as a result of being provided with a copy of an email that appears to have been sent by Mr El-Jeaan to a number of investors in the Fund in or around June 2019 (the "**El-Jeaan Email**") (**page 1 of Tab 2**).  Notwithstanding the positive performance of the Fund and the significant distributions made by the Fund to limited partners following the exit of the Fund's investments, the El-Jeaan Email made a number of unsubstantiated allegations regarding the purported mismanagement of the Fund and the alleged risk of the dissipation of the Fund's assets. By way of example, and as described in further detail at paragraph 2.3 of the Disclosure Letter (as defined below at **paragraph 40** and found at **Tab 3**) (**page 2 of Tab 3**), the El-Jeaan Email made the following misleading and inaccurate statements:

"*As I indicated to Tarek, based on my review of this matter, there is a critical need to protect the LPs' investment in the Port Fund. I must emphasize the need for speed on this matter in order to ensure that the assets of the Port Fund are not lost. It is imperative that they move quickly.*"

"*Despite the near USD 1 billion reported sale price for GGDH, Lazareva first attempted to evade the Port Fund's limited partners of all Port Fund exit monies by claiming that the Fund had exited all of its investments at a complete loss.*"

"*On information and belief, realizing that such a brazen fraud would be uncovered, the Port Fund and its executives subsequently accounted for the Clark Project exit in varying amounts.*"

18. As at the date of swearing this Affidavit, the Plaintiffs have not provided any evidence to substantiate the serious allegations made in the El-Jeaan Email (detailed further at section 2 of the Disclosure Letter.

4

19.     I further note that there are multiple references in the El-Jeaan Email to discussions with "Tarek". I am informed by counsel to KGLI and verily believe that such references are to Tarek Sultan, who is the Chief Executive Officer and Vice-Chairman of Agility Public Warehouse Company in Kuwait ("**Agility**") (see **Tab 4** for a copy of Tarek Sultan's biography). Counsel to KGLI has also informed me that Mr El-Jeaan previously worked as in-house legal counsel for Agility prior to joining Meysan Partners.

20.     I understand from my discussions with counsel to KGLI that Agility is a major commercial rival to the KGL Group in Kuwait and competes directly with the KGL Group for US government defence contracts. The KGL Group refers to a group of companies in Kuwait with regional interests in transportation, logistics and supply chain management. Counsel to KGLI consider that the El-Jeaan Email, as well as other steps taken by Agility and its representatives in Kuwait in connection with the Kuwaiti Criminal Proceedings (as defined below at **paragraph 83**), demonstrate that Agility and its associates have been pursuing a strategy of seeking to damage the interests of the KGL Group (and by extension the Defendants) in order to further their own commercial interests and agendas.

21.     In response to reviewing a copy of the El-Jeaan Email, in a letter dated 23 September 2019 (**BAE1/006**), the Defendants wrote to the board members of the First Plaintiff to express concerns that third parties had contacted investors of the Fund in order to encourage investors to commence legal proceedings against the Fund based upon unsubstantiated allegations (the "**23 September Letter**").

22.     In paragraphs 21 and 22 of El-Jeaan 1, the Defendants note that the First Plaintiff has attempted to characterise the Defendants as having "*repeatedly sought to avoid or unreasonably delay the provision of information*" to which the First Plaintiff is entitled. However, the First Plaintiff fails to note in El-Jeaan 1 that it was in fact the Defendants that reached out to the First Plaintiff in the first instance in the 23 September Letter in order to offer to meet with representatives of the First Plaintiff in order to address any concerns they had with respect to the business and management of the Fund. In the 23 September Letter, Walkers expressly stated that "*our client would welcome the opportunity to meet with the board of directors of GIC in order to correct the misleading statements which have been circulated to GIC*" in the El-Jeaan Email. The 23 September Letter also noted that the Fund is bound by confidentiality obligations to various third parties and, accordingly, it is not appropriate to disclose further details of

the sale of the Fund's investments in open correspondence and suggested that the First Plaintiff enter into an appropriate non-disclosure agreement.

23.   The Defendants' request that the First Plaintiff enter into an appropriate non-disclosure agreement prior to receiving certain information relating to the business of the Fund sought to address two primary concerns:

    (a)   to mitigate the risk of the Defendants incurring liability to certain third parties to whom the Defendants owed a duty of confidentiality; and

    (b)   ensuring that safeguards were in place that reduced the risk of the First Plaintiff subsequently misusing such confidential information (see **paragraphs 28 to 33** below for further explanation).

24.   The First Plaintiff wrote to Crowell & Moring LLP ("**Crowell**"), the Fund's US legal counsel, in a letter dated 8 October 2019 (**BAE1/015**) which referred to the Walkers letter dated 23 September 2019.  The First Plaintiff stated in this letter that they "*strongly oppose signing any non-disclosure agreement*" but failed to provide any explanation as to why they would not agree to enter into a non-disclosure agreement in order to prevent the Fund from breaching its confidentiality obligations and exposing it to potential claims for damages.

25.   Walkers responded to the First Plaintiff in a further letter dated 17 October 2019 (**BAE1/019**) in which Walkers reiterated that the information requested by the First Plaintiff was commercially sensitive and, importantly, that the Fund was bound by confidentiality obligations regarding this information.  The letter further noted that the board of directors of the GP could not take steps which would ultimately cause the Fund to breach its confidentiality obligations to third parties and expose the Fund to potential liability.  In the letter, Walkers asked the First Plaintiff to explain why it is unwilling to enter into a non-disclosure agreement with the Fund.

26.   In a further letter from Walkers to the First Plaintiff dated 4 November 2019 (**BAE1/007**), Walkers noted that section 7.1 of the amended and restated limited partnership agreement dated 14 July 2008 (the "**LPA**") expressly allows the Defendants to impose reasonable conditions and restrictions prior to releasing such information and that the Defendants considered that requiring the First Plaintiff to enter into an appropriate non-disclosure agreement prior to receiving the confidential information was plainly a "*reasonable condition*" as prescribed by section 7.1 of the LPA (see **page 22 of Tab 4.1**).

6

27.    In a letter from Meysan Partners to Walkers dated 13 November 2019 (**BAE1/018**), Meysan Partners stated that the First Plaintiff "*will not accept any preconditions*" to the provision of the information and made it clear that they would not enter into a non-disclosure agreement in order to receive the information requested from the Defendants.   In light of the above statements from the First Plaintiff and its legal counsel in correspondence with the Defendants and their legal counsel, the Defendants are surprised that, at paragraph 27 of El-Jeaan 1, the First Plaintiff notes that "*no draft NDA has ever been provided by Walkers (even though it would have been easy for them to do so)*".   Plainly, in circumstances where the First Plaintiff was unwilling to enter into a non-disclosure agreement there would have been little point in providing a draft.

