# EXHIBIT 15

JUDICIAL ADMINISTRATION

Date Received: 24ᵗʰ Apr. 2020

Time Received: 10:22am

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO.: FSD 235 OF 2019

IN THE MATTER OF THE APPLICATION FOR INFORMATION UNDER SECTION 22 OF THE EXEMPTED LIMITED PARTNERSHIP LAW 2014

(1) GULF INVESTMENT CORPORATION
(2) GENERAL RETIREMENT AND SOCIAL INSURANCE AUTHORITY

Plaintiffs

and

(1) THE PORT FUND L.P.
(2) PORT LINK GP LTD

Defendants

---

### THIRD AFFIDAVIT OF BADER ABDULMOHSEN EL-JEAAN

I, BADER ABDULMOHSEN EL-JEAAN, of Al Hamra Tower, 17ᵗʰ Floor, Al Shuhada Street, Sharq, Kuwait, make oath and say as follows:

Preliminary

1. I am the Senior Partner of Meysan Partners, a law firm based in the State of Kuwait, which serves as counsel to the Gulf Investment Corporation (the "First Plaintiff") and the General Retirement and Social Insurance Authority (the "Second Plaintiff", together with the First Plaintiff, the "Plaintiffs") in connection with the Plaintiffs' application for information pursuant to Section 22 of the Exempted Limited Partnership Law, 2014 (the "Section 22 Application").

2. I have previously sworn two other affidavits in connection with the Section 22 Application; the First Affidavit of Bader Abdulmohsen El-Jeaan sworn on 26 November 2019 (the "First Affidavit") and the Second Affidavit of Bader Abdulmohsen El-Jeaan sworn on 21 January 2020 (the "Second Affidavit"). In this affidavit (the "Third Affidavit"), I adopt the definitions used in the First and Second Affidavits and the definitions used in the unsworn First Affidavit of Andrew Joseph Childe dated 9 April 2020 (the "Childe Affidavit").

3. I am duly authorised to make this Third Affidavit on the Plaintiffs' behalf.

4. The facts and matters set out in this Third Affidavit are true to the best of my knowledge, information and belief. Where I have referred to matters not within my own knowledge, I have identified the sources of my information and believe them to be true to the best of my knowledge, information and belief.

5. I refer throughout this Third Affidavit to an exhibit which is a paginated bundle of documents marked "BAE3". In this Third Affidavit, when I refer to documents contained in BAE3, I do so in the format: [BAE3/XXX].

## Summary

6. I make this Third Affidavit on behalf of the Plaintiffs in response to the Childe Affidavit and in connection with the Section 22 Application.

7. I do not propose to deal again with the factual and legal background to the Section 22 Application or to repeat facts and evidence already filed in support of the Section 22 Application (which are fully set out in the First and Second Affidavits and their accompanying exhibits). Rather, this Third Affidavit will (1) reply to the information contained in the Childe Affidavit; (2) apprise the Honourable Court of relevant developments since I swore my First and Second Affidavits; and (3) address a number of mischaracterisations in the Childe Affidavit.

8. This Affidavit is divided as follows:

   a) Background to the Section 22 Application;

   b) The Defendants' approach in addressing the Plaintiffs' requests;

   c) The Defendants' approach to confidentiality; and

   d) The gaps between disclosure provided to the Plaintiffs to date and the information to which the Plaintiffs are entitled under the existing information requests.

Background to the Section 22 Application

9. As a preliminary point, in my First Affidavit (at paragraphs 14 and 15), I referred to the First Plaintiff's reasons for seeking the information in the Section 22 Application. By way of example, I referred to, among other things, the recent conviction of Marsha Lazareva and Saeed Dashti, two of the Port Fund's senior executive managers, for misappropriation and corruption, the failure of the Port Fund to produce audited financial statements for the past three financial years, and various unexplained (and large) discrepancies between the sums distributed to the First Plaintiff and the sums one would expect to have been distributed.

10. I mentioned these matters by way of background, to explain why the First Plaintiff issued the Section 22 Application. The Section 22 Application does not ask this Honourable Court to determine whether there has in fact been such wrongdoing. Instead, the Section 22 Application seeks further information and documentation from the Defendants to which the Plaintiffs are entitled.

11. As a result, I wish to clarify that the Section 22 Application does not invite this Honourable Court to make any findings of fact in respect of these matters, which, in any event, the Court would not be in any position to do. The Plaintiffs' entitlement to relief under Section 22 of the ELP Law arises independent of any wrongdoing by the Defendants.

12. It is therefore surprising to see that Mr Childe – who has only very recently been appointed as an independent director of Port Link and, by his own admission, does not have a full understanding of the facts and matters that underlie Plaintiffs' concerns and gave rise to the Section 22 Application – seeks to deny the Plaintiffs some of the documents and information they seek because he does "not see the relevance ... to the purported concerns of the Plaintiffs" (see, for example, Childe Affidavit at paragraph 44). Whether the documents and information requested by the Plaintiffs will ultimately be relevant to their concerns has no bearing upon the Defendants' consideration as to whether they should provide these materials . The Plaintiffs are entitled to these documents and information as a matter of statute under Section 22 of the ELP Law.

