# EXHIBIT 16

1. Defendants
2. Andrew J.Childe
3. Second Affidavit
4. Exhibit AC-2
5.  May 2020

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO. 235 OF 2019 (RJP)**

**IN THE MATTER OF THE APPLICATION FOR INFORMATION UNDER SECTION 22 OF THE EXEMPTED LIMITED PARTNERSHIP LAW (2018 REVISION)**

**BETWEEN:**

**(1)  GULF INVESTMENT CORPORATION**
**(2)  GENERAL RETIREMENT AND SOCIAL INSURANCE AUTHORITY**

**PLAINTIFFS**

**AND:**

**(1) THE PORT FUND L.P.**
**(2) PORT LINK GP LTD.**

**DEFENDANTS**

_____

**SECOND AFFIDAVIT OF ANDREW JOSEPH CHILDE**

_____

I, **ANDREW JOSEPH CHILDE**, of FFP (Directors) Limited, 2nd Floor, Harbour Centre, 42 North Church Street, George Town, Grand Cayman, Cayman Islands, being duly sworn **MAKE OATH AND SAY** as follows:

**Introduction**

1.     I am one of the Directors of Port Link GP Ltd. (the "**GP**"), which acts as the general partner of The Port Fund L.P. (the "**Fund**").  I am duly authorised to swear this Affidavit on behalf of the GP and the Fund (together, the "**Defendants**").

2.     I make this Affidavit in support of the Defendants' opposition to the application filed by Gulf Investment Corporation (the "**First Plaintiff**") and General Retirement and Social Insurance Authority (the "**Second Plaintiff**" and together with the First Plaintiff, the "**Plaintiffs**") for information from the Defendants pursuant to Section 22 of the Exempted Limited Partnership Law (2018 Revision) (the "**ELP Law**") in respect of the Fund (the "**S.22 Proceedings**"). I make this affidavit further to my First Affidavit in the S.22 Proceedings dated 9 April 2020 ("**Childe 1**") with exhibit AC-1.  Unless otherwise defined herein, I adopt the definitions as set out in Childe 1.

1

3.     Produced to me at the time of swearing this Affidavit and marked "**AC-2**" is a bundle of true copy documents referred to in this Affidavit.  A reference to a tab and page number in this Affidavit is a reference to the corresponding tab and page number of the exhibit. Where documents have been exhibited to El-Jeaan 1 (as defined below) and El-Jeaan 3 (as defined below) and referred to herein, I have not included such documents in AC-2 but have instead referred to such documents as they appear within the exhibits to El-Jeaan 1 and El-Jeaan 3.

4.     Save where otherwise indicated, the matters to which I depose are within my own knowledge acquired by me in the above capacities, except where I state that I am relying on information from others.  The content of this Affidavit is true to the best of my knowledge, information and belief.

5.     In circumstances where I have only recently been appointed as a Director of the GP, a final draft of this Affidavit has been carefully reviewed by Abdulghfoor M A Alwadhi, who has acted as a Director of the GP since 2010.  Following such review, Mr Alwadhi has sworn an affidavit confirming that he considers the facts deposed herein to be accurate and a true, full and frank account of the dealings of the Defendants (see **Tab 1**).

6.     For the avoidance of doubt, nothing in this Affidavit is intended to waive privilege in respect of any matter referred to and privilege is not being waived.

**Background to this Affidavit**

7.     On 26 November 2019, Bader Abdulmohsen El-Jeaan ("**Mr El-Jeaan**"), a Senior Partner of Meysan Partners who acts as Kuwaiti legal counsel to the Plaintiffs, swore an affidavit in support of the First Plaintiff's request for information in the S.22 Proceedings ("**El-Jeaan 1**") with its respective exhibit ("**BAE1**").  In paragraph 29 (a) to (u) of El-Jeaan 1, the First Plaintiff has set out its extensive requests for information and documentation to be provided by the Defendants (the "**Plaintiffs' Information Requests**").

8.     On 21 January 2020, Mr El-Jeaan swore a second affidavit in support of an application by the Second Plaintiff to be joined as an additional plaintiff in the S.22 Proceedings ("**El-Jeaan 2**").

9.     In Childe 1, the Defendants responded to the Plaintiffs' Information Requests and the evidence relied upon by the Plaintiffs in El-Jeaan 1. In accordance with the procedural

2

timetable agreed between the parties and set out in the consent order dated 30 March 2020 and filed with the Court (the "**Consent Order**"), the Plaintiffs were entitled to file and serve any reply affidavit evidence by 4pm on Friday, 24 April.  Accordingly, the First Plaintiff filed and served the third affidavit of Mr El-Jeaan dated 24 April 2020 ("**El-Jeaan 3**") with its exhibit BAE-3 ("**BAE-3**")[1].

10.     Having reviewed El-Jeaan 3 and BAE-3, it is clear that El-Jeaan 3 contains a number of new and extensive requests for further information that do not appear in El-Jeaan 1. Moreover, El-Jeaan 3 also contains a number of new allegations against the Defendants.  The purpose of this Affidavit is to respond to the new evidence and information requests in El-Jeaan 3.

**Payments made from the Noor Bank Account**

11.     In paragraphs 26 of El-Jeaan 3, Mr El-Jeaan states that the Defendants have left "*unaccounted an amount of USD 15 million*".  In section 3 of the Disclosure Letter and paragraphs 56 to 63 of Childe 1, it is explained that the Defendants had not included the details of a small number of payments to service providers of the Fund, all of whom are based in Kuwait, in the table of payments made by the Fund to third parties out of the Noor Account.

12.     As outlined in Childe 1, the Defendants have serious concerns that the disclosure of the identity of certain Kuwaiti based service providers of the Fund would, in all likelihood, lead to adverse consequences for such parties.

13.     In paragraph 26 of El-Jeaan 3, Mr El-Jeaan states that with respect to fees paid to Crowell & Moring LLP the Defendants have "*only accounted for USD 46.4 million of such amount, leaving completely unaccounted a further amount of over USD 4.2 million*".  Following the release of the $496 Million from the Noor Account, I understand from representatives of the Fund that the GP considered it prudent to retain a reserve in order to enable the Fund to deal with any future or contingent liabilities (the "**Reserve for Liabilities**"). In circumstances where the Defendants had spent a considerable period of time and cost in securing the release of the $496 Million from the Noor Account, I understand from representatives of the Fund that the decision was taken to move the Reserve for Liabilities from the Noor Account to the Fund's trust account with Crowell & Moring LLP where there was significantly less risk of such monies being

---

[1] A reference in this affidavit to BAE3/XXX and is a reference to the tab number under which a specific document is located within BAE3.

subject to any further restrictions or interference by third parties. I understand from Crowell & Moring LLP that the Reserve for Liabilities has been properly used for the payment of liabilities of the Fund since the release of the $496 Million in February 2019.

14.     In paragraph 28 of El-Jeaan 3, in relation to the information requested by the Plaintiffs at paragraphs 29(a) of El-Jeaan 1, the Plaintiffs raise a new request for information with respect to "*evidence regarding Port Link's request for the transfer of USD 94,613,499 from the Noor Bank Account to Ideal Gulf Holdings Limited, a company owned by one of Port Link's authorised signatories*". I am informed by authorised representatives of the Fund and verily believe that this figure comprised the investment manager's carry distribution and limited partner distributions owing to PetroLink and KGLI, and that these funds were being transferred to Ideal Gulf Holdings Limited to be distributed accordingly. However, as the money was frozen in the Noor Account the transfers were not processed.

**Allegations that EMPEML is an affiliate of the GP**

15.     In paragraph 42 of El-Jeaan 3, the Plaintiffs request information from the Defendant and also EMPEML in respect of the information requested by the Plaintiffs at paragraphs 29(k) and 29(I) of El-Jeaan 1. The Defendants note that the Plaintiffs are not entitled to such information, as outlined in Childe 1 at paragraph 60 and in the Disclosure Letter at paragraphs 6.2, 6.3 and 6.4.

16.     In paragraph 42 of El-Jeaan 3, in respect of the information requested by the Plaintiffs at paragraphs 29(k) and 29(I) of El-Jeaan 1, the Plaintiffs state that "*EMPEML was previously wholly owned by the Port Fund's sponsor and placement agent, KGLI KSCC, and therefore, was an affiliate of Port Link*" as basis that the Plaintiffs are relying in requesting this information. Further, the information request in paragraph 29(k) of El-Jeaan 1 seeks "*all information and documents held by the Defendants pertaining to KGLI!s sale of EMPEML, including but not limited to the sale purchase agreement (or equivalent) and any associated addenda including associated warranties and indemnities and any other material identifying the purchaser, the date and terms of sale*".

17.     As I explained at paragraph 62 of Childe 1 and outlined at paragraph 6.3 of the Disclosure Letter, EMPEML is a third party who provided services to the Fund. EMPEML is the former investment manager for the Fund. KGLI was the sponsor and placement agent, and the former parent company of EMPEML. The sale by KGLI of its

4

subsidiary, which has never been an asset of the Fund or controlled by the Fund, is not a matter which involves the Fund. EMPEML has never been owned or controlled by the Fund. Given this, it is unclear on what basis the Plaintiffs are relying in requesting this information. In any event, the Defendants are not in possession of any documentation or information relating to the sale of EMPEML and are therefore not in a position to disclose such information.

**New requests for information in El-Jeaan 3**

18.     El-Jeaan 3 raises new questions and requests for information, notwithstanding the Defendants have established their concern regarding the likely misuse of such information should it be disclosed to the Plaintiffs without appropriate safeguards.

19.     The new questions and requests for information contained in El-Jeaan 3 comprise:

(a)     In paragraph 28 of El-Jeaan 3, in respect of the information requested by the Plaintiffs at paragraphs 29(b) of El-Jeaan 1, the Plaintiffs state that "*the Plaintiffs require documentary evidence of (i) the identity of the payee designated by EMPEML, together with the bank details of such payee to which USD 59.9 million was wired from the Noor Bank Account, (ii) the identity of the payee designated by Apache Asia, together with the bank details of such payee and Apache Asia to which USD 36.2 million was wired from the C& M DC LLC IOLTA, and (iii) the identity of any other payee that remains unidentified.*";

(b)     In paragraph 28 of El-Jeaan 3, in respect of the information requested by the Plaintiffs at paragraphs 29(c) of El-Jeaan 1, the Plaintiffs state that "the *Plaintiffs therefore require documentary evidence of advisory services provided to the Port Fund by third parties, including unredacted engagement letters, correspondence, and invoices with time entries from all service providers (including their beneficial owners, shareholders, directors, officers, employees, or executives) namely (i) EMPEML, (ii) Udenna, (iii) Apache Asia, (iv) Wilfredo Placino, (v) Squire Patton Boggs, (vi) Brownstein Hyatt Farber Schreck, (vii) Marathon Strategies LLC, (viii) Fahmy Hudome International LLC, (ix) Mr. Bush, (x) Triple Canopy Media LLC, (xi) Laktineh & Co. Limited, (xii) Uzma Sarfaz dba Aurora International LLC, (xiii) Walkers, (xix) McCool Smith, and (xx) Crowell.*";

(c)     In paragraph 33 of El-Jeaan 3, in respect of the information requested by the Plaintiffs at paragraphs 29(f) of El-Jeaan 1, the Plaintiffs state that "*the*

5

*Plaintiffs' require a detailed explanation of (i) discrepancies in ownership balances for certain Limited Partners who made identical commitments (i.e., KGLI and GIC), (ii) the inflation of the dollar capital account for certain Limited Partners (i.e., KGLI), (iii) confirmation that all Limited Partners made their stated commitment and paid applicable penalty interest for late funding, and (iv) confirmation of the respective ownership percentages of the Limited Partners, as of 31 December 2018.*"; and

(d)   *In paragraph 42 of El-Jeaan 3, in respect of the information requested by the Plaintiffs at paragraphs 29(o) of El-Jeaan 1, the Plaintiff states that "the Plaintiffs require an explanation of (i) the basis upon which the Defendants concluded that EMPEML purportedly was entitled to receive Carry before the Limited Partners had received any return of their capital, and (ii) how such Carry was calculated."*,

(together, the "**New Plaintiffs' Information Requests**").

20.   Mr Rowland and myself, along with Mr Alwadhi are in the process of reviewing the New Plaintiffs' Information Requests which are not contained in El-Jeaan 1. We will need to carefully consider the New Plaintiffs' Information Requests in order to determine whether the Plaintiffs are entitled to such further disclosure in accordance with their rights under the terms of the LPA.  However, we will need some time to consider such requests and to respond substantively to the Plaintiffs in due course.  The Fund has understandably not had the opportunity to consider the New Plaintiffs' Information Requests in any detail in the short time since the service of El-Jeaan 3 and, as noted above, will need time to carefully consider the New Plaintiffs' Information Requests and respond substantively in due course.

**New allegations made by the KPA**

21.   Yousef Al Sabah ("**Mr Al Sabah**"), the Director General of the KPA, swore an affidavit in analogous but separate proceedings issued by the KPA pursuant to section 22 of the ELP Law (the "**KPA Proceedings**") ("**Al Sabah 1**") with its respective exhibit ("**YAS1**"). In paragraphs (a) to (w) of the Schedule to Al Sabah 1, the KPA set out its extensive requests for information and documentation to be provided by the Defendants (the "**KPA Information Requests**"). I note that the information being requested by the KPA in the KPA Proceedings is virtually identical to the Plaintiffs' Information Requests.

22.  In my First Affidavit in the KPA Proceedings dated 9 April 2020, the Defendants responded to the KPA Information Requests and the evidence relied upon by the KPA in Al Sabah 1. In accordance with the procedural timetable agreed between the parties and set out in the consent order dated 30 March 2020 and filed with the Court, the KPA were entitled to file and serve any reply affidavit evidence by 4pm on Friday, 24 April. Accordingly, the KPA filed and served the second affidavit of Mr Al Sabah dated 24 April 2020 ("**Al Sabah 2**") with its exhibit YAS-2 ("**YAS-2**")

23.  Having reviewed Al Sabah 2 and YAS-2, it is clear that Al Sabah 2 contains a number of new and extensive requests for further information that do not appear in Al Sabah 1. Moreover, Al Sabah 2 also contains a number of new allegations against the Fund and the management team of the Fund (the "**New KPA Allegations**"). Whilst such allegations are not contained in El-Jeaan 3, the Fund has responded to the New KPA Allegations in my Second Affidavit in the KPA Proceedings dated 1 May 2020 ("**KPA Childe 2**") with exhibit AC-2 ("**KPA AC-2**").

24.  In circumstances where the KPA's concerns are clearly shared by the Plaintiffs, we hereby exhibit a copy of KPA Childe 2 and KPA AC-2 that contains the Defendants' responses to the New KPA Allegations thereto (see **Tab 2**).

**Conclusion**

25.  The Defendants have substantively responded to the Plaintiffs' Information Requests in the Disclosure Letter and pursuant to the terms of the CIDL Application. To the extent that the Defendants have not responded to a limited number of the Plaintiffs' Information Requests, the Defendants note that the Plaintiffs are not entitled to such information under the ELP Law or the LPA and such matters will be dealt with in detail during legal submissions.

Sworn by the said **ANDREW JOSEPH CHILDE** )

at   *GEORGE TOWN*                                       )

on the  /ˢᵗ day of May 2020                            )      **ANDREW JOSEPH CHILDE**

Before me                                                    )

Notary Public

THIS AFFIDAVIT is filed by Walkers, Attorneys-at-Law, 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands, for the Defendants whose address for service is care of its said Attorneys-at-Law.

7

**Brett Basdeo**
Notary Public in and for the Cayman Islands
My commission expires January 31ˢᵗ, 20 21

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO. 235 OF 2019 (RJP)

IN THE MATTER OF THE APPLICATION FOR INFORMATION UNDER SECTION 22 OF
THE EXEMPTED LIMITED PARTNERSHIP LAW (2018 REVISION)

BETWEEN:

(1) GULF INVESTMENT CORPORATION
(2) GENERAL RETIREMENT AND SOCIAL INSURANCE AUTHORITY

PLAINTIFFS

AND:

(1) THE PORT FUND L.P.
(2) PORT LINK GP LTD

DEFENDANTS

THIS IS EXHIBIT "AC-2" TO THE SECOND AFFIDAVIT OF

ANDREW JOSEPH CHILDE

SWORN BEFORE ME THIS   DAY OF MAY 2020

_____
NOTARY PUBLIC

Brett Basdeo
Notary Public in and for the Cayman Islands
My commission expires January 31st, 20 2 1

# Table of Contents

| | | |
|---|---|---|
| 1. | Tab 1 - Second Affidavit of Abdulghfoor Awadhi - GIC | 1 |
| 2. | Tab 2 - Second Affidavit & Exhibit of Andrew Childe (KPA) | 3 |

1. The Defendants
2. Abdulghfoor M A Al Awadhi
3. Second Affidavit
4. Exhibit AA-2
5. 1 May 2020

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO. 235 OF 2019 (RJP)

IN THE MATTER OF THE APPLICATION FOR INFORMATION UNDER SECTION 22 OF THE
EXEMPTED LIMITED PARTNERSHIP LAW (2018 REVISION)

BETWEEN:

(1) GULF INVESTMENT CORPORATION
(2) GENERAL RETIREMENT AND SOCIAL INSURANCE AUTHORITY

PLAINTIFFS

AND:

(1) THE PORT FUND L.P.
(2) PORT LINK GP LTD.

DEFENDANTS

---

### SECOND AFFIDAVIT OF ABDULGHFOOR M A AL AWADHI

---

I, ABDULGHFOOR M A AL AWADHI, of Plot 326, Block 5, Meshref, Kuwait, being duly sworn
MAKE OATH AND SAY as follows:

1.  I am one of the Directors of Port Link GP Ltd. (the "GP"), who acts as the general
    partner of the Port Fund L.P. (the "Fund"). I am duly authorised to swear this Affidavit on
    behalf of the GP and the Fund.

2.  I make this Affidavit in support of the Defendants' opposition to the application filed by
    the Plaintiffs for information from the Defendants pursuant to Section 22 of the
    Exempted Limited Partnership Law (2018 Revision) in respect of the Fund (the "S.22
    Proceedings").

3.  Save where otherwise indicated, the matters to which I depose are within my own
    knowledge acquired by me in my capacity as a Director of the GP since 2010, except

8990158 1 T5138 D08984

1

where I state that I am relying on information from others. The content of this Affidavit is true to the best of my knowledge, information and belief.

4. Now produced and shown to me and marked "**AA-2**" is a copy of the substantively final draft of the second affidavit of Andrew Joseph Childe, which is intended to be sworn in support of the Defendants' opposition to the S.22 Proceedings ("**Childe 2**").

5. I have carefully reviewed Childe 2 and its exhibit and consider the facts deposed therein to be accurate and a true, full and frank account of the dealings of the Fund and the GP.

Sworn by **Abdulghfoor M A Al Awadhi**  )
at Kuwait City, Kuwait  )
on the 1 day of May 2020  )     Abdulghfoor M A Al Awadhi
Before me:  )

_Bader Almutairi_

Lawyer

Address: Kuwait city - Fahad Al salem st Kuwait Building - 14th Floor

Bader n almutairat
law firm

1. Defendants
2. Andrew J.Childe
3. Second Affidavit
4. Exhibit AC-2
5. 1 May 2020

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO. 13 OF 2020 (RJP)**

**IN THE MATTER OF THE APPLICATION FOR INFORMATION UNDER SECTION 22 OF THE EXEMPTED LIMITED PARTNERSHIP LAW (2018 REVISION)**

**BETWEEN:**

**KUWAIT PORTS AUTHORITY**

<u>**PLAINTIFF**</u>

**AND:**

**(1) THE PORT FUND L.P.**
**(2) PORT LINK GP LTD.**

<u>**DEFENDANTS**</u>

_____

**SECOND AFFIDAVIT OF ANDREW JOSEPH CHILDE**

_____

I, **ANDREW JOSEPH CHILDE**, of FFP (Directors) Limited, 2nd Floor, Harbour Centre, 42 North Church Street, George Town, Grand Cayman, Cayman Islands, being duly sworn **MAKE OATH AND SAY** as follows:

**Introduction**

1.      I am one of the Directors of Port Link GP Ltd. (the "**GP**"), which acts as the general partner of The Port Fund L.P. (the "**Fund**").  I am duly authorised to swear this Affidavit on behalf of the GP and the Fund (together, the "**Defendants**").

2.      I make this Affidavit in support of the Defendants' opposition to the application filed by the Kuwait Ports Authority (the "**Plaintiff**") for information from the Defendants pursuant to Section 22 of the Exempted Limited Partnership Law (2018 Revision) (the "**ELP Law**") in respect of the Fund (the "**S.22 Proceedings**"). I make this affidavit further to my First Affidavit in the S.22 Proceedings dated 9 April 2020 ("**Childe 1**") with exhibit AC-1.  Unless otherwise defined herein, I adopt the definitions as set out in Childe 1.

1

1

3.   Produced to me at the time of swearing this Affidavit and marked "**AC-2**" is a bundle of true copy documents referred to in this Affidavit.  A reference to a tab and page number in this Affidavit is a reference to the corresponding tab and page number of the exhibit. Where documents have been exhibited to Al Sabah 1 (as defined below) and Al Sabah 2 (as defined below) and referred to herein, I have not included such documents in AC-2 but have instead referred to such documents as they appear within the exhibits to Al Sabah 1 and Al Sabah 2.

