**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:

EX PARTE APPLICATION OF
GULF INVESTMENT CORPORATION FOR
AN ORDER TO OBTAIN DISCOVERY FOR
USE IN FOREIGN PROCEEDINGS
PURSUANT TO 28 U.S.C. §1782

Case No. 1:19-mc-00593-VSB

**GULF INVESTMENT CORPORATION'S MEMORANDUM OF LAW
IN RESPONSE TO THE PORT FUND ENTITIES' MOTION TO INTERVENE AND
IN FURTHER SUPPORT OF ITS *EX PARTE* APPLICATION FOR AN ORDER
TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS
PURSUANT TO 28 U.S.C. § 1782**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    ADDITIONAL FACTUAL BACKGROUND .....................................................2

III.   ARGUMENT .........................................................................................................4

    A.     The Motion to Intervene Should Be Denied ..............................................4

    B.     The Application Meets the Statutory Requirements of Section 1782.....................6

        1.     The Requested Discovery Is "For Use" in a Foreign Proceeding................6

    C.     The *Intel* Factors Weigh in Favor of the Application ...............................12

        1.     Requested Discovery Is Unavailable from a Foreign Proceeding Party ...................................................................................12

        2.     Cayman Courts Are Receptive to Section 1782 Discovery ......................14

        3.     Requested Discovery Does Not Circumvent Cayman Restrictions ..........14

        4.     Requested Discovery Is Neither Overbroad nor Unduly Burdensome ......................................................................................17

IV.    CONCLUSION.....................................................................................................18

## TABLE OF APPENDICES

| **Appendix** | **Declaration** |
| --- | --- |
| Appendix A | Declaration of Kristin N. Tahler (annexed to Application) |
| Appendix B | Declaration of Anna Peccarino (annexed to Application) |
| Appendix C | Declaration of Nicolas Bortman (annexed to Application) |
| Appendix D | Supplemental Declaration of Kristin N. Tahler (annexed hereto) |
| Appendix E | Supplemental Declaration of Anna Peccarino (annexed hereto) |

## **<u>TABLE OF AUTHORITIES</u>**

**<u>Page</u>**

### **<u>Cases</u>**

*In re ALB-GOLD Teigwaren GmbH*,
  2019 WL 4140852 (E.D.N.Y. Aug. 30, 2019)........................................................ 8

*Andover Healthcare, Inc. v. 3M Co.*,
  2014 WL 4978476 (D. Minn. Oct. 6, 2014) ......................................................... 17

*In re Asia Mar. Pac. Ltd.*,
  253 F. Supp. 3d 701 (S.D.N.Y. 2015)............................................................ 7, 17

*AT&T Corp. v. Sprint Corp.*,
  407 F.3d 560 (2d Cir. 2005)....................................................................... 6

*Bravo Express Corp. v. Total Petrochemicals & Ref. U.S.*,
  613 F. App'x 319 (5th Cir. 2015) ................................................................ 11

*In re Catalyst Managerial Servs., DMCC*,
  680 F. App'x 37 (2d Cir. 2017) ................................................................... 2

*Deposit Ins. Agency v. Leontiev*,
  2018 WL 3536083 (S.D.N.Y. July 23, 2018) ..................................................... 14

*Euromepa S.A. v. R. Esmerian, Inc.*,
  51 F.3d 1095 (2d Cir. 1995)...................................................................... 12

*In re Gushlak*,
  2011 WL 3651268 (E.D.N.Y. Aug. 17, 2011)..................................................... 16

*In re Hansainvest Hanseatische*,
  364 F. Supp. 3d 243 (S.D.N.Y. 2018).......................................................... 10, 11

*In re Hornbeam Corp.*,
  2015 WL 13647606 (S.D.N.Y. Sept. 17, 2015)), *aff'd*, 722 F. App'x 7 (2d Cir. 2018).. 6, 8, 10

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241 (2004)......................................................................... passim

*Inv. Vehicles v. KPMG, L.L.P.*,
  798 F.3d 113 (2d Cir. 2015).................................................................. 7, 10, 11

*In re Iraq Telecom Ltd.*,
  2020 WL 1047036 (S.D.N.Y. Mar. 4, 2020) ....................................................... 18

*Jiangsu Steamship Co., Ltd. v. Success Superior Ltd.*,
  2015 WL 3439220 (S.D.N.Y. Feb. 5, 2015)........................................................ 7

*In re Kreke Immobilien KG*,
  2013 WL 5966916 (S.D.N.Y. Nov. 8, 2013)..................................................... 16, 17

*In re Mangouras*,
  2017 WL 4990655 (S.D.N.Y. Oct. 30, 2017)..................................................... 8, 9

*Mees v. Buiter*,
   793 F.3d 291 (2d Cir. 2015) ........................................................................ 6, 12

*In re Metallgesellschaft*,
   121 F.3d 77 (2d Cir. 1997) ............................................................................ 16

*In re Microsoft Corp.*,
   428 F. Supp. 2d 188 (S.D.N.Y. 2006) .......................................................... 13

*In re MT BALTIC SOUL Produktentankschiff-Ahrtsgesellschaft mgH & Co. KG*,
   2015 WL 5824505 (S.D.N.Y. Oct. 6, 2015) ............................................... 9, 17

