# Appendix D

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>EX PARTE APPLICATION OF<br>GULF INVESTMENT CORPORATION FOR<br>AN ORDER TO OBTAIN DISCOVERY FOR<br>USE IN FOREIGN PROCEEDINGS<br>PURSUANT TO 28 U.S.C. §1782 | Case No. 1:19-mc-00593-VSB |

### SUPPLEMENTAL DECLARATION OF KRISTIN N. TAHLER

Pursuant to 28 U.S.C. § 1746, I, Kristin N. Tahler, declare under penalty of perjury as follows:

1.      I am the same Kristin N. Tahler who submitted a declaration on December 26, 2019 (**"First Tahler Declaration"**) (ECF 5), in support of the *ex parte* application submitted by Gulf Investment Corporation (**"GIC"**) for an order under 28 U.S.C. § 1782 (**"Section 1782"**) permitting GIC to take discovery from 12 banks (**"Correspondent Banks"**) in the Southern District of New York (**"Application"**).[1] I continue to represent GIC in this matter.

2.      I submit this supplemental declaration (a) in response to the Declarations submitted by Barnaby Gowrie (**"Gowrie Declaration"**) (ECF 25), dated May 14, 2020, and Kathy Chin (**"Chin Declaration"**) (ECF 26), dated May 15, 2020, submitted in support of the Motion to Intervene and Opposition to the Application (**"Opposition"**) (ECF 24) filed by putative intervenors The Port Fund L.P. (**"Port Fund"**) and Port Link GP Ltd. (**"Port Link"**; collectively with the Port Fund, **"Port Fund Entities"**); and (b) in support of GIC's Response to the Motion to Intervene and Reply in support of the Application (**"Reply"**).

---

[1]    As I explained in the First Tahler Declaration (¶¶ 2, 3), I understand that (a) GIC seeks documents and information from the Correspondent Banks, as defined in the Application as the "**Requested Discovery**"; and (b) the Requested Discovery is being sought to support the "**Contemplated Cayman Litigation**," as also defined in the Application.

3.      Specifically, this declaration (a) details a pattern and practice of obfuscation and delay that the Port Fund Entities have engaged in for years regarding, among other things, (i) the provision of Port Fund's audited financial statements; and (ii) a meeting to discuss GIC's questions regarding the Port Fund's finances and investments; (b) demonstrates how the purported disclosures made in the Port Fund Entities' self-professed "Disclosure Letter" were selective, incomplete, and raised more questions than they answered; (c) entirely dispels the Port Fund Entities' speculation regarding GIC's intended use for the Requested Discovery; (d) sheds light on a multimillion dollar lobbying and public relations campaign organized on behalf of a convicted former Port Link principal Marsha Lazareva; and (e) describes the central role of an attempted transfer by Port Link in the freezing of Port Fund monies.

4.      I am familiar with the information set forth in this declaration either from personal knowledge or on the basis of documents I have prepared and/or reviewed. Because I submit this declaration specifically in support of the Reply and response to the Opposition, it does not contain each and every fact within my knowledge regarding the topics discussed herein.[2]

## I.      THE PORT FUND ENTITIES' PATTERN AND PRACTICE OF OBFUSCATION AND DELAY

5.      On February 7, 2019, the Port Fund informed GIC that its administrator and auditors were purportedly preparing the Port Fund's financial statements for 2017 and 2018 with a "target" to send them to the Port Fund's limited partners "within the next 60 days."[3] The Amended and Restated Limited Partnership Agreement ("**LPA**") requires Port Link to provide the Port Fund's limited partners with copies of the Port Fund's audited financial statements within 90

---

[2]      I also certify that the exhibits attached hereto are true and correct copies of the original documents.

[3]      *See* First Tahler Declaration, Ex. E (ECF 5-1), February 7, 2019 letter from Port Fund to GIC.

days of the end of the subject year,[4] which rendered the 2017 statements nearly a year late, as of this February 2019. The Port Fund, however, failed to provide the already-overdue statements within the 60 days.

