


**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**Cause No. FSD 235 of 2019 (RPJ)**
**Cause No. FSD 13 of 2020 (RPJ)**

**IN THE MATTERS OF THE APPLICATIONS FOR INFORMATION UNDER SECTION 22 OF THE EXEMPTED LIMITED PARTNERSHIP LAW (2018 REVISION)**

**BETWEEN**

**(1) GULF INVESTMENT CORPORATION**
**(2) GENERAL RETIREMENT AND SOCIAL INSURANCE AUTHORITY**

**Plaintiffs in FSD 235 of 2019**

**(3) KUWAIT PORTS AUTHORITY**

**Plaintiff in FSD 13 of 2020**

**-and-**

**(1) THE PORT FUND L.P.**
**(2) PORT LINK GP LTD.**

**Defendants in both causes**

IN OPEN COURT VIA ZOOM

APPEARANCES: Ms Felicity Toube QC of South Square appearing for the Plaintiffs in FSD 235 OF 2019, GIC and GRSIA, instructed by Anna Peccarino of Travers Thorp Alberga.

Mr David Allison QC of South Square appearing for The Kuwait Ports Authority in FSD 13 of 2020 instructed by Jennifer Fox, Rachael Reynolds and Ilona Groark of Ogier.

Mr Tom Smith QC of South Square appearing for the Defendants in both causes, instructed by Barnaby Gowrie, Chris Keefe and Blake Egelton of Walkers.




| | |
|---|---|
| BEFORE: | THE HON. RAJ PARKER |
| HEARD: | 5 and 6 May 2020 |
| Draft Ruling: Circulated | 9 June 2020 |
| Ruling: Delivered | 16 June 2020 |

**Headnote**

*Exempted limited partnership-ss 16, 19, 21 and 22 Exempted limited Partnership Law (2018 Revision)-true and full information concerning the state of business and financial condition of the Fund-motives and intentions of limited partners seeking information-construction of Limited Partnership Agreement-section 3 (1) (j) Confidential Information Disclosure Law (2016 Revision)-legal privilege -working papers*

**Introduction**

1. The Plaintiffs (GIC, GRSIA, and KPA) respectively are limited partners in the First Defendant, the Port Fund L.P. (the Port Fund or the Fund), a Cayman Islands Limited partnership.

2. GIC is a Kuwait-based supranational corporation owned by the governments of the six member states of the Gulf Cooperation Council (Bahrain, Kuwait, Oman, Qatar, Saudi Arabia, and the UAE). GRSIA is a state owned enterprise responsible for administering the Qatari social security system. KPA is a state-owned enterprise responsible for administering Kuwait's commercial ports.

3. This was a contested application for disclosure of true and full information regarding the business and financial condition of the Port Fund under section 22 of the Exempted Limited Partnership Law (2018 Revision) (ELPL).

4. The Port Fund was set up in 2007 as a Cayman Islands exempted limited partnership for investments in port related assets around the world. The general partner in the Port Fund is the Second Defendant, Port Link GP Ltd. (the General Partner).



5. In January 2020 Christopher Rowland and Andrew Childe of FFP were appointed as directors of the General Partner[1] and they form the majority of the board of directors, with the third director being a Kuwaiti-based individual, Mr Alawadhi who has been on the board since 2010. The FFP directors have been guiding the response of the Fund to these proceedings. Ms Felicity Toube QC appeared for GIC and GRSIA. Mr David Allison QC appeared for KPA. Mr Tom Smith QC appeared for the Defendants.

6. Each of the Plaintiffs invested substantial monies into the Port Fund. KPA invested the largest amount which equalled at least 45% of the total commitments in the Fund. The total capital contributions into the Port Fund between 2007 and 2013 were US$188 million and together the Plaintiffs hold a majority ownership stake consisting of 61% of the total commitments.

7. KPA also has the support of the Kuwait Public Institution for Social Security (PIFSS) which brings the support of investors to approximately 80% of total commitments of the Fund. In fact if one disregards the limited partners said by the Plaintiffs to be connected to the Port Fund namely KGL Investment Company KSCC (KGLI) and Petrolink Holding Company KSCC (Petrolink)[2] the relief sought in this case is supported by limited partners whose investments amount to 95% of the total investments in the Fund.

8. Emerging Markets PE Management Ltd (formerly known as KGL Investment Cayman Ltd) acted as the Investment Manager of the Fund (the Investment Manager).

9. The term of the Fund has expired and it has been in wind down for over five years, exiting its investments. As such there are no ongoing investment activities.[3]

10. The Fund made a number of investments. The most significant return was received from an investment in Clark Global City, a major Greenfield airport infrastructure site in the Philippines. The Fund sold the project to third party. Pursuant to a Share Purchase Agreement dated 31 July 2017 and a Settlement Agreement dated 5 February 2019 (both agreements being governed by the laws of the Cayman Islands) a sum of US$496,429,777 was wired from the third party to the Fund's bank account in the name of the General Partner with the Noor Bank in Dubai on 14 November 2017. Noor Bank immediately froze this sum at the request of the Dubai authorities. The freezing of the funds is described in disclosure letters dated 27 February 2020 and 26 March 2020 provided by the Fund to the Plaintiffs.