28.    In circumstances where there is clear evidence that the First Plaintiff has previously misused confidential information belonging to representatives of the Funds (as described in detail below), the Defendants consider that it was an entirely reasonable request to require the First Plaintiff to enter into a non-disclosure agreement prior to providing the First Plaintiff with confidential information that, if misused, could have potentially exposed the Defendants to liability to third parties.

29.    By way of one recent example of the First Plaintiff's lack of regard for confidential information belonging to individuals involved with the management of the Fund, the Defendants note that on 20 February 2020 Meysan Partners filed documents in support of a criminal complaint in Kuwait made by the First Plaintiff against former executives of the Fund (see **Tab 5**).   Of particular concern to the Defendants is that the First Plaintiff exhibited copies of two confidential documents which have not been provided to the First Plaintiff or indeed any of the limited partners of the Fund:

   (a)      the investment management agreement between the Fund and EMPEML (formerly known as KGL Investment Cayman Ltd) in its capacity as the former investment manager of the Fund dated 28 June 2007 (**page 30 of Tab 5**); and

   (b)      the amended and restated shareholders agreement between EMPEML and its various individual shareholders including Ms Lazareva dated 9 February 2009 (the "**KGL Shareholders Agreement**") (**page 61 of Tab 5**),

   (together, the "**KGL Confidential Documents**").

30.    It is not clear to the Defendants how the First Plaintiff obtained copies of the KGL Confidential Documents.   However, I am informed by Ms Lazareva, who currently

7

serves as the Vice Chairman and CEO of KGLI, and verily believe that the Defendants, and to the best of her knowledge EMPEML, have not at any time provided the KGL Confidential Documents to any of the limited partners of the Fund, including the First Plaintiff.

31.   In particular, the KGL Shareholders Agreement is clearly a private and confidential document that was not intended to be provided to third parties such as the First Plaintiff. Clause 11.1 of the KGL Shareholders Agreement expressly deals with the obligations of the parties to keep the contents of the agreement confidential:

"*Each Shareholder undertakes to use all reasonable endeavours to keep confidential any information:*

(a)   *concerning the business, accounts, finance or contractual arrangements or other dealings, transactions or affairs of the Company its business, assets or affairs; and*

(b)   *which relates to the contents of this Agreement or any agreement or arrangement entered into pursuant to this Agreement.*" (**page 75 of Tab 5**)

32.   I am informed by counsel to KGLI and verily believe that the above example is not the only instance where the First Plaintiff has misused information relating to the Fund in order to advance its own agenda in Kuwait. In light of the above circumstances, the Defendants have (I suggest, understandably) adopted a cautious approach with respect to providing confidential information to the First Plaintiff that may ultimately be misused and expose the Fund to liability.

33.   It appears that the First Plaintiff refused to provide any reasonable explanation for its refusal to enter into an appropriate non-disclosure agreement and instead commenced the S.22 Proceedings without any prior warning or notice to the Defendants. Copies of the relevant correspondence between the Defendants and the First Plaintiff as well as their respective legal counsel can be found in the exhibit to El-Jeaan 1.

34.   Approximately one month after the First Plaintiff initiated the S.22 Proceedings, on 26 December 2019, the First Plaintiff filed an *ex parte* application in the United States District Court for the Southern District of New York (the "**US Court**") seeking an order to conduct discovery against twelve correspondent banks (the "**Banks**") for information relating to the business of the Fund for use in contemplated litigation in the Cayman Islands pursuant to 28 U.S.C. § 1782 and Federal Rules of Civil Procedure 26, 34, and

8

45 (the **"1782 Proceedings"**). The Defendants were disappointed that, despite repeated attempts to meet with the First Plaintiff in order to facilitate the provision of certain documentation and information, the First Plaintiff considered it appropriate and necessary to commence an additional set of information gathering proceedings in another jurisdiction without providing any prior notice to the Defendants. It was particularly surprising that the First Plaintiff considered it appropriate to commence the 1782 Proceedings in circumstances where it had already commenced the S.22 Proceedings in which it is already seeking extensive disclosure from the Defendants.

35. Having reviewed the application and evidence filed by First Plaintiff in the 1782 Proceedings, it is clear that there is significant overlap and duplication with the information being sought from the Fund and the GP in the S.22 Proceedings. To the extent that there are additional information and documentation requests in the 1782 Proceedings, it is not clear to the Defendants why the First Plaintiff has not sought such information and documentation directly from the Fund or the GP in the S.22 Proceedings. As a consequence of the First Plaintiff's premature decision to commence the 1782 Proceedings, the Defendants were left with no choice but to instruct US legal counsel in connection with the 1782 Proceedings, which has already resulted in the Fund incurring unnecessary costs and expenses.

36. Accordingly, on 24 January 2020, the Defendants wrote to the First Plaintiff requesting that it withdraw the 1782 Proceedings given the duplicative information requests in those proceedings, and the ability to easily amend the information sought in these proceedings to capture any additional information (to the extent necessary) (**Tab 6**). On 31 January 2020, the First Plaintiff however stated that it would not be withdrawing the 1782 Proceedings (**Tab 7**).

37. In my view, this is another example of the First Plaintiff's failure to engage constructively with the Defendants with a view to avoiding unnecessary litigation that is clearly not in the best interests of the Fund and all of the limited partners.

38. In light of the First Plaintiff's actions in initiating two sets of proceedings in different jurisdictions that are ultimately seeking the provision of substantially similar information, on 29 January 2020, the GP appointed myself and Christopher Rowland of FFP (Directors) Limited to the board of directors of the GP to assist the Fund in responding to such proceedings (the **"Independent Directors"**). The Independent Directors, who now constitute a majority of the directors appointed to the board, have a wealth of experience in providing independent directorships to entities in the Cayman

9

Islands. Importantly, we each have specific experience in dealing with vehicles involved in litigation and contentious issues comparable to those currently faced by the Defendants. On 4 February 2020, the Defendants wrote to all limited partners informing them of the appointment of the Independent Directors (**Tab 8**).

39.     Following our appointment, Mr Rowland and myself have fully familiarised ourselves with the Fund's affairs, including the present proceedings and the information requests made by the Plaintiffs. We have also familiarised ourselves with the broader context in which those requests have been made. We are satisfied that the Fund's response to those requests, as described in this Affidavit, is appropriate and in line with the legal duties and obligations of the Fund and the GP.