13. Because they are irrelevant in the context of the relief sought in the Section 22 Application, I do not respond in any detail to the parts of the Childe Affidavit that seek purely (for example ) to argue that the Port Fund's executives have been erroneously convicted on criminal charges, or to provide purported explanations for the discrepancies that the Plaintiffs have identified between expected and actual distributions. Moreover, even if such matters had relevance to the Section 22 Application, which they do not, Mr Childe's arguments and explanations are not supported by any evidence.

14. While the concerns set forth in my First Affidavit demonstrate that there is a pressing need for transparency in relation to the affairs of the Port Fund, the only relevant point for the Section 22 Application is that the Plaintiffs are entitled to assert their statutory right to receive the requested documents and information.

15. I note the allegations in the Childe Affidavit to my professional relationship with Agility. To be clear, Agility has no relevance to the proceedings at hand. Agility is not a party, nor is it a subsidiary, affiliate, or related party to the Plaintiffs in this proceeding. The allegations set forth in the Childe Affidavit therefore are wholly irrelevant to the Section 22 Application and , unless the Court wishes me to do so, I do not propose to address them any further herein.

The Defendants' lack of cooperation and delaying tactics

16. In my First Affidavit, I mentioned that the First Plaintiff had approached the Defendants asking them to provide the relevant documents voluntarily, but had been rebuffed. This was mentioned by way of background to explain further why the First Plaintiff was required to seek the Court's assistance, as well as why the First Plaintiff was increasingly and highly concerned about the lack of transparency in respect of the Port Fund.

17. In response, the Childe Affidavit asserts that it was in fact the Plaintiffs and their legal advisors who had failed to engage properly.

18. Nothing in the Section 22 Application, however, turns on the question of whether one party cooperated with the others. Moreover, the correspondence speaks for itself (in this regard, see

3

correspondence between the First Plaintiff's US counsel, Quinn Emanuel Urquhart & Sullivan LLP ("Quinn Emanuel"), and the Defendants' US counsel, Crowell & Moring LLP ("Crowell"), exhibited at BAE3/001 to BAE3/008) and makes clear that it was the Defendants who were avoiding the provision of documents and proper explanations. I will therefore not respond with further detail to this part of the Childe Affidavit.

19. I must, however, address Mr Childe's argument in relation to the alleged failure of the First Plaintiff to sign a non-disclosure agreement. One of the Defendants' excuses for refusing to provide disclosure is their claim that they are prohibited from producing certain materials unless the First Plaintiff signs a non-disclosure agreement. Although the Plaintiffs have never accepted that they should be required to enter into a non-disclosure agreement, they have nonetheless indicated on several occasions that they would be willing to do so, if that would persuade the Defendants to provide the relevant documents. The First Plaintiff even provided a draft non-disclosure agreement to the Defendants for this purpose. The Defendants, however, have continually failed to engage. In particular, the Court's attention is drawn to the following correspondence:

a) As outlined in the First Affidavit, on 13 November 2019, I sent a letter on behalf of the First Plaintiff to Crowell and Walkers (exhibited at BAE1/018 to the First Affidavit), in which I agreed to speak with the Port Fund's representatives to discuss the First Plaintiff's concerns.

b) Although I never received a substantive response to the offer made in the 13 November letter, nearly two months later, the Defendants, acting through Crowell, wrote to Quinn Emanuel in a letter dated 5 January 2020 (a copy of which is exhibited at BAE3/001), and inexplicably accused the First Plaintiff of having rebuffed the Defendants' offer to meet.

c) In response, the First Plaintiff, acting through Quinn Emanuel, wrote to Crowell in a letter dated 9 January 2020 (a copy of which is exhibited at BAE3/002), and again agreed to meet with the Defendants' counsel to discuss, among other items, the alleged misconduct underlying the Section 22 Application.

d) In this 9 January letter, the First Plaintiff reiterated that, under Section 7.2 of the LPA, the First Plaintiff was already obliged to ensure that it and its advisors comply with confidentiality obligations towards the Port Fund, and in light of this, the Defendants had failed to justify their position that a non-disclosure agreement would be required before a meeting between the parties could occur. Further, and as set out in more detail below, it is unclear why the Defendants were deeming as confidential the information that they were intending to share with the First Plaintiff.

e) Despite the First Plaintiff's view (as more fully set out in Paragraph 27 of the First Affidavit) that the provision of a non-disclosure agreement was (and is) inappropriate, in a continued demonstration of good faith, the First Plaintiff provided the Defendants with a draft non-disclosure agreement for proposed execution (under cover of the 9 January letter, BAE3/002).