4.   Save where otherwise indicated, the matters to which I depose are within my own knowledge acquired by me in the above capacities, except where I state that I am relying on information from others.  The content of this Affidavit is true to the best of my knowledge, information and belief.

5.   In circumstances where I have only recently been appointed as a Director of the GP, a final draft of this Affidavit has been carefully reviewed by Abdulghfoor M A Alwadhi, who has acted as a Director of the GP since 2010.  Following such review, Mr Alwadhi has sworn an affidavit confirming that he considers the facts deposed herein to be accurate and a true, full and frank account of the dealings of the Defendants (see **Tab 1**).

6.   For the avoidance of doubt, nothing in this Affidavit is intended to waive privilege in respect of any matter referred to and privilege is not being waived.

**Background to this Affidavit**

7.   On 27 January 2020, Yousef Al Sabah ("**Mr Al Sabah**") swore an affidavit in support of the Plaintiff's request for information in the S.22 Proceedings ("**Al Sabah 1**") with its respective exhibit ("**YAS-1**").  In paragraphs (a) to (w) of the Schedule to Al Sabah 1, the Plaintiff set out its extensive requests for information and documentation to be provided by the Defendants (the "**Plaintiff's Information Requests**").

8.   In Childe 1, the Defendants responded to the Plaintiff's Information Requests and the evidence relied upon by the Plaintiff in Al Sabah 1.  In accordance with the procedural timetable agreed between the parties and set out in the consent order dated 30 March 2020 and filed with the Court (the "**Consent Order**"), the Plaintiffs were entitled to file and serve any reply affidavit evidence by 4pm on Friday, 24 April.  Accordingly, the

9994569.1 T5138.D08984

Plaintiff filed and served the second affidavit of Mr Al Sabah dated 24 April 2020 ("**Al Sabah 2**") with its exhibit YAS-2 ("**YAS-2**")[1].

9.    Having reviewed Al Sabah 2 and YAS-2, it is clear that Al Sabah 2 contains a number of new and extensive requests for further information that do not appear in Al Sabah 1.   Moreover, Al-Sabah 2 also contains a number of new allegations against the Defendants.   The purpose of this Affidavit is to respond to the new evidence and information requests in Al Sabah 2.

**Financial Accounts**

10.   In paragraph 20(b) of Al Sabah 2, Mr Al Sabah refers to the Defendants' failure to produce the financial accounts required by the amended and restated limited partnership agreement with respect to the Fund (the "**LPA**").

11.   In paragraph 57 of Childe 1, I explained the difficulties the Fund has encountered in preparing and issuing audited financial statements for the years ending 2017, 2018 and 2019 as a result of the unsubstantiated allegations which have been made against representatives of the Fund. Accordingly, I do not intend to deal with this particular point in any further detail in this Affidavit.

12.   Following our appointment to the board of directors of the GP on 29 January 2020, Mr Rowland and I have familiarised ourselves with these proceedings and related litigation against the Fund, which has, understandably, taken a significant period of time.   We have also spent time liaising with representatives of the Fund based in Kuwait and the joint auditors of the Fund, BDO Al-Nisf & Partners and Moore Stephens Al-Bahar & Co (the "**Auditors**") in order to facilitate the issuance of the outstanding audited financial statements.

13.   Following a period of discussions between the directors of the GP and the Auditors, the audited financial statements for the year ending 2017 (the "**2017 Accounts**") have been finalised and issued by the Auditors on 30 April 2020.  The 2017 Accounts have only recently been completed and are in the process of being provided to all of the limited partners of the Fund, including the Plaintiff.  A copy of the 2017 Accounts is at **Tab 2**.

---

[1] A reference in this affidavit to YAS2/XXX is a reference to the tab number under which a specific document is located within YAS2.

14.     Following the issuance of the 2017 Accounts and my discussions with representatives of the Fund and the Auditors, the Defendants anticipate that the Fund will be in a position to release the audited financial statements for the years ending 2018 and 2019 sequentially within the next four to eight weeks and such statements will be provided to the Plaintiff and all the limited partners immediately following their release by the Auditors.

**The Clark Asset**

15.     At paragraphs 27 to 29 of Al Sabah 2, it is suggested that:

(a)     the Fund has not provided credible information concerning the value of its investment in the Clark Asset; and

(b)     the quoted US$200,000,000 investment in the Clark Asset by the KGL Group is evidence that of the inconsistency of the Fund's account in Childe 1 and the Disclosure Letter of its investment of US$100,000,000.

16.     At section 3-8 (page 67 of the Baker Tilly Report at Tab 12 of Exhibit AC-1) and in the introduction of the Baker Tilly Report, Baker Tilly clearly state that the total aggregate investment in the Clark Asset totals US$100,040,000. Please see attachment 8-2 to the Baker Tilly Report, which provides a more detailed breakdown and the relevant supporting materials of the Fund's equity investment into the Clark Asset (**Tab 3**).

17.     I am informed by representatives of the Fund and verily believe that the public report cited by Mr Al Sabah at paragraph 29 of Al Sabah 2 (see YAS-2/12), which quotes a total US$200,000,000 being invested into the Clark Asset by the KGL Group, has not drawn the distinction between the debt and equity invested into the Clark Asset and instead simply provided a headline figure of debt and equity combined.   The documentation exhibited to the Baker Tilly Report clearly evidences that the total equity investment made by the Fund into the Clark Asset totalled US$100,040,000 (**Tab 3**).

18.     Al Sabah 2 also cites certain inconsistencies between the amounts stated in the Baker Tilly Report and the audited financials of the Fund. At paragraph 30(a) of Al Sabah 2, it states that:

> *The Baker Tilly Report (upon which the Defendants place substantial reliance and in respect of which I have a number of concerns, explained in paragraphs 70 - 78 below) provides that in the year ending 31 December 2012, the Fund's total payments to Global Gateway Development Corporation ("GGDC") in*

4

*relation to the Clark Asset amounted to USD 13,050,000 (see the Baker Tilly Report at [AC-1/12], section 3.8.C).1 However, the Fund's audited financial statements for the year ending 31 December 2012 provide that additions to the Clark Asset during that year amounted to USD 5,000,000 (see Note 6 on page 17 of the Fund!s audited financial statements for the year ending 31 December 2012 at [AC-1/5]).*

19.  The alleged discrepancy cited by Mr Al Sabah arises from the different accounting treatments in the Baker Tilly Report and the audited financials issued by the Auditors. In short, the Auditors have accounted for the difference in equity and debt investments made by the Fund into the Clark Asset.  I note that Note 7 to the audited financial statements for the year ending 31 December 2012 evidences that a US$8,050,000 short term loan representing an advance provided to GGDC (the "**GGDC Loan**"), which was later converted into equity.  The GGDC Loan, together with the US$5,000,000 equity payments made by the Fund with respect to the Clark Asset, make up the US$13,050,000 cited in the Baker Tilly Report as total payments to GGDC in the financial year ending 31 December 2012.

20.  At paragraph 30(b) of Al Sabah 2, it states that:

> *The Baker Tilly Report provides that in the year ending 31 December 2013, the Fund's total payments to GGDC in respect of the Clark Asset amounted to USD 23,950,000 (at [AC-1/12], section 3.8.C). However, the Fund's audited financial statements for the year ending 31 December 2013 provide that additions to the Clark Asset during that year amounted to USD 30,000,000 (see Note 6 on page 14 of the Fund!s audited financial statements for the year ending 31 December 2013 at [AC-1/5]).*

21.  The Defendants have reviewed this matter and identified an error in the Baker Tilly Report with respect to the date of one of the investments made by the Fund in the Clark Asset.  I understand from representatives of the Fund that the transfer marked as "Transfer 37" in the table listing all of the investments made in the Clark Asset (section 3-8, page 67 of the Baker Tilly Report), being the US$2,000,000 investment, was in fact was made on 15 May 2014 and not in 2013.  The relevant transfer slip evidencing the payment being made by the Fund on 14 May 2014 (rather than 2013) is exhibited at **page 39 of Tab 3**.  Accordingly, the total payments made by the Fund with respect to the Clark Asset set out in the Baker Tilly Report should reflect is US$21,950,000 for the year ending in 31 December 2013.

5

22.    I am informed by representatives of the Fund and verily believe that in 2013 the Fund converted the GGDC Loan into equity into the Clark Asset (see Note 6 of the 2013 audited financial statements for the year ending 31 December 2013 (the "**2013 Accounts**")), thus explaining why in the audited financial statements there is an US$8,050,000 increase from US$21,950,000 to US$30,000,000 in the additions to the Clark Asset as noted in the audited financial statements.  Note 7 to 2013 Accounts shows the decrease in the loan amount owed to GGDC from US$8,050,000 to US$0.00 and refers back to Note 6 of the 2013 Accounts.

23.    In circumstances where the Baker Tilly Report was issued in December 2018 (i.e. after the conversion of the GGDC Loan into equity in 2013), it correctly categorised the US$8,050,000 as an equity contribution by the Fund into the Clark Asset which was actually paid in 2012.

*Clark Asset sale proceeds*

24.    As previously conveyed to the Plaintiff, and to the other two limited partners of the Fund who have also initiated corresponding proceedings under section 22 of the ELP Law with virtually identical information requests, the Defendants are subject to strict confidentiality obligations with respect to the information relating to the sale of the Clark Asset and have made the CIDL Application and the outcome of such application remains pending.

25.    Without prejudice to the above, I note that the 2017 Accounts (which have been issued by the Auditors and sent to all of the limited partners of the Fund) evidence that the sale price of the Clark Asset was in fact US$655,000,000 and not US$1 billion as repeatedly alleged by the Plaintiff.

26.    With respect to the concerns raised in Al Sabah 2 as regards the purported "*inconsistences*" in the proceeds the Fund received from the sale of the Clark Asset. The Defendants note that at paragraphs 35 and 36 of Al Sabah 2, the Plaintiff has referred to new material to support its allegations that the sale proceeds received by the Fund for the sale of the Clark Asset are significantly higher than that claimed by the Fund.  The Defendants note that the Fund has no control over any statements Udenna, or indeed any other third party, makes in relation to the purported sale value of the Clark Asset.  However, for the avoidance of the doubt, the Defendants reiterate that the Fund did not sell the Clark Asset for a sale price of US$1 billion as alleged by

6

Mr Al Sabah and I refer to the 2017 Accounts at **Tab 2** which provides clear evidences that the gross sale price for the Clark Asset was in fact US$655,000,000.

27.    Al Sabah 2 also makes new allegations of supposed inconsistencies with regards to statements made by the Fund as to total distributions to be paid to the limited partners following its sale of the Clark Asset.  At paragraph 37 of Al Sabah 2, Mr Al Sabah cites that the Fund stated on 22 November 2017 that US$370,000,000 would be distributed to limited partners, and then subsequently made a further statement on 29 November 2017 that the Fund's capital had increased to US$380,000,000.  I note that the statement dated 29 November 2017 did not refer to distributions and rather referred to the capital and earnings of the Fund.

28.    I am informed by representatives of the Fund and verily believe that that the US$10,000,000 difference between the statements made by the Fund regarding distributions that the Fund anticipated making and the total capital of the Fund resulted from the GP's intention to retain a sum of US$10 million for a period of time in order to ensure it would be in a position to satisfy any breach of warranty claims by Udenna in connection with the sale of the Clark Asset.

29.    The Defendants further note that the historic statements made by the Fund and referred to in Al Sabah 2 pre-dated and clearly did not account for the freezing of the $496 million for a period of 14 months and the costs that would necessarily be incurred by the Fund in securing the release of such funds from the Noor Account.

**Payments made to third party advisers**

30.    In Al Sabah 2, the Plaintiff has expressed concerns with respect to payments made to third party service providers and has requested additional information and documentation in relation to the engagement of such service providers.

31.    In paragraph 42(a) of the Al Sabah 2, the Plaintiff states that it "*has been unable to allay its concerns relating to these payments. For example: a. In relation to the USD 3.65 million paid to Filipino law firm, Jimeno Cope & David Law Offices, KPA is informed by the Defendants*".

32.    As outlined at paragraph 3.11 of the Disclosure Letter, the payment of US$3.65 million related to fees incurred by Jimeno Cope David & Associates Law Offices (the "**Jimeno Law Offices**") for legal services it provided to the Fund between January 2017 and 31 October 2017 in connection with matters regarding the sale of the Negros Navigation

7

Asset and the sale of the Clark Asset and, in particular, the complex regulatory aspects of the Clark Asset transaction (as described in further detail below).

33.    The Jimeno Law Offices assisted the Fund in analysing the regulatory requirements in connection with the transactions and providing strategic legal advice and advisory work with respect to such regulatory requirements. The Jimeno Law Offices also assisted the Fund in complying with the notification requirements of the Philippine Competition Commission and preparing numerous documents pursuant to and in compliance with such requirements, as well as tending to the submission of such documents and providing regular updates to the Fund on the same.

34.    In addition, the 2017 Accounts evidence that the sale price for the sale of GGDC was US$655 million.  Accordingly, the associated legal fees fall well within the scope of what the Fund considers to be reasonable given the significant amount of work conducted by the Jimeno Law Offices during the negotiation of the transaction up to and including the completion of the transaction. In circumstances where the gross sale price of GGDC was US$655 million and there is substantial regulatory approval required from the Philippines government, the Fund considers that the legal fees were properly and validly incurred and the payment of such legal fees was entirely reasonable in the circumstances.

35.    In paragraph 42(b) of the Al Sabah 2, the Plaintiff refers to the US$2.72 million paid to Wilfredo A Placino ("**Mr Placino**") as a "*very considerable amount of money to pay to one individual for advising in connection with the sale of the Clark Asset*" and that "*given the significant (by any standard) amount of money paid to Mr Placino and his connection to the purchaser of the asset, this is something that the GPs should reasonably be able to verify, and in any case, KPA is entitled to receive the terms of Mr Placino's engagement and the invoices issued by Mr Placino.*"

36.    As noted in paragraph 3.11 of the Disclosure Letter, Mr Placino acted as an advisor in connection with the sale of the Clark Asset.  I understand from speaking to representatives of the Fund that Mr Placino played a crucial role in facilitating the transaction with Udenna and facilitating the closing of the sale. Mr Placino was engaged by the Fund on a success fee structure and his fees were calculated as a percentage of the sale price of the Clark Asset in order to incentivise Mr Placino to achieve the highest possible sale price.  I am informed by representatives of the Fund and verily believe that Mr Placino was integral in the completion of the transaction and that, in all likelihood, the transaction would not have completed without his

8

involvement.   Accordingly, the Defendants consider that the advisory fees were properly and validly incurred and paid pursuant to the legal, valid and binding agreement between the Fund and Mr Placino.

37.   In addition, paragraph 42(b) of Al Sabah 2 states that "*Mr Placino is a Director of Udenna Corporation (the parent company of the purchaser of the Clark Asset, CGCC) and (now) President of CGCC (see [YAS-2/30]). It seems unusual to be paying someone connected with the purchaser of a target company to receive advice in connection with the purchase of that target.*"  Mr Placino was engaged by the Fund in his personal capacity and, as noted above, performed a crucial role in facilitating the completion of the transaction. The Defendants do not consider that it is for the Fund to scrutinise the connections Mr Placino has with Udenna or any other third party for that matter provided that he provided valuable services to the Fund and fulfilled his obligations to the Fund in accordance with the agreement between the parties.  I am informed by representatives of the Fund who were involved in the transaction at the time, that they do not consider that it would have been possible to complete the transaction without the involvement of Mr Placino.

38.   In paragraph 43(a) of Al Sabah 2, the Plaintiff references the US$36.2 million paid to Apache Asia.  Paragraph 3.11 of the Disclosure Letter explains that such fees were paid to Apache Asia on behalf of the Fund for fees owed to Apache Asia for advisory services it provided to the Fund in connection with the sale of the Clark Asset.  In particular, Apache Asia assisted the Fund in reviewing due diligence materials with respect to investors, connecting the Fund with potential investors, providing strategic advice with respect to the transaction and managing the information and resource requirements associated with the sales process.

39.   Apache Asia was engaged by the Fund on a success fee structure and, accordingly, the fee that Apache Asia received was calculated as a percentage of the sale of the Clark Asset. As with Mr Placino, the Defendants considers the advisory services Apache Asia provided to the Fund in connection with the sale of GGLC and associated advisory fees were properly and validly incurred and were therefore paid pursuant to the contractual arrangements between the Fund and Apache Asia.

40.   In paragraph 43(c) of Al Sabah 2, the Plaintiff references the US$1.95 million paid by the Fund to KGLI Asia ROHQ. Paragraph 3.11 of the Disclosure Letter explains that these fees were incurred in connection with administrative and personnel services it provided to the Fund in 2018 – 2019 in respect of the sale of GGLC and the subsequent

9994569.1 T5138.D08984

release of the monies frozen at Noor.  In paragraph 43(c) of Al Sabah 2, the Plaintiff states that "*this description does not evidence or sufficiently explain the basis on which KGLI Asia was engaged by the Fund or the services performed for the USD 1.95 million paid*."  I am informed by representatives of the Fund that it was KGLI Asia who, during the period when the $496 Million was frozen in the Noor Account, assisted the Fund in negotiating an informal standstill between the Fund and Udenna with respect to the monies owed by the Fund to Udenna.  Furthermore, representatives of KGLI Asia were involved on a daily basis in securing the release of the Fund monies at Noor bank.  KGLI Asia's assistance was crucial during this period, prevented Udenna from taking any enforcement steps against the Fund and played a key role in securing the release of the Fund monies from Noor Bank.

41.   Without prejudice to the above, the Fund is in any event willing to disclose the contractual arrangements relating to the above engagements, subject to appropriate safeguards on the use of the information and documentation being put in place.

**Payments made from the Noor Bank Account**

42.   In paragraphs 45 to 48 of Al Sabah 2, Mr Al Sabah states that the Defendants have "*still chosen not to account for approximately USD 15 million*".  In paragraph 3.1 of the Disclosure Letter and paragraphs 45 to 52 of Childe 1, I explained that the Defendants had not included the details of these payments to service providers of the Fund, all of whom are based in Kuwait, in the table of payments made by the Fund to third parties out of the Noor Account.

43.   As outlined in Childe 1, the Defendants have serious concerns that the disclosure of the identity of certain Kuwaiti based service providers of the Fund would, in all likelihood, lead to adverse consequences for such parties.  Such concerns also extend to services providers based in other parts of the Middle East.

44.   Mr Al Sabah's statements in Al Sabah 2 with respect to the KPA Press Release plainly mischaracterise the intended purpose of the KPA Press Release.  Having discussed this matter with representatives of Crowell & Moring LLP (in light of the fact that Crowell & Moring LLP were specifically named and targeted in the KPA Press Release), it is clear that the representatives of Crowell & Moring LLP interpreted the KPA Press Release as a clear threat intended to intimidate service providers who are engaged by the Fund and its former management team rather than any legitimate attempt to put parties on notice of a potential breach of trust as Mr Al Sabah alleges in paragraph 96

10

of Al Sabah 2.  At the date of swearing this affidavit, the KPA Press Release remained posted on the KPA's website.

45.    In paragraph 92 of Al Sabah 2, it is stated that "*only one example of so called malicious persecution has been put forward by the Defendants to support their refusal to provide information to which the LPs are plainly entitled*".  The Defendants note that following the publication of the KPA Press Release, Mr Al Sabah filed a criminal complaint with the Attorney General of the State of Kuwait dated 2 October 2019 (the "**KPA Criminal Complaint**") (**Tab 4**).

46.    The Defendants note the KPA Criminal Complaint, which has been signed by Mr Al Sabah in his capacity as the Director General of the KPA, states that:

"*Based on the above, and the <u>criminal conspiracy between the executives of the defendant company and the foreign parties for the purpose of harming the state</u> and its government and judicial, economic, and social system, and the incitement for not investing in the state, and applying international sanctions to some of its government officials, and cutting ties with its allies, <u>renders them guilty of the crimes stated under the above articles (5, 15).</u>*"

47.    Notwithstanding the Director General makes the above statements without providing any credible evidence in relation to the same, the Fund has been provided with the following letters found at **Tab 4a** which, at a minimum, place a significant question mark on the basis of the Director General's statements and his involvement in this regard:

(a)    a letter dated 25 April 2019 from the United States Senate to the Secretary of the Treasury, and a letter dated 28 June 2019 from Congress of the United States, note how Louis Freeh, former director of the Foreign Bureau of Investigation and a former U.S. district court judge, has examined the charges against Maria Lazareva and found them to be false and how he witnessed abuses of recognised rights of due process and justice during his attendance of a 24 March 2019 hearing against Maria Lazareva; and

(b)    a letter dated 5 September 2019 to the U.S. Department of the Treasury which details various human rights violations and acts of corruption in Kuwait with respect to the wrongful prosecution and arbitrary detention of Maria Lazareva.

11

48.   Accordingly, in circumstances where there appears to be cogent evidence, in the form of the KPA Press Release and the KPA Criminal Complaint, that the KPA will seek to take steps to encourage the authorities in Kuwait to bring actions against service providers who are in any way connected with the Fund and its former management team, the GP does not consider it appropriate to disclose the name of certain service providers as there is plainly a risk that such service providers will then be at risk of action brought by the KPA or others.