*In re OOO Promnefstroy*,
   2009 WL 3335608 (S.D.N.Y. Oct. 15, 2009) .............................................. 15

*In re Reyes*,
   2019 WL 6170901 (S.D.N.Y. Nov. 20, 2019) .............................................. 6

*In re RSM Prod. Corp.*,
   2018 WL 1229705 (S.D.N.Y. Mar. 9, 2018) ............................................... 13

*In re Sargeant*,
   278 F. Supp. 3d 814 (S.D.N.Y. 2017) .......................................................... 8

*In re Sarrio, S.A.*,
   119 F.3d 143 (2d Cir. 1997) .......................................................................... 5

*Schmitz v. Bernstein Liebhard & Lifshitz, LLP.*,
   376 F.3d 79 (2d Cir. 2004) ............................................................................ 13

*In re Top Matrix Holdings Ltd.*,
   2020 WL 248716 (S.D.N.Y. Jan. 16, 2020) ................................................ 9

*In re WinNet R CJSC*,
   2017 WL 1373918 (S.D.N.Y. Apr. 13, 2017) .............................................. 14

*In re XPO Logistics, Inc.*,
   2017 WL 2226593 (S.D.N.Y. May 22, 2017) .............................................. 14

## Rules and Regulations

Fed. R. Civ. P. 24 ...................................................................................................... 4, 5

## I.      INTRODUCTION

GIC seeks targeted discovery from the Correspondent Banks to assist it in Contemplated Cayman Litigation involving hundreds of millions of dollars of missing monies and alleged wrong-doing and malfeasance by the very entities and individuals in whom GIC trusted with its investment: the Port Fund and Pork Link (collectively, "**PFEs**") and their principals.[1] The PFEs have objected in an Opposition to the Application ("**Opposition**" or "**Opp.**") (ECF 24) that attempts to distract the Court from the extensive allegations of misconduct set forth in the Application, by littering its pages and declarations with irrelevant and disparaging complaints about the Kuwaiti judiciary, and specious, wholly unsupported hysterics regarding alleged motivations and confidentiality.

As an initial matter, the Court need not even entertain the PFEs' futile arguments in the Opposition as it should deny as untimely the PFEs' Motion to Intervene ("**Motion**") (ECF 24). Nevertheless, if considered, the Opposition while telling, falls far short. Indeed, the burden and cost to the PFEs for production of the Requested Discovery is nil. Nevertheless, they claim that the Application should be denied because GIC should seek records exclusively from them, through the Section 22 Proceeding in the Cayman Islands. Not only is this not the law, but it also betrays much. First, the Requested Discovery is distinct from the records sought in the Section 22 Proceeding, and in all events appropriately sought in the Application. Second, the PFEs have consistently *refused to disclose* information requested by GIC, and have fought mightily against the disclosures GIC seeks in the Section 22 Proceeding. All of this begs the question: Why have the PFEs so forcefully objected to subpoenas seeking nothing from them, absent a concern that the

---

[1]     Unless otherwise noted, all capitalized terms herein have the same meaning as in the Application and its supporting documents.

disinterested Correspondent Banks will produce evidence probative of the misconduct outlined in the Application and underlying the Contemplated Cayman Litigation, which otherwise will not be available to GIC?

Indeed, this is a paradigmatic Section 1782 case given GIC has ample reason to question whether any disclosures will ever be provided, much less "the completeness and accuracy" of any supporting evidence that may be provided. *In re Catalyst Managerial Servs., DMCC*, 680 F. App'x 37, 40 (2d Cir. 2017). Here, given the missing monies, the convictions of principals for embezzlement and self-dealing, and the well-worn path of obfuscation, delay, and distraction, GIC has *every reason* to distrust the accuracy, reliability, and completeness of any of disclosures that the PFEs may, eventually, make.

Despite the PFEs' laundry list of purported objections to the Application, the Opposition falls far short and cannot avoid that the Application clearly meets the statutory and discretionary requirements of Section 1782 because (1) the Contemplated Cayman Litigation was, and is, within reasonable contemplation and more than just a "twinkle in counsel's eye"; and (2) the discretionary factors set forth in *Intel* plainly weigh in favor of GIC being allowed to seek the Requested Discovery. The Application should be granted.

## II.     ADDITIONAL FACTUAL BACKGROUND

In an effort to distract the Court from the hundreds of millions of dollars of unaccounted investor funds, alleged misappropriation, and self-dealing underlying the Contemplated Cayman Litigation (Application at 8–12), the PFEs baselessly assert (Opp. at 3–4) that the Application is somehow part of "a global fishing expedition" to dredge up information for "presumably" nefarious use. Although GIC declines to burden the Court with a lengthy rebuttal of the PFEs' myriad misleading characterizations, it does provide the following corrections of the PFEs' most egregious misrepresentations.

*First*, far from a "fishing expedition … without any meaningful explanation" (Opp. at 20)," the Application is supported by substantial factual declarations and no fewer than 50 individual exhibits. This alone defeats the PFEs' complaints.

*Second*, although the *misconduct* underlying the Application and the Section 22 Proceeding may "overlap significantly" (Opp. at 4), the requests made in the two proceedings do not. *See* App'x E at ¶ 16. Indeed, the Application seeks disclosure from third party *Correspondent Banks*, unlike the Section 22 Proceeding, where the *PFEs are targeted directly*. *See id.* ¶ 15.