6.      Eight months later, the Port Fund had still failed to provide the financial statements to its limited partners. On October 8, 2019, GIC raised concerns with the Port Fund regarding, among other things, the continued failure to provide these belated financial statements.[5]

7.      On November 3, 2019, the Port Fund, ignoring its representation from nine months prior, informed GIC that it had now purportedly "engaged a professional financial firm who has commenced a review of all of the Fund's relevant financial transactions for the financial years ending 2017 and 2018 … with a view to ensuring that the 2017 and 2018 audited financial statements are finalised and completed by 31 December 2019."[6] The Port Fund again failed to meet this deadline.

8.      In a November 13, 2019 letter, GIC expressed its continued concerns about the Port Fund Entities' failures to provide information, including the financial statements, and raised additional questions about its investment. GIC also accepted the Port Fund's offer to meet.[7]

9.      Despite GIC's November 13 acceptance, the meeting that the Port Fund had offered never occurred. On November 21, 2019, the Port Fund confirmed receipt of GIC's November 13

---

[4]    *See id.*, Ex. D (ECF 5-1), LPA at § 7.2 (specifying that the general partner is to provide the limited partners with copies of the Port Fund's financial statements "[a]s soon as reasonably practicable after the end of each Fiscal Year (but in any event no later than 90 calendar days thereafter)").

[5]    *See id.*, Ex. G (ECF 5-1), October 8, 2019 letter from GIC to Walkers (the Port Fund's Cayman counsel).

[6]    *See* **Ex. A**, November 3, 2019 letter from Walkers to GIC.

[7]    *See* First Tahler Declaration, Ex. K (ECF 5-1), November 13, 2019 letter from Meysan Partners (GIC's Kuwaiti counsel) to Walkers (stating "[a]s you have indicated that you are willing to engage with representatives of GIC … we would appreciate if you could please speak with us at your earliest convenience in order to do so").

response and promised that a "substantive" reply would be forthcoming.[8] The Port Fund, however, failed to provide that substantive reply or meet with GIC.

10.     On January 5, 2020, after the Application's filing, and ignoring GIC's November 13 acceptance of the Port Fund's offer to meet, the Port Fund Entities wrote to GIC to again purport to extend an offer to meet.[9] Absent in this offer (as well as the Port Fund's prior communications) was any reference to purported confidentiality concerns related to third parties.

11.     On January 9, 2020, GIC wrote to accept the Port Fund Entities' renewed offer to meet, and further attached a proposed nondisclosure agreement to govern the meeting.[10]

12.     On January 21, 2020, the Port Fund Entities, for the very first time, and following months of discussion related to a theoretical meeting, informed GIC of the purported need for a third-party—Udenna Corporation ("**Udenna**"), the purchaser of the Clark Asset, as defined in the Application—to sign-off from on the terms of the meeting.[11]

13.     On January 28, 2020, notwithstanding the fact that the Port Fund Entities were under no obligation to consult Udenna about, much less obtain its consent to, the confidentiality terms governing a discussion among the Port Fund, its general partner, and one of its limited partners (GIC), GIC offered to meet with the Port Fund in early February 2020.[12]

---

[8]   *See id.*, Ex. L (ECF 5-1), November 21, 2019 letter from Walkers to Meysan Partners.

[9]   *See* **Ex. B**, January 5, 2020 Letter from Crowell to Quinn Emanuel (incorrectly claiming that GIC rejected the Port Fund's previous offer to meet, and purportedly offering again to meet).

[10]   *See* **Ex. C**, January 9, 2020 Letter from Quinn Emanuel to Crowell (demonstrating that GIC did not previously reject the Port Fund's offer to meet, and attaching a draft nondisclosure agreement that GIC was prepared to execute).