---

[1] They are experienced restructuring professionals, office holders, and directors

[2] KGLI acted as the sponsor and placement agent of the Port Fund, was the controlling shareholder of the Investment Manager during the conduct of the investments of the Fund, Marsha Lazareva (ML) is the vice-chairman and CEO of KGLI and a former director of both the General Partner and the Investment Manager and Saeed Dashti (SD) was the chairman of the KGL group of companies and a director of the General Partner. ML was (at least at one time) also a director of Petrolink which is a subsidiary of KGLI.

[3] See Al Sabah 1 § 15 and 2 §19



***Criminal proceedings in Kuwait***

11. The court has been referred to evidence relating to ongoing criminal proceedings in Kuwait concerning ML and SD who held management positions at the General Partner and who dealt with the service providers managing the Fund's investments. On 11 November 2019 they were each convicted by a Kuwaiti court and sentenced to imprisonment for 15 years in connection with misappropriation of public funds. An appeal is apparently pending. They were also both convicted on 20 January 2020 in connection with embezzlement from KPA accounts with ML being sentenced to 7 years' imprisonment and SD to 10 years' imprisonment. Again, an appeal is apparently pending.

12. The court has also been referred to evidence of substantial payments made by the Fund to public relations and lobbying firms in the United States and elsewhere in support of the cases of ML and SD and to Baker Tilly which provided a report to assist the defence of the criminal proceedings. The FFP directors consider that there are questions which cause them concern about the Kuwaiti proceedings. These are raised by the Baker Tilly report and a Petition and Case Update provided to the UN working group on Arbitrary Detention, which they have reviewed.

13. The background to the freezing of the funds relating to Clark Global City is said to lie in the criminal investigations against SD and ML. It appears that the Kuwaiti government, acting by its Attorney General approached the Dubai government and sought the transfer a portion of the funds to KPA and PIFSS. The Fund submitted that the amount requested to be transferred was in excess of the entitlements of those investors. The matter was then escalated and was the subject of correspondence passing between the Prime Minister of Kuwait and the Ruler of Dubai to transfer lesser amounts to KPA and PIFSS. The FFP directors understand that it was made very clear to the Fund by the Dubai authorities that unless the Kuwait government's request was met to pay KPA and PIFSS, the Fund would not obtain the balance of the monies. The Fund submitted that it took the decision that it was in the best interests of investors to comply and obtained the release of the monies which the FFP directors consider resulted in KPA receiving more than its legal entitlement. The FFP directors consider that it may be necessary to pursue recourse against KPA in due course. In any event the full sum of US$496,429.777 was distributed by the Fund in February to April 2019.

***The issues between the parties***

14. The Plaintiffs have demanded from the Defendants *'true and full information regarding the state of the business and financial condition'* of the Fund and have identified a number of specific categories of information that they require.

15. The reasons why KPA seeks the information are summarised at Al Sabah 2 at § 20 and are set out in Schedule 1 thereto which contains a helpful analysis of the requests made, the response given and any comments from KPA together with references to the Defendants' evidence and disclosure letter. In addition a draft order was




submitted shortly prior to the hearing which identified the specific information demanded.

16. The Defendants take issue with a number of these requests on the basis that they are outside the scope of the originating summonses issued by GIC and KPA, are new and are not verified by affidavit evidence.

17. As I made clear at the hearing, the court is not going to embark on a line by line analysis of which requests should be met, if at all, and by when. Instead the court will determine the legal issues that have arisen between the parties in order that the points of principle can then inform the parties approach to the provision of the requested materials. If the parties cannot agree any particular items there will of course be liberty to seek further guidance from the court.

18. There are extensive allegations and counter allegations in the evidence submitted to the court[4] concerning the propriety of the conduct of various entities and individuals involved in dealings with assets belonging to the Fund and alleged irregularities. The court is not in a position to determine those matters and is not asked to do so.

19. The relevant dealings all preceded the appointment of the FFP directors who have relatively recently been appointed and have conducted some investigations into these matters. The relevance of this is that it forms the basis of the FFP directors' concern that without safeguards, the information that is demanded by the Plaintiffs might be misused for collateral purposes, including for use against service providers to the Fund and the requests might themselves be motivated by purposes other than to find out detailed information about the business and financial condition of the Fund.