**The Defendants' responses to the Plaintiffs' Information Requests**

40.     The Defendants substantively responded to each request set out in the Plaintiffs' Information Requests in a letter dated 27 February 2020 (the **"Disclosure Letter"**). The Defendants also sought, where possible, to respond to the First Plaintiffs' information requests made in the 1782 Proceedings in the Disclosure Letter. See **Tab 3** for a copy of the Disclosure Letter and its enclosures.

41.     The Defendants do not propose to repeat their substantive responses to the Plaintiffs' Information Requests as set out in the Disclosure Letter in this Affidavit. However, in order to assist this Honourable Court's review of the evidence, the Defendants have summarised the responses that have been provided to the Plaintiffs' Information Requests and provided a cross-reference to the relevant section and paragraph in the Disclosure Letter.

*Fund Payments*

42.     The below table sets out the information requested by the Plaintiffs at paragraphs 29 (a) to (d) of El-Jeaan 1, along with the Defendants' responses to such information requests:

| El-Jeaan 1 Paragraph Reference | Plaintiffs' Information Request | Defendants' Response |
| --- | --- | --- |
| 29 (a) | Complete copies of the bank account statements for the bank account which the Fund held with Noor Bank in Dubai (the **"Noor Account"**) into which the proceeds of the sale of the Clark Asset | See paragraph 3.11 of the Disclosure Letter at **pages 6 to 10 of Tab 3**. |

10

|  | (as defined in El-Jeaan 1) (the "**496 Million**") were deposited from inception to date. |  |
|---|---|---|
| 29 (b) | The identities of all parties who received disbursements from the Noor Account, the amount and date of such disbursement, and the bank account details for such disbursements | See paragraph 3.11 of the Disclosure Letter at **pages 6 to 10 of Tab 3**. |
| 29 (c) | The legal basis upon which each and every payment above was made to such parties | See section 3 of the Disclosure Letter **pages 4 to 12 of Tab 3**. |
| 29 (d) | Details of the third party to whom payment was made in order to secure release of the 496 Million from Dubai, as referenced in the letter from Walkers dated November 4, 2019, and all information and documents held by the Defendants pertaining to the interactions with such third party, including but not limited to any written agreements, and all correspondence | See section 3 of the Disclosure Letter **pages 4 to 12 of Tab 3**. |

43.  As noted above and in the Disclosure Letter, the Defendants have responded to substantively all of the Plaintiffs' Information Requests as set out in paragraph 29 (a) to (d) of El-Jeaan 1. In particular, representatives and advisors of the Fund prepared a detailed summary and breakdown of the vast majority of the payments made from the Noor Account, which is set out in the tables at paragraphs 3.11 and 3.12 of the Disclosure Letter (**pages 6 to 12 of Tab 3**).

44.  The Defendants have not provided copies of the Noor Bank account statements or the bank account details of the third party recipients of payments made by the Fund from the Noor Account as such information is confidential and the Defendants are not at liberty to disclose such details without the permission of such third parties. In any event, the Defendants do not see the relevance of the bank account details of these third parties to the purported concerns of the Plaintiffs as set out in El-Jeaan 1.

45.  As noted in paragraph 3.13 of the Disclosure Letter (**page 12 of Tab 3**), representatives and advisors of the Fund have informed me that there have been occasions where service providers of the Fund have been subject to malicious persecution from the authorities in Kuwait in order to deter other parties from assisting the Fund and have been threatened by such authorities in relation to the same.

9859033.6 T5138.D08984

46.    By way of example, on 17 August 2019, the Kuwait Ports Authority (the "**KPA**") issued a press release in the form found at **Tab 9**. The KPA is another limited partner of the Fund which, on 29 January 2020, initiated its own set of proceedings requesting the same information from the Defendants under section 22 of the ELP Law. Given the information requests of the First Plaintiff and the KPA are essentially verbatim, it would appear that both limited partners have been liaising with one another in coordinating their pursuit of such information from the Defendants and sharing information accordingly.

47.    Upon clicking the KPA's home page on its official website address, this press release automatically appears as the first content available on its web page and remains so as at the date of swearing this Affidavit (the "**KPA Press Release**"). On page 2 of the KPA Press Release, the KPA has stated the following:

    "*The Kuwait Port Authority further warned any advisors engaged by KGL or its former executives—including Crowell & Moring LLP and Marathon Strategies—that, to the extent they claim to be engaged by The Port Fund or have received payments from assets rightfully belonging to The Port Fund, no such engagement was approved by the investors of The Port Fund, and such investors will seek to hold responsible those receiving such monies unlawfully from assets belonging exclusively to The Port Fund.*"

48.    It appears from this excerpt of the KPA Press Release that the KPA is publicly and openly suggesting the Fund has illegally engaged its service providers and the KPA will be pursuing such service providers for receiving such monies unlawfully. As is typical with a Cayman Islands exempted limited partnership, the governing documents of the Fund do not require the Fund to obtain the consent of the limited partners prior to engaging service providers to the Fund. The terms of the LPA specifically provide the GP with the requisite authority and power to engage service providers on behalf of the Fund without requiring prior investor consent to do so.

49.    Accordingly, this statement, which has been made publicly by the KPA, is plainly inaccurate and misleading. The Defendants note that the KPA, having reviewed and signed a copy of the LPA, would have been aware of its provisions (**page 32 of Tab 4.1**).

50.    However, perhaps more concerning to the Defendants than the misleading statement regarding investor consent, is the clear and public threat to any service provider of the Fund. I have been informed by representatives of the Fund that multiple service

providers engaged by the Fund have expressed their concerns with respect to the threats made by the KPA in the KPA Press Release.

51. For example, in a letter dated 19 August 2019 (**Tab 10**), Neil Bush Global Advisors, one of the Fund's service providers, wrote to the KPA expressing concerns in relation to the Press Release and described it as a "*disturbing development...that threatens members of the international defense team with baseless criminal charges in connection with their legal defense of their clients*" and is "*an appalling attempt to intimidate the international legal counsel and advisors*". Neil Bush Global Advisors also wrote to the KPA on 5 September 2019 urging the KPA that "*any further threats against our United States and international legal team, whose members are providing legal services to their clients in a completely professional and lawful manner, could result in a more serious diplomatic situation.*" (**Tab 11**).

52. Accordingly, in circumstances where information disclosed to the First Plaintiff would inevitably be shared with the KPA, and the disclosure of the identity of service providers to the Fund would, in all likelihood, lead to adverse and wholly unjust consequences for such parties, the Defendants have not included details of those transfers in the tables set out in the Disclosure Letter.