4

f) Crowell, on behalf of the Defendants, responded to the 9 January letter in a letter dated 21 January 2020 (a copy of which is exhibited at BAE3/003) and again delayed, in this instance putting off the meeting between the parties. The Defendants contended that the reason for such a delay was that they had "reached out to Udenna Corporation ("Udenna "), the purchaser of the GGDC project in the Philippines, to obtain its input on what confidentiality terms, possibly including court-ordered confidentiality terms, would be acceptable. Our clients believe that given the allegations, Udenna should share the same interest in clearing the record provided that its financial information is sufficiently protected according to the terms of the Share Purchase Agreement". There was no reason , however, for a third party to be consulted regarding, much less required to agree to, the confidentiality terms that would govern any discussion that was due to take place between the First Plaintiff and the Defendants, particularly insofar as it relates to information that plainly concerns the Port Fund. Further, it is notable and unfortunate that the Defendants waited until that late stage only to raise this purported barrier to meeting with the First Plaintiff, especially given that the First Plaintiff's concerns regarding the Port Fund's sale of the Clark Asset to Udenna have been long known to the Defendants, including as set forth in the First Affidavit and in numerous correspondence between the parties (by way of example, see the 13 November letter, BAE1/018).

g) Quinn Emanuel, on behalf of the First Plaintiff, responded to the 21 January letter on 28 January 2020 (a copy of which is exhibited at BAE3/004) expressing the First Plaintiff's concern that the Defendants were simply employing delaying tactics. Nevertheless, as a further demonstration of good faith, the First Plaintiff agreed to schedule a meeting for 6, 7 or 10 February 2020 and asked the Defendants to confirm their acceptance by 30 January 2020.

h) Crowell, on behalf of the Defendants, responded to the 28 January letter on 4 February 2020 (a copy of which is exhibited at BAE3/005) again seeking to delay any meeting between the First Plaintiff and the Defendants, now until 24 or 26 February, purportedly due to the appointment of the two new independent directors to the board of Port Link. The Defendants also confirmed that Udenna "objects to the disclosure of information related to its purchase of the Clark property to GIC". Absent from this letter, however, was any mention of the non-disclosure agreement that the First Plaintiff proffered in its 9 January letter. This failure to respond to the non-disclosure agreement was particularly surprising because the Defendants have repeatedly (both in correspondence and in the Childe Affidavit) criticised the First Plaintiff's alleged reluctance to enter a non-disclosure agreement as the reason for both the delay in the provision of information by the Defendants and the delay in meeting with the First Plaintiff.

i) Ultimately, on 4 March 2020, Quinn Emanuel, on behalf of the First Plaintiff, met with Crowell and Walkers, both on behalf of the Defendants. Despite the Defendants' assertions in a letter from Crowell dated 18 February 2020 (a copy of which is exhibited at BAE3/007) that they "anticipate[d] sharing an agenda and proposed non-disclosure agreement well in advance of March 4", neither an agenda nor a non-disclosure agreement was provided to the First Plaintiff. In addition, despite the Defendants having repeatedly asserted in correspondence that they would be willing to share further information with the First Plaintiffs at a meeting, no information was forthcoming.

Indeed, Crowell and Walkers refused to answer Quinn Emanuel's specific queries regarding, among other items, points of concern set out in the First Affidavit.

Documents inappropriately designated as confidential

20. As is evident, including from the correspondence set out above and exhibited to this Third Affidavit, the Defendants have repeatedly raised purported concerns about confidentiality obligations they claim are owed to third parties as a basis not to provide the Plaintiffs with the information to which they are entitled under Section 22 of the ELP Law.

21. By way of example, in Paragraph 29 of the Childe Affidavit, Mr Childe expresses the Defendants' "concern" that the First Plaintiff had in its possession two confidential documents that he states "have not been provided to the First Plaintiff or any limited partners of the Fund". An investment management agreement entered into between the Port Fund and its former investment manager, however, is not confidential as against the Limited Partners of the Port Fund. The Defendants' assertion otherwise is particularly surprising in circumstances where Section 13.1 (confidentiality) of the investment management agreement (see page 42 of Tab 5 of the exhibit to the Childe Affidavit), does not seek to assert that the mere existence or contents of the agreement itself is confidential. Furthermore, the fact that the Defendants voluntarily admitted to a liability of USD 57 million (plus interest) in favour of the investment manager pursuant to this agreement (further details of which are set out in paragraph 14(c) of the First Affidavit) underscores the relevance of this document to the Limited Partners who, understandably, need a transparent accounting for their investment.

22. While this is just one example of the Defendants' unjustified designation of information as confidential, it causes the Plaintiffs further concern with regard to the Defendants' assertions of confidentiality in respect of other documents. For instance, at paragraph 3 of the Disclosure Letter (as defined in the Childe Affidavit and exhibited at Tab 3 of the Childe Affidavit), the Defendants assert that the "transaction details" in relation to the sale of the Clark Asset to Udenna (further details of which are set out in paragraph 14(a) of the First Affidavit) are "subject to non-disclosure obligations". At no point, however, have the Defendants provided the Plaintiffs with a copy of this purported non-disclosure agreement with Udenna, nor have they explained how there could be obligations to Udenna, a third party, that would prevent the disclosure of information to the Port Fund's Limited Partners. For the Defendants to have entered into agreements with third parties that seek to keep information secret from its Limited Partners is both surprising and concerning.

23. Similarly, in response to the Plaintiffs' requests concerning the Damietta Loan (further details of which are set out in paragraph 14(b) of the First Affidavit), the Defendants have sought to designate relevant information as confidential and have asserted that KGL Ports has not consented to the release of information. It is remarkable that the Defendants waited until February 2020 to seek leave from KGL Ports to waive a confidentiality obligation, when the Plaintiffs have been seeking this information for many months (by way of example, see the 13 November letter, BAE1/018).

24. Moreover, although it is a matter for legal submissions, the Plaintiffs' position is that the statutory duty under Section 22 of the ELP Law cannot be overridden by a contractual non-

6

disclosure provision.