49.   I note that paragraph 46 of Al Sabah 2 states that "*in any event, there is no explanation for why the Defendants could not (at the very least) have provided a breakdown of the payments out of the account*".   In order to address this point, the Defendants have prepared a table summarising such payments out of the Noor Account but have protected the identities of the Kuwaiti based service providers engaged by the Fund for the reasons outlined in Childe 1 and this Affidavit:

| | Recipient | Sum Transferred (in US$) | Date of Transfer | Transaction Details |
|---|---|---|---|---|
| 1. | Service provider of the Fund based in Kuwait | 837,745.46 | 10 Feb 2019 | The service provider was engaged by the Fund on a joint mandate to provide assistance with (i) the Fund's effort to secure the release of the frozen funds in the Noor Account and (ii) the Kuwaiti Criminal Proceedings. |
| 2. | Service provider of the Fund based in Kuwait | 670,196.37 | 11 Feb 2019 | The service provider was engaged by the Fund on a joint mandate to provide assistance with (i) the Fund's effort to secure the release of the frozen funds in the Noor Account and (ii) the Kuwaiti Criminal Proceedings. |
| 3. | Service provider of the Fund based in Kuwait | 14,070,000 | 12 Feb 2019 | The service provider was engaged by the Fund to provide assistance with the Fund's effort to secure the release of the frozen funds in the Noor Account and this payment accounted for the success fee |
| 4. | Service provider of the Fund based in Kuwait | 350,000.00 | 13 Feb 2019 | The service provider was engaged by the Fund to provide legal advice to the Fund in connection with the Fund's efforts to secure the release of the frozen funds in the Noor Account. |

12

| | Recipient | Sum Transferred (in US$) | Date of Transfer | Transaction Details |
|---|---|---|---|---|
| 5. | Service provider of the Fund based in the United Arab Emirates | 6,849.85 | 14 Feb 2019 | The service provider was engaged by the former Investment Manager of the Fund in connection with the DIFC Proceedings and the Fund settled the outstanding sums as it was ordered to pay the legal costs of the former Investment Manager pursuant to the terms of the DIFC judgment. |
| 6. | Service provider of the Fund based in Kuwait | 160,975.44 | 14 March 2019 | The service provider was engaged by the Fund to provide legal advice to the Fund in connection with the frozen funds in the Noor Account. |

50.  In paragraph 48 of Al Sabah 2, Mr Al Sabah states that "*USD 4,276,145.77 of the amount paid into C&M's trust account is not accounted for*".  Following the release of the $496 Million from the Noor Account, the GP considered it prudent to retain a reserve in order to enable the Fund to deal with any future or contingent liabilities (the "**Reserve for Liabilities**") and actions to recover additional monies due to the Fund from various parties. In circumstances where the Defendants had spent a considerable period of time and cost in securing the release of the $496 Million from the Noor Account, the decision was taken to move the Reserve for Liabilities from the Noor Account to the Fund's trust account with Crowell & Moring LLP where there was significantly less risk of such monies being subject to any further restrictions or interference by third parties.  The Reserve for Liabilities has properly been used for the payment of liabilities of the Fund since the release of the $496 Million in February 2019.

51.  In paragraph 65 of Al Sabah 2, Mr Al Sabah speculates about the possibility of comingling of funds beneficially owned by the GP with funds beneficially owned by the Fund in the Noor Account.  However, we have not seen any evidence of any "commingling" in the Noor Account between monies beneficially belonging to the Fund and monies beneficially belonging to the GP or that the Noor Account contained any monies beneficially belonging to the GP.

13

**Allegations of unfunded capital contributions**

52.  In paragraphs 51 and 52 of Al Sabah 2, the Defendants note that Mr Al Sabah sets out some analysis on the audited financial statements of the Fund for the period between 2007 and 2016 (the "**Audited Accounts**").  It appears that Mr Al Sabah's analysis of the Audited Accounts has led him to incorrectly conclude that:

(a)  there is a shortfall of US$12,164,153 in potentially unfunded capital commitments as of 31 December 2016; and

(b)  there is an apparent shortfall between assumed capital contribution and capital commitment by KGLI.

53.  During the period since our appointment as directors of the GP, Mr Rowland and I have not identified any evidence to substantiate Mr Al Sabah's conclusions that there is a shortfall of US$12,164,153 in unfunded capital commitments.  I also note that the Audited Accounts have been prepared by an independent and highly respected international accounting firm and it is clear that the Auditors have not identified any such shortfall either.

54.  With respect to the apparent shortfall between assumed capital contribution and capital commitment by KGLI as set out in paragraph 52 of Al Sabah 2, in the short period of time since being served with Al Sabah 2 I have reviewed the relevant financial records of the Fund as well as documentation provided to me by KGLI in order to investigate and respond to this allegation.  As described in further detail below, based on the documentation I have reviewed to date, it is clear to me that there is no shortfall between the assumed capital contribution and capital commitment by KGLI as Mr Al Sabah has alleged in Al Sabah 2.

55.  Representatives of the Fund have prepared a spreadsheet which explains how KGLI paid its capital contributions between 6 May 2008 and 31 December 2016 (the "**KGLI Commitment Analysis**") (**Tab 5**).  The KGLI Commitment Analysis shows that KGLI made 13 bank transfers between 6 May 2008 and 9 July 2015 to the Port Fund in order to discharge KGLI's obligations to pay its capital contributions to the Fund. These 13 bank transfers comprised a total sum of US$12,977,378 and the relevant payment instructions and remittance vouchers are at **Tab 5a**.

56.  Furthermore, the KGLI Commitment Analysis also shows that Capital Link Holding Company K.S.C. ("**Capital Link**"), a wholly owned subsidiary of KGLI, made two bank

14

transfers of US$700,000 on 24 May 2010 and US$75,000 on 7 June 2010 to Global Gateway Development Corporation ("**GGDC**") in connection with the Fund's investment in the Clark Asset (the "**Capital Link Transfers**").  I understand from representatives of the Fund that the Fund had instructed KGLI to make the Capital Link Transfers direct to GGDC as there was an urgent need for liquidity at GGDC in order to continue with the development of the Clark Asset.  I also understand from representatives of the Fund that the Fund informed KGLI that the sum of the Capital Link Transfers (being US$775,000) would be recorded in the Fund's financial records as a payment towards KGLI's outstanding capital commitments.

57.    The KGLI Commitment Analysis also shows that the Fund owed management fees to KGLI pursuant to the terms of the investment management agreed between the former investment manager of the Fund (Emerging Markets PE Management Limited) (the "**IM**") and the Fund (the "**IMA**") and the terms of a letter of assignment between the IM and KGLI dated 2 September 2007 (the "**Letter of Assignment**").  In accordance with the terms of the IMA and the Letter of Assignment, the Fund owed the KGLI management fees in relation to the Fund for the period between 2007 and 2010 as summarised below:

(a)    US$2,721,963 for the year ending 31 December 2008;

(b)    US$1,857,040 for the year ending 31 December 2009; and

(c)    US$714,260 for the year ending 31 December 2010,

(together, the "**Outstanding Management Fees**").

58.    The Outstanding Management Fees comprised a total sum of US$5,293,263 and I understand from representatives of the Fund that the Fund and KGLI agreed that the Outstanding Management Fees would be offset against the balance of the outstanding capital contributions owed by KGLI to the Fund.

59.    The KGLI Commitment Analysis also shows that the Fund deducted a sum of US$690,785 from the distribution paid to KGLI on 10 October 2016 following the Fund's sale of Negros Navigation.  Accordingly, KGLI's proportional share of the distributions made by the Fund following the sale of Negros Navigation totalled US$3,842,158. However, following the agreement between the Fund and KGLI to deduct US$690,785 and set off such sum against the outstanding capital contributions owed by KGLI to the Fund, the distribution received by KGLI was in fact US$3,151,373.14.

15

60.     The KGLI Commitment Analysis also highlights that KGLI had paid a number of expenses for and on behalf of the Fund, which comprised a total of US$962,135 (the "**Incurred Expenses**").  I understand from representatives of the Fund that KGLI and the Fund agreed to offset KGLI's entitlement to be repaid for the Incurred Expenses against the outstanding capital contributions owed by KGLI to the Fund.

61.     The Auditors provided two letters addressed to the GP dated 31 March 2016 (the "**BDO Letters**") which stated that based upon their review of the relevant materials and the issuance of the Audited Accounts they were in a position to "*confirm that the Capital commitment balance with the accrued interest charged has been properly recorded in the books of accounts of the Fund and disclosed in the statement of financial position and the note to the Audited Financial Statements of the Fund as part of Due from KGL Investment Company*" (**Tab 6**).

62.     Furthermore, the BDO Letters also confirm the following points with respect to KGLI's capital commitments with respect to the Fund:

(a)     as at 31 December 2015, the balance due from KGLI to the Fund with respect to its capital commitments stood at US$3,551,979 which comprised of US$690,785 in principal and US$2,861,194 in accrued interest; and

(b)     as at 31 December 2015, KGLI had paid US$19,309,215 of its capital commitment to the Fund.

63.     The Defendants also note that Note 9 to the 2017 Accounts evidence that as at 31 December 2017, the balance due from KGLI to the Fund with respect to its capital commitments stood at US$1,698,665 which comprised of US$1,698,665 in accrued interest on prior outstanding commitments and the principal amount of US$20,000,000 had been settled in full by KGLI.

64.     I have been informed by representatives of the Fund and verily believe that the Fund charged KGLI and the KPA the same rate of 8% interest per annum on their outstanding capital contributions and, accordingly, KGLI's limited partnership interest in the Fund was treated in exactly the same fashion as the KPA's limited partnership interest.

65.     The Defendants do not understand Mr Al Sabah to be questioning the independence of the Auditors or the accuracy of the Audited Accounts and therefore trust that the

16

content of the BDO Letters, along with the other evidence exhibited to this Affidavit, has adequately addressed the concerns expressed in paragraph 52 of Al Sabah 2.

**The DIFC Claim**

66. Mr Al Sabah's account of the DIFC Proceedings in paragraphs 54 to 59 of Al Sabah 2 mischaracterises the Defendants' response to the DIFC Claim.  Al Sabah 2 has raised two principal concerns with respect to the DIFC Proceedings:

    (a) that the Fund did not provide notice to its limited partners with respect to the DIFC Claim nor a corresponding explanation on the basis that it was initiated; and

    (b) the sequence and timing of the DIFC Proceedings raise concerns as to whether the Fund properly engaged with and considered the DIFC Claim.

67. The Fund was under no obligation to provide notice to the limited partners of the DIFC Claim.  Furthermore, the Fund has provided the Plaintiff with EMPEML's demand letter filed in the DIFC Proceedings, which clearly outlines the basis on which they were entitled to the sums awarded (the "**Demand Letter**").  In circumstances where the S.22 LPs have copies of the Demand Letter, the LPA and the IMA which set out the relevant provisions on which the Demand Letter relies, it is unclear what further information the Fund can provide with respect to the basis of EMPEML's claim.

68. The sequence and timing of the DIFC Proceedings as portrayed by the Plaintiff is misleading in suggesting that sequence and timings relating to such proceedings only spanned two and a half weeks, as demonstrated with the below chronology:

    (a) the original demand letter was issued by EMPEML on 16 June 2018 and reserved the right to charge interest and seek other damages (a copy of which can be found at **Tab 7**);

    (b) following the issuance of the original demand letter, the Fund sought legal advice with respect to the same. Upon receipt of such advice, the Fund determined that not only was the claim valid but it was in the best interests of the Fund and its limited partners to avoid incurring significant legal costs in attempting to defend a claim which the Defendants considered to be a valid and *bona fide* claim;

17

(c)     on 7 July 2018, the Defendants received a revised demand letter from EMPEML's counsel which included the basis upon which the various sums had been calculated and due and payable to EMPEML which totalled US$57,506,999.00 (Schedule 5 of the Disclosure Letter, which is at Tab 5 of Exhibit AC-1);

(d)     following the receipt of this further demand notice, the Defendants carefully considered such calculations with their legal counsel and determined that EMPEML had overstated the sums it was owed and instead resolved to settle the amount for US$56,808,505. EMPEML's total claim was for US$57,506,999.00 whilst the Defendants only admitted to US$56,808,005 due to a defective interest calculation by EMPEML. The partial admission by the Defendants was  US$698,495 less than EMPEML's original claim amount as a result of the Defendants efforts in analysing EMPEML's claim;

(e)     furthermore, EMPEML claimed US$45,462,000 for the carry it alleged it was owed, which was/is US$2,000,000 less than the actual amount of US$47,462,000 owed to EMPEML as reflected in the Fund's 2017 audited financial accounts. It was to the advantage of the Defendants to agree to the lower carry amount claimed by EMPEML saving the Fund US$2,000,000 in actual carry monies otherwise due to EMPEML according to the Fund's 2017 audited financials;

(f)     the Fund noted that termination of the IMA by EMPEML precluded EMPEML from claiming any additional management fees from the Fund for any subsequent periods; and

(g)     accordingly, on 11 July 2018, the Fund filed an acknowledgment of service and partial admission with respect to the sums claimed by EMPEML for the revised sum of US$56,808,505 which the Fund concluded was validly owed to EMPEML (**Tab 7**).

69.     As noted above, I have been informed by representatives of the Fund and verily believe that the GP considered EMPEML's claims to be valid claims for monies properly owed to EMPEML in its role as the investment manager of the Fund between 2007 and 2018. Accordingly, the GP not consider it appropriate to incur unnecessary legal costs disputing a claim that the GP had carefully considered and concluded to be a *bona fide* claim to which the Fund should admit.

18

**Damietta Loan**

70.   Al Sabah 2 raises new questions and requests for information with respect to the
      Damietta Loan.  It is also unclear to the Defendants why the Plaintiff has decided to
      wait until their Reply Evidence to submit such new information requests
      notwithstanding they stem from their review of the Fund's audited financial statements
      for the years ending 2008 and 2009.

71.   In paragraph 62(a) of Al Sabah 2, Mr Al Sabah has queried why the Fund did not invest
      directly in the investment vehicle, DIPCO.  The Defendants have already addressed
      this point in the Disclosure Letter and Childe 1.  As previously noted, the Fund was not
      able to invest directly into DICPO as the period for investment into DIPCO had expired
      as all available shares in DIPCO had already been allocated by the time the Fund was
      able to participate in the potential investment opportunity.  In circumstances where the
      Fund's view at the time was that any potential opportunity to invest in DIPCO (whether
      direct or indirect) was an attractive investment opportunity, the Fund's only opportunity
      to invest in DIPCO came as a result of the commercial arrangement with KGL Ports. I
      understand from representatives of the Fund that, in circumstances where KGL Ports
      was fully aware that its offer was the only route by which the Fund would be able to
      invest in DIPCO, it was apparent at the time that KGL Ports considered that it could
      reasonably charge the Fund a premium to facilitate the Fund's proposed investment in
      DIPCO.  Accordingly, I understand that one of the conditions imposed by KGL Ports
      was the payment of a placement fee of 3% of the value of the loan, which the Fund
      understood to effectively operate as premium charged by KGL Ports and paid by the
      Fund in order to provide the Fund with a gateway to obtaining a future equity stake in
      DIPCO.

72.   In paragraph 62(c) of Al Sabah 2, Mr Al Sabah has queried why KGL Ports as the
      borrower would agree to a 28% rate of interest.  It is not for the Defendants to question
      the commercial rationale of a third party who is not under the control of the Fund.
      However, in the interests of transparency and notwithstanding that the Defendants are
      unable to speak for KGL Ports, I understand from representatives of the Fund that
      during the commercial negotiations between the Fund and KGL Ports, the
      representatives of KGL Ports initially indicated that they would be seeking to impose a
      limit on any potential upside the Fund could receive from any future sale of its equity
      in DIPCO once the loan had been converted.  In response to such commercial
      demands from KGL Ports, I understand from representatives of the Fund that the Fund

9994569.1 T5138.D08984

insisted on including such interest rate to mirror any potential cap on the Fund's upside that KGL Ports were seeking to impose.

73.   I further understand from representatives of the Fund that during the global financial crisis, the Fund entered into discussions with representatives of KGL Ports to see if an agreement could be reached regarding a potential reduction in the interest rate payable on the loan in consideration for the repayment of the total outstanding amounts under the loan agreement to the Fund in short order.   However, such discussions were unsuccessful and no agreement to reduce the interest rate was reached between the Fund and KGL Ports.

74.   In paragraph 62(d) of Al Sabah 2, the Plaintiff has questioned why "*the Fund elected to write off in the Fund's accounts both the principal amount of the Damietta Loan and the accrued interest as such an early stage*".   As noted in the audited financial statements for the year ending 31 December 2014 (the "**2014 Accounts**") (Schedule 3 of the Disclosure Letter contains the 2014 Accounts; a copy of the Disclosure Letter can be found at Tab 5 of Exhibit AC-1), the Damietta Loan was in fact impaired for accounting purposes and not written off by the Fund.   As explained on page 10 of the 2014 Accounts, where objective evidence indicates that the chances of recoveries on financial assets has reduced, such impairment in recoveries should be reflected to avoid carrying over value that may not be recovered.   If in a subsequent period, the amount of impairment loss changes, such impairment may be reversed or amended as applicable.   This is standard accounting practice and notwithstanding the accounting treatment of the outstanding sums, the Fund continued with its efforts to recover the full amounts of principal and interest through legal proceedings in the Kuwaiti Courts.

75.   Mr Al Sabah has also questioned at paragraph 62(d) of Al Sabah 2 why the Defendants delayed issuing legal proceedings against KGL Ports.   I understand from representatives of the Fund and verily believe that the Fund waited until 2016 before issuing legal proceedings against KGL Ports for the following reasons:

(a)   the Fund was attempting to reach a settlement with KGL Ports with respect to the repayment of the loan; and

(b)   DIPCO filed an arbitration proceeding against the Damietta Port Authority (the "**DPA**") in 2015 seeking compensation for the wrongful termination of the Damietta Concession Agreement (the "**Concession Agreement**") (the "**DIPCO**

20

Arbitration Proceedings"). In circumstances where the result of such proceedings would have a bearing on the ability of KGL Ports to settle the loan, the Fund considered it appropriate to evaluate the direction such proceedings were taking before commencing legal proceedings. When it became clear to the Fund that it was unlikely that the DIPCO Arbitration Proceedings would be resolved in a short period of time, the Fund decided to commence legal proceedings against KGL Ports in order to protect its interests and seek to recover the outstanding sums under the Convertible Loan Agreement.

76. I am further informed by representatives of the Fund and verily believe that the DIPCO Arbitration Proceedings continued from the time the case was filed until the final decision was issued in February 2020. The tribunal or arbitrators concluded that the termination of the Concession Agreement by the DPA was unlawful and, accordingly, DIPCO is entitled to recover nearly USD 500 million in damages, interest and costs from the DPA (the "**DIPCO Award**"). Following the DIPCO Award, I have been informed by representatives of the Fund that KGL Ports and DIPCO entered into settlement discussions with respect to outstanding sums owed from DIPCO to KGL Ports. In order to provide KGL Ports with a period of time to conduct such settlement negotiations with DIPCO, the Fund agreed to adjourn the appeal of the proceedings until August 2020.

77. Furthermore, I understand from representatives of the Fund that the Plaintiff ordered a full due diligence report dated October 2009 prior to its first investment in the Fund (the "**DD Report**") (**Tab 8**). An extract from that report reads as follows:

> *#The Port Fund has indirectly invested USD 20 million in DIPCO, through a loan to KGL Ports International (KGL-PI). The loan carries a simple interest rate of 28% per annum and has a holding period of 5 years, during which the Fund has the option of either holding the loan or converting it into a 10% initial equity capital of DIPCO. On the other hand, KGLPI has the option to settle the loan and accumulated interest after the second year of the loan term.$*

78. I understand from representatives of the Fund that both the Plaintiff and Gulf Investment Corporation ("**GIC**") further committed to increase their investment in the Fund by the end of 2012 (i.e. after the provision of the DD Report), and funded their capital commitments in 2013. I have been provided with copies of additional due diligence reports which were commissioned by the Plaintiff on the Fund's operations and investments to date (**Tab 8**). Such due diligence reports dated November 2011

contained a similar summary of the Fund's indirect investment in DIPCO as that set out in the DD Report.

79.   Furthermore, I am informed by representatives of the Fund and verily believe that the Plaintiff had two permanent members on the advisory board of the Fund, which met on annual basis.  I have also been informed that the advisory board met a number of times at the actual site of the Damietta port and members of the board were given an opportunity to ask questions of the Fund's representatives, financiers, government authorities with respect to the investment. I understand from representatives of the Fund that representatives of GIC were also invited to attend meetings of the advisory board and attended such meetings on multiple occasions.

80.   In circumstances where the Plaintiff and GIC received a significant amount of information on the Fund's investment in DIPCO and the commercial arrangements with KGL Ports between 2009 and 2011 noted in the abovementioned due diligence reports which such limited partners demanded that the Fund provide and pay for, the Defendants are unable to comprehend why the Plaintiff or indeed GIC and/or GRSIA did not raise any concerns with respect to the transaction at the time and indeed continued to invest further monies in the Fund.