*Third*, although the PFEs correctly acknowledge that the "Court need not determine the validity of the accusations or the guilt or innocence of Ms. Lazareva and Mr. Dashti to determine whether the GIC Application should be granted" (Opp. at 3), they seek to have it both ways by (1) inviting the Court to second guess convictions; and (2) engaging in baseless speculation regarding the use of the Requested Discovery in future criminal proceedings. While the Kuwaiti judiciary will determine whether Ms. Lazareva's and Mr. Dashti's criminal convictions should be upheld, it should be noted that the purported "tremendous interest in the plight of Ms. Lazareva" (Chin Decl. ¶18 n.27) results from an aggressive, USD 4.9 million lobbying and public relations campaign that has included, among other things, a fake protest, large payments to U.S. editorialists, misleading news reports, and op-eds by a pseudonymous correspondent. *See* App'x D at ¶ 25. Critically, the Requested Discovery seeks information relating to the Port Fund's spending on, among other things, lobbying and public relations firms, which are plainly an improper use of limited partner funds. *See* Application at 11–13.

*Fourth*, while the PFEs make assertions regarding the purported "role of the Kuwaiti government in the freez[ing]" of the Clark Asset sale proceeds held in Port Link's account at Noor Bank (Opp. at 4), they conveniently neglect to inform the Court that the freeze was (1) executed

independently by the UAE authorities without the involvement or knowledge of the Kuwait government; and (2) triggered, in substantial part, by Port Link's unexplained attempt to wire USD 94.6 million of these proceeds to a third party, Ideal Gulf Holdings Limited, an inactive company established a year earlier in an obscure trade zone in the Emirate of Ajman, which (a) was assessed by the UAE authorities to have no commercial purpose or record of financial activity, and (b) perhaps most notably, is hardly an independent third party, but rather was incorporated by a signatory to Port Link's bank account. *See* App'x D at ¶¶ 27–29.

## III.   ARGUMENT

### A.   The Motion to Intervene Should Be Denied

The Motion should be denied as untimely. First, Federal Rule of Civil Procedure 24 requires a potential intervenor to (1) file a *timely* motion to intervene, regardless of whether the motion is based on "intervention of right" or "permissive intervention"; and (2) serve the motion upon the parties in the case. Fed. R. Civ. P. 24(a)-(c). The PFEs failed to timely file the Motion, which caused unnecessary delay and prejudice to GIC, and provides ample basis for the Court to deny the Motion. Fed. R. Civ. P. 24(a)-(b).

A brief review of the relevant chronology reveals the PFEs' unnecessary and preclusive delay, which notably mirrors the PFEs' delay in providing long-overdue audited financial statements to the Port Fund's limited partners. *See* App'x D at ¶¶ 5–17. On December 26, 2019, GIC filed the Application. On January 6, 2020, the PFEs advised the Court by letter ("**January 6 Letter**") (ECF 8) of their "interest in this matter" and "to request the opportunity to be heard with respect to [the Application]."[2] Seeking to short-circuit further delay caused by letter writing and ensure that the PFEs followed proper procedure for the Court to take action, GIC by letter on

---

[2]   The PFEs claim (Motion at 7) that they requested leave to intervene in the January 6 Letter. That is simply not the case. *See* January 6 Letter at 1. And certainly the January 6 Letter does not constitute a Rule 24 motion.

January 9, 2020, ("**January 9 Letter**") (ECF 10), called attention to the January 6 Letter's lack of compliance with Rule 24 and requested that the Court (1) reject the January 6 Letter as an intervention motion; and (2) require the PFEs to file a proper Rule 24 motion. In the PFEs' leisurely response, filed three weeks later, ("**January 30 Letter**") (ECF 17), they again neglected to follow Rule 24, and instead, despite lacking standing to do so, purported "to bring other relevant matters to the Court's attention." In its February 3, 2020 response (ECF 18), GIC reiterated the PFEs' lack of standing to object, having failed intervene under Rule 24.

The PFEs again sat silent for a month, failing to move under Rule 24 or request that GIC consent to intervention, ultimately forcing the Court's involvement in March 2020 (ECF 19). As GIC explained in the Application (App'x A at ¶¶ 15–16), delay by the PFEs has a long and concerning history, and the PFEs' tactics on intervention are yet another example. *See also* App'x D at ¶¶ 10–17 (detailing further delays since the filing of the Application). Based upon the PFEs' repeated refusal to file a proper Rule 24 motion, which can only be seen as an attempt to delay the Court's potential approval of the Application and authorization of the subpoenas (as well as GIC's receipt and use of the Requested Discovery in the Contemplated Cayman Litigation), the Court may deny the Motion.