[11]   *See* **Ex. D**, January 21, 2020 Letter from Crowell to Quinn Emanuel (noting receipt of GIC's draft confidentiality agreement and, for the very first time, expressing a need to consult with third party Udenna about confidentiality terms prior to any meeting with GIC).

[12]   *See* **Ex. E**, January 28, 2020 Letter from Quinn Emanuel to Crowell (questioning the Port Fund Entities' need to consult with Udenna, but nonetheless agreeing to schedule a meeting in early February 2020).

14.     On February 4, 2020, nearly a year after the Port Fund had represented that already-delayed financial statements would be provided within 60 days, no financial statements had been provided and yet additional appointments were announced by the Port Fund, this time of purported independent directors to Port Link's board.[13] No explanation was provided as to the status of the "professional financial firm" that purportedly had been engaged in November 2019 to generate financial statements, or when (if ever) the statements would be provided.

15.     On February 11, 2020, despite concerns regarding (a) Udenna's purported objections; (b) the appointment of new members to Port Link's board; and (c) the Port Fund's repeated failure to provide the required financial statements, and in light of the information that long had been lacking, GIC agreed to schedule a substantive, in-person meeting.[14]

16.     On March 4, 2020, the date for which the in-person meeting was eventually scheduled, GIC's U.S. counsel met with the Port Fund Entities' U.S. and Cayman counsel. During the meeting, the Port Fund Entities' counsel failed to provide any material information.

17.     On April 30, 2020, over two years after they should have been provided to the limited partners pursuant to the LPA—and conveniently just days before a hearing in GIC's proceeding against the Port Fund Entities in the Cayman Islands, pursuant to Section 22 of the Cayman Islands Exempted Limited Partnership Law ("**Section 22 Proceeding**") was to occur—the Port Fund Entities issued the Port Fund's audited financial statements for year ended December 31, 2017.[15] To date, the Port Fund Entities have yet to provide the limited partners with the Port Fund's audited financial statements for years ended December 31, 2018, and December 31, 2019.

---

[13]   *See* **Ex. F**, February 4, 2020 Letter from Crowell to Quinn Emanuel (advising that Udenna had purportedly objected to the Port Fund Entities' disclosure of information to GIC).

[14]   *See* **Ex. G**, February 11, 2020 Letter from Quinn Emanuel to Crowell.

[15]   *See* Chin Declaration, Ex. B (ECF 26-2), Port Fund's 2017 audited financial statements.

## II.     THE PORT FUND ENTITIES' PURPORTED "DISCLOSURE LETTER"

18.     On February 27, 2020, the Port Fund Entities' Cayman counsel sent a letter to GIC's Cayman counsel, which the Port Fund claims responds to both GIC's Section 22 Proceeding and the Application.[16] In short, it does no such thing.

19.     Mr. Gowrie and Ms. Chin refer to this letter as a "Disclosure Letter" (Gowrie Declaration ¶¶ 18–19; Chin Declaration ¶ 27). It is not and will be referred to herein as the "**Letter**." GIC has pointed out to the Port Fund Entities many of the Letter's failings, including that its selective, incomplete, and unsworn disclosures fall far short of satisfactorily addressing the requests that GIC made of the Port Fund Entities in the Section 22 Proceeding, much less the Requested Discovery that GIC seeks *from the Correspondent Banks* through the Application.[17]

20.     By way of example only, the Letter claims that the Port Fund made over USD 86 million in disbursements across three transactions on February 7, 2019.[18] It further asserts that the Port Fund Entities' U.S. counsel, "acting on the instructions of the board of directors of the Fund," made a USD 36.2 million disbursement on an undisclosed date.[19] The Letter, however, fails to disclose the critical identity of the recipients of those funds or provide any back up documentation to support its claims regarding the rationale for the disbursements. The Port Fund Entities' position, therefore, can be summed up with: take our word for it.