20. It is accepted by Mr Smith QC that as limited partners in the Fund, the Plaintiffs are entitled to information about the Fund, but he says that the FFP directors are right to scrutinise the requests very carefully to be sure that they fall within the legal entitlements of the limited partners. They say they have requested what they say are reasonable safeguards and restrictions to be put in place in order that they and the Fund do not become embroiled in the contentious matters and criminal proceedings that have arisen in Kuwait and elsewhere, or in what is said to be a campaign waged against ML and SD and service providers to the Fund.

21. The Plaintiffs on the other hand are concerned that the financial affairs of the Fund have not been managed in an appropriate way by the General Partner and require information concerning the management of the investments made and the application of monies received by the Fund on the realisation of its investments. They argue that the concerns of the FFP directors are irrelevant to the Fund's obligation to provide the information demanded and that the safeguards and restrictions required by the General Partner are not necessary, reasonable or legitimate. They argue that

[4] El -Jeaan 1 26 November 2019, El-Jeaan 2 21 January 2020, El-Jeaan 3 24 April 2020; Al Sabah 1 27 January 2020, Al Sabah 2 24 April 2020; Childe 1, 9 April 2020, Childe 2 1 May 2020, Alawahdi 1, 9 April 2020.

any motive that the Plaintiffs may have is irrelevant to their right to demand true and full information which has been outstanding for a period of more than a year.

22. They base their right to this information on section 22 of the *Exempted Limited Partnership Law (2018 Revision)* (ELPL).




***The legal framework***

23. It is agreed that the Fund is subject to the provisions of the ELPL.

24. An exempted limited partnership consists of a general partner and one or more limited partners: section 4 (2). A limited partner is prohibited from taking part in the conduct of the business of the partnership: section 14(1). It is the general partner that enters into all the communications, contract, deeds and instruments on behalf of the limited partnership: section 14(2).

25. It is agreed that the general partner in this case carried out the obligations and duties necessary for the business of the Fund on behalf of the limited partners.

26. Any rights or property of every description (including all choses in action) and any right to make capital calls or receive the proceeds thereof that is conveyed to vested in or held on behalf of the general partner(s) or in the name of the exempted limited partnership is held by the general partner(s) on trust as an asset of the exempted limited partnership in accordance with the terms of the partnership agreement: section 16(1).

27. Any debt or obligation incurred by a general partner(s) in the conduct of the business of an exempted limited partnership is a debt or obligation of the exempted limited partnership: section 16 (2).

28. Section 21 of the ELPL deals with the maintenance of books of account for the partnership:

> *"(1) A general partner shall keep or cause to be kept proper books of account including, where applicable, material underlying documentation including contracts and invoices, with respect to-*
>
> *a) all sums of money received and expended by the exempted limited partnership and matters in respect of which the receipt of expenditure takes place;*
>
> *b) all sales and purchases of goods by the exempted limited partnership; and*
>
> *c) the assets and liabilities of the exempted limited partnership.*





*(2) For the purposes of subsection (1), proper books of account shall not be deemed to be kept if there are not kept such books as are necessary to give a true and fair view of the business and financial condition of the exempted limited partnership and to explain its transactions.*

29. Section 22 provides that:

*"Subject to any express or implied term of the partnership agreement, each limited partner may demand and shall receive from a general partner true and full information regarding the state of the business and financial condition of the exempted limited partnership".*

30. The contractual rights and obligations of the general partner and the limited partners are set out in the Fund's Limited Partnership Agreement dated 22 March 2007 (as amended and restated on 24 July 2008) (LPA).

31. Clause 3.3 of the LPA provides:

*"Limited Partners shall have no right to, and shall not, take part in the management or control of the Partnership's business or act for or bind the Partnership provided that the Limited Partners shall have all of the rights, powers and privileges granted to the Limited Partners in this Agreement and, where not inconsistent with the terms of this Agreement, under the Partnership Law."*

32. Clause 7.1 of the LPA provides:

*"Appropriate records and books of account of the Partnership shall be kept by the Partnership at the principal place of business of the General Partner, and each Partner shall have access to the records and books of account and the right to receive copies thereof under such reasonable conditions and restrictions as the General Partner may prescribe".*

33. Clause 7.2(a) provides that audited accounts shall be prepared, and mailed to each limited partner *"As soon as reasonably practicable after the end of each Fiscal Year (but in any event no later than 90 calendar days thereafter)".*

34. Clause 7.3 (Confidentiality) provides as follows:

*"Each of the Partners shall, and shall direct those of its directors, officers, partners, members, employees, attorneys, accountants, consultants and advisers (the "Representatives") who have access to Confidential Information to, keep confidential and not disclose any Confidential Information without the express consent, in the case of Confidential Information acquired from the Partnership, of the Partnership... 'Confidential Information' shall mean any information, including the identity of any Partner, that a Partner may acquire from the Partnership, any Portfolio Company or Subsidiary thereof..."*



***The parties' submissions on the law***

35. Ms Toube QC, supported by Mr Allison QC, submitted that whilst the Plaintiffs have good cause for concern about the management of the Fund which have led the Plaintiffs to seek extensive documents and information, it is not necessary for the Plaintiffs to prove any wrongdoing on the part of the Fund or the General Partner, or even that they have a reasonable suspicion of wrongdoing. It is for that reason that the court is not required or invited to reach any findings of fact on these questions, which can only be relevant background to explain the reason why the applications have been made.