*Preferred Return Amount*

53. The below table sets out the information requested by the Plaintiffs at paragraphs 29 (e) to (g) of El-Jeaan 1, along with the Defendants' responses to such information requests:

| El-Jeaan 1 Paragraph Reference | Plaintiffs' Information Request | Defendants' Response |
|---|---|---|
| 29 (e) | Confirmation and itemisation of the capital commitments and contributions made by each limited partner at the commencement of the Port Fund and in each calendar year since that commencement, together with (i) bank statements showing the capital contributions received, and (ii) an explanation of for which of the Port Fund's investments the capital was received and applied towards. | See paragraph 4.2 of the Disclosure Letter **page 13 of Tab 3**. |

| 29 (f) | Confirmation of the respective ownership percentages of the limited partners since the commencement of the Fund. | See paragraph 4.3 of the Disclosure Letter at **page 13 of Tab 3**. This information has already been disclosed to the Plaintiff in the audited financial statements of the Fund for the period between 31 July 2007 and 31 December 2016. |
| --- | --- | --- |
| 29 (g) | The capital account statement in respect of the Plaintiff covering each calendar year since commencement of the Port Fund. Such capital account statements should show the capital contributions made by and distributions made to the Plaintiff, any adjustments made to the Plaintiff's capital account including an explanation of the nature of any adjustments, and the corresponding preferred return balance accrued to the capital account balance of the Plaintiff over that period. | See paragraph 4.3 of the Disclosure Letter at **page 13 of Tab 3**. This information has already been disclosed to the Plaintiff in the audited financial statements of the Fund for the period between 31 July 2007 and 31 December 2016. |

54. With respect to the information request at paragraph 29 (e) of El-Jeaan 1 and without waiving privilege in any way, I am advised that the Plaintiffs are not entitled to obtain copies of bank statements itemising the capital contributions made by each limited partner of the Fund or a breakdown of precisely how the Fund's capital has been applied to the various investments made by the Fund.

*Comingling of funds*

55. Paragraph 15 (b) of El-Jeaan 1 states that the following "*fact*" has exacerbated certain issues raised by the Plaintiffs:

"*The Defendants failed to properly segregate the accounts of the Port Fund from those of Port Link [(its general partner)]...resulting in a shocking commingling of monies belonging to the Port Fund with those of Port Link*".

56. Accordingly, the Plaintiffs have requested the following information at paragraph 29 (h) of El-Jeaan 1:

"*Any and all correspondence relating to, (i) the opening of the Noor Account and (ii) the rationale for the USD 496 million being deposited into the Noor Account rather than*

14

*any of the bank accounts that had historically been utilised in the name of the Port Fund (for example Al Ahli Bank of Kuwait or HSBC Kuwait)"*

57.     As further detailed on pages 13 and 14 of the Disclosure Letter at **Tab 3**, the Defendants note that the Fund cannot hold property in its own right given it is a Cayman Islands exempted limited partnership and has no separate legal personality. Accordingly, it was entirely appropriate for the Fund's bank account to be registered in the name of GP. In my experience, this is entirely standard practice. The Plaintiffs' attempt to characterise such an arrangement as amounting to an improper or *"shocking"* segregation and commingling of bank account monies demonstrates a failure to appreciate the law which applies to exempted limited partnerships and how they are required to operate as a matter of Cayman Islands law. It appears to also demonstrate a desire and intent to seek to attack the Fund and the GP through any means possible, notwithstanding that there is in fact no foundation for the allegation made.

*Carry Entitlement*

58.     The below table sets out the information requested by the Plaintiffs at paragraphs 29 (i) and (j) of El-Jeaan 1, along with the Defendants' responses to such information requests:

| El-Jeaan 1 Paragraph Reference | Plaintiffs' Information Request | Defendants' Response |
|---|---|---|
| 29 (i) | Any and all underlying spreadsheets (including any distribution waterfall calculations prepared pursuant to the LPA) explaining how the quantum of each distribution to limited partners was quantified. | See paragraph 6.8 of the Disclosure Letter **page 15 of Tab 3**. |
| 29 (j) | All information held by the Defendants in connection with any loans and/or any other liabilities of the Port Fund that were paid as part of exit proceeds from the Clark Asset. | See section 3 of the Disclosure Letter at **pages 4 to 12 of Tab 3**. |

59.     With respect to the information request set out at paragraph 29 (i) of El-Jeaan 1 and without waiving privilege in any way, I am informed that the Plaintiffs are not entitled to

this documentation which effectively comprise the internal working papers of the management of the Fund.

*The DIFC Claim*

60.     The below table sets out the information requested by the Plaintiffs at paragraphs 29 (k) to (p) of El-Jeaan 1, along with the Defendants' responses to such information requests:

| El-Jeaan 1 Paragraph Reference | Plaintiffs' Information Request | Defendants' Response |
|---|---|---|
| 29 (k) | All information and documents held by the Defendants pertaining to KGLI's sale of EMPEML, including but not limited to the sale purchase agreement (or equivalent) and any associated addenda including associated warranties and indemnities and any other material identifying the purchaser, the date and terms of sale. | See paragraphs 6.2 and 6.3 of the Disclosure Letter **page 14 of Tab 3**. |
| 29 (l) | All written communication from EMPEML received by Port Link, including but not limited to demand notices and correspondence relating to the investment management agreement. | See paragraph 6.4 of the Disclosure Letter at **page 14 of Tab 3**. |
| 29 (m) | Any information and documents pertaining to the DIFC claim brought by EMPEML against the Port Fund and Port Link (the **"DIFC Proceedings"**), including all associated legal advice, received by any of the parties on matters including, but not limited to, their decisions to submit to service in the DIFC and not to file a defence and any other material relevant to that claim | See paragraphs 6.5 and 6.6 of the Disclosure Letter **page 15 of Tab 3**. |
| 29 (n) | All information and documents (including documentary evidence and relevant agreements) submitted in the DIFC Claim or otherwise relied upon in support of EMPEML's claim of 8% penalty | See paragraphs 6.7 and 6.8 of the Disclosure Letter **page 15 of Tab 3**. |

| | | | |
|---|---|---|---|
| | | compound interest on delays in paying the Carry and Management Fees (as such terms are defined in the LPA). | |
| | 29 (o) | All information, analysis, accounts and other documents (including documentary evidence provided by way of disclosure) submitted in the DIFC Claim or otherwise relied upon in support of EMPEML's calculation of the Carry as USD 45,462,000. | See paragraphs 6.7 and 6.8 of the Disclosure Letter page 15 of Tab 3. |
| | 29 (p) | All information and documents pertaining to the Port Fund's settlement of the DIFC Claim judgment debt with EMPEML, including the identity of all beneficiaries of that judgment debt, the dates of, amounts of and justifications for those distributions. | See paragraphs 6.9 and 6.10 of the Disclosure Letter page 15 of Tab 3. |

61.   As set out in paragraphs 6.1 to 6.10 of the Disclosure Letter (**pages 14 to 15 of Tab 3**), the Defendants have substantively responded to the vast majority of the information requests relating to the DIFC Proceedings.