Gaps between disclosure provided to the Plaintiffs to date and the Plaintiffs' information requests

25. Paragraph 40 of the Childe Affidavit asserts that the Defendants' Disclosure Letter " substantively responded" to each request set out in paragraph 29 of the First Affidavit. This characterization is inaccurate. The information provided by the Defendants in the Disclosure Letter was substantially incomplete and remains insufficient in addressing the Plaintiffs' detailed requests for information.

26. On the most basic level, the Defendants' Disclosure Letter is deficient because it fails to provide an explanation for the current apparent shortfall in the Port Fund's capital. By way of example, while the Defendants admit that USD 496 million in sales proceeds from the Clark Asset transaction were deposited into the Noor Bank Account, the Defendants have only accounted for USD 481 million of such amount, leaving unaccounted an amount of USD 15 million. Moreover, while the Defendants also maintain that USD 50.7 million was paid to Crowell "for their legal fees and for disbursements on behalf of the Fund", they have only accounted for USD 46.4 million of such amount, leaving completely unaccounted a further amount of over USD 4.2 million.

27. In order to assist the Honourable Court's review of the Plaintiffs' original requests in paragraph 29 of the First Affidavit, the Defendants' disclosure to date, and the information and documentation that remains outstanding in respect of each request, the Plaintiffs provide the following summary charts, arranged by topic. I note that these summaries are not intended to be a complete description of every gap, nor to otherwise change or modify any of the Plaintiffs' requests as set out in the First Affidavit.

Fund Payments

28. The below table relates to the information requested by the Plaintiffs at paragraph 29(a) to (d ) of the First Affidavit.

| Ref | Request | What the Defendants have provided | What is outstanding |
|---|---|---|---|
| 29(a) | Complete copies of bank account statements for the Noor Bank Account into which the USD 496 million in relation to the Clark Asset was deposited from inception to date. | Disclosure Letter, paragraph 3.11. An incomplete ledger with USD 15 million unaccounted for and numerous payees' identities hidden. | Plaintiffs' request remains outstanding. The Plaintiffs require complete, unredacted copies of statements for the Noor Bank Account showing, among other things, the amount of the payment, the date of the payment, and the party to whom the funds were paid (including any "designated payees"). |

| | | | Further, its existence now having been revealed by the Defendants in the Disclosure Letter, the Plaintiffs also seek, by the letter from Travers Thorp Alberga dated 26 March 2020 (a copy of which is exhibited at BAE3/009 ), copies of statements for the C &M LLP DC IOLTA into which a total of USD 50.7 million was deposited, from 7 February 2019 (the date of the first deposit) to date. |
|---|---|---|---|
| | | | Further, because of information provided in the Disclosure Letter , the Plaintiffs also seek missing documentary evidence regarding Port Link's request for the transfer of USD 94,613,499 from the Noor Bank Account to Ideal Gulf Holdings Limited, a company owned by one of Port Link's authorised signatories (as demonstrated by Schedule 2 to the Disclosure Letter at page 44 ). |
| 29(b) | The identities of all parties who received distributions from the Noor Bank Account, the amount and date of such disbursement, and the bank account details for such disbursements. | Disclosure Letter, paragraph 3.11. See 29(a) | See 29(a).<br><br>Further, the Plaintiffs require documentary evidence of (i) the identity of the payee designated by EMPEML, together with the bank details of such payee to which USD 59.9 million was wired from the Noor Bank Account, (ii) the identity of the payee designated by Apache Asia, together with the bank details of such payee and Apache Asia to which USD 36.2 million was wired from the C& M DC LLC IOLTA, and (iii) the identity of any other payee that remains unidentified. |
| 29(c) | | | See 29(a). |

| | The legal basis upon which each and every payment in (b) above was made to such parties. | Disclosure Letter, section 3. See 29(a). | The ledger indicates that considerable fees were paid to various consultants including for "services and to assist in Fund's efforts to unfreeze $496 million held by Noor and protect the reputation of the Fund". It is entirely unclear what these services involved. Indeed, the Defendants have now admitted that Port Fund monies may have been expended to assist Port Link's former officials in defending criminal proceedings ( Paragraph 10.3 of the Disclosure Letter). |
| | | | By way of example, over USD 1 million was paid to Neil Bush for unspecified "services" in addition to his work assisting with the "Fund's efforts to unfreeze $496 million held by Noor". It is unclear what services Mr. Bush claims to have performed to earn this fee, or the basis upon which the fee was calculated. In fact, from Mr. Bush's public statements, which the Defendants, acting through Walkers, cited in their letter to the First Plaintiff dated 23 September 2019 at footnote 4 on page 3 (exhibited at BAE1/006 to the First Affidavit), it is clear that at least some of Mr. Bush's efforts have been to call for the release of Ms. Lazareva from prison in Kuwait, a matter unrelated to the Port Fund. |
| | | | The Plaintiffs therefore require documentary evidence of advisory services provided to the Port Fund by third parties, including unredacted engagement letters, |