81.   Finally, the Defendants confirm that no loan account statements exist with respect to the Damietta Loan.

**The Baker Tilly Report**

82.   At paragraphs 70 to 78, Al Sabah 2 has introduced new allegations regarding the independence of Petrolink and its commissioning of the Baker Tilly Report.  However, the Defendants note that Mr Al Sabah's account of the facts surrounding the instruction of Baker Tilly is misleading.

83.   Mr Al Sabah fails to mention that Ms Lazareva resigned from Petrolink's board of directors on 15 June 2015, some three years before Baker Tilly was instructed by Petrolink to commission its report (see **Tab 9** for a copy of Ms Lazareva's resignation letter). Accordingly, paragraph 75(a) of Al Sabah 2 is incorrect in stating that Ms Lazareva is "*Vice Chairman and Director of Petrolink*".

84.   Furthermore, Mr Al Sabah's alleges that it cannot be said that Baker Tilly were acting independently in circumstances where "*the Vice Chairman and Director of a company giving them their instructions was the very person who had been charged with various*

22

*offences in connection with the operation of the Fund in the Kuwaiti Criminal Proceedings".*  As noted above, Ms Lazareva was not the Vice Chairman and Director of Petrolink at the time the Baker Tilly Report was commissioned and therefore this statement is plainly misleading.

85.  Al Sabah 2 also suggests that Petrolink is a wholly owned subsidiary of KGLI. This is incorrect.  I understand from my discussions with Kuwaiti based representatives of the Fund that almost half of the shares in Petrolink are held by the Public Institution for Social Security ("**PIFSS**") who Mr Al Sabah has claimed are supportive of these Proceedings.

86.  Al Sabah 2 further attempts to call into question the independence of the Baker Tilly Report by citing the Fund's payment to Baker Tilly for the commissioning the report. In circumstances where (i) the Fund determined that the Baker Tilly Report would be of use to the Fund in determining the legitimacy of the disputed payments relating to the business of the Fund that were the subject of the Kuwaiti Criminal Proceedings, and (ii) the Fund was on notice of contingent indemnity claims from the former directors of the GP with respect to defending such proceedings, the Fund plainly had an interest in determining the legitimacy of such payments and the ultimate outcome of the Kuwaiti Criminal Proceedings.

**Lobbying Fees and the Attorney General Correspondence**

87.  Notwithstanding that Mr Al Sabah filed an affidavit containing 103 paragraphs of evidence in reply to Childe 1, the Defendants note that Mr Al Sabah failed to respond in any meaningful way to the Attorney General Correspondence exhibited to the Disclosure Letter.

88.  In paragraph 81 of Al Sabah 2, Mr Al Sabah states that "*the material on which the Defendants rely suggests that the State of Kuwait was trying to obtain the release of the funds, not their restraint*". This statement is plainly misleading and fails to acknowledge the content of the letter from the Dubai Attorney General to the Kuwait Attorney General dated 7 June 2018 in which the letter enclosed a memorandum entitled "*A Memo Regarding Judicial Assistance Request Number 127 of 2018 Submitted by the Public Prosecution, Kuwait.*"  That memorandum expressly states that "*[t]he Public Prosecution in Dubai received a judicial assistance request from the Public Prosecution in Kuwait*" and that "*[t]he request mainly included the following:*

23

*Take the necessary action to transfer USD 400 million deposited in UAE bank accounts to PIFSS and KPA in Kuwait\* "*

89.    It is clear from the letter dated 7 June 2018 and the memorandum enclosed with such letter that  the Kuwait AG had, in fact, had been seeking to have US\$400 million of the \$496 Million transferred to the KPA and PIFSS' accounts.  In such extraordinary circumstances, the Fund was fully entitled to take all necessary steps, including the engagement of legal, lobbying, and public relations firms, to resist the Kuwait AG's efforts to expropriate the vast majority of the \$496 Million to two Kuwaiti based limited partners.

90.    Al Sabah 2 also raises concerns with respect to the funds paid to Marathon Strategies LLC ("**Marathon**") and Squire Patton Boggs ("**Squire**"). I understand from representatives of the Fund that once the release of the \$496 Million occurred, Marathon and Squire subsequently entered into new engagement agreements with another third party. I also understand that this means that the Fund did not pay Marathon and Squire the amounts claimed Al Sabah 2.

**Other Matters**

91.    I would also comment on a number of matters which have arisen as follows.

    (a)    In relation to requests 29(n) and 29(o) in El-Jeaan 1, the only materials submitted by EMPEML in connection with the DIFC claim were the demand letters and a copy of the IMA.

    (b)    The DIPCO Convertible Loan Agreement is part of the subject matter of the application under the Confidential Information Disclosure Law application.  It is not believed that there are any "modifications" to this agreement.

    (c)    We are not aware of the existence of any "analysis impairment disclosure requirements relating to the Damietta loan as required by IFRS 7 for the years 2013 and 2014".

    (d)    The Fund does not hold information as to the beneficial ownership of the GP or the GP's connections to KGLI.

**Undertaking**

24

92.   Finally, I would add that we have continually kept the information requests made by the Plaintiffs under review.   As explained in the skeleton argument which will be submitted on behalf of the Fund, we consider that in certain respects it would be appropriate to provide further information to the Plaintiffs, above and beyond that which has already been provided, subject to appropriate safeguards being put in place.

93.   As to this, we are aware that Clause 7.1 of the LPA empowers the GP specifically to prescribe "reasonable conditions and restrictions" on the provision of information and documents.   We have carefully considered all of the evidence which has been submitted in these proceedings and, in the exercise of its discretion, the GP considers that it is appropriate and necessary to prescribe such conditions and restrictions, specifically, by requiring the Plaintiffs to provide an undertaking to the Court on the use of the information and, to the extent that any copy bank statements are provided, by redacting irrelevant and/or personal information from those statements.

Sworn by the said **ANDREW JOSEPH CHILDE** )
at   GEORGE TOWN   )
on the 1ˢᵗ day of May 2020   )                    **ANDREW JOSEPH CHILDE**
Before me:   )

Notary Public



**Brett Basdeo**
Notary Public in and for the Cayman Islands
My commission expires January 31ˢᵗ, 20 ₂₁

25

**THIS AFFIDAVIT** is filed by Walkers, Attorneys-at-Law, 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands, for the Defendants whose address for service is care of its said Attorneys-at-Law

26

9994569.1 T5138.D08984

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

CAUSE NO. 13 OF 2020 (RJP)

**IN THE MATTER OF THE APPLICATION FOR INFORMATION UNDER SECTION 22 OF THE EXEMPTED LIMITED PARTNERSHIP LAW (2018 REVISION)**

BETWEEN:

KUWAIT PORTS AUTHORITY

<u>PLAINTIFF</u>

AND:

(1) THE PORT FUND L.P.
(2) PORT LINK GP LTD.

<u>DEFENDANTS</u>

---

**INDEX TO EXHIBIT AC-2**

---

| Tab No. | Documents |
|---------|-----------|
| 1. | Affidavit sworn by Abdulghfoor M A Alwadhi |
| 2. | Audited financial statements for the year ending 2017 |
| 3. | Attachment 8-2 to the Baker Tilly Report |
| 4. | Criminal complaint with the Attorney General of the State of Kuwait dated 2 October 2019 |
| 4a. | GMA Letters re Al Sabah |
| 5. | Spreadsheet which explains how KGLI paid its capital contributions between 6 May 2008 and 31 December 2016 |
| 5a. | 13 bank transfers comprised a total sum of US$12,977,378 |
| 6. | Letters from Auditors to the GP dated 31 March 2016 |
| 7. | Demand letter issued by EMPEML on 16 June 2018 and an acknowledgment of service dated 11 July 2018 |
| 8. | Due diligence reports dated October 2009 prior to its first investment in the Fund |

9641533.1T5138.D08984

1

| 9. | Ms Lazareva resignation letter from Petrolink's board of directors on 15 June 2015 |
|---|---|

9641533.1T5138.D08984

2

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO. 13 OF 2020 (RJP)

IN THE MATTER OF THE APPLICATION FOR INFORMATION UNDER SECTION 22 OF
THE EXEMPTED LIMITED PARTNERSHIP LAW (2018 REVISION)

BETWEEN:

KUWAIT PORTS AUTHORITY

PLAINTIFF

AND:

(1) THE PORT FUND L.P.
(2) PORT LINK GP LTD.

DEFENDANTS

THIS IS EXHIBIT "AC-2" TO THE SECOND AFFIDAVIT OF

ANDREW JOSEPH CHILDE

SWORN BEFORE ME THIS   DAY OF MAY 2020

_____
NOTARY PUBLIC

Brett Basdeo
Notary Public in and for the Cayman Islands
My commission expires January 31st, 20

27

1. The Defendants
2. Abdulghfoor M A Al Awadhi
3. Second Affidavit
4. Exhibit AA-2
5. 1 May 2020

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO. 13 OF 2020 (RJP)**

**IN THE MATTER OF THE APPLICATION FOR INFORMATION UNDER SECTION 22 OF THE EXEMPTED LIMITED PARTNERSHIP LAW (2018 REVISION)**

**BETWEEN:**

**KUWAIT PORTS AUTHORITY**

**PLAINTIFF**

**AND:**

**(1) THE PORT FUND L.P.**
**(2) PORT LINK GP LTD.**

**DEFENDANTS**

---

### SECOND AFFIDAVIT OF ABDULGHFOOR M A AL AWADHI

---

I, **ABDULGHFOOR M A AL AWADHI**, of Plot 326, Block 5, Meshref, Kuwait, being duly sworn **MAKE OATH AND SAY** as follows:

1. I am one of the Directors of Port Link GP Ltd. (the "**GP**"), who acts as the general partner of the Port Fund L.P. (the "**Fund**"). I am duly authorised to swear this Affidavit on behalf of the GP and the Fund.

2. I make this Affidavit in support of the Defendants' opposition to the application filed by the Plaintiff for information from the Defendants pursuant to Section 22 of the Exempted Limited Partnership Law (2018 Revision) in respect of the Fund (the "**S.22 Proceedings**").

3. Save where otherwise indicated, the matters to which I depose are within my own knowledge acquired by me in my capacity as a Director of the GP since 2010, except where I state that I am relying on information from others. The content of this Affidavit is true to the best of my knowledge, information and belief.

9990122.1 T5138 D08984



1

4.   Now produced and shown to me and marked "**AA-2**" is a copy of the substantively final draft of the second affidavit of Andrew Joseph Childe, which is intended to be sworn in support of the Defendants' opposition to the S.22 Proceedings ("**Childe 2**").

5.   I have carefully reviewed Childe 2 and its exhibit and consider the facts deposed therein to be accurate and a true, full and frank account of the dealings of the Fund and the GP.

Sworn by **Abdulghfoor M A Al Awadhi**          )
at Kuwait City, Kuwait          )
on the 1 day of May 2020          )          Abdulghfoor M A Al Awadhi
Before me:          )

Bader Almutairi

Lawyer

Address: Kuwait city-Fahad Alsalem st - Kuwait Building - 24th Floor

Bader n almutairat
law firm

THIS AFFIDAVIT is filed by Walkers, Attorneys-at-Law, 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands, for the Defendants whose address for service is care of its said Attorneys-at-Law

9990122.1 T5138 D08984

2

**The Port Fund L.P.**
**Cayman Islands**

**Financial statements and independent auditors' report**
For the year ended 31 December 2017

EXHIBIT - Nov 2020

CONFIDENTIAL

1

**The Port Fund L.P.**
**Cayman Islands**

**Financial statements and independent auditors' report**
For the year ended 31 December 2017

| Contents | Pages |
|---|---|
| General information | 1 |
| Independent auditors' report | 2 - 3 |
| Statement of financial position | 4 |
| Statement of comprehensive income | 5 |
| Statement of changes in partners' capital | 6 |
| Statement of cash flows | 7 |
| Notes to the financial statements | 8 - 27 |

EXHIBIT - May 2020
CONFIDENTIAL

2

**The Port Fund L.P.**
**Cayman Islands**

**Financial statements and independent auditors' report**
For the year ended 31 December 2017

**General information**

| | |
|---|---|
| **Investment Manager (Formerly) (a):** | KGL Investment Cayman Ltd.<br>C/O Walkers Corporate Limited<br>Cayman Corporate Centre, 27 Hospital Road,<br>George Town, Grand Cayman, KY1-9008,<br>Cayman Islands. |
| **General Partner (a):** | Port Link GP Ltd.<br>C/O Walkers Corporate Limited<br>Cayman Corporate Centre, 27 Hospital Road,<br>George Town, Grand Cayman, KY1-9008,<br>Cayman Islands. |
| **Bankers:** | Al Ahli Bank of Kuwait<br>Main Office, Kuwait City<br>Kuwait |
| **Kuwait Auditors:** | BDO Al-Nisf & Partners<br>P.O. Box 25578<br>Safat 13116<br>State of Kuwait<br><br>Moore Stephens<br>P.O. Box: 4090<br>Safat 13041<br>12th Floor Mashoura Tower, Qibla,<br>State of Kuwait |
| **Legal Advisors:** | Walkers Dubai LLP<br>Level 14<br>Burj Daman<br>Dubai International Finance Centre P.O. Box 506513<br>Dubai<br>United Arab Emirates |
| **Administrators:** | TMF Mauritius Limited<br>3rd Floor, Standard Chartered Tower<br>19 Cybercity<br>Ebene, Republic of Mauritius |

(a) The Investment Management Agreement was terminated by the former Investment Manager on 7 July 2018.

1

3





Al Shaheed Tower, 6th Floor
Khaled Ben Al Waleed Street, Sharq
P.O. Box 25578, Safat 13116
Kuwait
Tel: +965 2242 6999
Fax: +965 2240 1666
www.bdo.com.kw

Al Mashoura Tower, 12th Floor
Hamad Al Saqer Street, Qibla
P.O. Box 4090, Safat 13041
Kuwait
Tel: +965 2246 3115

www.moore-kuwait.com

### INDEPENDENT AUDITORS' REPORT

**To the limited partners of The Port Fund L.P.**
**Cayman Islands**

**Report on the Audit of the Financial Statements**

*Opinion*
We have audited the financial statements of The Port Fund L.P (hereinafter the "Fund"), which comprise the statement of financial position as at 31 December 2017, and the statements of comprehensive income, changes in net assets and cash flows for the year then ended, and notes to the financial statements, including a summary of significant accounting policies.

In our opinion, the accompanying financial statements present fairly, in all material respects, the financial position of the Fund as at 31 December 2017, and its financial performance and its cash flows for the year then ended in accordance with International Financial Reporting Standards ("IFRSs").

*Basis for Opinion*
We conducted our audit in accordance with International Standards on Auditing ("ISAs"). Our responsibilities under those standards are further described in the Auditors' Responsibilities for the Audit of the Financial Statements section of our report. We are independent of the Fund in accordance with the International Ethics Standards Board for Accountants' Code of Ethics for Professional Accountants ("IESBA Code") together with ethical requirements that are relevant to our audit of the financial statements, and we have fulfilled our other ethical responsibilities in accordance with these requirements and the IESBA Code. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

*Emphasis of Matter*
We draw attention to (Note 3) of the financial statements, which describes that these financial statements have been prepared on net realisable basis as the Fund's term ended on 31 December 2014 and the Fund is in the process of exiting its investments and winding up all its operations. Our opinion is not modified in respect of this matter.

*Responsibilities of General Partner for the Financial Statements*
The General Partner is responsible for the preparation and fair presentation of the financial statements in accordance with IFRSs, and for such internal control as General Partner determines is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, the General Partner is responsible for assessing the Fund's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless the General Partner either intends to liquidate the Fund or to cease operations, or has no realistic alternative but to do so.





**INDEPENDENT AUDITORS' REPORT**

**To the limited partners of The Port Fund L.P.**
**Cayman Islands**

**Report on the Audit of the Financial Statements (Continued)**

*Auditors' Responsibilities for the Audit of the Financial Statements*
Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditors' report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with ISAs will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these financial statements.

As part of an audit in accordance with ISAs, we exercise professional judgment and maintain professional skepticism throughout the audit. We also:

- Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinion. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control.
- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Fund's. internal control.
- Evaluate the appropriateness of accounting policies used and the reasonableness of accounting estimates and related disclosures made by the General Partner.
- Conclude on the appropriateness of the Fund Manager's use of the going concern basis of accounting and, based on the audit evidence obtained, whether a material uncertainty exists related to events or conditions that may cast significant doubt on the Fund's ability to continue as a going concern. If we conclude that a material uncertainty exists, we are required to draw attention in our auditor's report to the related disclosures in the financial statements or, if such disclosures are inadequate, to modify our opinion. Our conclusions are based on the audit evidence obtained up to the date of our auditor's report. However, future events or conditions may cause the Fund to cease to continue as a going concern.
- Evaluate the overall presentation, structure and content of the financial statements, including the disclosures, and whether the financial statements represent the underlying transactions and events in a manner that achieves fair presentation.

We communicate with General Partner regarding, among other matters, the planned scope and timing of the audit and significant audit findings, including any significant deficiencies in internal control that we identify during our audit.

**Qais M. Al-Nisf**
**License No. 38-A**
**BDO Al Nisf & Partners**

**Dr. Hussa Al Bahar**
**License No. 66-A**
**Moore Stephens Al Bahar & Co.**

**Kuwait: April 30, 2020**

3

5

**The Port Fund L.P.**
**Cayman Islands**

**Statement of financial position**
As at 31 December 2017

|  | Notes | 2017 US$ | 2016 US$ |
|---|---|---|---|
| **ASSETS** | | | |
| Bank balances | | 11,840,213 | 2,058,885 |
| Receivables – restricted bank balance | | 733,298 | |
| Financial assets at fair value through profit or loss | 6 | - | 407,560,192 |
| Net receivables on sale of financial assets at fair value through profit or loss | 7 | 392,166,898 | - |
| Due from a related party | 8 | 1,698,665 | 2,161,632 |
| **Total assets** | | 406,439,074 | 411,780,709 |
| | | | |
| **LIABILITIES** | | | |
| Due to the former Investment Manager | 8 | 47,462,000 | 50,508,050 |
| Other payables, provisions and accrued expenses | 9 | 10,977,074 | 1,088,457 |
| **Total liabilities** | | 58,439,074 | 51,596,507 |
| **Net assets attributable to limited partners** | | 348,000,000 | 360,184,202 |
| | | | |
| **Represented by** | | | |
| Fund capital | 10 | 158,152,000 | 158,152,000 |
| Retained earnings | | 189,848,000 | 202,032,202 |
| **Net assets** | | 348,000,000 | 360,184,202 |

The financial statements have been authorised and approved by the General Partner Directors on April 30, 2020 and signed on their behalf by:

**Abdul Ghfoor M. A. AL Awadhi**
*Director*

Appointed:
18 November 2010

**Andrew Childe**
*Director*

Appointed:
29 January 2020

**Christopher Rowland**
*Director*

Appointed:
29 January 2020

The accompanying notes on pages 8 to 27 form an integral part of these financial statements.

4

EXHIBIT May 2020

CONFIDENTIAL

6

**The Port Fund L.P.**
**Cayman Islands**

**Statement of comprehensive income**
For the year ended 31 December 2017

| | Notes | 2017 US$ | 2016 US$ |
|---|---|---|---|
| **Income** | | | |
| Unrealised loss on financial assets at fair value through profit or loss | | - | (11,168,828) |
| Realised (loss) / gain on sale of financial assets at fair value through profit or loss | 6 | (2,590,399) | 9,486,615 |
| Other income | | - | 506,805 |
| | | (2,590,399) | (1,175,408) |
| **Expenses** | | | |
| General and administrative expenses | 11 | (12,640,192) | (2,743,178) |
| Foreign exchange differences | | 339 | (502) |
| | | (12,639,853) | (2,743,680) |
| **Loss for the year** | | (15,230,252) | (3,919,088) |
| Other comprehensive income | | - | - |
| **Total comprehensive loss for the year** | | (15,230,252) | (25,230,252) |
| **Net decrease in net assets attributable to limited partners:** | | | |
| Attributable to the former Investment Manager * | 8 | (3,046,050) | (783,818) |
| Attributable to Limited Partners | 10 | (12,184,202) | (3,135,270) |
| | | (15,230,252) | (3,919,088) |

\* The loss allocation to the former Investment Manager is as per S 4.2c of the Limited Partnership Agreement.

The accompanying notes on pages 8 to 27 form an integral part of these financial statements.

5

EXHIBIT – May 2020
CONFIDENTIAL

**The Port Fund L.P.**
**Cayman Islands**

**Statement of changes in net assets**
For the year ended 31 December 2017

| | Fund capital | Retained earnings | Net Assets attributable to limited partners |
|---|---|---|---|
| | US$ | US$ | US$ |
| **Balance at 1 January 2016** | 188,152,000 | 205,167,472 | 393,319,472 |
| Total comprehensive loss for the year attributable to limited partners | - | (3,135,270) | (3,135,270) |
| Capital withdrawal (Note 10) | (30,000,000) | | (30,000,000) |
| **Balance at 31 December 2016** | 158,152,000 | 202,032,202 | 360,184,202 |
| Total comprehensive loss for the year attributable to limited partners | - | (12,184,202) | (12,184,202) |
| **Balance at 31 December 2017** | 158,152,000 | 189,848,000 | 348,000,000 |

The accompanying notes on pages 8 to 27 form an integral part of these financial statements.