Moreover, should the Court deny the Motion and grant the Application, the PFEs can, *at that time*, file motions to intervene and quash the subpoenas. The Court can then collectively address any motions to quash by the targets of the subpoenas (*i.e.*, the Correspondent Banks) and/or potential intervenors such as the PFEs. Indeed, the Section 1782 cases cited by the PFEs (Motion at 6–7) demonstrate that the appropriate time to bring a motion to intervene is *after* the Application has been granted and the subpoenas authorized. *See In re Sarrio, S.A.*, 119 F.3d 143, 148 (2d Cir. 1997) ("[S]tanding to oppose subpoenas issued under § 1782 is [not] limited to the subpoenaed

witness. We have recognized, though implicitly, that parties against whom the requested information will be used may have standing *to challenge the lawfulness of discovery orders directed to third parties.*") (emphasis added, citation omitted); *In re Hornbeam Corp.*, 2015 WL 13647606, at *2 (S.D.N.Y. Sept. 17, 2015), *aff'd*, 722 F. App'x 7 (2d Cir. 2018) (quoting *Sarrio* for the proposition that the potential intervenor had standing to move to vacate this Court's order authorizing discovery pursuant to Section 1782); *In re Reyes*, 2019 WL 6170901, at *2 (S.D.N.Y. Nov. 20, 2019) (same).[3]

### B.    The Application Meets the Statutory Requirements of Section 1782

The PFEs do not contest that the first statutory element is satisfied, and beyond musing that GIC might not be a "person" because it is owned by foreign sovereigns (Opp. at 13), essentially concede the third statutory element, recognizing the weight of authority establishes that GIC, as a putative plaintiff in a foreign proceeding, is an "interested person." *See, e.g.*, *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004) ("litigants … may be the most common example of … the 'interested person[s]' who may invoke § 1782"). Although the PFEs argue that GIC falls short as to the second element (Opp. at 9), the Contemplated Cayman Litigation clearly is "within reasonable contemplation." *Mees v. Buiter*, 793 F.3d 291, 301 (2d Cir. 2015).

### 1.    The Requested Discovery Is "For Use" in a Foreign Proceeding

The PFEs argue (Opp. at 9–13) that the Application should be denied because it does not sufficiently show that the Requested Discovery is for use in a reasonably contemplated proceeding. According to the PFEs, GIC is on a mere fishing expedition for which it cannot even provide a legal theory to support any contemplated litigation. This argument fails on all grounds.

---

[3]    The only other case cited by the PFEs (Motion at 7) in support of their intervention argument, *AT&T Corp. v. Sprint Corp.*, 407 F.3d 560 (2d Cir. 2005), does not involve a Section 1782 proceeding.

*First*, the Application is not a fishing expedition searching for some elusive yet unknown wrongdoing; it provides detailed, concrete evidence showing the basis for the Contemplated Cayman Litigation and revealing its reasonable contemplation. This is particularly so when considered against what courts, in fact, require. *See* Application at 19–20. All that is needed is some "objective indicium that the action is being contemplated" that goes beyond a subjective "twinkle in counsel's eye." *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 123–24 (2d Cir. 2015).

Despite the PFEs' protests otherwise, GIC far surpasses that standard. For example, unlike in *KPMG*, where the court held reasonable contemplation was not satisfied because the applicant had done no more than retain counsel and talk about the *mere possibility* of initiating some future litigation (*id.* at 24), GIC intends to file a just and equitable winding up petition in the Cayman Islands against the PFEs ("**J&E Petition**"). *See* App'x E at ¶¶ 6–12 (describing J&E Petition).

Similarly in *Jiangsu Steamship Co., Ltd. v. Success Superior Ltd.*, the applicant sought discovery to locate the identity of financial assets that it could one day potentially attach to collect on a future arbitration award. 2015 WL 3439220, at *4 (S.D.N.Y. Feb. 5, 2015). The court found that these hypothetical attachment proceedings were not within reasonable contemplation. *Id.* at *4–5. The applicant did not even know where the assets were, much less whether the country where they were located would allow an attachment proceeding. *Id.* And one proposed attachment proceeding was entirely speculative because it was based on a yet un-won arbitration. *Id.* at *5. The court compared this scenario to a person who "reasonably contemplate[s] buying a new car because [he] might win the lottery if [he] decides to buy a ticket." *Id.*; *see also In re Asia Mar. Pac. Ltd.*, 253 F. Supp. 3d 701, 707 (S.D.N.Y. 2015) (rejecting for similar reasons application relating to post-judgment attachment proceedings).

Here, by sharp contrast, the Contemplated Cayman Litigation is concrete and specific. The Application shows that GIC went beyond just discussing the mere possibility of litigation. Indeed, GIC identified millions of unaccounted investor funds, named the country where it will be pursuing litigation in connection with the PFEs' alleged misconduct and wrongdoing related to those funds, hired Cayman counsel, extensively investigated all publicly available documents, commenced the Section 22 Proceeding [4] and evaluated specific claims against Port Link and others for mismanagement of the Port Fund. *See* Application at 10–12; App'x B ¶¶ 2–7. Far from a situation where asset whereabouts are unknown or a lottery ticket has been purchased, GIC has identified the specific monies that it believes were misappropriated and the parties responsible. *See* Application at 8–12. These concrete actions show that the Contemplated Cayman Litigation far exceeds a "twinkle in counsel's eye."