21.     In addition, the Letter does not even try to account for millions of dollars of Port Fund monies. Although the Letter claims to provide "a summary and breakdown of the vast

---

[16]   *See* Gowrie Declaration, Ex. 11 (ECF 25-11), February 27, 2020 letter from Walkers to Travers Thorp Alberga.

[17]   *See* **Ex. H**, April 7, 2020 Letter from Quinn Emanuel to Crowell.

[18]   *See* Gowrie Declaration, Ex. 11 (ECF 25-11), February 27, 2020 letter from Walkers to Travers Thorp Alberga, ¶ 3.11 at Transactions 15, 16, 18.

[19]   *See id.*, ¶ 3.12 at Transaction 12.

majority of the payments made from" an account in Port Link's name at Noor Bank in Dubai (into which proceeds from the sale of the Clark Asset were transferred) ("**Noor Account**"), the 34 listed disbursements from the Noor Account only sum to USD 481,079,527.97, leaving USD 15,350,239.03 entirely unaccounted from the USD 496,429,767 that the Port Fund purportedly received from Udenna in connection with the sale of the Clark Asset.[20] Further, the 18 listed disbursements from the Port Fund Entities' U.S. counsel's trust account only sum to USD 46,423,854.23, leaving yet another USD 4,276,145.77 entirely unaccounted from the USD 50,700,000 in disbursements that the Port Fund made to its U.S. counsel from the Noor Account.[21]

22.     As such, and contrary to Ms. Chin's assertions (Chin Declaration ¶ 27), the Port Fund Entities have not, in fact, already "provided much of the requested information" to GIC that it seeks through the Application. If anything, the information missing from the Letter, which is compounded by the Port Fund Entities' refusal to turn over Noor Account banking records, only highlights GIC's continued need for the discovery it seeks from the Correspondent Banks.

## III.    PURPOSE OF THE REQUESTED DISCOVERY

23.     The Port Fund Entities' speculation (Opposition at 24) that GIC may bring information that it uncovers through the Application "to the attention of the Kuwaiti authorities in hopes of commencing yet another criminal investigation" is baseless. The Port Fund Entities' insinuation (*id.* at 25) that GIC may have filed the Application in "bad faith," as part of a "ruse" to obtain information for such purposes is insulting.

---

[20]   *See id.*, ¶ 3.11. The Port Fund's recent statement that it purportedly sold the Clark Asset in July 2017, for proceeds of USD 655 million (Chin Declaration ¶ 5), only makes this unaccounted amount all the more glaring.

[21]   *See id.*, ¶ 3.12.

24.    As the Application made clear (at 13), GIC seeks the Requested Discovery in support of its claims in the Contemplated Cayman Litigation. Suggestions of ulterior motives are wholly without merit.

## IV.    LOBBYING AND PUBLIC RELATIONS CAMPAIGN FOR MS. LAZAREVA

25.    Marsha Lazareva and Saeed Dashti, two former Port Link principals have been convicted in criminal proceedings in Kuwait. Unremarkably, they have appealed. Ms. Chin asserts (Chin Declaration ¶ 18 n.27) that there has been "tremendous interest in the plight of Ms. Lazareva." Ms. Chin, however, neglects to mention the aggressive, USD 4.9 million lobbying and public relations campaign underlying any "tremendous interest," and that included "a fake protest, thousands of dollars in payments to some U.S. opinion writers, misleading news reports and a correspondent who may not exist."[22] GIC is concerned that Port Fund monies may have been inappropriately directed to such lobbying and public relations efforts—a concern that finds support in the Letter.[23] As set forth in the Application (at 11 n.7), this very concern forms part of the basis for the Requested Discovery.