36. Moreover, she submitted that there is no requirement under section 22 ELPL for a limited partner to even identify the reasons why it wishes to demand and receive true and full information.

37. The one reported Cayman Islands case on section 22 ELPL is the recent decision of Mangatal J in *Dorsey Ventures* 2019 (1) CILR 249.

38. The limited partner in *Dorsey* demanded information from the general partner which included a detailed breakdown of the nature of and justification for various transactions along with supporting documents such as bank statements contracts and invoices (see paragraph 13).[5]

39. The general partner in *Dorsey* argued that the Amended Limited Partnership Agreement (LPA) in that case expressly conferred on the limited partner the rights to receive audited accounts and unaudited quarterly accounts from the general partner (see paragraph 25) and so it was argued the parties had impliedly excluded any more general right to information which might otherwise exist under section 22 ELPL (see paragraph 27).

40. This argument was rejected by the Judge. At paragraph 36 of the Judgment, Mangatal J held that there was nothing in the wording of the LPA which was inconsistent with an overriding general right to information under section 22 ELPL.

41. In particular the fact that a clause (15.3) in the LPA required the provision of the accounts to the limited partners could not be said to modify the obligation under section 22:

*"The fact that the Amended LPA at clause 15.3 provides for and addresses the subject of the furnishing of accounts is not the same thing as the topic dealt with under section 22 of the ELP, which is the limited partner's right to demand and receive from a general partner true and full information regarding the state of the business and the financial condition of the exempted limited partnership. The right to demand and receive true*

---

[5] It included a requirement to disclose supporting documentation for 224 line items of transactions.



*and full information, in my view is wide, and encompasses more than accounts, audited or unaudited."*- (Paragraph 37).

42. Mangatal J also made reference to section 21 ELPL which contains the obligation of the general partner to keep material underlying documentation, including contracts and invoices with respect to all sums of money received and expended by the exempted limited partnership.

43. She observed at paragraph 38:

*"Section 21 of the ELP provides for the keeping of detailed accounts and information and documentation. It seems obvious to me, that, in relation to the Amended LPA [the general partner] is bound expressly to keep books of account in accordance with the ELP. Unless the amended LPA said expressly that the limited partner is not entitled to true and full information, then the limited partner has the right under the governing law, the ELP, to such information".*

44. She held that there was no basis for the implication of a term that the limited partners' right to demand information under section 22 should be excluded (see paragraphs 39-43).

45. She therefore ordered the general partner to provide the information sought, which included documents which did not already exist and had to be created to provide breakdowns into specified categories and schedules relating to certain costs and expenses in order to comply with section 22.

46. Ms Toube QC referred to the more limited rights of inspection of a partnership's books under English law where there is no equivalent to the section 22 provision. Ms Toube QC submitted that even in the more circumscribed English law regime, a partner's statutory right to inspect the partnership books is absolute and his motives are irrelevant: see *Lindley and Banks on Partnership 20th edition paragraph 22.16* where it is said that the court has no discretion to refuse appropriate relief because the statutory right of inspection is an absolute one and the motives and indeed bona fides of the partners seeking to exercise it will be irrelevant.

47. Ms Toube QC also relied on *Inversiones [2012] Bus LR 1136* where a dissatisfied investor sought to obtain various documents from the general partner of the limited partnership. The general partner and investment manager submitted:

*".. the present application is a blatant attempt to trawl through [the general partner's] and [investment manager's] day-to-day operational documents with a view to enabling [the limited partner] and their appointed forensic accountants to prepare a claim against [the investment manager], and that the mounting of litigation is not a legitimate purpose for which to seek the inspection of documents or the provision of information".*




48. This was rejected at paragraph 26 by Norris J:

> *"In my judgment the question of motive or purpose is irrelevant to the exercise of a statutory right of access to the partnership books. I accept the proposition (stated in Lindley & Banks on Partnership para 22.16) that because the statutory right of inspection is expressed in unqualified terms the motives and bona fides of the partner seeking to exercise it will be irrelevant*".

49. At paragraph 27 Norris J observed by reference to *Trego [1896] AC 7* that even if a limited partner were to seek to access the documents for an unlawful purpose, this did not entitle the partnership to restrict access to the information.