62.   With respect to the information request made by the Plaintiffs at paragraph 29 (k) of El-Jeaan 1, as noted at paragraph 6.3 of the Disclosure Letter (**page 14 of Tab 3**), EMPEML is a third party who provided services to the Fund. It has never been owned or controlled by the Fund. Given this, it is unclear on what basis the Plaintiff is relying in requesting this information. In any event, the Defendants are not in possession of any documentation or information relating to the sale of EMPEML and are therefore not in a position to disclose such information.

63.   With respect to the request made by the Plaintiffs at paragraph 29 (m) of El-Jeaan 1, and without waiving privilege in any way, I am advised that the Plaintiffs are not entitled to copies of the legal advice provided to the Fund in connection with the DIFC Proceedings.

*The Damietta Loan*

64.    The below table sets out the information requested by the Plaintiffs at paragraphs 29
       (q) to (s) of El-Jeaan 1, along with the Defendants' responses to such information
       requests:

| El-Jeaan 1 Paragraph Reference | Plaintiffs' Information Request | Defendants' Response |
|---|---|---|
| 29 (q) (i) | The original executed loan agreement between the Port Fund and the borrower and any subsequent modifications to this loan agreement. | See section 7 of the Disclosure Letter at **pages 15 to 17 of Tab 3**. |
| 29 (q) (ii) | All loan statements prepared by the lender and provided to the borrower from the date of drawdown of the Damietta Loan, to the date of any subsequent write-off in 2014 and in the absence of any such statements, any and all correspondence between the parties showing the level of the borrower's indebtedness to the Port Fund. | See section 7 of the Disclosure Letter at **pages 15 to 17 of Tab 3**. |
| 29 (q) (iii) | Details of any placement fee paid by the Port Fund to the borrower, including (but not limited to) the date and amount of any such fee. | See section 7 of the Disclosure Letter at **pages 15 to 17 of Tab 3**. |
| 29 (q) (iv) | Any and all correspondence regarding the Damietta loan relating to the waiver of the lender's entitlement to interest and confirmation provided by the Port Fund to the borrower that the loan principal had been repaid. | See section 7 of the Disclosure Letter at **pages 15 to 17 of Tab 3**. |
| 29 (r) (i) – (iii) | Internal documentation (including (but not limited to) board minutes, meeting notes and correspondence) setting out the rationale and approval process of any decision taken by the Port Fund in respect of: (i) any waiver by the Port Fund of its entitlement to interest on the Damietta loan; (ii) the rationale | See section 7 of the Disclosure Letter at **pages 15 to 17 of Tab 3**. |

| | | |
|---|---|---|
| | for any decision of the Port Fund to write off the Damietta Loan; and (iii) the rationale for any decision of the Port Fund not to convert the Damietta Loan (and accrued interest) into shares in the Borrower. | |
| 29 (s) | Documentation relating to the Port Fund's analysis of impairment disclosure requirements relating to the Damietta loan as required by IFRS 7 for the years 2013 and 2014. | See section 7 of the Disclosure Letter at **pages 15 to 17 of Tab 3**. |

65.  As set out in paragraphs 7.1 to 7.10 of the Disclosure Letter (**pages 15 to 17 of Tab 3**), the Defendants have substantively responded to the vast majority of the information requests relating to the Fund's investment in the Damietta International Port Company in Egypt ("**DIPCO**") through the convertible loan agreement entered into with KGL Ports dated 22 August 2007 whereby the Fund provided a US$20 million loan to KGL Ports (the "**DIPCO Loan**") with an option to be converted into equity in DIPCO at a later date (the "**DIPCO Loan Agreement**").

66.  With respect to the request made by the Plaintiffs at paragraph 29 (r) of El-Jeaan 1, and without waiving privilege in any way, I am advised that the Plaintiffs are not entitled to copies of the internal working papers of the Fund (including board minutes, meeting notes and correspondence) in connection with the DIPCO Loan and/or the DIPCO Loan Agreement.

*The Port Fund's Audited Financial Statements*

67.  The below table sets out the information requested by the Plaintiffs at paragraphs 29 (t) and (u) of El-Jeaan 1, along with the Defendants' response to such information requests:

| El-Jeaan 1 Paragraph Reference | Plaintiffs' Information Request | Defendants' Response |
|---|---|---|
| 29 (t) | A full accounting of the process used to reach the purported ownership percentages of the limited partners and general | See paragraphs 9.1 to 9.6 of the Disclosure Letter **page 19 of Tab 3**. |

| | | partner of the Port Fund as stated in the 2015 and 2016 audited financial accounts. | |
| --- | --- | --- | --- |
| | 29 (u) | A full account or explanation of the process used to distribute funds following the completion of the 2015 and 2016 audited financial accounts. | See paragraphs 9.1 to 9.6 of the Disclosure Letter **page 19 of Tab 3**. |

68. The Fund has already provided an explanation with respect to the delay in finalising and issuing the audited accounts for 2017 - 2019. As noted in letters to all limited partners dated 3 October 2019, as a result of unsubstantiated allegations in connection with the management and affairs of the Fund made by third parties whose interests are adverse to those of the Fund, the GP has encountered difficulties in instructing external auditors for the financial years ending 2017, 2018 and 2019 (**Tab 12**).

**The CIDL Application**

69. As the Defendants have noted in previous correspondence and as described in further detail above at paragraphs 10 to 39, there are certain categories of documents and information, which have been requested by the Plaintiffs, that are subject to stringent confidentiality obligations arising under contracts entered into with third parties (the **"Confidential Information"**).

70. Notwithstanding the stringent confidentiality obligations owed by the Fund to third parties, the Defendants would like to provide the Plaintiffs with copies of the Confidential Information. Accordingly, the Defendants have filed a substantive application seeking appropriate relief pursuant to section 4 of the Confidential Information Disclosure Law, 2016 (the **"CIDL Application"**) in order to provide the Confidential Information to the Plaintiffs without breaching their existing third party confidentiality obligations and thereby potentially exposing the Fund to significant liability in damages.

71. The CIDL Application is listed for hearing on 17 April 2020. On the assumption that the Defendants obtain the relief sought in the CIDL Application, the Defendants intend to file and serve supplementary evidence following the hearing in order to provide the Plaintiffs with copies of the Confidential Information in accordance with the terms of any order made by the Court.