| | | | correspondence, and invoices with time entries from all service providers (including their beneficial owners, shareholders, directors, officers, employees, or executives) namely (i) EMPEML, (ii) Udenna, (iii) Apache Asia, (iv) Wilfredo Placino, (v) Squire Patton Boggs , (vi) Brownstein Hyatt Farber Schreck, (vii) Marathon Strategies LLC, (viii) Fahmy Hudome International LLC, (ix) Mr. Bush, (x) Triple Canopy Media LLC, (xi) Laktineh & Co. Limited, (xii) Uzma Sarfraz dba Aurora International LLC, (xiii) Walkers, (xix) McCool Smith, and (xx) Crowell. |
|---|---|---|---|
| 29(d) | Details of the third party to whom payment was made in order to secure release of the USD 496 million from Dubai, as referenced in the letter from Walkers dated November 4, 2019, and all information and documents held by the Defendants pertaining to the interactions with such third party, including but not limited to any written agreements, and all correspondence. | Disclosure Letter, section 3. Assertion that it was KPA and PIFSS who were the third parties who received " overpayments" of USD 125 million and USD 79.2 million, respectively, to secure the release of the USD 496 million from Noor Bank. | Plaintiffs' request as to the relevant documents remains outstanding. |

29. As the foregoing illustrates, the Defendants have not responded substantively to any of the requests set out in paragraphs 29(a) to (d) of the First Affidavit, but instead have provided an incomplete summary. For example, the Defendants have not provided copies of the Noor Bank Account statements showing the exact amounts paid to third parties, dates of payments, and the parties to whom the funds were paid (including any "designated payees"). Instead, they have provided an unverified, incomplete ledger showing selective payments out of the Noor Bank Account, which, in a number of cases, did not specify the identity of the ultimate recipient of the funds.

30. By way of further example, the Disclosure Letter asserts that a total of USD 50.7 million was transferred from the Noor Bank Account to Crowell's trust account, as "[r]etainer monies paid to Crowell for their legal fees and for disbursement on behalf of the Fund" (see

transactions 14, 26, and 32 in paragraph 3.11 of the Disclosure Letter). In a glaring omission, however, the Disclosure Letter only accounts for the manner in which USD 46.4 million of these funds were used, leaving unaccounted a sum of over USD 4.2 million.

31. On 26 March 2020, Travers Thorp Alberga, acting for the Plaintiffs, sent a letter to the Defendants (see BAE3/009) requesting, among other things, the production of complete, unredacted copies of statements for the C&M LLP DC IOLTA into which this money was deposited. To date, the Defendants have not responded to this request.

32. In addition, the Plaintiffs reject the Defendants' assertions of confidentiality over the Noor Bank Account in circumstances where the Noor Bank Account was set up for the benefit of the Port Fund and forms part of the Port Fund's books and records to which the Limited Partners are entitled to access under Section 7.1 of the LPA and Section 22 of the ELP Law. Contrary to the assertions made in paragraph 43 of the Childe Affidavit, it is not necessary for third parties to authorize the Plaintiffs to obtain copies of the Noor Bank Account statements.

Preferred return amount

33. The below table relates to the information requested by the Plaintiffs at paragraph 29(e) to (g) of the First Affidavit.

| Ref | Request | What the Defendants have provided | What is outstanding |
|---|---|---|---|
| 29(e) | Confirmation and itemization of the capital commitments and contributions made by each Limited Partner at the commencement of the Fund, and in each calendar year since that commencement, together with: (i) bank statements showing the capital contributions received, and (ii) an explanation of for which of the Port Fund's investments the capital was received and applied towards. | Disclosure Letter, paragraph 4.2. Assertion that the Plaintiffs are not entitled to obtain copies of bank statements itemizing the capital contributions. | The Plaintiffs' request remains outstanding. The Plaintiffs disagree with the Defendants' assertion about entitlement. Among other things, the Plaintiffs require confirmation and itemization of the capital commitments and contributions made by each Limited Partner at the commencement of the Port Fund, and in each calendar year since that commencement, together with: (i) bank statements showing the capital contributions received, and (ii) an explanation of for which of the Port Fund's investments the capital was received and applied towards. Such information would have been included in the Port Fund's financial statements, had they |

| | | | |
|---|---|---|---|
| | | | been produced. |
| 29(f) | Confirmation of the respective ownership percentages of the Limited Partners since the commencement of the Fund. | Disclosure Letter, paragraph 4.3. Audited financial statements from 2007 to 2016 (with 2017, 2018, and 2019 remaining outstanding ), which provide no explanation for anomalous variations in the Limited Partners' ownership percentages. | The information provided is incomplete (by date range) and nonresponsive to the Plaintiffs' request. The Plaintiffs require a detailed explanation of (i) discrepancies in ownership balances for certain Limited Partners who made identical commitments (i.e. KGLI and GIC), (ii) the inflation of the dollar capital account for certain Limited Partners (i.e., KGLI) (iii ) confirmation that all Limited Partners made their stated commitment and paid applicable penalty interest for late funding, and (iv) confirmation of the respective ownership percentages of the Limited Partners, as of 31 December 2018.