6

8

**The Port Fund L.P.**
**Cayman Islands**

**Statement of cash flows**
For the year ended 31 December 2017

| | Notes | 2017 US$ | 2016 US$ |
|---|---|---|---|
| **CASH FLOW FROM OPERATING ACTIVITIES** | | | |
| Loss for the year | | (15,230,252) | (3,919,088) |
| *Adjustments for:* | | | |
| Unrealised loss on financial assets at fair value through profit or loss | | | 11,168,828 |
| Realised loss / (gain) on sale of financial assets at fair value through profit or loss | 6 | 2,590,399 | (9,486,615) |
| | | (12,639,853) | (2,236,875) |
| *Changes in operating assets and liabilities:* | | | |
| Financial assets at fair value through profit or loss | | 12,802,895 | 59,379,024 |
| Receivables – restricted bank balance | | (733,298) | - |
| Due from / to related parties – net | | 462,967 | (22,847,664) |
| Other payables, provisions and accrued expenses | | 9,888,617 | (3,048,702) |
| **Net cash from operating activities** | | 9,781,328 | 31,245,783 |
| **CASH FLOW FROM FINANCING ACTIVITIES** | | | |
| Capital withdrawal | 10 | - | (30,000,000) |
| **Net cash used in financing activities** | | - | (30,000,000) |
| **Net increase in bank balances** | | 9,781,328 | 1,245,783 |
| Bank balances at the beginning of the year | | 2,058,885 | 813,102 |
| **Bank balances at the end of the year** | | 11,840,213 | 2,058,885 |

The accompanying notes on pages 8 to 27 form an integral part of these financial statements.

7

9

40

**The Port Fund L.P.**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2017

1.    **GENERAL INFORMATION**

The Port Fund L.P., (hereinafter "the Fund") was established on 21 March 2007 and is registered as an exempt limited partnership in the Cayman Islands under the Exempted Limited Partnership Law (as amended). The first closing acceptance of committed contributions was on 15 July 2007 and the final closing occurred on 31 December 2012.

The Fund offers select sophisticated investors the opportunity to participate in the growth and consolidation of the port management industry and related sectors through selected private equity investments in high potential Companies on a worldwide basis.

Port Link GP Ltd. ("General Partner") has previously appointed Emerging Markets PE Management Limited (formerly known as KGL Investment Cayman Limited) (the "former Investment Manager") who was responsible for the preparation of the financial statements for each financial period in accordance with the Limited Partnership Agreement. During the subsequent period, the Investment Manager Agreement ("IMA") was terminated (Note 17), accordingly, the General Partner is responsible for preparation of the financial statements.

TMF Mauritius Limited (formerly Equity Trust (Mauritius) Limited) are the Administrators of the Fund The Administrator carries out services related to the administration of the Fund including maintaining proper books and records of the Fund and preparing financial statements of the Fund.

The term of the Fund ended on 31 December 2012, and by a resolution of the General Partner on 28 July 2012, the term of the Fund was extended for another period of two years until 31 December 2014. The Fund has been in the process of exiting its investments since 1 January 2015 until the date of issuance of the financial statements.

The registered office of the Fund is at Cayman Corporate Centre, 27 Hospital Road, George Town, Grand Cayman, KY1-9008, Cayman Islands.

These financial statements of the Fund for the year ended 31 December 2017 were authorised for issue by the General Partner Directors on April 30, 2020.

2.    **APPLICATION OF NEW AND REVISED INTERNATIONAL FINANCIAL REPORTING STANDARDS (IFRSs)**

a)    **New standards, interpretations and amendments effective from 1 January 2017**

The accounting policies applied by the Fund are consistent with those used in the previous year except for the changes due to implementation of the following new and amended International Financial Reporting Standards:

- Amendments to IAS 7 – Disclosure Initiative.
- Amendments to IAS 12 – Recognition of Deferred Tax Assets for Unrealized Losses.
- Annual Improvements to IFRSs 2014 – 2016 Cycle.

These amendments became effective on 1 January 2017. The adoption of these amendments did not have any material impact on the current period or any prior period and is not likely to affect future periods.

8

10

**The Port Fund L.P.**
Cayman Islands

**Notes to the financial statements**
For the year ended 31 December 2017

## 2. APPLICATION OF NEW AND REVISED INTERNATIONAL FINANCIAL REPORTING STANDARDS (IFRSs) (CONTINUED)

**b) Standards and interpretations issued but not effective**

The following new and amended IASB Standards have been issued but are not yet effective, and have not been adopted by the Fund:

*Amendments to IFRS 2 - Classification and Measurement of Share-based Payment Transactions*
This standard will be effective for annual periods beginning on or after 1 January 2018, the amendments address three main areas:

- The effects of vesting conditions on the measurement of a cash-settled share-based payment transaction
- The classification of a share-based payment transaction with net settlement features for withholding tax obligations
- The accounting where a modification to the terms and conditions of a share-based payment transaction changes its classification from cash-settled to equity-settled.

These amendments are not expected to have any material impact to the Fund.

*IFRS 9 - Financial Instruments*
The standard, effective for annual periods beginning on or after 1 January 2018, replaces the existing guidance in IAS 39 Financial Instruments: Recognition and Measurement. IFRS 9 specifies how an entity should classify and measure its financial instruments and includes a new expected credit loss model for calculating impairment of financial assets and the new general hedge accounting requirements. It also carries forward the guidance on recognition and derecognition of financial instruments from IAS 39.

The Directors of the Fund anticipate that the application of IFRS 9 in the future may not have a material impact on amounts reported in respect of the Fund's financial assets and financial liabilities. However, it is not practicable to provide a reasonable estimate of the effect of IFRS 9 until the Fund undertakes a detailed review.

*IFRS 15 - Revenue from contracts with customers*
The standard, effective for annual periods beginning on or after 1 January 2018, establishes a comprehensive framework for determining whether, how much and when revenue is recognised. It replaces the following existing standards and interpretations upon its effective date:

- IAS 18 – Revenue,
- IAS 11 – Construction Contracts,
- IFRIC 13 – Customer Loyalty Programs,
- IFRIC 15 – Agreements for the Construction of Real Estate,
- IFRIC 18 – Transfers of Assets from Customers, and,
- SIC 31 – Revenue-Barter Transactions Involving Advertising Services.

The Fund is currently assessing the impact of IFRS 15 and plans to adopt the new standard on the required effective date.

9

**The Port Fund L.P.**
Cayman Islands

**Notes to the financial statements**
For the year ended 31 December 2017

2.  **APPLICATION OF NEW AND REVISED INTERNATIONAL FINANCIAL REPORTING STANDARDS (IFRSs) (CONTINUED)**

b)  **Standards and interpretations issued but not effective (Continued)**

*IFRS 16 - Leases*
This standard will be effective for annual periods beginning on or after 1 January 2019. This standard will be replacing IAS 17 "Leases" and will require lessees to account for all leases under a single on-balance sheet model in a similar way to finance leases under IAS 17 with limited exceptions for low-value assets and short-term leases. At the commencement date of a lease, a lessee will recognise a liability to make lease payments and an asset representing the right to use the underlying asset during the lease term.

These amendments are not expected to have any material impact to the Fund.

*IFRS 17 – Insurance Contracts*
This standard will be effective for annual periods beginning on or after 1 January 2021 and replaces IFRS 4 - Insurance Contracts. The new standard applies to all types of insurance contracts, regardless of the type of entities that issue them, as well as to certain guarantees and financial instruments with discretionary participation features. The core of IFRS 17 is the general model, supplemented by:
a)  A specific adaptation for contracts with direct participation features (Variable fee approach)
b)  A simplified approach (premium allocation approach) mainly for short duration contracts

These amendments are not expected to have any material impact to the Fund.

*IFRIC 22 - Foreign Currency Transactions and Advance Consideration*
The interpretation will be effective for annual periods beginning on or after 1 January 2018 and clarifies that in determining the spot exchange rate to use on initial recognition of the related asset, expense or income (or part of it) on the derecognition of a nonmonetary asset or non-monetary liability relating to advance consideration, the date of the transaction is the date on which an entity initially recognises the non-monetary asset or nonmonetary liability arising from the advance consideration. If there are multiple payments or receipts in advance, then the entity must determine a date of the transactions for each payment or receipt of advance consideration.

These amendments are not expected to have any material impact to the Fund.

*Amendments to IAS 28 – Investment in Associates and Joint Ventures*

The amendments should be applied retrospectively and are effective from 1 January 2018, with earlier application permitted.

The amendments clarify that:
a)  An entity that is a venture capital organisation, or other qualifying entity, may elect, at initial recognition on an investment-by-investment basis, to measure its investments in associates and joint ventures at fair value through profit or loss.
b)  If an entity that is not itself an investment entity has an interest in an associate or joint venture that is an investment entity, the entity may, when applying the equity method, elect to retain the fair value measurement applied by that investment entity associate or joint venture to the investment entity associate's or joint venture's interests in subsidiaries. This election is made separately for each investment entity associate or joint venture, at the later of the date on which (i) the investment entity associate or joint venture is initially recognised; (ii) the associate or joint venture becomes an investment entity; and (iii) the investment entity associate or joint venture first becomes a parent.

These amendments are not expected to have any material impact to the Fund.

10

12

**The Port Fund L.P.**
Cayman Islands

**Notes to the financial statements**
For the year ended 31 December 2017

2.   **APPLICATION OF NEW AND REVISED INTERNATIONAL FINANCIAL REPORTING STANDARDS (IFRSs) (CONTINUED)**

b)   **Standards and interpretations issued but not effective (Continued)**

*Amendments to IAS 40 – Transfers of Investment Property*
The amendment will be effective for annual periods beginning on or after 1 January 2018 and clarify when an entity should transfer property, including property under construction or development, into or out of investment property. The amendments state that a change in use occurs when the property meets, or ceases to meet, the definition of investment property and there is evidence of the change in use. A mere change in management's intentions for the use of a property does not provide evidence of a change in use.

These amendments are not expected to have any material impact to the Fund.

3.   **GOING CONCERN ASSUMPTION**

These financial statements have been prepared on net realisable basis as the Fund's term ended on 31 December 2014 and the Fund is in the process of exiting its investments and winding up all its operations.

4.   **SIGNIFICANT ACCOUNTING POLICIES**

4.1   **Statement of compliance**

The financial statements of the Fund have been prepared in accordance with the International Financial Reporting Standards ("IFRSs") as issued by the International Accounting Standards Board ("IASB"), IFRIC interpretations as issued by the International Financial Reporting Interpretations Committee ("IFRIC").

The preparation of financial statements in compliance with adopted IFRS requires the use of certain critical accounting estimates. It also requires the Fund's management to exercise judgment in applying the Fund's accounting policies. The areas of significant judgments and estimates made in preparing the financial statements and their effect are disclosed in (Note 5).

4.2   **Basis of preparation**

The financial statements have been prepared under liquidation basis (Note 3) as at 31 December 2017 and 2016, accordingly the assets and liabilities have been measured at their estimated net realisable values and estimated settlement amounts, respectively.

These financial statements have been presented in United States Dollar (US$) which is the functional and presentation currency of the Fund, reflecting the fact that the investing and capital transactions of the Fund are conduct primarily in United States Dollars.

11

13

44

The Port Fund L.P.
Cayman Islands

**Notes to the financial statements**
For the year ended 31 December 2017

## 4.   SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

### 4.3   Financial assets

*Classification, initial recognition and measurement*
Financial assets within the scope of IAS 39 are classified as "loans and receivables", "financial assets at fair value through profit or loss" ("FVTPL"), "Held-to-maturity investments", "financial assets available for sale" ("AFS"). The classification depends on the purpose for which financial assets were acquired and it is determined at initial recognition.

Investments are initially recognised at fair value plus transaction costs for all financial assets not carried at fair value through profit or loss. Financial assets carried at fair value through profit or loss are initially recognised at fair value, and transaction costs are expensed in the statement of comprehensive income.

A "regular way" purchase of financial assets is recognised using the trade date accounting. Regular way purchases or sales are purchases or sales of financial assets that require delivery of assets within the time frame generally established by regulations or conventions in the market place.

*Classification*
The Fund's financial assets include "bank balances", "receivables – restricted bank balance", "financial assets at fair value through profit or loss", "net receivables on sale of financial assets at fair value through profit or loss" and "due from a related party".

The Fund has not classified any of its financial assets as financial assets available for sale or held to maturity.

***Subsequent measurement***
The subsequent measurement of financial assets depends on their classification as follows:

*Bank balances*
Bank balances included in the statement of financial position and the statement of cash flows consist of current accounts in banks.

*Financial assets at fair value through profit or loss ("FVTPL")*
Investments are classified as FVTPL where the financial asset is either held for trading or it is designated as FVTPL.

A financial asset is classified as held for trading if: (i) it has been acquired principally for the purpose of selling in the near future; or (ii) it is a part of an identified portfolio of financial instruments that the Fund manages together and has a recent actual pattern of short-term profit-taking; or (iii) it is a derivative that is not designated and effective as a hedging instrument.

A financial asset other than a financial asset held for trading may be designated as FVTPL upon initial recognition if: (i) such designation eliminates or significantly reduces a measurement or recognition inconsistency that would otherwise arise; or (ii) the financial asset forms part of a group of financial assets or financial liabilities or both, which is managed and its performance is evaluated on a fair value basis, in accordance with the Fund's documented risk management or investment strategy, and information about the grouping is provided internally on that basis; or (iii) it forms part of a contract containing one or more embedded derivatives, and IAS 39 Financial Instruments: Recognition and Measurement permits the entire combined contract (asset or liability) to be designated as at FVTPL.

Financial assets at FVTPL are stated at net realisable value, in accordance with the liquidation basis with any resultant gain or loss recognised in the statement of comprehensive income. The net gain or loss recognised in the statement of comprehensive income incorporates any dividend or interest earned on the financial asset.

12

**The Port Fund L.P.**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2017

4.   **SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

4.3   **Financial assets (continued)**

*Subsequent measurement (continued)*

*Loans and receivables*
These are non-derivative financial assets with fixed or determinable payments that are not quoted in an active market. Loans and receivables are measured at net realisable value.  Loans and receivables include bank balances and due from a related party.

*Impairment of financial assets*
Financial assets, other than those at FVTPL, are assessed for indicators of impairment at end of each reporting period. Financial assets are considered to be impaired where there is objective evidence that, as a result of one or more events that occurred after the initial recognition of the financial asset, the estimated future cash flows of the financial asset have been impacted.

For financial assets carried at amortised cost, the amount of the impairment is the difference between the asset's carrying amount and the present value of estimated future cash flows, discounted at the financial asset's original effective interest rate. The carrying amount of the financial asset is reduced by the impairment loss directly for all financial assets.

*Derecognition of financial assets*
The Fund derecognises a financial asset only when the contractual rights to the cash flows from the asset expire; or it transfers the financial asset and substantially all the risks and rewards of ownership of the asset to another entity. If the Fund neither transfers nor retains substantially all the risks and rewards of ownership and continues to control the transferred asset, the Fund recognises its retained interest in the asset and an associated liability for amounts it may have to pay. If the Fund retains substantially all the risks and rewards of ownership of a transferred financial asset, the Fund continues to recognise the financial asset and also recognises a collateralised borrowing for the proceeds received.

4.4   **Financial Liabilities**

*Classification, initial recognition and measurement*
Financial liabilities within the scope of IAS 39 are classified as financial liabilities at fair value through statement of income and loan and borrowings, as appropriate. The Fund determines the classification of its financial liabilities at initial recognition.

*Classification*
The Fund's financial liabilities consist of "due to the former Investment Manager" and "other payables, provisions and accrued expenses" and are stated at estimated settlement amounts.

*Subsequent measurement*
The subsequent measurement of financial liabilities depends on their classification as follows:

*Other payables and accrued expenses*
Other payables and accrued expenses are recognised for amounts to be paid in the future for goods or services received, whether billed by the supplier or not.

13

**The Port Fund L.P.**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2017

4.   SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

**4.4   Financial Liabilities (Continued)**

*Derecognition of financial liabilities*
A financial liability is derecognised when the obligation under the liability is discharged or cancelled
or expired. When an existing financial liability is replaced by another from the same lender on
substantially different terms or the terms of an existing liability are substantially modified, such an
exchange or modification is treated as a derecognition of the original liability and the recognition of
a new liability, and the difference in the respective carrying amounts is recognised in the statement
of comprehensive income.

**4.5   Offsetting of financial instruments**

Financial assets and financial liabilities are offset and the net amount reported in the statement of
financial position if, and only if, there is a currently enforceable legal right to offset the recognised
amounts and there is an intention to settle on a net basis, or to realise the assets and settle the
liabilities simultaneously. There were no financial assets or liabilities subject to offsetting during
the year.

**4.6   Provisions**

A provision is recognised in the statement of financial position when the Fund has a legal or
constructive obligation as a result of a past event, it is probable that an outflow of economic benefits
will be required to settle the obligation and a reliable estimate can be made of the amount of the
obligation. If the effect is material, provisions are determined by discounting the expected future
cash flows that reflects current market assessments of the time value of money and, where
appropriate, the risks specific to the liability.

**4.7   Revenue recognition**

Revenue is recognised to the extent that it is probable that the economic benefits will flow to the
Fund and the revenue can be reliably measured regardless of when the payment is being made.
Revenue is measured at the fair value of the consideration received or receivable, taking into account
contractually defined term of payment and excluding tax or duty.

*Interest income*
Interest income is accrued on a time basis, by reference to the principal outstanding and at the
effective interest rate applicable, which is the rate that exactly discounts estimated future cash
receipts through the expected life of the financial asset to that asset's net carrying amount.

*Other income*
Other income is recognised on an accrual basis.

**4.8   Foreign currency translation**

*Functional and presentation currency*
The financial statements are presented in United States Dollar ("USD") which is the functional and
presentation currency of the Fund. The Fund determines its own functional currency and items
included in the financial statements are measured using that functional currency.

14

**The Port Fund L.P.**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2017

4.   **SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)**

4.8   **Foreign currency translation (Continued)**

*Foreign currency transactions and balances*
Foreign currency transactions are translated into the functional currency of the respective Fund, using the exchange rates prevailing at the dates of the transactions (spot exchange rate). Foreign exchange gains and losses resulting from the settlement of such transactions and from the remeasurement of monetary items denominated in foreign currency at year-end exchange rates are recognised in statement of comprehensive income. Non-monetary items are not retranslated at year-end and are measured at historical cost (translated using the exchange rates at the transaction date), except for non-monetary items measured at fair value which are translated using the exchange rates at the date when fair value was determined.

5.   **SIGNIFICANT ACCOUNTING JUDGMENTS AND ESTIMATION UNCERTAINTY**

In the application of the Fund's accounting policies, which are described in (Note 4), the General Partner is required to make judgments, estimates and assumptions about the carrying amounts of assets and liabilities that are not readily apparent from other sources. The estimates and associated assumptions are based on historical experience and other factors that are considered to be relevant. Actual results may differ from these estimates.

The estimates and underlying assumptions are reviewed on an ongoing basis. Revisions to accounting estimates are recognised in the period in which the estimate is revised if the revision affects only that period or in the period of the revision and future periods if the revision affects both current and future periods.

*Accounting judgements*
The following are the critical judgments, apart from those involving estimations (see below), that General Partner has made in the process of applying the Fund's accounting policies and that have the most significant effect on the amounts recognised in the financial statements.

*Classification of investments*
The classification of investments depends on the nature and purpose on acquisition of financial assets whether they should be classified as financial assets carried at fair value through profit or loss or financial assets available for sale. The Fund classifies financial assets as carried at fair value through profit or loss if they are acquired primarily for the purpose of short-term profit making. The Fund has classified all its investments at financial assets at FVTPL.

*Estimation uncertainty*
The key assumptions concerning the future and other key sources of estimation uncertainty at the financial position date, that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year are discussed below:

*Impairment of financial assets*
The General Partner reviews periodically items classified as loans and receivables to assess whether a provision for impairment should be recorded in the statement of comprehensive income. The General Partner estimates the amount and timing of future cash flows when determining the level of provisions required. Such estimates are necessarily based on assumptions about several factors involving varying degrees of judgment and uncertainty.

15

**The Port Fund L.P.**
Cayman Islands

**Notes to the financial statements**
For the year ended 31 December 2017

5.   **SIGNIFICANT ACCOUNTING JUDGMENTS AND ESTIMATION UNCERTAINTY (CONTINUED)**

*Estimation uncertainty (Continued)*

*Valuation of unquoted equity investments*
Valuation of unquoted equity investments is normally based on one of the following:

- recent arm's length market transactions;
- current fair value of another instrument that is substantially the same;
- the expected cash flows discounted at current rates applicable for items with similar terms and risk characteristics; or
- Other valuation models.

The determination of the cash flows and discount factors for unquoted investments requires significant estimation.

6.   **FINANCIAL ASSETS AT FAIR VALUE THROUGH PROFIT OR LOSS**

|  | 2017 | 2016 |
|---|---|---|
|  | US$ | US$ |
| *Unquoted investments* |  |  |
| Sabah Al-Ahmad Global Gateway Logistics City | - | 407,560,192 |
|  | - | 407,560,192 |

During the year, the Fund sold its investment in Sabah Al-Ahmad Global Gateway Logistics City (SAGGLC). The net sales proceeds amounted to USD 404,969,793 resulting in a realised loss of USD 2,590,399.