Seeking to undermine this evidence, the PFEs point to several cases (Opp. at 10) in which district courts have warned that Section 1782 should not be used "to investigate whether litigation is possible before launching it." *In re Sargeant*, 278 F. Supp. 3d 814, 823 (S.D.N.Y. 2017). This, however, is not a bright-line rule, and courts routinely find this prong satisfied while investigation is progressing. *See In re Hornbeam,* 722 Fed. App'x at 9 (applicant's representation that it "intended to initiate further litigation once it obtained additional information" was a "sufficiently 'concrete basis' for a 'contemplated [foreign] proceeding'"); *see also In re ALB-GOLD Teigwaren GmbH*, 2019 WL 4140852, at *9 (E.D.N.Y. Aug. 30, 2019) (Section 1782 application granted where applicant could only initiate Swiss proceedings "if the applicant presents newly discovered material facts that it was unable to discover previously."); *In re Mangouras*, 2017 WL 4990655,

---

[4]   A Section 22 proceeding is a pre-action-disclosure proceeding in the Cayman Islands. *See* App'x E at ¶ 11.

at \*5 (S.D.N.Y. Oct. 30, 2017) ("[D]iscovery is available [under Section 1782] when the materials may help the applicant either *to plead* or to prove the anticipated claims."(emphasis added)).

More fundamentally, the PFEs are mistaken that the Application is being used to investigate whether litigation is possible. The PFEs misleadingly quote GIC's Cayman counsel to argue "GIC is seeking information [through the Application] for 'potential claims that GIC is considering using in the Cayman Islands.'" Opp. at 11 (quoting App'x B ¶ 6). The full quote, including the PFEs' self-serving omission, is: "I further understand that the Requested Discovery is being sought to **support** potential claims GIC is considering pursuing in the Cayman Islands." App'x B ¶ 6 (emphasis added). GIC does not seek the Requested Discovery to investigate *whether to* bring claims; but to bulk up *existing* claims against the PFEs regarding, among other things, hundreds of millions of dollars of missing limited partner funds. *See id.* at ¶¶ 5–7; App'x E at ¶¶ 9, 11–12. GIC's desire for more evidence is akin to any request for evidence from a third party to support one's claims, particularly where, as here, one's counter-party has obfuscated and continually refused to provide information.

*Second*, the PFEs are also wrong that GIC was required to detail the claims it intends to bring. While sworn statements describing an applicant's legal theories in contemplated litigation is one factor that may be considered, the PFEs' cases reveal this is not a necessary *prerequisite*. *See In re Top Matrix Holdings Ltd.*, 2020 WL 248716, at \*4 (S.D.N.Y. Jan. 16, 2020) (finding intent to litigate and description of legal theories to be sufficient but not prerequisites); *In re MT BALTIC SOUL Produktentankschiff-Ahrtsgesellschaft mgH & Co. KG*, 2015 WL 5824505, at \*2 (S.D.N.Y. Oct. 6, 2015) (considering as one factor whether the applicant identified its legal theory). Indeed, making the legal-theory requirement mandatory would run smack into the Second Circuit's choice "not [to] decide … what precisely an applicant must show to establish" that a

foreign proceeding is in reasonable contemplation. *KPMG*, 798 F.3d at 123. Reasonable contemplation is fact dependent, not automatically met with prescribed magic words.

This is further demonstrated by cases in which courts have found the reasonable contemplation standard met without identifying the underlying legal theory. For example, in *In re Hornbeam*, the applicant had "previously brought two related actions in the BVI against [a corporation] and represented that it intended to initiate further litigation." 722 F. App'x at 9. The Second Circuit affirmed Your Honor's determination that this was a "sufficiently concrete basis"—even without the particular legal theory—for finding that a foreign proceeding was reasonably contemplated.[5] *Id.*; *see also In re Hansainvest Hanseatische*, 364 F. Supp. 3d 243, 250 (S.D.N.Y. 2018) (considering numerous factors, but not the legal theory's identification). This approach makes sense: the ultimate question is not whether a *particular claim* is reasonably contemplated; it is whether the *litigation as a whole* is reasonably contemplated.

Here, as a matter of litigation strategy, GIC did not wish to lay bare for the PFEs the precise legal theory it will pursue in the Contemplated Cayman Litigation, and there are clearly more than one cause of action arising from Port Link's misconduct (*e.g.*, not properly distributing Clark Asset sale proceeds) that could be brought before the Cayman Court. These causes of action encompass the J&E Petition, which, at the time of the Application's filing, GIC intended—and continues to intend—to file. *See* App'x E at ¶ 12. In that action, GIC will argue that Port Link's misconduct justifies winding up the Port Fund. *Id.* at ¶¶ 9–12. The Requested Discovery will help GIC prove that a windup is proper. *Id.* To be clear, however, the Requested Discovery is to support GIC's windup claim, not to establish whether it is proper in the first place. *Id.* at ¶ 12. Indeed, GIC's

---

[5]   Later in the opinion, the Second Circuit also noted that the applicant had described its legal theory, but the court did not rely on the specific theory to find that the facts mentioned above were sufficient to meet the reasonable-contemplation requirement. 722 F. App'x at 10. All that mattered was that litigation was forthcoming.

filing of the J&E Petition is not dependent on whether the Court grants the Application. *Id.* As such, GIC has proven that the Contemplated Cayman Litigation is within reasonable contemplation.

In a footnote, the PFEs wrongly posit (Opp. at 12 n.5) that the Court cannot consider a declaration laying out GIC's legal theory. This is simply not the law,[6] and the case the PFEs rely upon, *KPMG*, does not suggest otherwise. Unlike here, the applicant in *KPMG* argued on appeal that the foreign proceeding had commenced *since the appeal was taken*. 798 F.3d at 124. The Second Circuit rejected this attempt to supplement the trial record, unsurprisingly finding that it "must instead consider the facts as they were presented to the district court." *Id*. The court then held that the district court did not err "on the record before it," and noted that the applicant could just file a new application bringing the changed circumstances to "the district court's attention in the first instance." *Id.* at 124–25. As such, *KPMG* stands for the unremarkable and inapt proposition that appellate courts do not consider evidence for the first time on appeal.