26.    Ms. Chin further cites (Chin Declaration ¶ 18 n.27) an ongoing review by the United Nations Working Group on Arbitrary Detention, as well as "efforts to initiate a Global Magnitsky Act inquiry" as evidence of an "international outcry" against Ms. Lazareva's conviction. Neither has any relevance to the Application. First, the object of these efforts has been the Kuwaiti judiciary and Kuwaiti government officials. GIC, which is owned by the government

---

[22]    Zachary Mider, Ben Elgin, & Joe Light, *Kuwaiti Cash Fuels a Surge of Misleading U.S. Media Coverage*, BLOOMBERG (Jan. 9, 2020), https://www.bloomberg.com/news/articles/2020-01-09/kuwaiti-cash-fuels-a-surge-of-misleading-u-s-media-coverage.

[23]    *See* Gowrie Declaration, Ex. 11 (ECF 25-11), February 27, 2020 letter from Walkers to Travers Thorp Alberga, ¶ 10.3 (noting that "the GP considered it appropriate for the firms engaged by the Fund to provide assistance to the former directors of the GP in relation to the criminal proceedings in Kuwait").

of the six member states of the Gulf Cooperation Council, is neither.[24] Second, attempts to gin up Magnitsky-related sanctions against Kuwaiti authorities have been entirely unavailing.

## V.   PORT LINK'S ATTEMPTED USD 94.6 MILLION TRANSFER TO IDEAL GULF HOLDINGS LIMITED

27.     In discussing the freezing of the Noor Account (and sale proceeds from the Clark Asset held therein) upon suspicions of money laundering, the Port Fund Entities highlight (Opposition at 4–5) the purported "role of the Kuwaiti government in the freeze." The Port Fund Entities, however, omit any mention of the fact that the freeze was (a) executed independently by the UAE authorities without the involvement or knowledge of the Kuwaiti government; and (b) triggered, in part, by Port Link's unexplained attempt to wire USD 94.6 million of the Clark Asset sale proceeds to a suspicious third party, Ideal Gulf Holdings Limited ("**IGHL**").[25]

28.     The resolution to freeze the Noor Account was made by the Public Prosecution of Dubai following a request by the Financial Intelligence Function at the Central Bank of the UAE.[26] The grounds for the Central Bank's request to the Public Prosecutor are laid out by the UAE authorities, and cite such fundamental irregularities as the fact that the final beneficiary of the transfer was unknown.[27] That the Central Bank raised such concerns underlines the fact that the freezing took place independently of the Kuwaiti government.

29.     IGHL, which had been incorporated only the previous year in the obscure free trade zone of emirate of Ajman, was assessed by the UAE authorities to have no commercial purpose or

---

[24]   *See* First Tahler Declaration, ¶ 1 n.1.

[25]   *See* Gowrie Declaration, Ex. 11 (ECF 25-11), February 27, 2020 letter from Walkers to Travers Thorp Alberga, Schedule 2, p. 14.

[26]   *See id.* p. 13.

[27]   *See id.*

record of financial activity.[28] Notably, IGHL is hardly an independent third party given that it is "owned by one of the authorized signatories of Port Link GP LTD Company's bank account,"[29] either Abdullah Akbar Jabr Akbar (who is not only a signatory, but a Port Link executive) or Qassim Mohamed Hafez.[30] Although the opacity of Ajman's corporate records is such that ownership information is not publicly available, the overlap between IGHL and either signatory is enough to undermine any suggestion of independence.

30.    Critically, GIC only learned of this attempted transfer—of nearly USD 100 million of Port Fund investor monies, to a previously unknown third party—because of its mention in a schedule appended to the Letter.[31] We note that a recent explanation offered by the Port Fund Entities regarding the attempted transfer, namely that it comprised the Port Fund investment manager's carry distribution and limited partner distributions owed to PetroLink and KGLI, raises yet more questions. There is no explanation as to why separate payments to three distinct legal entities would be transferred to a third party with no legal relation to any of them.

* * *

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed in Los Angeles, California on this the 12th day of June 2020.

Kristin N. Tahler

---

[28]  *See id.*, p. 14.

[29]  *See id.*

[30]  *See id.*, p. 12.

[31]  *See generally id.*