50. Ms Toube QC pointed out that the Cayman Islands position is even stronger because, by virtue of section 19(2) of the ELPL, unlike the position in England, it is stated that:

> *"Subject to any express provisions of the partnership agreement to the contrary, a limited partner of an exempted limited partnership in that capacity does not owe any fiduciary duty in exercising any of its rights or authorities or otherwise in performing any of its obligations under the partnership agreement to the exempted limited partnership or any other partner."*

51. It follows from this decision, the Plaintiffs say, that as a matter of statutory interpretation there is an entitlement to demand and receive all of the books and records maintained by the general partner pursuant to the statutory obligation imposed on it under section 21, and there is no proper basis for the General Partner to contend that any of the categories of information and documentation fall outside the operation of section 22 ELPL, as interpreted in the *Dorsey* case. They submit that I should follow the *Dorsey* case unless it was shown to be plainly wrong.

52. Mr Tom Smith QC for the Defendants submitted that in the case of a limited partnership, it is the LPA which contains the agreement between the parties as to how the limited partnership is to be constituted and managed. Thus, in the case of rights to the provision of information, in the first instance it is the terms of the LPA which sets out what the parties agreed and their respective rights and obligations in this regard.

53. In the present case, clauses 7.1 to 7.3 of the LPA set out carefully delineated rights to information and corresponding duties to provide information with the inclusion of appropriate safeguards and restrictions in relation to confidentiality.

54. He submitted that the provisions of the LPA do not exclude the application of section 22 ELPL. Section 22 ELPL sets out the general principle that a limited partner is entitled to information about the state of business and financial condition of the partnership but this general principle is subject to what the partnership parties actually agree in the LPA. In the present case, clauses 7.1 and 7.3 contain the parties' agreement as to how that principle is to be satisfied in relation to the Fund.

GRAND COURT CAYMAN ISLANDS FINANCIAL SERVICES DIVISION

55. He skilfully dealt with *Dorsey* on the basis that although Mangatal J appeared to consider that section 22 gave rise to an overriding general right to information beyond what was provided under the terms of the LPA, that decision (whilst it may have been right on the facts of that case) should be seen to be a decision where the LPA itself only provided for limited partners to have limited rights to information, that is to say, only to receive annual audited accounts plus a quarterly report including unaudited accounts. The LPA did not require production of books and records (see paragraph 33) which is unlike the present case where it does. The decision was 'probably right', Mr Smith QC submitted because section 22 ELPL may have a role to play where the terms of the LPA did not satisfy the requirement to provide true and full information.

56. He argued that in the present case clauses 7.1 to 7.3 taken together do provide a comprehensive scheme for the provision of information and 'occupy the field'. There is no room or basis for resort to be had to section 22 ELPL itself.

57. Moreover, he argued that clause 7.1 explicitly sets out the parties' agreement relating to the provision of records and books of account and is subject to *"such reasonable conditions and restrictions as the general partner may prescribe"*. He says it would be odd if that explicit restriction could be evaded and ignored by limited partners simply seeking to have resort to the general terms of section 22 ELPL without regard to what had been agreed in the LPA.

58. He also relied on *Inversiones* for the proposition that the test as to what the limited partners were entitled to receive was a 'functional' one which depends on the facts of the case (see paragraph 23(K)).

59. The General Partner acting by the FFP directors is concerned that information provided to the Plaintiffs might be misused, including being used for purposes other than informing themselves about the affairs of the Fund. The Defendants argue that the confidentiality restriction at clause 7.3 of the LPA would be very difficult to police and enforce, particularly given the location of the parties and the conduct would take place abroad.

60. Mr Rowland and Mr Childe are experienced office holders and constitute the majority on the board of the General Partner. They have carefully considered the limited partners' demands against the wider background and context. Mr Smith QC therefore contended that the General Partner seeks to impose, in the exercise of its discretion afforded to it by the LPA, reasonable restrictions and conditions on the provision of information and documentation so that each of the Plaintiffs undertake to this court that without the consent of the General Partner or further order they will use the information and documentation provided only for the purpose of informing themselves about the affairs of the Fund and not for any other purpose.

61. Mr Smith QC submitted that in doing so the FFP directors seek to achieve a balance.





He says that the limited partners' rights to receive information are not unlimited and unfettered and it is not unreasonable to undertake that they will only use the information for the purposes of informing themselves about the affairs of the Fund.

62. Mr Smith QC argues that there will be no prejudice in the Plaintiffs having to provide such an undertaking.

63. In support of his construction of the relevant provisions of the LPA and his 'occupy the field' argument he relies upon the *Interpretation of Contracts Sixth Edition* by Sir Kim Lewison at page 378:

*"Where a contract contains general provisions and specific provisions, the specific provisions will be given greater weight than the general provisions where the facts to which the contract is to be applied fall within the scope of the specific provisions".*

64. He also referred to an extract from Hansard dated 10 April 2014 where the second reading of the Exempted Limited Partnership Bill 2014 was said to meet the key objective of:

*"..The market led demand that the law does not unduly restrict the ability of partners to determine for themselves by agreement their rights and obligations as between themselves"*, among other objectives.