**The Defendants' response to El-Jeaan 2**

72.  As noted above at paragraph 4, the Second Plaintiff filed an application to be joined as an additional plaintiff in the S.22 Proceedings supported by El-Jeaan 2. In El-Jeaan 2, Mr El-Jeaan states that:

> "GRSIA shares the same concerns about the management of the Port Fund and the series of transactions identified in my First Affidavit in these proceedings and wishes to receive the same disclosure, for the same reasons and on the same terms as GIC. As noted above, GRSIA is, like GIC, a limited partner in the Port Fund and its interests are thus, at least insofsar as the disclosure sought is concerned, aligned."

73.  The Second Plaintiff has not filed any additional evidence outlining its specific concerns with respect to the management of the Fund and has instead indicated that it intends to rely on the evidence in El-Jeaan 1 in support of the Plaintiffs' Information Requests. Accordingly, in light of the approach taken by the Second Plaintiff in the S.22 Proceedings, the Defendants do not consider it necessary to substantively respond to El-Jeaan 2.

**Misleading and inaccurate statements made in El-Jeaan 1**

74.  Having reviewed the contents of El-Jeaan 1 and the documents exhibited thereto, the Defendants note that there are a number of misleading and inaccurate statements made in El-Jeaan 1. Of particular concern to the Defendants is the allegation made at paragraph 7 of El-Jeaan 1 that "KGLI...may have been involved in the misappropriation of assets belonging to the Port Fund". Despite the seriousness of this allegation, the Plaintiffs have failed to provide any evidence to substantiate it.

*Investments made by the Fund*

75.  Paragraph 12 of El-Jeaan 1 states that "the Port Fund made five investments". This is incorrect. While the former management of the Fund considered a number of potential investments, the Fund only made four investments during its term.

*The DIFC Claim*

76.  Paragraph 14 (c) of El-Jeaan 1 states that "A Lawsuit filed in Dubai against the Port Fund by the Investment Manager...was uncontested...". This statement appears to suggest that the Fund did not seek to oppose such proceedings nor engage legal counsel in relation to the same. I refer to **pages 14 to 15** of the Disclosure Letter at

21

**Tab 3** which explains how the Fund engaged DIFC legal counsel to represent the Fund in connection with those proceedings.

*Payment to Unknown Third Party*

77.     Paragraph 24 of El-Jeaan 1 states that the Defendants have "*admitted to having already disbursed an amount of at least USD 191 million to an unknown third party without the knowledge or approval of the limited partners*". This statement is wholly misleading and the Defendants have made no such admission in correspondence with the Plaintiffs. I note that paragraphs 3.4 to 3.10 of the Disclosure Letter provide a detailed explanation in this regard (**see pages 4 to 6 of Tab 3**).

78.     Furthermore, the Defendants note that the First Plaintiff's suggestion in paragraph 24 of El-Jeaan 1 that limited partner consent is necessary before the Fund makes disbursements is plainly inconsistent with clause 3 of the LPA, which expressly permits the GP to deal with such disbursements without the requirement to obtain the permission of the limited partners.

*TMF Mauritius' determination of distribution entitlements*

79.     Paragraph 15 (c) of El-Jeaan 1 states that "*the Defendants inexplicably [choose] to reject the determination of contractual entitlements due to the Plaintiff made by TMF Mauritius*". On 4 November 2019, the Defendants wrote to the First Plaintiff (the "**4 November Letter**") explaining why the First Plaintiff's suggestion that TMF Mauritius (the administrator of the Fund) can create a contractual entitlement to distribution proceeds is misconceived and does not account for the provisions of the LPA of the Fund (see **page 2 and 3** of the 4 November Letter found at **BAE1/007** which go into further detail on this point).

*Criminal Proceedings in Kuwait*

80.     In paragraph 14 (e) of El-Jeaan 1, the Defendants note that Mr El-Jeaan states that the First Plaintiff is concerned by "*the indictment and recent conviction in Kuwait of two of the Port Fund's senior executive managers for misappropriation of public funds*". However, the First Plaintiff fails to provide any details relating to the judgment in Kuwait and notably omits to mention that Ms Lazareva and Mr Dashti have filed an appeal against such convictions as described in further detail below.

81.     The Fund attracted investment from a number of Kuwaiti based investors, including the KPA and the Public Institution for Social Security ("**PIFSS**"), both of whom are

considered extensions of the government of the State of Kuwait.  The Fund and its former management team were investigated by the Public Prosecution of the State of Kuwait (the "**Kuwaiti Prosecutor**") who alleged that the capital commitments of the KPA and PIFSS, considered to be 'public' or 'state' funds as a matter of Kuwaiti law, had been embezzled by members of the management team of the Fund.

82.     I am informed by counsel to KGLI and verily believe that such investigations originated from complaints first made by Ms Mona Abdul Wahab in or around June 2012 (also noted in the 15 November 2019 Case Update (defined and further described below) at **pages 10 and 11 of Tab 13**). Ms Wahab was a disgruntled employee of Ms Lazareva in Kuwait who, following her termination on 30 March 2010, "*forged Ms Lazareva's identity and stole more than USD 500,000 from Ms Lazareva's personal bank account*" (**page 10 and 11 of Tab 13**).  Ms Wahab was consequently convicted on charges of embezzlement and sentenced to three years imprisonment on 30 May 2016.

83.     Following such investigations, the Kuwaiti Prosecutor commenced criminal proceedings in felony number 1496/2012 (computation of public funds), listed under No. 23/2015 Criminal Felonies Investigations (the "**Kuwaiti Criminal Proceedings**"). The allegations made by the Kuwaiti Prosecutor in the Kuwaiti Criminal Proceedings were made against the following individuals:

(a)     Maria Lazareva (the "**First Defendant**");

(b)     Saeed Ismail Dashti (the "**Second Defendant**"); and

(c)     Mohamed Abdul Muhsen Abdullatif Al Asfour (the "**Third Defendant**"),

(together, the "**Kuwait Defendants**")

84.     The Kuwaiti Prosecutor alleged in the Kuwaiti Criminal Proceedings that the First Defendant and Second Defendant, who also acted as Directors of the GP between 2007 and 2018, committed crimes of embezzling public funds and related money laundering offences when they acted as directors of the GP.  I am informed by counsel to KGLI and verily believe that:

(a)     the charges made by the Kuwaiti Prosecutor related to 167 separate transactions made, the vast majority of which were in connection with the business of the Fund (the "**167 Transactions**"); and

(b)     the First Defendant and Second Defendant were directors of the GP at the time the 167 Transactions took place.