The assertion that the 2017, 2018, and 2019 financial statements are being prepared and will be provided "in due course" (see paragraphs 4.3 and 4.5 of the Disclosure Letter) is noted, as is the significant continued delay, but no further update has been provided in the two months since the Disclosure Letter was sent, or in the more than five months since this assertion was first made in written correspondence. |
| 29(g) | The capital account statement in respect of the Plaintiff covering each calendar year since commencement of the Fund. Such capital account statements should show the capital contributions made by and distributions to the Plaintiff, any adjustments | Disclosure Letter, paragraph 4.3. Audited financial statements from 2007 to 2016 (with 2017, 2018, and 2019 remaining outstanding ), which provide no explanation for anomalous variations in the Limited Partners' ownership | The Plaintiffs' request remains outstanding. |

| | made to the Plaintiff's capital account including an explanation of the nature of any adjustments, and the corresponding preferred return balance accrued to the capital account balance of the Plaintiff over that period. | percentages. | |
|---|---|---|---|

34. As shown, the information provided by the Defendants in the Disclosure Letter is incomplete and does not satisfy the information requests in paragraphs 29(e) to (g) of the First Affidavit.

35. By way of example, the limited information disclosed to the Plaintiffs does not sufficiently demonstrate that the Defendants have distributed to the Limited Partners their contractual entitlements in accordance with the terms of the LPA.

Commingling of funds

36. The below table relates to the information requested by the Plaintiffs at paragraph 29(h) of the First Affidavit.

| Ref | Request | What the Defendants have provided | What is outstanding |
|---|---|---|---|
| 29(h) | Any and all correspondence relating to: (i) the opening of the Noor Bank Account, and (ii) the rationale for the USD 496 million being deposited into the Noor Bank Account rather than the bank accounts that had historically been utilized in the name of the Port Fund (for example, Al Ahli Bank of Kuwait or HSBC Kuwait). | Disclosure Letter, section 5. A non-responsive answer regarding the structure and operation of exempted limited partnerships. | The Plaintiffs' request remains outstanding. |

37. While the Disclosure Letter and the Childe Affidavit (at paragraph 57) correctly state that the Port Fund "cannot hold property in its own right given it is a Cayman Islands exempted limited partnership and has no separate legal personality", the role of the Port Link remains one as a trustee under section 16(1) of the ELP Law, and it therefore should have opened a separate account "in its capacity as general partner" of the Port Fund in order to distinguish its own assets from those held by it as trustee.

Carry entitlement

38. The below table relates to the information requested by the Plaintiffs at paragraph 29(i) and (j
) of the First Affidavit.

| Ref | Request | What the Defendants have provided | What is outstanding |
|---|---|---|---|
| 29(i) | Any and all spreadsheets ( including any distribution waterfall calculations prepared pursuant the LPA) explaining how the quantum of each distribution to Limited Partners was quantified. | Audited financial statements (in respect of the 2016 distribution but not the 2019 distribution), which do not contain the information requested, and a non-responsive answer stating that the Plaintiffs are not entitled to receive documentation comprising the internal working papers of the management of the Port Fund. | The Plaintiffs' request remains outstanding. |
| 29(j) | All information held by the Defendants in connection with any loans and/or any other liabilities of the Fund that were paid as part of the exit proceeds from the Clark Asset. | The Defendants refer to a broad description of payments relating to sale of the Clark Asset, which contains no reference to loans or liabilities. | The Plaintiffs' request remains outstanding. |

39. The limited and incomplete information provided in the Disclosure Letter does not accurately address the information requests in paragraphs 29(i) and (j) of the First Affidavit. Notably, the Defendants refuse to provide any further information about any loans and/or other liabilities of the Port Fund that were paid as part of the exit proceeds from the Clark Asset.

40. Furthermore, the Childe Affidavit is silent on the discrepancy of over USD 500 million between the purported exit value for the Clark Asset, as set out in Philippines corporate filings by the purchaser (exhibited at page 13 of BAE1/003 of the First Affidavit), and the sums which were deposited into Port Link's account (as evidenced by the SWIFT transaction exhibited at Exhibit BAE1/004 of the First Affidavit). The Disclosure Letter provides no explanation, and instead attempts to disclaim responsibility, stating "[i]t is not up to the Fund to explain Udenna's regulatory filings" (paragraph 3.2).

41. Additionally, as set out in paragraph 22 above, the Defendants assert (in the Disclosure Letter , but not in the Childe Affidavit) that the details of the sale and purchase of the Clark Asset are subject to non-disclosure obligations. The Defendants, however, have not provided the Plaintiffs with any evidence of these purported non-disclosure obligations. That the Defendants apparently entered into an agreement denying the Limited Partners the right to information relating to the sale of the Clark Asset is of very real concern to the Plaintiffs.

The DIFC Claim

42. The below table relates to the information requested by the Plaintiffs at paragraph 29(k) to (p) of the First Affidavit.