The details of the sale of the investment are as follows:

|  | 2017 |
|---|---|
|  | US$ |
| Sales proceeds of Sabah Al-Ahmad Global Gateway Logistics City | 655,000,000 |
| Less: loans and accruals paid as condition precedent to closing of sale (a) | (202,820,635) |
| Add: debt service reserve account balance and other adjustments (b) | 2,540,428 |
|  | 454,719,793 |
| Less: costs to sell (c) | (49,750,000) |
| Net sales proceeds | 404,969,793 |
| Carrying amount of financial assets at FVTPL at 1 January 2017 | (407,560,192) |
| Realised loss | (2,590,399) |

(a)   The details of loans and accruals paid as condition precedent to closing of sale are as follows:

|  | 2017 |
|---|---|
|  | US$ |
| Repayment of Baring Company's loan | 193,570,223 |
| Repayment of Petrolink Overseas Company's loan | 7,150,412 |
| Repayment of accrued consultancy fees | 2,100,000 |
|  | 202,820,635 |

16

18

49

**The Port Fund L.P.**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2017

6.   **FINANCIAL ASSETS AT FAIR VALUE THROUGH PROFIT OR LOSS (CONTINUED)**

The details of the sale of the investment are as follows:

(b)   The details of debt service reserve account balance and other adjustments are as follows:

| | 2017 |
| --- | --- |
| | US$ |
| Debt service reserve account balance | 2,657,121 |
| Bank balances of GGDC | (116,693) |
| | 2,540,428 |

(c)   The details of costs to sell are as follows:

| | 2017 |
| --- | --- |
| | US$ |
| Success fees | 48,770,000 |
| Arrangement and due diligence fees | 980,000 |
| | 49,750,000 |

7.   **NET RECEIVABLES ON SALE OF FINANCIAL ASSETS AT FAIR VALUE THROUGH PROFIT OR LOSS**

| | 2017 | 2016 |
| --- | --- | --- |
| | US$ | US$ |
| Net receivable on sale Sabah Al-Ahmad Global Gateway Logistics City | 392,166,898 | - |
| | 392,166,898 | - |

The computation of the net receivables on sale Sabah Al-Ahmad Global Gateway Logistics City are as follows:

| | 2017 |
| --- | --- |
| | US$ |
| Net funds received in a bank in UAE after settlement of certain liabilities | 496,429,777 |
| Less: repayment of working capital to the buyer as per the SPA (Note 17) | (58,842,879) |
| Less: costs to sell payable as at the reporting date | (45,420,000) |
| | 392,166,898 |

The funds, held at a Dubai based bank, were frozen at the behest of the United Arab Emirates central bank on 14 November 2017 as part of an investigation into alleged money laundering involving these funds. Subsequently, the funds were released to the Fund's bank account on 5 February 2019 by the Dubai authorities after completion of an investigation and other necessary compliance.

For additional information on reconciliation between the Sales proceeds and the net fund received, please refer to (Note 16).

17

19

50

**The Port Fund L.P.**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2017

8.  **RELATED PARTY BALANCES AND TRANSACTIONS**

Related parties are General Partner, Limited Partners, former Investment Manager, Directors, key management personnel and entities controlled, jointly controlled or significantly influenced by such parties.  All related party transactions are carried out in the normal course of business and with the approval of the management.

The related party balances and transactions included in the financial statements are as follows:

| | 2017 US$ | 2016 US$ |
|---|---|---|
| *Statement of financial position* | | |
| *Due from a related party* | | |
| - KGL Investment Company K.S.C.C. | | |
|   - Accrued interest on prior outstanding commitments | 1,698,665 | 2,161,632 |
| *Due to a related party* | | |
| Due to the former Investment Manager (a) | 47,462,000 | 50,508,050 |

Amounts due from related parties are free of interest and receivable on demand.

(a)  In accordance with the Limited Partnership Agreement, 20% of the earnings for the year have been allocated to the former Investment Manager Entity as performance fees. During the subsequent period, the former Investment Manager has been sold to a third party and the former Investment Manager Agreement has been terminated (Note 17).

Amounts due to the former Investment Manager are recorded free of interest and are payable upon the exits of the investments in accordance with the IMA. Subsequently the Fund repaid the balance due to the former Investment Manager (Note 17).

9.  **OTHER PAYABLES, PROVISIONS AND ACCRUED EXPENSES**

| | 2017 US$ | 2016 US$ |
|---|---|---|
| Accrued expenses | 4,861,840 | 277,633 |
| Executive retention fee payable | 1,000,000 | - |
| Provision for professional and consultancy fees | 570,000 | 200,000 |
| Provision for legal fees | 4,455,959 | 500,000 |
| Others | 89,275 | 110,824 |
| | 10,977,074 | 1,088,457 |

18

20

51

**The Port Fund L.P.**
Cayman Islands

**Notes to the financial statements**
For the year ended 31 December 2017

10.   FUND CAPITAL

| | Ownership % | Total commitments (Fund capital) US$ | Capital withdrawal during 2016 US$ | Capital accounts at 31 December 2016 US$ | Loss for the year 2017 US$ | Capital accounts at 31 December 2017 US$ |
|---|---|---|---|---|---|---|
| *Limited Partners* | | | | | | |
| General Retirement and Social Insurance Authority, Qatar | 5.86 | 9,852,000 | (1,892,984) | 22,741,539 | (713,994) | 22,027,545 |
| Gulf Investment Corporation | 9.23 | 20,000,000 | (2,832,404) | 34,011,296 | (1,130,694) | 32,880,602 |
| Behbehani Investment Company | 0.69 | 1,300,000 | (220,358) | 2,647,047 | (84,071) | 2,562,976 |
| The Public Institution For Social Security | 23.77 | 40,000,000 | (2,684,455) | 92,318,478 | (2,896,185) | 89,422,293 |
| Yaqoub Behbehani | 0.59 | 1,000,000 | (192,170) | 2,308,806 | (71,887) | 2,236,919 |
| Petro Link Holding Company K.S.C.C. | 1.78 | 3,000,000 | (576,372) | 6,924,434 | (216,878) | 6,707,556 |
| Kuwait Reinsurance Company K.S.C.C. | 1.19 | 2,000,000 | (384,202) | 4,615,626 | (144,992) | 4,470,634 |
| Al Ahlia Insurance Company | 1.78 | 3,000,000 | (576,372) | 6,924,433 | (216,879) | 6,707,554 |
| Mohammed Ali Al-Naki | 1.78 | 3,000,000 | (576,372) | 6,924,433 | (216,879) | 6,707,554 |
| KGL Investment Company K.S.C.C. | 11.89 | 20,000,000 | (3,842,158) | 46,158,246 | (1,448,702) | 44,709,544 |
| Kuwait Ports Authority | 41.39 | 85,000,000 | (11,222,153) | 134,609,864 | (5,043,041) | 129,566,823 |
| | 100 | 188,152,000 | (30,000,000) | 360,184,202 | (12,184,202) | 348,000,000 |

During the subsequent period, in February 2019, the Fund distributed its remaining capital and accumulated profits to the Limited Partners (Note 17).

19

EXHIBIT - MG-002G
CONFIDENTIAL

21

**The Port Fund L.P.**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2017

11.    **GENERAL AND ADMINISTRATIVE EXPENSES**

|  | 2017 | 2016 |
|---|---|---|
|  | US$ | US$ |
| Consultancy and legal fees | 11,573,190 | 2,525,789 |
| Fund administration expenses | 40,000 | 54,000 |
| Executive retention fees | 1,000,000 | - |
| Finance charges for MPC - GMO obligation | - | 17,714 |
| Others | 27,002 | 145,675 |
|  | 12,640,192 | 2,743,178 |

12.    **TAXATION**

As per the Limited Partnership Agreement any tax liability arising from the activities of the Fund will be borne by Limited Partners.

13.    **FINANCIAL RISK AND CAPITAL MANAGEMENT**

**Financial risk management**

Risk is inherent in the Fund's activities but it is managed through a process of ongoing identification, measurement and monitoring, subject to risk limits and other controls. This process of risk management is critical to the Fund's continuing profitability and each individual within the Fund is accountable for the risk exposures relating to his or her responsibilities. The Fund is exposed to market risk, credit risk and liquidity risk. The independent risk control process does not include business risks such as changes in the environment, technology and industry. The Fund's policy is to monitor those business risks through Fund's strategic planning process. No changes were made in the risk management objectives, policies or processes during the year ended 31 December 2017.

*Market risk*
Market risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in market prices. Market risk comprises three types of risk: foreign currency risk, interest rate risk, and equity price risk.

*Foreign currency risk*
Foreign currency risk is the risk that the fair value or future cash flows of an exposure will fluctuate because of changes in foreign exchange rates. The Fund's exposure to the risk of changes in foreign exchange rates relates primarily to the Fund's operating activities.

Foreign currency sensitivity
The following tables demonstrate the sensitivity to a reasonably possible change in Kuwaiti Dinar exchange rates, with all other variables held constant. The impact on the Fund's profit is due to changes in the fair value of monetary assets and liabilities designated foreign currency. The Fund's exposure to foreign currency changes for all other currencies is not material.

20

**The Port Fund L.P.**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2017

13.     **FINANCIAL RISK AND CAPITAL MANAGEMENT (CONTINUED)**

*Market risk (Continued)*

*Interest rate risk*
Interest rate risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in market interest rates. The Fund is not exposed to interest rate risk as it does not have any floating interest bearing assets or liabilities.

*Equity price risk*
Equity price risk is the risk that the fair value of equities will fluctuate as a result of changes in the level of equity indices or the value of individual share price. Equity price risk arises from the changes in fair values of equity investments. The Fund is not exposed to price risk since there are no equity investments held by the Fund in the statement of financial position.

**Credit risk**
Credit risk is the risk that one party to a financial instrument will cause a financial loss for the other party by failing to discharge an obligation and arises principally from outstanding trade receivables, bank balances and committed transactions. The Fund seeks to limit its credit risk with respect to receivables by setting credit limits for individual customers and monitoring outstanding receivables on a regular basis. Normal credit terms for customers range up to one month. The Fund seeks to limit its credit risk with respect to bank balances by dealing with reputable banks and financial institutions.

*Exposure to credit risk*
The carrying amount of financial assets represents the maximum credit exposure. The maximum net exposure to credit risk by class of assets at the reporting date is as follows:

|  | 2017 | 2016 |
|---|---|---|
|  | US$ | US$ |
| Bank balances | 11,840,213 | 2,058,885 |
| Receivables – restricted bank balance | 733,298 | - |
| Net receivables on sale of financial assets at fair value through profit or loss | 392,166,898 | - |
| Due from a related party | 1,698,665 | 2,161,632 |
|  | 406,439,074 | 4,220,517 |

*Liquidity risk*
Liquidity risk is the risk that the Fund will encounter difficulty in meeting commitments associated with financial liabilities, arises because of the possibility (which may often be remote) that the entity could be required to pay its liabilities earlier than expected.

Ultimate responsibility for liquidity risk management rests with the Board of Directors, which has built an appropriate liquidity risk management framework for the management of the Fund's short, medium and long-term funding and liquidity management requirements. The Fund manages liquidity risk by maintaining adequate reserves, and by continuously monitoring forecast and actual cash flows and matching the maturity profiles of financial assets and liabilities.

The maturity profile of the Fund's undiscounted financial liabilities at 31 December based on contractual undiscounted repayment obligations. Undiscounted cash flows in respect of balances due within 12 months equal their carrying amounts in the statement of financial position.

21

**The Port Fund L.P.**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2017

13.    FINANCIAL RISK AND CAPITAL MANAGEMENT (CONTINUED)

*Liquidity risk (Continued)*

| | On demand US$ | 3-6 months US$ | 6-12 months US$ | Total US$ |
|---|---|---|---|---|
| *31 December 2017* | | | | |
| *Assets* | | | | |
| Bank balances | 11,840,213 | - | - | 11,840,213 |
| Receivables – restricted bank balance | - | 733,298 | - | 733,298 |
| Net receivables on sale of financial assets at fair value through profit or loss | - | | 392,166,898 | 392,166,898 |
| Due from a related party | - | - | 1,698,665 | 1,698,665 |
| | 11,840,213 | 733,298 | 393,865,563 | 406,439,074 |
| | | | | |
| *Liabilities* | | | | |
| Due to the former Investment Manager | - | - | 47,462,000 | 47,462,000 |
| Other payables, provisions and accrued expenses | - | 10,977,074 | - | 10,977,074 |
| | - | 10,977,074 | 47,462,000 | 58,439,074 |

| | On demand US$ | 3-6 months US$ | 6-12 months US$ | Total US$ |
|---|---|---|---|---|
| *31 December 2016* | | | | |
| *Assets* | | | | |
| Bank balances | 2,058,885 | - | - | 2,058,885 |
| Due from a related party | - | - | 2,161,632 | 2,161,632 |
| | 2,058,885 | - | 409,721,824 | 411,780,709 |
| | | | | |
| *Liabilities* | | | | |
| Due to the former Investment Manager | - | - | 50,508,050 | 50,508,050 |
| Other payables, provisions and accrued expenses | - | 388,457 | 700,000 | 1,088,457 |
| | - | 388,457 | 51,208,050 | 51,596,507 |

**Capital risk management**

The Fund's objectives when managing capital are to safeguard the Fund's ability to continue as a going concern, so that it can continue to provide returns for Limited Partners.

The Fund sets the amount of capital in proportion to risk. The Fund manages the capital structure and makes adjustments to it in the light of changes in economic conditions and the characteristics of the underlying assets. The Fund's Manager is in the process of winding up the operations of the Fund and returning capital to Limited Partners.

22

24

**The Port Fund L.P.**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2017

14.  **FAIR VALUE OF FINANCIAL INSTRUMENTS**

*Valuation techniques and assumptions applied for the purposes of measuring fair values*
Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The fair value measurement is based on the presumption that the transaction to sell the asset or transfer the liability takes place either:
-   In the principal market for the asset or liability.
-   In the absence of a principal market, in the most advantageous market for the asset or liability.

*Fair value measurements recognised in the statement of financial position*
All assets and liabilities for which fair value is measured or disclosed in the financial statements are categorised within the fair value hierarchy, described as follows, based on the lowest level input that is significant to the fair value measurement as a whole:

Level 1:   Quoted (unadjusted) market prices in active markets for identical assets or liabilities.
Level 2:   Valuation techniques for which the lowest level input that is significant to the fair value measurement is directly or indirectly observable.
Level 3:   Valuation techniques for which the lowest level input that is significant to the fair value measurement is unobservable.

As of 31 December, the fair values of financial instruments approximate their carrying amounts. The management of the Fund has assessed that fair value of financial assets and liabilities approximate their carrying amounts largely due to the short-term maturities of these financial instruments.

The financial assets measured at fair value in the statement of financial position are grouped into the fair value hierarchy as follows:

|  | Level 3 | Total |
|---|---|---|
|  | US$ | US$ |
| **31 December 2017** |  |  |
| Financial assets at fair value through profit or loss | - | - |
| **31 December 2016** |  |  |
| Financial assets at fair value through profit or loss | 407,560,192 | 407,560,192 |

15.  **LEGAL CASES**

*State of Kuwait*
A lawsuit No. 2012/1496 together with two lawsuits No. 2013/ 547 and 2014/1719 were filed against former Officers and Directors of the Fund's General Partner and a third party. The lawsuit was referred to the Kuwaiti Court on 26 April 2017.

Most of the accusations (167 transactions) were cleared by the Criminal Court of First Instance and the remaining accusations (2 transactions) are currently under review at the Court of Appeal. The Fund is not a party to, or litigant in, such case. Subsequently, the case number 1496/2012 will not have any material effect on the Fund's financial statements.

23

25

**The Port Fund L.P.**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2017

15.   **LEGAL CASES (CONTINUED)**

*State of Kuwait (continued)*

*KGL Ports International regarding the Fund's L.P. Damietta Egypt Investment*
On 8 July 2016, the Fund filed a civil action in the Kuwait Court of First Instance against KGL Ports International ("KGLPI") seeking payment from KGLPI under the terms of a USD 20 million convertible loan agreement dated 22 August 2007. The loan was convertible into a portion of KGLPI's 25 percent equity holding in the Damietta Ports International Company ("DIPCO"), which was then developing a seaport in Damietta, Egypt under a concession agreement with the Damietta Port Authority ("DPA"). The DPA terminated the concession agreement before the Fund could convert the loan into equity. The Fund requested the court to appoint an expert to review the convertible note and to order KGLPI to pay the Fund USD 20 million plus interest. Notwithstanding that the expert's report concluded that the Fund was entitled to receive USD 20 million plus interest, the court on 11 November 2019, denied the Fund's request for payment. On 12 December 2019, the Fund appealed the decision. The appeal is pending before the court.

Relatedly, on 13 February 2020, the ICC International Court of Arbitration issued a final award in favor of DIPCO and against the DPA finding that DPA illegally terminated of the concession agreement and awarding DIPCO over USD 400 million in damages. The Fund intends to seek recovery of the loan from the proceeds of KGLPI's share of the award to DIPCO.

*Cayman Islands*
*Gulf Investment Corporation and General Retirement and Social Insurance Authority, Qatar*
On 29 November 2019, Gulf Investment Corporation ("GIC"), one of the limited partners of the Fund , commenced a proceeding against the Fund and against the General Partner. The proceeding was made under Section 22 of the Cayman Island Exempted Limited Partnership Law, as amended in the Grand Court of the Cayman Islands (FSD 325/2019).

On 30 January 2020, another limited partner of the Fund, General Retirement and Social Insurance Authority, Qatar ("GRISA") filed a summon seeking to become a second plaintiff in the GIC proceeding.

The plaintiffs are seeking an order from the Cayman court requiring the Fund to disclose certain information pursuant to Section 22. There are no claims asserted against the Fund in these proceedings, and the Cayman court has not yet decided what information the Fund is required to disclose.

*Kuwait Public Authority*
On 29 January 2020, Kuwait Port Authority ("KPA"), one of the limited partners of the Fund, commenced a proceeding against the Fund and against the General Partner. The proceeding was made under Section 22 of the Cayman Island Exempted Limited Partnership Law, as amended in the Grand Court of the Cayman Islands (FSD 325/2019).

The plaintiff is seeking an order from the Cayman court requiring the Fund to disclose certain information pursuant to Section 22. There are no claims asserted against the Fund in these proceedings, and the Cayman court has not yet decided what information the Fund is required to disclose.

24

**The Port Fund L.P.**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2017

15.   **LEGAL CASES (CONTINUED)**

*United States*
*Gulf Investment Corporation*
On 26 December 2019, GIC, one of the limited partners of the Fund , filed an ex parte application in the United States District Court for the Southern District of New York (Case No. 1:19-mc-00593) seeking the Court's permission, pursuant to 28 U.S.C. Section 1782, to issue subpoenas to twelve correspondents banks seeking information that may relate to contemplated but not yet filed litigation against the Fund. There are no claims asserted against TPF in these proceedings, and the Court has not yet decided whether to issue the requested subpoenas to the correspondent banks.

*Kuwait Public Authority*
On 28 January 2020, KPA, one of the limited partners of the Fund , filed an ex parte application in the United States District Court for the Southern District of New York (Case No. 1:20-mc-00046) seeking the Court's permission, pursuant to 28 U.S.C. Section 1782, to issue subpoenas to two financial institutions seeking information that may relate to contemplated but not yet filed litigation against the Fund. There are no claims asserted against TPF in these proceedings, and the Court has not yet decided whether to issue the requested subpoenas to the financial institutions.

16.   **ADDITIONAL INFORMATION**

The balance of net funds received in a bank in UAE after settlement of certain liabilities amounted to USD 496,429,777 can be reconciled with the sales proceeds of Sabah Al-Ahmad Global Gateway Logistics City amounted to USD 655,000,000 as follows:

|  | **2017** |
|---|---|
|  | US$ |
| Sales proceeds of Sabah Al-Ahmad Global Gateway Logistics City | 655,000,000 |
| Less: advance received | (40,000,000) |
|  | 615,000,000 |
| Add: reimbursement cost incurred after the SPA | 13,500,000 |
| Add: debt service reserve account balance | 2,657,121 |
|  | 631,157,121 |
| Less: repayment loans as condition precedent to closing of sale (Barings Company's loan) | (193,570,223) |
|  | 437,586,898 |
| Add: working capital to return to the purchaser as per the SPA | 58,842,879 |
|  | 496,429,777 |

25

**The Port Fund L.P.**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2017

17.    **SUBSEQUENT EVENTS**

*Emerging Markets PE Management Limited (formerly known as KGL Investment Cayman Ltd.)*
*("EMPEML" or the "former Investment Manager")*

—    KGL Investment Cayman Ltd. ownership was sold to third party during 2018, and accordingly
the new owner is entitled to claim the amount due to the former Investment Manager.

—    On 7 July 2018, EMPEML provided a termination notice to the General Partner under section
12.2(a) of the 28 June 2007 IMA between KGLI Investment Cayman Ltd. and the General
Partner. The termination notice claimed breaches of the IMA and demanded immediate
payment under section 12.5 of the IMA of the unpaid carried interest, unpaid management fees
under section 5.1 of the IMA, and applicable interest. On 9 July 2018, EMPEML filed a civil
claim in the Dubai International Financial Centre Court of First Instance ("DIFC") (Claim No.
CFI-050-2018) against the Fund and the General Partner asserting the same claims, and on 25
July 2018 the DIFC entered a judgment against the defendants in the amount USD 56,999,978
plus interest at 9% per annum until paid. After the Fund's monies were unfrozen in February
2019, the General Partner paid the DIFC judgment, plus applicable interest, in the amount of
USD 59,990,461 to EMPEML.