Indeed, courts frequently consider evidence and representations submitted and made at the district court after the application is filed to find that a foreign proceeding is reasonably contemplated. *See, e.g.*, *In re Hansainvest Hanseatische*, 364 F. Supp. 3d at 249 (relying on, among other things, applicants' "affirmative representation at oral argument that [they] would file their litigation before the end of the year" to hold that the foreign proceeding was reasonably contemplated); *see also Bravo Express Corp. v. Total Petrochemicals & Ref. U.S.*, 613 F. App'x 319, 323 (5th Cir. 2015) (same).

---

[6]    Indeed, even the PFEs do not take their proposed rule seriously: they themselves rely on events occurring after the Application's filing. *See, e.g.*, Opp. at 17–18 (discussing purported "Disclosure Letter," dated February 27, 2020).

The PFEs' position that subsequent events should be ignored is not only wrong legally, it also would undermine a core purpose of Section 1782: "providing efficient means of assistance to participants in international litigation." *Mees*, 793 F.3d at 297. It would be a waste of judicial resources, time, and money for GIC to restart with a new application to repeat what is already before this Court. Thankfully, the law does not demand this needless exercise in futility.

In the end, GIC's actions are more than sufficient to show that the Contemplated Cayman Litigation is reasonably contemplated and far surpass a "twinkle in counsel's eye."

### C.     The *Intel* Factors Weigh in Favor of the Application

As shown, the Application promotes the "twin aims" of Section 1782, *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095 (2d Cir. 1995), and contrary to the PFEs' assertions (Opp. at 13–25), each of the *Intel* discretionary factors weighs in favor of granting the Application.

### 1.     Requested Discovery Is Unavailable from a Foreign Proceeding Party

It is undisputed that the Correspondent Banks (1) will not be parties to the Contemplated Cayman Litigation; (2) are not parties to the Section 22 Proceeding; (3) are outside the jurisdictional reach of a Cayman court; and (4) possess inherently different records from those that GIC seeks from the PFEs in the Section 22 Proceeding. Ignoring that the Correspondent Banks are paradigmatic targets for Section 1782 discovery requests, *see Intel*, 542 U.S. at 264 (noting likely unattainability of evidence from nonparties not subject to foreign tribunal's reach "absent § 1782(a) aid"), the PFEs assert (Opp. at 13–16) that the Requested Discovery should be denied because it purportedly includes certain information in the PFEs' possession or control that is "already within the jurisdiction of a Cayman court."

Try as they might, however, the PFEs cannot establish that the documents and information GIC seeks from the Correspondent Banks are the same as what GIC seeks from the PFEs in the

Section 22 Proceeding,[7] nor do they point to any authority suggesting that some potential overlap precludes the Application. The PFEs misleadingly cite bank records as evidence of claimed overlap. Not so. First, GIC seeks bank records from the PFEs in the Section 22 Proceeding, not from the Correspondent Banks. Second, the PFEs have fought mightily against disclosing any bank records in their possession and instead have provided self-serving partial disclosures, unsupported by meaningful documentation, let alone bank statements or records. *See* App'x D at ¶¶ 18-22. Third, given concerns regarding the misconduct set forth in the Application, there is absolutely no guarantee that the bank records GIC seeks through the Section 22 Proceeding still exist or will ever be produced. Indeed, the PFEs' conduct to date starkly suggests otherwise.[8] *See id.*

Finally, the PFEs' purported authority is readily distinguishable. *See In re RSM Prod. Corp.*, 2018 WL 1229705, at *1 (S.D.N.Y. Mar. 9, 2018) (1782 application sought discovery from an individual within jurisdiction of foreign tribunal); *In re Microsoft Corp.*, 428 F. Supp. 2d 188, 194 (S.D.N.Y. 2006) (1782 application sought discovery that was "encompassed in [petitioner's] request to [the foreign tribunal]" and available from foreign tribunal); *Schmitz v. Bernstein Liebhard & Lifshitz, LLP.*, 376 F.3d 79, 84–85 (2d Cir. 2004) (1782 application sought discovery from law firm that possessed documents from its client—a party to underlying foreign proceeding).

The first *Intel* factor, therefore, weighs in favor of granting the Application.

---

[7]     As an initial matter, the Correspondent Banks maintain qualitatively different records as compared to end user banking clients like the PFEs, a truth that even the PFEs are willing to concede (Opp. at 15).

[8]     The PFEs' drumbeat of confidentiality considerations (Opp. at 18–19, 22) is misleading and cannot be credited as any reason for foreclosing the discovery sought here. First, confidentiality obligations under Cayman law—which the PFEs mischaracterize (*see* App'x E at ¶ 14)—have no applicability to the discovery that GIC seeks from the third-party Correspondent Banks. Second, the entire basis for the PFEs' professed "serious concerns about potential malicious prosecution" of its service providers (Opp. at 18) is a single *press release* from another Port Fund limited partner. Third, there is no basis to suggest GIC will misuse any disclosed information. *See* App'x D at ¶¶ 23–24.