65. Finally, as far as clause 7.2 is concerned, the Fund's 2017 Accounts, which have been audited and finalised, are in the process of being provided and the 2018 and 2019 Accounts should be provided sequentially within the next month or two.

66. Ms Toube QC, supported by Mr Allison QC, resists the undertaking on the basis that there is no warrant for it. They argued that Mr Smith QC's analysis of how the provisions fit together is wrong and his construction of section 7.1 is also wrong.

67. They argue that the restrictions which are prescribed in clause 7.1 simply deal with the practical side of *providing* the information and give no right to allow the General Partner to impose conditions or restrictions on *use* and do not require an undertaking in that regard. Use should in effect be unfettered, save that the limited partner would not be able to use material provided in order to harm the partnership.

68. As to prejudice to the Plaintiffs of the undertaking sought by the Defendants, they argue that to have to seek the consent of the General Partner and then the court is an unnecessary hurdle and would cause further delay and disputes. They submit that the General Partner should not be permitted to 're-write' the contract whereby they agreed to provide information consistent with the statutory right conferred by section 22 ELPL. There is no balancing of interests to be done by the General Partner as between the limited partners and the third parties which it is seeking to protect because the Plaintiffs contend that the General Partner owes no duties to the third parties but only to the limited partners.




69. They submit that Mr Smith QC's reliance on *Hansard* is misplaced because the relevant Law was created years before the extract was relied upon and the reliance on Lewison bolsters the Plaintiffs' case rather than the Defendants.

70. Mr Smith QC had also contended for the General Partner that there were certain categories of documents and information falling within the application which are subject to confidentiality obligations under contracts entered into with third parties. An application has therefore been made pursuant to section 4 of the Confidential Information Disclosure Law (2016 Revision) (CIDL) for relief to enable the General Partner to provide these materials.

71. The Plaintiffs argue that this application is unnecessary. In the event that the court makes an order for the provision of the information requested, it is clear from the terms of section 3(1)(j) of CIDL that "*disclosure of confidential information in accordance with or pursuant to a right or duty created by any law... shall not constitute a breach of the duty of confidence and shall not be actionable at the suit of any person.*"

72. They rely on the analysis of Kawaley J in *re XYZ Ltd (unreported) 12 February 2019*, in which he rejected any suggestion that there was a need to seek directions under section 4(2) of CIDL in circumstances where the parties are able to demonstrate that they complied with a court order to produce confidential information. They submit that the court should not concern itself with the CIDL application as any order in favour of the Plaintiffs pursuant to section 22 ELPL will address any concerns. Moreover, there is in any event a real issue as to whether section 4 of CIDL applies as it is restricted to circumstances in which a person is 'giving evidence in proceedings' which is not the situation in the present case.

73. To complete the scope of the submissions there are also issues relating to legal privilege raised by the General Partner to avoid the provision of certain categories of information and certain working papers are refused for certain other categories of information sought.

***Analysis***

74. The proper meaning, application and effect of section22 ELPL is important to the outcome of this application. If the court decides that section 22 ELPL is a free standing, unqualified, provision expressed in mandatory terms, then the only basis for resisting the requests would be if the General Partner could establish that the statutory obligation has been cut down or modified by the express terms of the LPA. On the other hand if the LPA 'occupies the field' in the way suggested by Mr Smith QC, then that will govern the provision of information on the basis of the interpretation of the LPA agreed by the parties and there is no room for resort to be had to section 22 ELPL.

75. In addition, the question of what, if any, restrictions (by way of the undertaking sought) should be imposed as a result of the FFP directors' concerns arise, as do the issues with confidentiality, legal privilege and working papers.

76. As I indicated at the hearing, although I heard submissions on the detailed requests made, I will give my decisions on the questions posed on this application as a matter of principle following which the parties should be in a position to agree the application of those principles to the numerous categories of documents in dispute and in due course agree an Order.

GRAND COURT FINANCIAL SERVICES DIVISION CAYMAN ISLANDS

**Decision on the legal issues**

***The ELPL***

77. My interpretation of sections 16, 19, 21 and 22 of the ELPL and the way they apply in this case is as follows.

78. Section 16 makes clear that all rights and property of the Fund are held by the general partner on trust as an asset of the Fund in accordance with the terms of the LPA.

*Any rights or property of every description of the exempted limited partnership, including all choses in action and any right to make capital calls and receive the proceeds thereof that is conveyed to or vested in or held on behalf of any one or more of the general partners or which is conveyed into or vested in the name of the exempted limited partnership shall be held or deemed to be held by the general partner and if more than one then by the general partners jointly, upon trust as an asset of the exempted limited partnership in accordance with the terms of the partnership agreement. (section 16(1))*

*Any debt or obligation incurred by a general partner in the conduct of the business of an exempted limited partnership shall be a debt or obligation of the exempted limited partnership. (section 16(2))*

79. It is clear that section 19 (1) of the ELPL provides a one-way obligation for the General Partner to act in good faith at all times in the interests of the partnership subject to any express provision of the LPA to the contrary.