85.     The purported embezzlement of Kuwaiti state funds related to the capital commitments of the KPA and PIFSS, which had been invested in the Fund between 2007 and 2013. As explained above, the alleged crimes were considered the embezzlement of 'public funds' as a consequence of the KPA's and PIFSS' statuses as arms of the government of the State of Kuwait.

86.     In connection with the Kuwaiti Criminal Proceedings, the Kuwaiti Prosecutor filed a bill of indictment dated 26 April 2017 setting out details of the 167 Transactions along with supporting evidence, which provided an explanation as to why the Kuwaiti Prosecutor believed such transactions amounted to criminal offences under Kuwaiti law (the **"Accusation Report"**).   A copy of the Accusation Report along with a certified translation is at **Tab 14**.

*The Baker Tilly Report*

87.     Following the filing of the Accusation Report and the commencement of the Kuwaiti Criminal Proceedings, one of the limited partners of the Fund, PetroLink Holding Company K.S.C.C. (**"PetroLink"**), appointed Baker Tilly Consulting Company WLL (**"Baker Tilly"**) as an independent third party financial advisor to review the evidence provided in the Accusation Report relating to the 167 Transactions and provide a report of their findings to PetroLink.

88.     Baker Tilly issued their report on 11 December 2018 (the **"Baker Tilly Report"**), which examined each of the 167 Transactions in detail, including reviewing the relevant transfer documentation, the underlying contractual agreements between the parties and the key governing documents of the Fund including the LPA and the offering memorandums of the Fund (**page 5 of Tab 15**). The Baker Tilly Report ultimately concluded that there was no evidence of the embezzlement of public funds and all of the transactions listed in the Accusation Report were valid transactions and in accordance with the constitutional documents of the Fund and commercial agreements between the relevant parties. A copy of the Baker Tilly Report is at **Tab 15**.

89.     The Fund has extracted the Summary of the Final Opinion issued by Baker Tilly in the Baker Tilly Report (my emphasis added) (**page 5 of Tab 15**):

*"1.7 Summary of the Final Opinion*

24

In light of our review of the Fund's Private Placement Memorandum (PPM), the Limited Partnership Agreement (LPA), the Incorporation Agreement of the General Partner, the resolutions issued by the General Partner, the supporting documents to the Fund's accounting records, the list of confirming evidence and other documents, below are the conclusions of our findings:

a) _The Port Fund's money has been used toward its investments and transactions made in line with the Fund's provisions and documents, PPM, LPA, as well as the Incorporation Agreement of the General Partner and the resolutions issued by the General Partner. They did not involve any suspicion of facilitating embezzlement and did not involve any suspicion of embezzlement._

b) The Port Fund has successfully exited its investment in Negros Navigation in the Philippines during 4Q2016 where the fund distributed USD 30 million to Port Fund's investors including Kuwait Port Authority "KPA" (which received USD 11,222,152.44 – i.e., 13.2% of total capital commitment) and Public Institution for Social Security "PIFSS" (which received USD 7,684,540.56 – i.e., 19.2% of the total capital commitment). All the above mentioned amounts, including Negros Navigation exit proceeds, were recorded in the audited financial statement of the Fund.

c) All the Port Fund's financial information and statements prove that Sabah Al Ahmad Logistics City was owned by the Fund. In November 2017, the Fund successfully exited that investment and transferred the proceeds to the Fund's bank account. The Fund advised its limited partners about the distribution of more than USD 300 million (i.e., more than double the capital commitments). Therefore, there is no suspicion of facilitating embezzlement or suspicion of unlawful embezzlement or damaging the public funds.

d) _All the transactions listed in the bill of indictment have been conducted in accordance with the Fund's PPM, LPA, Incorporation Agreement of the General Partner and the resolutions issued by the General Partner, as well as other valid legal documents. Such transactions did not involve any suspicion of facilitating embezzlement or any suspicion of unlawful embezzlement, as detailed in this report._

9859033.6 T5138.D08984

e) *The amounts reported in the supporting documents conform to the Fund's accounting records and were reflected in the Fund's audited financial statements in accordance with accounting standards."*

90.   Following an extensive and detailed review of each transaction and all supporting documentation, Baker Tilly reached an unqualified conclusion that there was no evidence that any of the 167 Transactions constituted embezzlement as alleged in the Accusation Report and the Kuwaiti Criminal Proceedings.

91.   I am informed by counsel to KGLI and verily believe that the Baker Tilly Report was submitted into evidence in the Kuwaiti Criminal Proceedings by Kuwaiti legal counsel for the Kuwait Defendants in such proceedings.

*11 November Judgment*

92.   Notwithstanding the filing of robust evidence by the Kuwait Defendants (including the Baker Tilly Report), which demonstrated that all of the 167 Transactions were in fact legitimate transactions pursuant to legal, valid and binding agreements between the parties, the Kuwaiti Court of First Instance in the Kuwaiti Criminal Circuit (the "**Kuwait Court of First Instance**") delivered its verdict in the Kuwaiti Criminal Proceedings on 11 November 2019 and found the Kuwait Defendants guilty on one charge of embezzling or facilitating the embezzlement of public funds and one charge of money laundering (the "**11 November Judgment**"). A copy of the 11 November Judgment is exhibited at **Tab 16**, along with a certified English translation at **Tab 16.**

93.   In the 11 November Judgment, the Kuwait Court of First Instance found that 165 of the 167 Transactions were legitimate transactions in connection with the business of the Fund and did not constitute the embezzlement of public funds or money laundering as a matter of Kuwaiti law. However, the Kuwait Court of First Instance found that two of the 167 Transactions were not legitimate transactions and constituted the embezzlement of 'public' funds as matter of Kuwaiti law.

*Reliability of evidence relied upon by the Kuwait Court of First Instance in making its judgment*

94.   I am informed by counsel to KGLI and verily believe that significant concerns arise with regards to the reliability of the evidence the Kuwait Court of First Instance relied upon in making its findings that the Disputed Payments were illegal.

95.   I am informed by counsel to KGLI and verily believe that on 23 May 2019 international counsel for Ms Lazareva submitted a petition to the UN Working Group on Arbitrary

Detention (the "**UN Working Group**") complaining that the State of Kuwait was arbitrarily detaining Ms Lazareva in breach of its obligations under international law (notably Articles 9 and 14 of the International Covenant on Civil and Political Rights). In the most recent case update to the UN Working Group dated 15 November 2019, Ms Lazareva's counsel provided an analysis with respect to the lack of reasoning and clear contradictions in the 11 November Judgment (the "**15 November 2019 Case Update**") (**Tab 13**).