| Ref | Request | What the Defendants have provided | What is outstanding |
|---|---|---|---|
| 29(k) | All information and documents held by the Defendants pertaining to KGLI's sale of EMPEML, including but not limited to the sale purchase agreement (or equivalent) and any associated addenda including associated warranties and indemnities and any other material identifying the purchaser, the date and terms of sale. | Disclosure Letter, paragraphs 6.2 and 6.3. The Defendants state that they are not in possession of any documentation relating to the sale of EMPEML as EMPEML is a third party that is not and has never been owned or controlled by the Port Fund or Port Link. | The Plaintiffs' request remains outstanding.<br><br>The Plaintiffs require copies of all documents, invoices, emails, and other correspondence sent to or received from any of the Defendants, on the one hand, and, on the other hand, EMPEML, or any beneficial owners, shareholders, directors, officers, employees, or executives of EMPEML.<br><br>Although EMPEML was never owned or controlled by the Port Fund, EMPEML was previously wholly owned by the Port Fund's sponsor and placement agent, KGLI KSCC, and, therefore, was an affiliate of Port Link through common control by way of Ms. Lazareva, a former executive at EMPEML and executive at Port Link and the Port Fund. The Plaintiffs are, therefore, entitled to the information requested as, despite the assertions made in paragraph 62 of the Childe Affidavit, EMPEML is not a mere "third party" entity. |
| 29(l) | All written communication from EMPEML received by Port Link, including, but not limited to, demand notices and correspondence relating to the management agreement. | Disclosure Letter, paragraph 6.4. Incomplete communication, comprising a copy of the demand letter dated 7 July 2018 issued by EMPEML's DIFC legal counsel, Clyde & Co LLP, to the Port Fund. | See 29(k). |
| 29(m) | | | |

|  | Any information and documents pertaining to the DIFC claim brought by EMPEML against the Port Fund and Port Link, including all associated legal advice, received by any of the parties on matters including, but not limited to, their decisions to submit to service in the DIFC and not to file a defence and any other material relevant to that claim. | Disclosure Letter, paragraphs 6.5 and 6.6. Non-responsive answer stating that, while legal advice is subject to privilege, the Fund concluded that EMPEML's claims had merit and that the Port Fund was not in the position to engage in litigation. | The Defendants' response is incomplete. |
|---|---|---|---|
| 29(n) | All information and documents (including documentary evidence and relevant agreements) submitted in the DIFC Claim or otherwise relied upon in support of EMPEML's claim of 8% penalty compound interest on delays in paying the Carry and Management Fees (as such terms are defined in the LPA). | Disclosure Letter, paragraphs 6.7 and 6.8. Non-responsive answer stating that the claim form and EMPEML demand letter set out the basis upon which EMPEML calculated the sums claimed in the DIFC proceedings. | The Defendants' response is incomplete.<br><br>The claim form and EMPEML demand letter do not set out the basis upon which EMPEML was allegedly entitled to interest. This is particularly striking, given that the Defendants have asserted that EMPEML's claims had merit (see paragraph 6.6 of the Disclosure Letter). |
| 29(o) | All information, analysis, accounts and other documents (including documentary evidence provided by way of disclosure) submitted in the DIFC Claim or otherwise relied upon in support of EMPEML's calculation of the Carry as USD 45,462,000. | Disclosure Letter, paragraphs 6.7 and 6.8. Non-responsive answer stating that the claim form and EMPEML demand letter set out the basis upon which EMPEML calculated the sums claimed in the DIFC proceedings. | The Defendants' response is incomplete.<br><br>Since the Defendants have asserted that EMPEML's claims had merit, the Plaintiffs require an explanation of (i) the basis upon which the Defendants concluded that EMPEML purportedly was entitled to receive Carry before the Limited Partners had received any return of their capital, and (ii) how such Carry was calculated. |
| 29(p) | All information and documents pertaining to the Port Fund's settlement of the DIFC Claim judgment debt with EMPEML, including the identity of all beneficiaries of that judgment debt, the dates of, amounts of | Disclosure Letter, paragraphs 6.9 and 6.10. Non-responsive answer referring the Plaintiffs to (i) the DIFC judgment as proof of judgment sum ordered to be paid by the Port Fund, | The Defendants' response is incomplete.<br><br>Plaintiffs require an explanation of the Port Fund's settlement of the DIFC Claim judgment debt with EMPEML, including the identity of all beneficiaries of |

| | | | |
|---|---|---|---|
| | and justifications for those distributions. | and (ii) the fact that the Port Fund made a payment of USD 59,990,461 to EMPEML. | that judgment debt, the dates of, amounts of and justifications for those distributions. |

43. Thus, as shown, the Plaintiffs' requests at paragraph 29(k) to (p) remain unanswered in significant and material respects.

44. Further, the Defendants (in paragraph 63 of the Childe Affidavit) claim that the Plaintiffs are not entitled to the information sought at paragraph 29(m) because such information is privileged. Travers Thorp Alberga, on behalf of the Plaintiffs, asked the Defendants to identify the categories of information and documentation over which they intended to claim privilege in their letter of 19 March 2020 (exhibited at BAE3/010). (It is noted that this letter is marked without prejudice, but it is clear from its contents that it is not in fact so privileged). To date, the Defendants have not responded to that request. The issue of privilege will be addressed fully by counsel in submissions. The Plaintiffs' position, however, is that privilege cannot be asserted as a defence to the Section 22 Application.