*Distribution to Limited Partners*
—    The Fund distributed to the limited partners USD 335,000,000 in two distributions. The first
distribution of USD 30,000,000 was paid in October 2016 and the second distribution of USD
305,000,000 was paid in February 2019. Details of the second distribution as follows:

|  | February 2019 |
| --- | --- |
|  | US$ |
| *Limited Partners of the Fund:* |  |
| General Retirement and Social Insurance Authority, Qatar | 17,282,345 |
| Gulf Investment Corporation | 25,366,019 |
| Behbehani Investment Company | 2,004,241 |
| The Public Institution For Social Security | 79,201,193 |
| Yaqoub Behbehani | 1,759,160 |
| Petro Link Holding Company K.S.C.C. | 5,266,181 |
| Kuwait Reinsurance Company K.S.C.C. | 3,507,018 |
| Al Ahlia Insurance Company | 5,266,179 |
| Mohammed Ali Al-Naki | 5,266,179 |
| KGL Investment Company K.S.C.C. | 35,081,485 |
| Kuwait Ports Authority | 125,000,000 |
| Total second distribution to Limited Partners | 305,000,000 |

26

**The Port Fund L.P.**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2017

---

17.   **SUBSEQUENT EVENTS (CONTINUED)**

*Net receivables on sale of financial assets at fair value through profit or loss*

—   The sale proceeds in respect of the Sabah Al-Ahmad Global Gateway Logistics City investment were released on 5 February 2019 by the Dubai based bank following an investigation and other necessary compliance requirements.

—   The details of the sale proceeds, the distributions to Limited Partners and payments made by the Fund are as follows:

|  | 2019 |
|---|---|
|  | US$ |
| Net sales proceeds released on 5 February 2019 | 496,429,777 |
| Less: repayment of working capital to the buyer as per the SPA (a) | (55,343,116) |
| Less: net costs to sell payable as at the reporting date | (45,420,000) |
| Less: repayment of the former Investment Manager balance due | (59,990,461) |
| Less: distributions to the Limited Partners | (305,000,000) |
| Less: legal, advisory, consultancy, retainers and other expenses | (30,676,200) |

(a)   During February 2019, the Fund reached a settlement with the buyer (Udenna Development Corporation), to pay an amount of USD 55,343,116 instead of USD 58,842,879 (Note 7), resulting in a decrease in liabilities of USD 3,499,763, which the Fund has subsequently recognised as other income in the statement of comprehensive income.

27

29

مرفق 8-2

8-2

## ORDER MEMORANDUM

GULF BANK

REF :   T.T   7650.00

DATE :   ...   . . .   2008

We have to-day effected the undermentioned
transfer of funds by tested Telex.

PAYING
BANK:   WACHOVIA N.A.
11. WALL STREET
NEW YORK    NY. 10043
U.S.A

SWIFT: CITIUS33

5.   REFERENCE NO. :025.7650.08
VALUE DATE/AMT:08040BUSD35000..
OUR COVER BANK /10942957
FOR IT PAYS   PNBPUS3NNYC
WACHOVIA BANK NY ABA026005092
THRU PHYBPHMM /2000191008317
PHILIPPINE VETERANS BANK
"004070000062
CARK INTL AIRPORT CORPORATION
IIO. Que

| CURRENCY | RATE | KD. | FILS. |
|---|---|---|---|
| USD  *35,000.00 | 0.26525 | | |
| USD  *35,000.00 | 0.26525 | *9 28... ... | |
| COMMISSION | USD  *7.54 | | * |
| EXCHANGE COMPENSATION | USD  *0.00 | | |
| TELEX CHARGES | USD  *26.39 | | ... ... |
| TOTAL | USD  *35,033.93 | *9  ... ... | |

من المتفق عليه أن البنك لا يتحمل مسؤولية عن التأخير أو الخطأ الذي يحصل في الإرسال.
It is understood that the Bank declines all responsibility for any delay or
errors that may occur in transmission.

MAIL TO   INVESTMENT CO
BOX 24565 (HOLD)
SALAT
KUWAIT

In Reimbursement we have
DEBITED YOUR A/C NO   04807432

Received Cash :   Cheque No. :

A VISIONS AACHOO-rash
Tien - 00110/355557

For GULF BANK K.S.C.

AUTHORISED SIGNATURE          AUTHORISED SIGNATURE



# KGL

## INVESTMENT CO.

### INNOVATION IN INVESTMENT

Date : April 21,2008
Ref: INV/182-04/08

Mrs. Huda Al Shimmery
Senior Manager
Investment Banking
Burgan Bank – Head Office

Dear Mrs. Al Shimmery

Kindly arrange to transfer for our KD. Account the amount of US$ **205,000/-** (US Dollars Tow Hundred Five Thousand Only) at agreed rate **0.26610** to the following account details:-

| Beneficiary Name | : | Lord A. Villanueva TITF Global Gateway Development Corporation |
| Bank Name | : | Bank of Philippine Islands |
| Account No. | : | 1924 1099 94 |
| Swift Code | : | BOPIPHMM |

Kindly debit our account No. 3160997279  with you.

Thanking you & Best Regards,

On Behalf Of KGL Investment Company



Yaqoub Abdullah Al Wazzan

RECEIVED
BURGAN BANK
Financial Institutions Div.
Date : 21/4/08
Time : 2:20 pm

P.O.Box 24565 - Al-Safat 13106, Kuwait - Tel.: +965 2246444 - Fax : +965 2246424    www.kglinvest.com    +965 2246424 :ﺲﻛﺎﻓ - +965 2246444 :ﻒﺗﺎﻫ
Registered Name: KGL Investment Co. K.S.C (Closed) C.R. 117642 Paid Up Capital KD 15,000,000

3



Date/Time:   28/07/2008  15:23:16                              SWIFT  Ref : TT 11280708092

Name       :  THE PORT FUND L.P                                YOUR REF :
Address    :  P.O. Box:24565 SAFAT-13106 – KUWAIT
              KUWAIT                                               Account : 11581420
Telephone:  1


Amount Remitted    : USD**3965030.00**      @


Charges       :       USD 30.30
Total         :       USD 3965060.30
Payment Details :


We Pay To     :       004070000062
                      CLARK INTERNATIONAL AIRPORT          PHILIPPINE VETERANS BANK

Through       :       CITIBANK NA, NEWYORK                 Value Date :       20080728

Computer generated advice  No signature is required.              هذا الإشعار صادر عن الكمبيوتر ولايحتاج لتوقيع من البنك

4



Date/Time:    28/07/2008 15:18:40

SWIFT  Ref : TT 11280708091

Name      :  THE PORT FUND L.P
Address   :  P.O. Box:24565 SAFAT-13106 - KUWAIT
             KUWAIT
Telephone:  1

YOUR REF :

Account : 11581420

Amount Remitted    : USD**1794970.00**    @

Charges        :    USD 30.30
Total          :    USD 1795000.30
Payment Details :

We Pay To    :    1924109994
                  LORD A VILLANUEVA TITF GLOBAL

BANK OF PHILIPPINES ISLAND

Through      :    CITIBANK NA, NEWYORK

Value Date  :        20080730

Computer generated advice. No signature is required.

هذا الاشعار صادر عن الكمبيوتر و لايحتاج لتوقيع من البنك



THE PORT FUND L.P.
PO BOX 24565, SAFAT 13106
KUWAIT

MOO1

KUWAIT BRANCH
TELEGRAPHIC TRANSFER ISSUING ADVICE
THE PORT FUND L.P.
WE HAVE DEBITED YOUR ABOVE ACCOUNT WITH THE COST OF ISSUING A
TELEGRAPHIC TRANSFER TT SFTO44277MNY DRAWN ON HSBC BANK USA NA GEN REM A/C HK
NEW CASTLE FAVOURING GLOBAL GATEWAY DEVELOPMENT ISLANDS

| | | | |
|---|---|---|---|
| TELEX TRANSFER USD | 4,000,000.00 | USD | 4,000,000.00 |
| CABLE | | USD | 29.86 |
| TOTAL DEBITED | | USD | 4,000,029.86 |
| VALUE DATE | 15SEP2008 | | |

**Choose a random combination of numbers for your PIN. Do not keep your Card and PIN together**
HSBC Bank Middle East Limited

$A \cdot 6$

# the**PORT FUND**

Date: March 09, 2009
Ref : PV/02/03/09

Mrs. Nada Al Fares
Senior Relationship Manager
Corporate Banking
HSBC

Dear Mrs. Al Fares,

Kindly arrange to transfer the amount of **US\$ 1,500,000.00** (US Dollars One Million Five Hundred Thousand Only) to the following account details:-

Bank Name                : Bank Of Philippines Islands
Beneficiary Name    : Global Gateway Development Corporation
Account No.              : 1924 1107 39
Swift Code                : BOPIPHMM

Kindly debit our account No. 001-004001-160 with you.

*Thanking you & Best Regards,*

*On behalf of The Port Fund L.P.*

*Marsha Lazareva*
*Director*

Tel.: +965 2240444 / +965 7700060 / +965 7700040 - Fax.: +965 2240424 - P.O.Box 24565 Safat 13106 Kuwait - Email: info@kglinvest.com - info@kglinvest.com
www.kglinvest.com - www.theportfund.com

 HSBC Bank Middle East Limited

## REQUEST FOR FUNDS TRANSFER FORM

Date:

Please complete form in **BLOCK** letters and tick where applicable.

| I/We wish to apply for | ☐ Telex Transfer | ☐ Demand Draft | ☐ Cashier's Order |
| Delivery Instructions (Demand Draft/Cashier's Order) | ☐ Dispatch directly to beneficiary | ☐ Dispatch directly to me/us | ☐ Hold for collection |

**REMITTER'S ACCOUNT DETAILS**

| Debit Account Number | | Account Name | |

**REMITTANCE DETAILS** (please tick only one box)

| Remittance Currency | ☑ KWD Dinar  ☐ US Dollar  ☐ Pound Sterling  ☐ Euro  ☐ Indian Rupee  ☐ Other |
| Amount in figures (Please specify currency) | ☐ Remittance currency OR ☐ Other currency |
| Amount in words | |

| Charges (Only for T/T's) | Sending bank | ☐ Charge my account | ☐ Charge from remittance amount |
| | Other bank | ☐ Charge my account | ☑ Charge from remittance amount |
| Corporate Clients only | Exchange Rate | Agreed with (Name) | |
| | Value date | Forward Contract ☑ Yes ☐ No | Reference Number: |

**BENEFICIARY DETAILS**

| Name: | |
| Account Number: | |
| Bank: | |
| Branch: | City: |
| State/County/Province: USD  *1,500,000.00 | Country: USD  *1,500,000.00 |
| Bank Code*: TT SFT063875MNY | (*SWIFT/Sort Code/Fedwire ID/CHIPS UID/etc.) |
| eficiary address (head or Business) | USD  *0.00  11MAR2009 |
| Payment details: | *0.00  *27.21  *0.00 |
| | *27.21  USD |

**REMITTER'S DETAILS**

| Contact Numbers: 001-00400 15160  Mobile: THE PORT FUND U.B. Office/Residence: | E-mail: USD  *1,500,27.21 |
| I/We agree to the Terms & Conditions given at the back | S.V. | Bank Staff Name & Signature |
| Customer Signature: | | |
| LTR DT 090309 RF   AV/02/03/09 | | |

LTRABO?  12:14 001 KW11A 0038 PO15 0002

**BANK USE ONLY**  P  /  EXCH

| P= | DD or COC ref. no. | Value Date | Rate | To Bank | Benf. Bank | Charge Type: Our/Ben/Sha | Charge Code | Commission | Maker | Authorised Signature |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | MSG |
| | | | | | | | | | | Cover |



7

PAGE  1          C
06APR2009
001-004001-160

THE PORT FUND L.P.
PO BOX 24565, SAFAT 13106
KUWAIT
C/O HSBC, KUWAIT, MAIL BOX NO 23
-                           C001

KUWAIT BRANCH
TELEGRAPHIC TRANSFER ISSUING ADVICE
THE PORT FUND L.P.
WE HAVE DEBITED YOUR ABOVE ACCOUNT WITH THE COST OF ISSUING A
TELEGRAPHIC TRANSFER TT SFT067178MNY DRAWN ON HSBC BANK USA NA GEN REM A/C HK
NEW CASTLE FAVOURING GLOBAL GATEWAY DEVELOPMENT CORP

| | | | |
|---|---|---|---|
| TELEX TRANSFER USD | 1,500,000.00 | USD | 1,500,000.00 |
| CABLE | | USD | 27.54 |
| TOTAL DEBITED | | USD | 1,500,027.54 |
| VALUE DATE | 06APR2009 | | |

Choose a random combination of numbers for your PIN. Do not keep your Card and PIN together
HSBC Bank Middle East Limited



THE PORT FUND L.P.
PO BOX 24565, SAFAT 13106
KUWAIT
C/O HSBC, KUWAIT, MAIL BOX NO 23
-                          C001

KUWAIT BRANCH
TELEGRAPHIC TRANSFER ISSUING ADVICE
THE PORT FUND L.P.
WE HAVE DEBITED YOUR ABOVE ACCOUNT WITH THE COST OF ISSUING A
TELEGRAPHIC TRANSFER TT SFT086278MNY DRAWN ON HSBC BANK USA NA GEN REN A/C HK
NEW CASTLE FAVOURING GLOBAL GATEWAY DEVELOPMENT CORP

| | | | | |
|---|---|---|---|---|
| TELEX TRANSFER USD | 3,000,000.00 | | USD | 3,000,000.00 |
| CABLE | | | USD | 27.91 |
| TOTAL DEBITED | | | USD | 3,000,027.91 |
| VALUE DATE | 16SEP2009 | | | |

Choose a random combination of numbers for your PIN. Do not keep your Card and PIN together
HSBC Bank Middle East Limited                    بنك إتش إس بي سي الشرق الأوسط المحدود



```
THE PORT FUND L.P.
PO BOX 24565, SAFAT 13106
KUWAIT
C/O HSBC, KUWAIT, MAIL BOX NO 23
                          C001
```

```
KUWAIT BRANCH
TELEGRAPHIC TRANSFER ISSUING ADVICE
THE PORT FUND L.P.
WE HAVE DEBITED YOUR ABOVE ACCOUNT WITH THE COST OF ISSUING A
TELEGRAPHIC TRANSFER TT SFT102479MNY TO BANK OF THE PHILIPPINE ISLANDS HEAD
OFFICE MANILA FAVOURING GLOBAL GATEWAY DEVELOPMENT CORPORATION AS FOLLOWS:
```

```
TELEX TRANSFER USD      500,000.00            USD      500,000.00
CABLE                                         USD           27.82
TOTAL DEBITED                                 USD      500,027.82
VALUE DATE     21JAN2010
```

**Choose a random combination of numbers for your PIN. Do not keep your Card and PIN together**

HSBC Bank Middle East Limited                    بنك إتش إس بي سي الشرق الأوسط المحدود



PAGE  1
14FEB2010
001-004001-160

THE PORT FUND L.P.
PO BOX 24565, SAFAT 13106
KUWAIT
C/O HSBC, KUWAIT, MAIL BOX NO 23
                            C001

KUWAIT BRANCH
TELEGRAPHIC TRANSFER ISSUING ADVICE
THE PORT FUND L.P.
WE HAVE DEBITED YOUR ABOVE ACCOUNT WITH THE COST OF ISSUING A
TELEGRAPHIC TRANSFER TT SFT105589MNY TO BANK OF THE PHILIPPINE ISLANDS AYALA
ALABANG BR MANILA FAVOURING GLOBAL GATEWAY DEVELOPMENT CORPORATION AS FOLLOWS:

| | | |
|---|---|---|
| TELEX TRANSFER USD       500,000.00 | USD | 500,000.00 |
| CABLE | USD | 27.71 |
| TOTAL DEBITED | USD | 500,027.71 |
| VALUE DATE      16FEB2010 | | |

**Choose a random combination of numbers for your PIN. Do not keep your Card and PIN together**

**HSBC Bank Middle East Limited**                                            بنك إتش إس بي سي الشرق الأوسط المحدود



PAGE   1
16MAR2010
001-004001-160

THE PORT FUND L.P.
PO BOX 24565, SAFAT 13106
KUWAIT
C/O HSBC, KUWAIT, MAIL BOX NO 23
-                                C001

KUWAIT BRANCH
TELEGRAPHIC TRANSFER ISSUING ADVICE
THE PORT FUND L.P.
WE HAVE DEBITED YOUR ABOVE ACCOUNT WITH THE COST OF ISSUING A
TELEGRAPHIC TRANSFER TT SFT109772MNY TO BANK OF THE PHILIPPINE ISLANDS AYALA
ALABANG BR MANILA FAVOURING GLOBAL GATEWAY DEVELOPMENT CORPORATION AS FOLLOWS:

| | | | | |
|---|---|---|---|---|
| TELEX TRANSFER USD | 300,000.00 | | USD | 300,000.00 |
| CABLE | | | USD | 27.72 |
| TOTAL DEBITED | | | USD | 300,027.72 |
| VALUE DATE | 16MAR2010 | | | |

**Choose a random combination of numbers for your PIN. Do not keep your Card and PIN together**

**HSBC Bank Middle East Limited**                                    بنك إتش إس بي سي الشرق الأوسط المحدود

اشعار حوالة خارجية   **OUTWARD REMITTANCE VOUCHER**

| | | | | | |
|---|---|---|---|---|---|
| REF NO. مرجعنا | | VALUE حق | BRANCH الفرع | DATE التاريخ | التاريخ |
| Re66 8R07OD2010011842 | | 26/05/2010 | Central Retail IS | 24/05/2010 | |

BY DEBIT << NOSTRO ACCOUNT >> NO. من حسابنا طرفهم رقم | | BY CREDIT << VOSTRO ACCOUNT >> NO. | | بالاضافة إلى حسابهم طرفنا رقم |

THROUGH / TO بواسطة / إلى

TELEX نظام تلكس

SWIFT سويفت نظام سويفت X

البنك المرسل

BANK TO BANK INSTRUCTIONS تعليمات من البنك     CORRESPONDENT BANK

JPMorgan Chase Bank, N.A.
4 Chase Metrotech Center,
Brooklyn, New York, NY 11245,
U.S.A.

AMOUNT IN WORDS المبلغ بالحروف

US Dollars Seven Hundred Thousand Only.

| DISBURSEMENT INSTRUCTIONS تفاصيل التحويل | CCY العملية | AMOUNT مبلغ التحويل |
|---|---|---|
| | USD | *700,000.00 |
| | RATE | *0.2894000000 السعر |

BENEFICIARY'S NAME/ADDRESS المستفيد  GLOBAL GATEWAY DEVELOPMENT
CORPORATION

| | EQUIVALENT المعادل | *700,000.00 |
|---|---|---|
| | TELEX CHARGES م. تلكس | *24.19 |

BENY'S A/C NO. 1924110739
BANK OF PHILIPPINES ISLANDS
BOPIPHMM

COMMISSION عمولة لحسابهم رقم - لدى
OTHER CHARGES م. اخرى

ABA / SWIFT / SORT CODE عنوان المستفيد   TOT USD المجموع  *700,024.19

CASH نقدا

PAYMENT INSTRUCTION تفاصيل الدفع   DEBIT A/C NO. من الحساب X

0603-755991-002

It is understood that the Bank declines all responsibility for any delay or errors that may occur in transmission.   من المتفق عليه أن البنك غير مسئول عن التأخير أو الخطأ الذي يحصل في الارسال

البنك الأهلي الكويتي
ALAHLI BANK OF KUWAIT!
KUWAIT

CUSTOMER NAME / ADDRESS   اسم وعنوان العميل

CAPITAL LINK HOLDING CO.
C/O AL AHLI BANK OF KUWAIT
MAIL BOX #515

SER0143 On 24/05/2010 At 08:09 00010 PD241 P

2-PD15 FFB HBD15   CUSTOMER COPY   R.P. 03/09   R.D. 01/06

13

| OUTWARD REMITTANCE VOUCHER | اشعار حوالة خارجية |

| | REF NO. مرجعنا | | VALUE حق | | BRANCH الفرع | DATE التاريخ |
|---|---|---|---|---|---|---|
| | Regb BRQ7002010013095 | | 09/06/2010 | | Central Retail S | 07/06/2010 |

BY DEBIT<< NOSTRO ACCOUNT>> NO.   من حسابنا طرفهم رقم

بالإضافة إلى حسابهم طرفنا رقم   BY CREDIT<< VOSTRO ACCOUNT>> NO.

THROUGH / TO    نظام تلكس   TELEX      SWIFT   ☒ لنظام سويفت    بواسطة / الى

BANK TO BANK INSTRUCTIONS   تعليمات من البنك

CORRESPONDENT BANK   البنك المرسل

JPMorgan Chase Bank, N.A.
4 Chase Metrotech Center,
Brooklyn, New York, NY 11245,
U.S.A.