### 2.    Cayman Courts Are Receptive to Section 1782 Discovery

This factor is uncontested as the PFEs do not dispute that Cayman courts would be receptive to the Requested Discovery.[9] The PFEs' speculation that GIC wrongly could seek to instigate criminal proceedings with the Requested Discovery is entirely baseless and should be dismissed in its entirety. *See* App'x D at ¶¶ 23– 24.

Indeed, several the PFEs' cited cases (Opp. at 24–25) highlight that allegations of bad faith must be supported by *evidence*. *See, e.g.*, *Deposit Ins. Agency v. Leontiev*, 2018 WL 3536083, at *11–12 (S.D.N.Y. July 23, 2018) (finding "substantial evidence" not "sufficiently conclusive of bad faith"); *In re WinNet R CJSC*, 2017 WL 1373918, at *9 (S.D.N.Y. Apr. 13, 2017) (finding bad faith when petitioner failed to provide "full and fair description of the pertinent litigation" to the court). Conversely here, the PFEs' idle, unsupported speculation that GIC may "misuse," or has withheld from the Court its true intentions for, the Requested Discovery is plainly defective. Accordingly, there is no basis to suggest that GIC is acting in bad faith.

The second *Intel* factor, therefore, also weighs in favor of granting the Application.

### 3.    Requested Discovery Does Not Circumvent Cayman Restrictions

Notwithstanding the PFEs' assertions (Opp. at 16–19), the Requested Discovery does *not* seek to circumvent any proof-gathering restrictions imposed by Cayman courts. *See* App'x B at ¶¶ 10–12; App'x E at ¶¶ 16–18. *First*, Cayman courts have never rejected the Requested Discovery. *See* App'x E at ¶ 17 n.14; *compare In re XPO Logistics, Inc.*, 2017 WL 2226593, at *7 (S.D.N.Y. May 22, 2017) ("Because [respondent] has not demonstrated that [petitioner] has been

---

[9]    Although not raised in the Opposition, the PFEs' Cayman counsel asserts that "Cayman Courts are not *always* receptive to the existence of parallel section 1782 proceedings in the United States as a matter of course …." Gowrie Decl. ¶ 31(emphasis added). Setting aside that the PFEs' inapt authority for this proposition (*see* App'x E at ¶ 17), the second *Intel* factor simply does *not* seek to assess whether a foreign tribunal will "always," "as a matter of course," be receptive to Section 1782 discovery. Further, the weight of authority has shown, and the PFEs do not contest, that Cayman courts are, in fact, receptive to such discovery. *See* Application at 23 (collecting cases).

definitively rebuffed in seeking such discovery in [foreign proceeding], the Court has no basis to conclude that [petitioner] is seeking to circumvent foreign proof-gathering restrictions."), *with In re OOO Promnefstroy*, 2009 WL 3335608, at *9 (S.D.N.Y. Oct. 15, 2009) (1782 application sought discovery that had been repeatedly denied by foreign courts).

*Second*, there is no evidence that GIC is seeking to appeal or avoid an unfavorable discovery decision by Cayman courts. *See* App'x E at ¶ 17 n.13. The Section 22 Proceeding allows GIC to exercise its statutory rights (under Cayman law) and contractual rights (under the Limited Partnership Agreement entered into between the Port Fund's limited partners and Port Link) to seek documents and information directly from the PFEs. By contrast, the Application, pursuant to Section 1782, permits GIC to seek documents and information from the Correspondent Banks for use in foreign proceedings. Although allegations of misconduct by the PFEs and its principals underlie both, the two proceedings (which seek *different* documents and information, from *different* entities, on *different* legal bases) are otherwise unrelated. *See id.* at ¶ 16. As such, there is simply no way for this Court to somehow "preempt or contradict" the Cayman court, rendering the PFEs' purported concerns regarding "principles of comity" (Opp. at 16–19) wholly unavailing.

Indeed, this Court's forthcoming decision on whether to grant the Application will have no bearing on the Section 22 Proceeding. Simply put, a ruling by a U.S. Court, under U.S. law, regarding GIC's ability to seek records held in the United States by U.S. banks would in no way infringe upon a ruling made by a Cayman court, under Cayman statutes and an agreement governed by Cayman law, regarding GIC's ability to seek records held by Cayman entities. Further, by the PFEs' logic, a ruling in GIC's favor in the Section 22 Proceeding would nullify any such concerns.

Arguing the opposite position, the PFEs assert (Opp. at 19) that a ruling in GIC's favor in the Section 22 Proceeding would "moot many of GIC's discovery requests in its §1782

Application." As shown, however, the information sought in the two proceedings is distinct, starting with the fact that different entities with different records are the targets. Even if the target records were the same—and they are not (*see* App'x E at ¶ 16)—the PFEs' well-worn pattern of delay and obfuscation to avoid disclosure causes serious questions regarding what they ultimately will disclose. *See* App'x D at ¶¶ 5–17. For example, although the PFEs tout their self-professed "Disclosure Letter," it is anything but, and instead managed to raise more questions and evoke increased concerns. *See id.* at ¶¶ 18–22. In short, the PFEs' purported disclosures to date only further highlight the need for the Requested Discovery from the Correspondent Banks, which, as disinterested third parties, will provide comprehensive disclosure.