*"A general partner shall act at all times in good faith and, subject to any express provisions of the partnership agreement to the contrary, in the interests of the exempted limited partnership".*

80. I say 'one-way' because there is express recognition in section 19 (2) that a limited partner does not owe any fiduciary duty in exercising any of its rights under the LPA to any other partner.




*"Subject to any express provisions of the partnership agreement to the contrary, a limited partner of an exempted limited partnership in that capacity does not owe any fiduciary duty in exercising any of its rights or authorities or otherwise in performing any of its obligations under the partnership agreement to the exempted limited partnership or any other partner."*

81. Section 21 (1), imposes an obligation on the General Partner to keep proper books of account and material underlying documentation, including contracts and invoices, concerning money received and expended, sales and purchases and assets and liabilities of the partnership. I follow Mangatal J's reasoning in *Dorsey* in this regard.

82. Section 21 (2) deems that proper books of account will not be kept if these are not sufficient to give a true and fair view of the business and financial condition of the partnership and to explain its transactions.

83. Section 22 is a different obligation from section 21. It is in its terms broader and requires provision of more than accounting information:

> *"Subject to any express or implied term of the partnership agreement, each limited partner may demand and shall receive from a general partner true and full information regarding the state of the business and financial condition of the exempted limited partnership."*

84. Again, I follow Mangatal J's reasoning in *Dorsey* on this. On a plain and natural reading of section 22 it provides the Plaintiffs with an entitlement to demand and receive true and full information regarding the business and financial affairs of the partnership.

85. This makes logical commercial sense as they are partners in the business and its financial affairs are managed on their behalf. They have in effect paid for all of the activity undertaken on their behalf pursuant to which they require true and full information.

86. It is a very wide unqualified provision and will include all of the books and records maintained by the General Partner pursuant to the statutory obligation imposed on it under section 21. However it is wider than section 21 as it requires information to be provided, not just documents, and the information needs to be 'true and full', not 'true and fair' as is the case under section 21, which only deals with books and records of account.

87. To adopt Mr Smith QC's phrase, section 22 'occupies the field', not clause 7.1 of the LPA which is limited, as is section 21, to keeping and providing proper books and records of account.




***What do the Plaintiffs have to show and are their intentions relevant?***

88. I accept the Plaintiffs' submissions that there is no requirement for a limited partner to provide its reasons for the demand. It is only if there is a proper basis for contending that any of the categories of information demanded fall outside the operation of section 22 ELPL that the Plaintiffs claim would fail. That would only be in cases where it is clear that the information sought did not relate to the business and financial affairs of the partnership, which is a very wide target to aim at.

89. Reliance on *Hansard* and *Lewison* does not assist the Defendants in this case. As to *Hansard* it is clear the provision which is now section 22 ELPL was introduced into Cayman law before the extract relied upon. It existed previously in the former section 12.

90. As to *Lewison*, I do not accept Mr Smith QC's submission because we are not dealing with a general confidentiality provision on use which is not to take precedence over a specific provision on use. On a proper construction of the LPA there is no restriction on use in relation to information provided relating to the books and records and accounting material, so the argument does not apply.

91. In any event the sentence, *"Such Confidential Information may be used by a Partner only in connection with Partnership matters"* in clause 7.3 is what the limited partners intend to do and does not restrict them in the way the Defendants contend.

92. I accept the Plaintiffs' submissions that any irregularities in the management of the Fund by the General Partner are also strictly irrelevant to the Plaintiffs' statutory rights to the information they demand. The backdrop of the suggested wrongdoing in Mr Al-Sabah's evidence is of no relevance to their entitlement. I note that the disputed evidence of Mr Childe at paragraphs 74 - 100 of his First Affidavit in FSD 235 of 2019 denies any suggestion that anything irregular or unlawful has occurred in the administration of the Fund, (although of course he is unable to any give first-hand evidence and relies on Mr Alwadhi[6]), but it is not necessary to consider that evidence for the purpose of this exercise.

93. Similarly the evidence given by Mr Childe at paragraphs 19, 20, 28 to 32 and 45 to 52 of the same affidavit which deals with various collateral or ulterior motives alleged against the Plaintiffs for bringing this application are of no relevance: see paragraph 26 *Inversiones* per Norris J.

94. The Plaintiffs accept they cannot require or use information to harm the Fund. The Fund is in exit mode. They seek the information in order to, among other things, consider exercising claims against third parties which would realise assets for the Fund.

---

[6] Objection is taken to this evidence by Mr Allison QC on the basis that it does not comply with GCR O.41, r.5 and Mr Childe has no first hand knowledge of what he says. It is not necessary to resolve this point.