96.    In the 15 November 2019 Case Update, it is noted that:

(a)    when convicting Ms Lazareva, the Court expressly relied on the testimony of Hamad Al-Allayan who had prepared three "Expert Reports" for the Kuwaiti Prosecutor and provided witness evidence in the Kuwaiti Criminal Proceedings. However, in other proceedings in Kuwait against Ms. Lazareva, Mr Al-Allayan submitted forged evidence which initially led to Ms Lazareva's conviction. Such conviction was overturned and Mr Al-Allayan has since been convicted for forging those very documents and sentenced to six months' imprisonment (**pages 11 and 12 of Tab 13**). Strangely, the Kuwait Court of First Instance explicitly and repeatedly dismissed Mr Al-Allayan's testimony (see **page 12 of Tab 13**) but also inexplicably and in clear contrast with the rest of the 11 November Judgment relied on Mr Al-Allayan's statement that the two transactions (i.e. the Disputed Payments) were illegal. Neither Mr Al-Allayan nor the Kuwait Court of First Instance provided any further particulars as to why these transfers where unlawful (see **page 12 of Tab 13**); and

(b)    as noted above at paragraph 82, the investigations into the Kuwait Defendants followed complaints made by Mona Abdul Wahab. Ms Wahab was convicted and sentenced for three years imprisonment for embezzlement in Kuwait after forging Ms Lazareva's identity and steeling over US$500,000 from Ms Lazareva's personal bank account (see **pages 10 to 11 of Tab 13**). Despite this, Ms Wahab provided witness evidence in the Kuwaiti Criminal Proceedings for the Kuwaiti Prosecutor. Similarly as above, the Kuwait Court of First Instance both recognised the unreliability of Ms Wahab's testimony in other sections of the 11 November Judgment but relied on such testimony in finding that the Disputed Payments were illegal (see **page 11 of Tab 13**). The 15 November 2019 Case Update also states that Ms Wahab's statement "*amounted to little more than a bare assertion that Ms Lazareva was guilty of criminal conduct, without any particulars or explanation. She did not set out any*

27

*account of the facts that could form the basis of a conviction by any court acting reasonably. It is therefore, perhaps unsurprising that the Court failed to give any reason for its reliance on Ms Wahab's testimony, let alone an explanation of how it enabled the Court to overcome the doubt established by the defence evidence"* (see **page 11 of Tab 13**).

97.     I am informed by counsel to KGLI and verily believe that the Kuwait Defendants have filed an appeal of the 11 November Judgment with the Court of Appeal in the Kuwaiti Criminal Circuit – Case No. 3065/2019 (the **"Kuwait Appeal Proceedings"**), which is expected to be heard during the course of this year.

*Lobbying Fees*

98.     In paragraph 14 (e) of El-Jeaan 1, the First Plaintiff expresses concerns that a number of public relations and lobbying firms have been engaged by the Fund *"in order to exert pressure on the Government of Kuwait to release these individuals from prison"*. As set out in detail at paragraphs 10.1 to 10.3 of the Disclosure Letter (**pages 19 to 20 of Tab 3**), the $496 Million was frozen by Noor Bank for a total of 14 months between November 2017 and February 2019.   During this period, the Defendants became aware that the Kuwaiti authorities were attempting to persuade the Dubai authorities to instruct Noor Bank to transfer the vast majority of the $496 Million from the Noor Account to two limited partners in Kuwait, a request that the Defendants believed would amount to an illegal expropriation of the Fund's monies.   I refer in this respect to paragraphs 3.5 to 3.10 of the Disclosure Letter (**pages 5 to 6 of Tab 3**) and the correspondence exhibited at Schedule 2 (**pages 31 to 72 of Tab 3**) to that letter.

99.     In such circumstances, I suggest that it is entirely understandable and reasonable that the Defendants took all available steps to try and obtain the release of the $496 Million wired to Noor Bank so that the Fund could settle its liabilities and make final distributions to its investors.   Accordingly, a number of firms were engaged by the Defendants to assist with such efforts in the US, Kuwait and elsewhere.

100.    Some of the firms engaged by the Fund to assist with the unfreezing of the $496 Million were also assisting the former directors of the GP in relation to the ongoing criminal proceedings in Kuwait.   In circumstances where (i) such criminal proceedings directly related to the legitimacy of payments made by the Fund; and (ii) the Fund was on notice of contingent indemnity claims from the former directors of the GP with respect to defending such proceedings, the Fund was clearly interested in such payments and

the outcome of the criminal proceedings in Kuwait.  The Defendants were provided with certain reports relating to the payments made by the Fund the subject of the allegations in the criminal proceedings in Kuwait, and on such evidence, it appears clear that the former directors of the GP took the view that the payments were legitimate payments in connection with the business of the Fund and the allegations in the Kuwaiti criminal proceedings were without merit.  Accordingly, the Defendants considered it appropriate for the firms engaged by the Fund to provide assistance to the former directors of the GP in relation to the criminal proceedings in Kuwait.

**Conclusion**

101.   As set out in this Affidavit, the Defendants have substantively responded to the Plaintiffs' Information Requests in the Disclosure Letter and pursuant to the terms of the CIDL Order. To the extent that the Defendants have not responded to a limited number of the Plaintiffs' Information Requests, the Defendants note that the Plaintiffs are not entitled to such information under the ELP Law or the LPA and such matters will be dealt with in detail during legal submissions.

Sworn by the said **ANDREW JOSEPH CHILDE** )

at                                                                                )

on the      day of April 2020                              )     **ANDREW JOSEPH CHILDE**

Before me:                                                            )

_____

Notary Public

**THIS AFFIDAVIT** is filed by Walkers, Attorneys-at-Law, 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands, for the Defendants whose address for service is care of its said Attorneys-at-Law

9859033.6 T5138.D08984

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO. 235 OF 2019 (RJP)**

**IN THE MATTER OF THE APPLICATION FOR INFORMATION UNDER SECTION 22 OF THE EXEMPTED LIMITED PARTNERSHIP LAW (2018 REVISION)**

**BETWEEN:**

**(1) GULF INVESTMENT CORPORATION**
**(2) GENERAL RETIREMENT AND SOCIAL INSURANCE AUTHORITY**

**PLAINTIFFS**

**AND:**

**(1) THE PORT FUND L.P.**
**(2) PORT LINK GP LTD**

**DEFENDANTS**

THIS IS EXHIBIT **"AC-1"** TO THE FIRST AFFIDAVIT OF

**ANDREW JOSEPH CHILDE**

SWORN BEFORE ME THIS 9TH DAY OF APRIL 2020

_____

NOTARY PUBLIC

30