Damietta Loan

45. The below table relates to the information requested by the Plaintiffs at paragraph 29(q) to (s) of the First Affidavit.

| Ref | Request | What the Defendants have provided | What is outstanding |
|---|---|---|---|
| 29(q)(i) | The original executed loan agreement between the Port Fund and the borrower and any subsequent modifications to this loan agreement. | Section 7 of the Disclosure Letter. Non-responsive answer citing confidentiality provisions in the DIPCO Loan Agreement preventing the Port Fund from disclosing the agreement to any third parties without the prior written consent of KGL Ports. | The Plaintiffs' request remains outstanding. |
| 29(q)(ii) | All loan statements prepared by the lender and provided to the borrower from the date of drawdown of the Damietta Loan, to the date of any subsequent write-off in 2014 and in the absence of any such statements, any and all correspondence between the parties showing the level of | Section 7 of the Disclosure Letter. See 29(q)(i). | The Plaintiffs' request remains outstanding. |

| | | | |
|---|---|---|---|
| | the borrower's indebtedness to the Port Fund. | | |
| 29(q)(iii) | Details of any placement fee paid by the Port Fund to the borrower, including (but not limited to) the date and amount of any such fee. | Section 7 of the Disclosure Letter. See 29(q)(i). | The Plaintiffs' request remains outstanding. |
| 29(q)(iv) | Any and all correspondence regarding the Damietta loan relating to the waiver of the lender's entitlement to interest and confirmation provided by the Port Fund to the borrower that the loan principal had been repaid. | Section 7 of the Disclosure Letter. See 29(q)(i). | The Plaintiffs' request remains outstanding. |
| 29(r) | Internal documentation ( including, but not limited to board minutes, meeting notes and correspondence) setting out the rationale and approval process of any decision taken by the Port Fund in respect of: (i) any waiver by the Port Fund of its entitlement to interest on the Damietta Loan ; (ii) the rationale for any decision of the Port Fund to write off the Damietta Loan; and (iii) the rationale for any decision of the Port Fund not to convert the Damietta Loan (and accrued interest) into shares of the Borrower. | Section 7 of the Disclosure Letter. See 29(q)(i). | The Plaintiffs request remains outstanding. |
| 29(s) | Documents related to the Port Fund's analysis of impairment disclosure requirements related to the Damietta loan, as required by IFRS 7 for the years 2013 and 2014. | Section 7 of the Disclosure Letter. Non-responsive answer stating it is standard accounting practice to treat the unpaid loan as a provisional loss. | The Plaintiffs' request remains outstanding. |

46. The Plaintiffs' requests for information from the Defendants in relation to the Damietta Loan remain outstanding in full. Rather than providing any substantive response, the Defendants claim that the DIPCO Loan Agreement is subject to non-disclosure obligations that "prevent

the Fund from disclosing the agreement to any third parties without the prior written consent of KGL Ports" (see paragraph 7.3 of the Disclosure Letter). As with the same argument in respect of the Clark Asset, the Defendants have not provided the Plaintiffs with a copy of the non-disclosure obligations which they claim prevent the Defendants from disclosing the information requested in paragraph 29(q). Indeed, as mentioned in paragraph 23 above, the Defendants waited until February 2020 to seek a waiver from KGL Ports for the alleged non-disclosure (see paragraph 7.7 of the Disclosure Letter). In any event, as with the Clark Asset, that the Defendants claim to have entered into an agreement denying the Limited Partners the right to the information relating to the sale and the assets of the Port Fund is of very real concern to the Plaintiffs.

Audited financial statements

47. The below table sets out the information requested by the Plaintiffs at paragraph 29(t) to (u) of the First Affidavit.

| Ref | Request | What the Defendants have provided | What is outstanding |
|---|---|---|---|
| 29(t) | A full accounting of the process used to reach the purported ownership percentages of the limited partners and general partner of the Port Fund as stated in the 2015 and 2016 audited financial accounts. | Paragraphs 9.1 to 9.6 of the Disclosure Letter. Non-responsive answer stating that the Port Fund's financial statements were audited in accordance with international financial reporting standards. | The Plaintiffs' request remains outstanding. |
| 29(u) | A full account or explanation of the process used to distribute funds following the completion of the 2015 and 2016 audited financial accounts. | Paragraphs 9.1 to 9.6 of the Disclosure Letter. Non-responsive answer that distributions to the limited partners were made in accordance with the provisions of the LPA. | The Plaintiffs' request remains outstanding. |

48. The Plaintiffs' requests in respect of the audited financial statements of the Port Fund remain unanswered by the Defendants.

49. In respect of the request in paragraph 29(t), while the financial statements may have been audited in accordance with "international financial reporting standards", in the performance of their audit auditors usually rely on management's representations. The Plaintiffs therefore seek a full accounting of the internal process used by management to reach the purported ownership percentages of the Limited Partners and General Partner in the 2015 and 2016 audited financial statements, as well as a full account or explanation of the process used to distribute funds following completion of the 2015 and 2016 audited financial statements.

Conclusion

50. For the reasons set out in this Third Affidavit, I respectfully submit that the requests set out in paragraph 29 of the First Affidavit – as supplemented by the Plaintiffs' 26 March 2020 request for complete, unredacted copies of statements for the C&M LLP DC IOLTA into which a total of USD 50.7 million was deposited – relate to information and documentation to which the Plaintiffs are entitled pursuant to Section 22 of the ELP Law. The Plaintiffs therefore seek the relief from the Court set out in the originating summons.


SWORN by BADER ABDULMOHSEN EL-JEAAN

At   Dubai, united Arab Emirates

This _____ day of April 2020

_____

Notary Public

_____

Bader Abdulmohsen El-Jeaan