AMOUNT IN WARDS   المبلغ بالحروف   CCY العملية   AMOUNT   مبلغ التحويل

US Dollars Seventy Five Thousand Only.   USD   *75,000.00

D:SBURSEMENT INSTRUCTIONS   تفاصيل التحويل   RATE   *0.2926500000

BENEFICIARY'S NAME/ADDRESS GLOBAL GATEWAY DEVELOPMENT   المستفيد
CORPORATION

| | | EQUIVALENT المعادل | *75,000.00 |
|---|---|---|---|
| | | TELEX CHARGES م. تلكس | *23.92 |

1924110739   لحسابهم رقم - لدى   COMMISSION عمولة

BENY'S A/C NO.   BANK OF PHILIPPINES ISLANDS   OTHER CHARGES م. أخرى
BOPIPHMM

ABA / SWIFT / SORT CODE   عنوان المستفيد   10USD المجموع   *75,023.92

CASH   نقدا   ☐

PAYMENT INSTRUCTION   تفاصيل الدفع   DEBIT A/C NO.   من الحساب ☒

0603-755991-002

It is understood that the Bank declines all responsibility   من المتفق عليه أن البنك غير مسؤول من التأخير أو الخطأ الذي يحصل في الإرسال
for any delay or errors that may occur in transmission.

البنك الأهلي الكويتي ؛
AL AHLI BANK OF KUWAIT عن /
KUWAIT الكويت

CUSTOMER NAME / ADDRESS   اسم وعنوان العميل

CAPITAL LINK HOLDING CO.
C/O AL AHLI BANK OF KUWAIT
MAIL BOX #515

SER0143 On 07/06/2010 At 11:31 00046   PD24J P
2-PD2D   PD020   CUSTOMER COPY   R P. 11/09   R D. 01/08

15

75



PAGE 1
01JUL2010
001-004001-160

THE PORT FUND L.P.
PO BOX 24565, SAFAT 13106
KUWAIT
C/O HSBC, KUWAIT, MAIL BOX NO 23
-                              C001

KUWAIT BRANCH
TELEGRAPHIC TRANSFER ISSUING ADVICE
THE PORT FUND L.P.
WE HAVE DEBITED YOUR ABOVE ACCOUNT WITH THE COST OF ISSUING A
TELEGRAPHIC TRANSFER TT SFT125815MNY DRAWN ON HSBC BANK USA NA GEN REM A/C HK
NEW CASTLE FAVOURING GLOBAL GATEWAY DEVELOPMENT CORPORATION

| | | | | |
|---|---|---|---|---|
| TELEX TRANSFER USD | 1,000,000.00 | USD | 1,000,000.00 |
| CABLE | | USD | 27.44 |
| TOTAL DEBITED | | USD | 1,000,027.44 |
| VALUE DATE | 01JUL2010 | | |

Choose a random combination of numbers for your PIN. Do not keep your Card and PIN together

HSBC Bank Middle East Limited                    بنك إتش إس بي سي الشرق الأوسط المحدود

16



PAGE  1
02AUG2010
001-004001-160

THE PORT FUND L.P.
PO BOX 24565, SAFAT 13106
KUWAIT
C/O HSBC, KUWAIT, MAIL BOX NO 23
                                    C001

KUWAIT BRANCH
TELEGRAPHIC TRANSFER ISSUING ADVICE
THE PORT FUND L.P.
WE HAVE DEBITED YOUR ABOVE ACCOUNT WITH THE COST OF ISSUING A
TELEGRAPHIC TRANSFER TT SFT130689MNY DRAWN ON HSBC BANK USA NA GEN REM A/C HK
NEW CASTLE FAVOURING GLOBAL GATEWAY DEVELOPMENT CORPORATION

TELEX TRANSFER USD    6,000,000.00          USD      6,000,000.00
CABLE                                        USD            27.83
TOTAL DEBITED                                USD      6,000,027.83
VALUE DATE      02AUG2010

Choose a random combination of numbers for your PIN. Do not keep your Card and PIN together
**HSBC Bank Middle East Limited**                        بنك إتش إس بي سي الشرق الأوسط المحدود



*16*

PAGE  1              c
20FEB2011
KW06HBME0000000000001004001160

THE PORT FUND L.P.
PO BOX 24565, SAFAT 13106
KUWAIT
C/O HSBC, KUWAIT, MAIL BOX NO 23
-                        C001

KUWAIT BRANCH
TELEGRAPHIC TRANSFER ISSUING ADVICE
THE PORT FUND L.P.
WE HAVE DEBITED YOUR ABOVE ACCOUNT WITH THE COST OF ISSUING A
TELEGRAPHIC TRANSFER TT SFT172374MNY DRAWN ON HSBC BANK USA NA GEN REM A/C HK
NEW CASTLE FAVOURING GLOBAL GATEWAY DEVELOPMENT CORPORATION

| | | | | |
|---|---|---|---|---|
| TELEX TRANSFER USD | 750,000.00 | | USD | 750,000.00 |
| CABLE | | | USD | 28.65 |
| TOTAL DEBITED | | | USD | 750,028.65 |
| VALUE DATE | 22FEB2011 | | | |

Choose a random combination of numbers for your PIN. Do not keep your Card and PIN together
HSBC Bank Middle East Limited                                    بنك إتش إس سي الشرق الأوسط المحدود



THE PORT FUND L.P.
PO BOX 24565, SAFAT 13106
KUWAIT
C/O HSBC, KUWAIT, MAIL BOX NO 23
-                               C001

KUWAIT BRANCH
TELEGRAPHIC TRANSFER ISSUING ADVICE
THE PORT FUND L.P.
WE HAVE DEBITED YOUR ABOVE ACCOUNT WITH THE COST OF ISSUING A
TELEGRAPHIC TRANSFER TT SFT177547MNY DRAWN ON HSBC BANK USA NA GEN REM A/C HK
NEW CASTLE FAVOURING GLOBAL GATEWAY DEVELOPMENT CORPORATION

| | | | |
|---|---|---|---|
| TELEX TRANSFER USD | 4,174,970.00 | USD | 4,174,970.00 |
| CABLE | | USD | 28.74 |
| TOTAL DEBITED | | USD | 4,174,998.74 |
| VALUE DATE | 03MAR2011 | | |

Choose a random combination of numbers for your PIN. Do not keep your Card and PIN together
HSBC Bank Middle East Limited                    بنك إتش إس بي سي الشرق الأوسط المحدود



THE PORT FUND L.P.
PO BOX 24565, SAFAT 13106
KUWAIT
C/O HSBC, KUWAIT, MAIL BOX NO 23
-                          C001

KUWAIT BRANCH
TELEGRAPHIC TRANSFER ISSUING ADVICE
THE PORT FUND L.P.
WE HAVE DEBITED YOUR ABOVE ACCOUNT WITH THE COST OF ISSUING A
TELEGRAPHIC TRANSFER TT SFT201189WNY DRAWN ON HSBC BANK USA NA GEN REM A/C HK
NEW CASTLE FAVOURING GLOBAL GATEWAY DEVELOPMENT CORPORATION

| | | | |
|---|---|---|---|
| TELEX TRANSFER USD | 5,000,000.00 | USD | 5,000,000.00 |
| CABLE | | USD | 29.06 |
| TOTAL DEBITED | | USD | 5,000,029.06 |
| VALUE DATE | 31MAY2011 | | |

Choose a random combination of numbers for your PIN. Do not keep your Card and PIN together
HSBC Bank Middle East Limited                              بنك اتش، اس، بي، سي، الشرق، الأوسط المحدود



**PAGE  1**

17OCT2011
KW06HBME000000000001004001160

*19*

THE PORT FUND L.P.
PO BOX 24565, SAFAT 13106
KUWAIT
C/O HSBC, KUWAIT, MAIL BOX NO 23
C001

KUWAIT BRANCH
TELEGRAPHIC TRANSFER ISSUING ADVICE
THE PORT FUND L.P.
WE HAVE DEBITED YOUR ABOVE ACCOUNT WITH THE COST OF ISSUING A
TELEGRAPHIC TRANSFER TT SFT237335MNY TO BANK OF THE PHILIPPINE ISLANDS HEAD
OFFICE MANILA FAVOURING GLOBAL GATEWAY DEVELOPMENT CORPORATION AS FOLLOWS:

| | | | |
|---|---|---|---|
| TELEX TRANSFER USD | 5,000,000.00 | USD | 5,000,000.00 |
| CABLE | | USD | 29.05 |
| TOTAL DEBITED | | USD | 5,000,029.05 |
| VALUE DATE | 17OCT2011 | | |

Choose a random combination of numbers for your PIN. Do not keep your Card and PIN together
**HSBC Bank Middle East Limited**                    بنك إتش إس بي، بي، الشرق الأوسط المحدود

21



2o

```
                                              PAGE  1                     C
                                    22DEC2011
                                    KW06HBME000000000000001004001160

     THE PORT FUND L.P.
     PO BOX 24565, SAFAT 13106
     KUWAIT
     C/O HSBC, KUWAIT, MAIL BOX NO 23
                                         C001

     KUWAIT BRANCH
     TELEGRAPHIC TRANSFER ISSUING ADVICE
     THE PORT FUND L.P.
     WE HAVE DEBITED YOUR ABOVE ACCOUNT WITH THE COST OF ISSUING A
     TELEGRAPHIC TRANSFER TT SFT256594MNY TO BANK OF THE PHILIPPINE ISLANDS HEAD
     OFFICE MANILA FAVOURING GLOBAL GATEWAY DEVELOPMENT CORPORATION AS FOLLOWS:

     TELEX TRANSFER USD    5,000,000.00           USD    5,000,000.00
     CABLE                                        USD           28.72
     TOTAL DEBITED                                USD    5,000,028.72
     VALUE DATE      22DEC2011
```

Choose a random combination of numbers for your PIN. Do not keep your Card and PIN together.

22



THE PORT FUND L.P.
PO BOX 24565, SAFAT 13106
KUWAIT
C/O HSBC, KUWAIT, MAIL BOX NO 23
-                                C001

KUWAIT BRANCH
TELEGRAPHIC TRANSFER ISSUING ADVICE
THE PORT FUND L.P.
WE HAVE DEBITED YOUR ABOVE ACCOUNT WITH THE COST OF ISSUING A
TELEGRAPHIC TRANSFER TT SFT297130MNY TO BANK OF THE PHILIPPINE ISLANDS HEAD
OFFICE MANILA FAVOURING GLOBAL GATEWAY DEVELOPMENT CORPORATION AS FOLLOWS:

| TELEX TRANSFER USD | 5,000,000.00 | USD | 5,000,000.00 |
|---|---|---|---|
| CABLE | | USD | 28.82 |
| TOTAL DEBITED | | USD | 5,000,028.82 |
| VALUE DATE | 30APR2012 | | |

**OUTWARD REMITTANCE VOUCHER**

| | | | |
|---|---|---|---|
| Ref 8R07002013025779  مرجعنا | VALUE  حق  20/12/2013 | BRANCH  الفرع  Central Retail | DATE  التاريخ  18/12/2013 |

DEBIT << NOSTRO ACCOUNT >> NO.   من حسابنا طرفهم رقم

BY CREDIT << VOSTRO ACCOUNT >> NO   بالإضافة إلى حسابهم طرفنا رقم

THROUGH / TO  بواسطة / إلى

SWIFT   ثكام سويفت

CORRESPONDENT BANK   البنك المراسل

JPMorgan Chase Bank, N.A.
4 Chase Metrotech Center,
Brooklyn, New York, NY 11245,
U.S.A.

AMOUNT IN WORDS   المبلغ بالعروف

US Dollars Five Million Only.

| CCY  العملة | AMOUNT  مبلغ التحويل |
|---|---|
| USD | $5,000,000.00 |

DISBURSEMENT INSTRUCTIONS   تفاصيل التحويل

| | |
|---|---|
| RATE  *0.281550000 | |

BENEFICIARY'S NAME/ADDRESS  GLOBAL GATEWAY DEVELOPMENT CORPORATION   المستفيد

| EQUIVALENT  المعادل | 5,000,000.00 |
|---|---|
| SWIFT CHARGES  م. سويفت | |

1824110739

BENY'S A/C NO.   BANK OF PHILIPPINES ISLANDS   لحسابهم رقم – لدى

| COMMISSION  عمولة | |
|---|---|
| OTHER CHARGES  م. أخرى | |

ABA / SWIFT / SORT CODE   رمز البنك  BOPIPHMM

| USD | 5,000,024.86 |
|---|---|

PAYMENT INSTRUCTION   تفاصيل الدفع

INVESTMENT

| CASH  نقداً | ☐ |
|---|---|
| DEBIT A/C NO.  من الحساب ☐ | |

PD33

0603-493283-001

It is understood that the Bank declines all responsibility for any delay or errors that may occur in transmission   من المتفق عليه أن البنك غير مسئول عن التأخير أو الخطأ الذي يحصل في الإرسال

CUSTOMER NAME / ADDRESS   اسم وعنوان العميل

من / البنك الأهلي الكويتي ش.م.ك.ع  AL AHLI BANK OF KUWAIT K.S.C.  KUWAIT  الكويت

THE PORT FUND LP
ALAHLI BANK OF KUWAIT
IBAN: KW33 ABKK 0000 0000 0060 3493 2830 01   MAIL BOX 514

USER0159 On 18/12/2013 At 12:27 00016   PD33J P

PR01035   CUSTOMER COPY

R.P. 01/13

R.D. 09/11

e loph

**Authorized Signatory**

Tel.: +965 22462444 - Fax : +965 22461633 - P.O.Box 903, Dasman 15460, Kuwait - Email: info@kglinvest.com - info@portfund.com
www.kglinvest.com - www.portfund.com

**aBK الهلي**

OUTWARD REMITTANCE VOUCHER

اشعار حوالة خارجية

| | | | |
|---|---|---|---|
| Ref BRO7002014001662  مرجعنا | VALUE  حق  29/01/2014 | BRANCH  الفرع  Central Retail S | DATE  التاريخ  27/01/2014 |

BY DEBIT << NOSTRO ACCOUNT >> NO:   من حسابنا طرفهم رقم

BY CREDIT << VOSTRO ACCOUNT >> NO   بالاضافة إلى حسابهم طرفنا رقم

THROUGH / TO   الى التحويل وحد البنك بواسطة الذي

SWIFT   نظام سويفت   بوسطه / إلى

CORRESPONDENT BANK   البنك المراسل

JPMorgan Chase Bank, N.A.
4 Chase Metrotech Center,
Brooklyn, New York, NY 11245,
U.S.A.

AMOUNT IN WORDS   المبلغ بالصروف

US Dollars Ten Million Only.

| | | |
|---|---|---|
| DISBURSEMENT INSTRUCTIONS  تفاصيل التحويل | CCY  العملة  USD | AMOUNT  مبلغ التحويل  10.000.000.00 |
| BENEFICIARY'S NAME/ADDRESS GLOBAL GATEWAY DEVELOPMENT  المستفيد  CORPORATION  HARAJO TOWER. 312,26TH STREET  1724110739 | RATE  *0.2816000000 | يمر |
| | EQUIVALENT  المبادئ | 10.000.000.00 |
| | SWIFT CHARGES  م -سويت | *24.86 |
| BENY'S A/C NO.  BANK OF PHILIPPINES ISLANDS  لحسابهم رقم - لدى | COMMISSION  صولة | |
| | OTHER CHARGES  م. اخرى | |
| ABA / SWIFT / SORT CODE  رمز البنك  BOPIPHHH | TOTAL  الجموع | 10.000.024.86 |
| | CASH  نقدا | ☐ |
| PAYMENT INSTRUCTION  تفاصيل الدفع  INVESTMENT | DEBIT A/C NO. ☐  من الحساب | X |

0603-493283-001

It is understood that the Bank declines all responsibility for any delay or errors that may occur in transmission
من المتفق عليه أن البنك غير مسئول عن التأخير أو الخطأ الذي يحصل في الارسال

البنك الاهلي الكويتي ش.م.ك.
AL AHLI BANK OF KUWAIT K.S.C.
الكويت KUWAIT

CUSTOMER NAME / ADDRESS   اسم وعنوان العميل

THE PORT FUND LP
P.O. BOX 903 QASHAN
15460 KUWAIT

P2K IBAN: KW53 ABKK 0000 0000 0060 3493 2830 01

/SER0159 On 27/01/2014 At 12:33 00045  PD33J P
/Z-P020 S=P020
PR01005

CUSTOMER COPY

R P 07/13

R.D 09:11



24

PAGE  1                    C
11JUL2012
KW06HBME0000000000001004001160

THE PORT FUND L.P.
PO BOX 24565, SAFAT 13106
KUWAIT
C/O HSBC, KUWAIT, MAIL BOX NO 23
-                          C001

KUWAIT BRANCH
TELEGRAPHIC TRANSFER ISSUING ADVICE
THE PORT FUND L.P.
WE HAVE DEBITED YOUR ABOVE ACCOUNT WITH THE COST OF ISSUING A
TELEGRAPHIC TRANSFER TT SFT320092MNY TO BANK OF THE PHILIPPINE ISLANDS HEAD
OFFICE MANILA FAVOURING GLOBAL GATEWAY DEVELOPMENT CORPORATION AS FOLLOWS:

| | | | | |
|---|---|---|---|---|
| TELEX TRANSFER USD | 2,000,000.00 | | USD | 2,000,000.00 |
| CABLE | | | USD | 28.41 |
| TOTAL DEBITED | | | USD | 2,000,028.41 |
| VALUE DATE | 11JUL2012 | | | |

**Choose a random combination of numbers for your PIN. Do not keep your Card and PIN together**
**HSBC Bank Middle East Limited**                    بنك إتش إس سي الشرق الأوسط المحدود



THE PORT FUND L.P.
PO BOX 24565, SAFAT 13106
KUWAIT
C/O HSBC, KUWAIT, MAIL BOX NO 23
–                              C001

KUWAIT BRANCH
TELEGRAPHIC TRANSFER ISSUING ADVICE
THE PORT FUND L.P.
WE HAVE DEBITED YOUR ABOVE ACCOUNT WITH THE COST OF ISSUING A
TELEGRAPHIC TRANSFER TT SFT330279MNY TO BANK OF THE PHILIPPINE ISLANDS HEAD
OFFICE MANILA FAVOURING GLOBAL GATEWAY DEVELOPMENT CORPORATION AS FOLLOWS:

| TELEX TRANSFER USD | 700,000.00 | | USD | 700,000.00 |
|---|---|---|---|---|
| CABLE | | | USD | 28.33 |
| TOTAL DEBITED | | | USD | 700,028.33 |
| VALUE DATE | 13AUG2012 | | | |

Choose a random combination of numbers for your PIN. Do not keep your Card and PIN together
HSBC Bank Middle East Limited                    بنك إتش إس بي سي الشرق الأوسط المحدود



26

Branch: 001

THE PORT FUND L.P.
PO BOX 24565, SAFAT 13106
KUWAIT
C/O HSBC, KUWAIT, MAIL BOX NO 23

**Account Statement**

Branch Number:   001
Branch Name:   KUWAIT BRANCH
Page 1 of 3

| Statement Details | |
|---|---|
| STATEMENT DATE | 30OCT2012 |
| CUSTOMER NUMBER | 001-004001 |
| ACCOUNT NUMBER | 001-004001-160 |
| IBAN | KW06HBME900000000000010104001160 |
| SEQUENCE NUMBER | 40 |
| CURRENCY | USD |
| PRODUCT TYPE | CURRENT ACCOUNT |
| DESPATCH CODE | C - COLLECT |

| Date | Transaction Details | Deposits | Withdrawals | Balance (DR=Debit) |
|---|---|---|---|---|
| 30SEP2012 | BALANCE BROUGHT FORWARD | | | 1,320,242.31 |
| 01OCT2012 | TT SFT346894MNY | | | |
| | LTR REF PV 02 09 12 | | | |
| | DTD 30 09 2012 | | | |
| | GLOBAL GATEWAY DEVELOPMENT | | | |
| | 1924110739 | | | |
| | REF K128-00007 | | 1,250,000.00 | 70,242.31 |
| | TT SFT346898MIL | | | |
| | LTR REF PV 02 10 12 | | | |
| | DTD 01 10 2012 | | | |
| | VISTRA B V | | | |
| | NL11ABNA0619451092 | | | |
| | INV NO 19052 218020 AND 19069 | | | |
| | 218025 | | | |
| | VAT NL 8000 44 228 B01 | | | |
| | COC AMSTERDAM 30091120 | | | |
| | REF K128-00015 | | 4,231.50 | 66,010.81 |
| | TT SFT346891MNY | | | |
| | LTR REF PV 01 10 12 | | | |
| | DTD 01 10 2012 | | | |
| | MATT WILLIAMS CONSULTING | | | |
| | 7502453336 | | | |
| | INV NO 316 | | | |
| | REF K128-00016 | | 1,500.00 | 64,510.81 |
| | TT SFT346898MIL | | | |
| | CABLE    KWD 8.000 | | | |
| | REF K128-00015 | | 28.50 | 64,482.31 |
| | TT SFT346891MNY | | | |
| | CABLE    USD 28.39 | | | |
| | REF K128-00016 | | 28.39 | 64,453.92 |
| | TT SFT346894MNY | | | |
| | CABLE    USD 28.39 | | | |
| | BALANCE CARRIED FORWARD | | | 64,453.92 |

*Bank charges $ 195.56.*

**HSBC Bank Middle East Limited**

بنك إتش إس بي سي الشرق الأوسط المحدود

28