*Third*, GIC is not required to exhaust its efforts to seek disclosure through the Cayman courts before availing itself of Section 1782's aid. *See In re Metallgesellschaft*, 121 F.3d 77, 79 (2d Cir. 1997) ("[A] 'quasi-exhaustion requirement[]' finds no support in the plain language of [Section 1782] and runs counter to its express purposes."); *In re Gushlak*, 2011 WL 3651268, at *5 (E.D.N.Y. Aug. 17, 2011) ("[T]he possibility that [a Cayman court] will rule on discovery requests similar to the ones at issue here does not weigh against granting Petitioner's application. Again, a § 1782 applicant need not exhaust foreign discovery remedies. Requiring Petitioner to wait for the outcome of the ... discovery proceedings would amount to enforcing such an 'exhaustion' requirement."(citation omitted)).[10]

Accordingly, the PFEs' suggestion (Opp. at 16) that the Application "seeks to avoid or preempt a negative ruling from the Cayman court in the [Section 22] [P]roceeding" should be rejected. The PFEs offer no analogous cases that mandate otherwise. *See e.g.*, *In re Kreke*

---

[10]   Indeed, even if a Cayman court "had already denied discovery requests similar to the ones made here, this would not necessarily require the court to deny [GIC's] application." *In re Gushlak*, 2011 WL 3651268, at *5.

*Immobilien KG*, 2013 WL 5966916, at *5 (S.D.N.Y. Nov. 8, 2013) (1782 application by *German* petitioner sought discovery from *German* bank for underlying foreign proceeding before *German* court); *Andover Healthcare, Inc. v. 3M Co.*, 2014 WL 4978476, at *7 (D. Minn. Oct. 6, 2014) (1782 application sought discovery that was indisputably the same as that sought in foreign court).

The third *Intel* factor, therefore, also weighs in favor of granting the Application.

### 4.    Requested Discovery Is Neither Overbroad nor Unduly Burdensome

The Requested Discovery is neither overbroad nor unduly burdensome.[11] Should the Correspondent Banks have such objections they may be made in motions to quash following service of the subpoenas. The PFEs' preemptive raising of these potential arguments on the Correspondent Banks' behalf (Opp. at 20–25) is both gratuitous and unavailing.

*First*, this factor is highly fact dependent, and the cases cited by the PFEs are factually distinct in that the requested information was disproportionate to the proceeding it sought to support. *See e.g.*, *In re MT BALTIC SOUL*, 2015 WL 5824505, at *3 (requests to banks for "all documents relating to any transactions" for seven business entities was overbroad for purposes of an alter ego analysis); *In re Asia Mar. Pac. Ltd.*, 253 F. Supp. 3d at 705 (finding request overly broad where "*no* basis" provided to link requested information and discovery targets).[12] *Second*, despite the PFEs' suggestion otherwise (Opp. at 22), the Requested Discovery does *not* implicate confidentiality restrictions under private agreements and Cayman law. The Correspondent Banks are *not* bound by any private agreements that the PFEs may have entered into, or by restrictions

---

[11]   The Requested Discovery is narrowly tailored in that it seeks only records (1) concerning transactions between the PFEs and a finite list of entities that is specific to each Correspondent Bank; (2) from a specific time period; (3) that the Correspondent Banks would maintain in the regular course of business; and (4) that are directly relevant to the issues in the Contemplated Cayman Litigation. *See* Application at 25.

[12]   Even if the Court were to find that the proposed subpoenas are overbroad and/or unduly burdensome—which it should not—the Court need not deny the Application in its entirety, as the PFEs suggest (Opp. at 22). Instead, the Court may exercise its authority to limit the requests and reduce the burden. *See* Application at 25 n.27.

imposed by Cayman law. *See, e.g.*, *In re Iraq Telecom Ltd.*, 2020 WL 1047036, at *2 (S.D.N.Y. Mar. 4, 2020) (finding foreign bank secrecy law inapplicable to documents held in United States by U.S. banks). *Third*, as shown in Sections III.C.1 and III.C.3, *supra*, and contrary to the PFEs' assertions (Opp. at 22), GIC has *not* "already [sought] to obtain, or [] already obtained, much of the same information in its Section 22 Proceeding" that it seeks through the Requested Discovery. *Fourth*, the PFEs' argument that GIC is seeking "to use § 1782 to subpoena foreign financial records" (Opp. at 23–24) is incoherent and false, as GIC plainly seeks records held in the United States by the Correspondent Banks.

The fourth *Intel* factor, therefore, also weighs in favor of granting the Application.

## IV.    CONCLUSION

For the foregoing reasons, GIC respectfully asks that the Court (1) deny the Motion; and (2) grant the Application and authorize GIC to serve the draft subpoenas attached to the Application as Exhibits M-X to Appendix A (ECF 5-1, 5-2).

Dated:  June 12, 2020

Respectfully submitted,

/s/ *Kristin N. Tahler*

_____
QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Kristin N. Tahler, Esq.
  kristintahler@quinnemanuel.com
Marc P. Hedrich, Esq.
  marchedrich@quinnemanuel.com

865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: 213-443-3000

1300 I Street NW, Suite 900
Washington, DC 20005
Telephone: 202-538-8000

*Attorneys for Applicant Gulf Investment
Corporation*