***The LPA***

95. Unless the provisions of the LPA modify or cut down the wide and otherwise unqualified obligation in section 22 ELPL, it should be applied and the concerns of the FFP directors are irrelevant.

96. In this regard, I follow the reasoning of Norris J in *Inversiones* [at paragraphs 25 and 26].

97. As to Clause 7.1 of the LPA, this obliges the General Partner to keep appropriate records and books of account and affords each partner the right to have access and the right to receive copies under such reasonable conditions and restrictions as the General Partner may prescribe. This provision is consistent with section 21 of the ELPL.

98. It is distinct from and does not qualify section 22 ELPL, which is on its terms a wider statutory obligation to provide true and full information regarding the state of the business and financial condition of the partnership:

> *"7.1 Appropriate records and books of account of the Partnership shall be kept by the Partnership at the principal place of business of the General Partner, and each Partner* ***shall have access*** *to the records and books of account* ***and the right to receive copies thereof under such reasonable conditions and restrictions as the General Partner may prescribe***". [my emphasis]

99. Giving those words their ordinary and natural meaning, it seems to me that the General Partner can impose conditions and restrictions for *access* and the *provision* of copies as a matter of the practicalities of complying with the obligation. That is, what the ordinary meaning of '*have access*' and '*the right to receive copies*' means. It does not mean use of the material accessed, copied and received. That is also consistent with giving effect to the word '*under*' in conjunction with such reasonable conditions and restrictions as may be prescribed. This is all in the context, as can be seen from the opening words of clause 7.1, of the right of partners to gain access to and obtain copies of the books and records of account at the place of business of the General Partner. The reasonable conditions and restrictions extend only to practicalities.

100. It does not seem to me to provide the General Partner with a separate and distinct right to require the kind of condition that is sought in this case by way of an undertaking on *use*. Such a right would need to be expressed in clear and unambiguous terms.

101. In fact there is no provision as to the *use* of information provided in the LPA except as provided for in clause 7.3 which imposes duties of confidentiality on the Plaintiffs in respect of a very wide range of information:




*"Each of the Partners shall, and shall direct those of its directors, officers, partners, members, employees, attorneys, accountants, consultants and advisers (the "Representatives") who have access to Confidential Information to, **keep confidential and not disclose** any Confidential Information **without the express consent, in the case of Confidential Information acquired from the Partnership, of the Partnership,** or, in the case of Confidential Information acquired from another Partner, such other Partner, unless (a) **such disclosure shall be required by applicable law governmental rule or regulation, court order, administrative or arbitral proceeding or by any bank regulatory authority having jurisdiction over such Limited Partner, (b) such disclosure is reasonably required in connection with any litigation against or involving the Partnership or any Partner .***

***Such Confidential Information may be used by a Partner only in connection with Partnership matters**; provided, that this sentence shall not prohibit any Partner from making other passive investments without disclosing to third parties such Confidential Information. **'Confidential Information' shall mean any information, including the identity of any Partner, that a Partner may acquire from the Partnership, any Portfolio Company or Subsidiary thereof** or, as a consequence of being a Partner in the Partnership, from another Partner other than information that (i) is already available through publicly available sources of information (other than as a result of disclosure by such Partner) (ii) was available to a Partner on a non confidential basis prior to its disclosure to such Partner by the Partnership or (iii) becomes available to a Partner on a non confidential basis from third party …."* [my emphasis]

102. That represents the extent of the regime agreed by the parties in the LPA as to the *use* of information once provided. I do not consider that there is any basis for requiring the Plaintiffs to agree to any further or other restrictions or conditions on use of information to be provided.

***Working papers and legal privilege***

103. There is no condition in the ELPL or the LPA relating to working papers or material which is covered by legal privilege. As a matter of Cayman law, a general partner cannot assert privilege against a limited partner unless the legal advice itself concerns a dispute with a limited partner: *Re Torchlight (unreported McMillan J 26 February 2016).* Where a general partner seeks legal advice for the benefit of the partnership, rather than for its own benefit in litigation against the other partners, the general partner will not be entitled to assert privilege against the limited partner [paragraphs 40-42].

104. As to working papers, there is nothing in section 22 ELPL (or the LPA) that suggest that there is any limitation to be placed on the information that is required to be provided if it is to satisfy the 'true and full' requirement.

***CIDL***

105. No separate CIDL order under section 4 is required because the Order in the present case for the General Partner to provide the information demanded will provide sufficient protection under section 3(1)(j). I follow Kawaley J's reasoning in *re XYZ* in this regard.

106. The court was told by Mr Smith QC that the 2017 accounts as audited were provided shortly before the hearing and they contain a lot of information about matters which have been the subject of questions from the limited partners. The audited 2018 and 2019 accounts were to follow in the next few weeks. The sooner this can be achieved the better.

**THE HON. RAJ PARKER**
**JUDGE OF THE GRAND COURT**